## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

SYNGENTA BIOTECHNOLOGY, INC., )
GARWOOD SEED CO., )
GOLDEN SEED COMPANY, L.L.C., and )
THORP SEED CO., )
    )    C.A. No. 07-38-SLR
    )
    Plaintiffs,    )    **PUBLIC VERSION**
    v.    )
    )
DEKALB GENETICS CORPORATION, and )
MONSANTO COMPANY, )
    )
    Defendants.    )

## MEMORANDUM IN SUPPORT OF DEFENDANTS DEKALB GENETICS CORPORATION AND MONSANTO COMPANY'S MOTION TO TRANSFER

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19801
Tel: (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Defendants*

OF COUNSEL:

Susan K. Knoll
Thomas A. Miller
Steven G. Spears
HOWREY LLP
1111 Louisiana, 25th Floor
Houston, TX 77002
Tel: (713) 787-1400

Dated: January 25, 2007
Public Version Dated: February 1, 2007
775810 / 31144

# TABLE OF CONTENTS

I.      INTRODUCTION ....................................................................................................1

II.     NATURE AND STAGE OF THE PROCEEDINGS ............................................. 2

III.    SUMMARY OF THE ARGUMENT .................................................................... 4

IV.     STATEMENT OF FACTS .................................................................................... 6

V.      ARGUMENT.......................................................................................................... 7

A.      This Declaratory Judgment Action Should Be Transferred To Missouri
        So That DEKALB's Patent Infringement Claims Against All Of The
        Syngenta Companies Can Be Litigated In One Court ..........................................7

        1.  This Declaratory Judgment Action Could Have Been Brought
            In Missouri .............................................................................................7

        2.  Applying The First-Filed Rule, The Present Declaratory
            Judgment Action Should Be Transferred To Missouri ..........................7

        3.  The Interests Of Justice Favor Transfer To Missouri ...........................8

        4.  The Convenience Of The Witnesses And Parties Favors
            Transfer To Missouri .............................................................................9

B.      Alternatively, This Court Should, In Its Discretion, Decline To
        Exercise Jurisdiction Over This Declaratory Judgment Action............................11

VI.     CONCLUSION..................................................................................................... 12

## TABLE OF AUTHORITIES

**Cases**

*Air Prods. & Chems., Inc. v. MG Nitrogen Servs.*,
 133 F. Supp. 2d 354 (D. Del. 2001).............................................................................. 8

*Arrow Commc'n Labs., Inc. v. John Mezzalingua Assocs., Inc.*,
 C.A. No. 05-357-SLR, 2005 WL 2786691 (D. Del. Oct. 26, 2005)................................ 8

*Automotive Techs. Int'l v. American Honda Motor Co.*,
 C.A. No. 06-187 GMS, 2006 WL 3783477 (D. Del. Dec. 21, 2006) ........................... 10

*Cooley v. DaimlerChrysler Corp.*,
 281 F. Supp. 2d 979 (E.D. Mo. 2003)............................................................................ 9

*Crosley Corp. v. Hazeltine Corp.*,
 122 F.2d 925 (3d Cir. 1941)..................................................................................... 8, 11

*E.E.O.C. v. University of Pennsylvania*,
 850 F.2d 969 (3d Cir. 1988)......................................................................................... 8

*Hoffman v. Blaski*,
 363 U.S. 335 (1960).................................................................................................... 7

*Jackson v. United States*
 2006 WL 839179 (E.D. Mo. Mar. 24, 2006) ................................................................ 9

*Kahn v. General Motors Corp.*,
 889 F.2d 1078 (Fed. Cir. 1989)................................................................................... 8

*Telectronics Pacing Sys., Inc. v. Ventritex, Inc.*,
 982 F.2d 1520 (Fed. Cir. 1992)................................................................................. 11

**Statutes**

28 U.S.C. § 1391 .................................................................................................... 4, 7

28 U.S.C. § 1404(a) ............................................................................................. 4, 7, 8

## I.    INTRODUCTION

Defendants DEKALB Genetics Corporation and Monsanto Company (collectively, "Defendants") move the court for an order transferring this declaratory judgment patent case to the Eastern District ("E. D.") of Missouri. On August 9, 2006, DEKALB filed an action in the E. D. Missouri against Syngenta Biotechnology, Inc., Garwood Seed, Co., Golden Seed Co., LLC, and Thorp Seed Co., the declaratory judgment plaintiffs here (collectively, "Delaware DJ Plaintiffs"), as well as other Syngenta-related companies, for infringement of DEKALB's U.S. Patent No. 5,554,798 to Lundquist et al. ("the '798 patent"), the same patent that is the basis for this declaratory judgment action. That suit is currently pending. The E. D. Missouri has already denied a motion by the Syngenta-related companies (including the Delaware DJ Plaintiffs) to transfer that case to Delaware. This declaratory judgment action, together with a recent series of motions filed in the E. D. Missouri, is an attempt by the Syngenta-related companies to circumvent the E. D. Missouri's denial of that transfer motion, which had been filed in the first-filed action.

Because this declaratory judgment action could have been brought in the E. D. Missouri and because DEKALB's patent infringement action on the '798 patent is already pending there, this Court should transfer this declaratory judgment action to the E. D. Missouri where all of the Syngenta-related companies are before the court. Alternatively, this Court should, in its discretion, decline to exercise jurisdiction over this declaratory judgment action and dismiss it, thereby allowing the first-filed case in the E. D. Missouri to proceed.

## II.    NATURE AND STAGE OF THE PROCEEDINGS

This declaratory judgment action was filed on January 18, 2007.    [D.I. 1]

Defendants have not yet answered the complaint.  A discussion of the procedural posture

of this case, however, must include the first-filed action brought by DEKALB against the

Syngenta-related companies in the E. D. Missouri for infringement of the '798 patent.

On August 9, 2006, DEKALB filed suit in the E. D. Missouri against Syngenta

Seeds, Inc., Syngenta Biotechnology, Inc., Golden Harvest Seeds, Inc., Garwood Seed

Co., Golden Seed Company, LLC, Sommer Bros. Seed Co., Thorp Seed Co., JC

Robinson Seeds, Inc., and Garst Seed Co. (collectively, "the Syngenta Companies") for

infringement of the Lundquist '798 patent based on their making, using, and selling

GA21 corn.  [Exhibit 1]  St. Louis is now the location of DEKALB's principal place of

business.  [*Id.* ¶1]

The '798 patent claims are directed to glyphosate resistant corn plants, not

processes for making such plants as were the claims of U.S. Patent Nos. 5,538,880 and

6,013,863 ("the '880 and '863 patents," respectively), that were involved in the prior

litigation in this Court (C.A. No. 04-305 SLR) now on appeal to the Federal Circuit.[1]

DEKALB did not bring suit on the '798 patent against the Syngenta Companies before

August 9, 2006 because the '798 patent was tied up in litigation in the Middle District of

North Carolina.  On August 7, 2006, the North Carolina court entered judgment denying

plaintiff Rhone Poulenc Agro's (now Bayer) request that its scientists be added as

---

[1] The '798 patent is related to the '880 and '863 patents in the earlier case because the '798 patent has the same inventors and claims priority to the earliest application in the same chain as the '880 and '863 patents.  However, the claims of the '798 patent are product claims, not method claims.  Thus, the basis for this Court's summary judgment of noninfringement of the method claims of the '880 and '863 patents is inapplicable to this case.

inventors on the '798 patent, finding that DEKALB scientists had conceived of that invention before any interaction with Rhone Poulenc. [Exhibit 2] In reaching its decision, the North Carolina court construed the '798 patent claim term "the plant exhibits resistance to normally toxic levels of glyphosate, wherein said resistance is not present in a *Zea mays* plant not containing said DNA construct."[2] [Exhibit 3, at 39]

On October 5, 2006, Syngenta Seeds, Inc., Golden Harvest Seeds, Inc., and Garst Seed Company filed a declaratory judgment complaint in this Court regarding other Lundquist patents owned by DEKALB, U.S. Patent Nos. 6,946,587 and 5,538,877. [Exhibit 4] That suit was dismissed, however, when DEKALB gave the Syngenta Companies a covenant not to sue on those patents. [Exhibits 5 and 6] Thus, the current declaratory judgment action is not the first one brought by the Syngenta Companies in this Court in an attempt to manufacture grounds for transferring DEKALB's first-filed E. D. Missouri case to Delaware.

On October 20, 2006, just two weeks before a Rule 16 conference was to be held (on November 3, 2006) in the first-filed Missouri action, the Syngenta Companies filed a motion to transfer DEKALB's '798 patent infringement action from the E. D. Missouri to Delaware. After the motion was briefed by the parties [Exhibits 7, 8, and 9], the court held a two-hour hearing on the motion on November 17, 2006. On December 29, 2006, the court issued a Memorandum and Order denying transfer on grounds that venue in

---

[2] The Syngenta companies are collaterally estopped from challenging that claim construction because it was necessary to the court's judgment and that action involved the same parties-in-interest—DEKALB and Syngenta's predecessor-in-interest, Rhone Poulenc Agro. Thus, the North Carolina court's claim construction of the '798 patent is binding upon Syngenta and therefore will apply in the current '798 patent litigation. For the same reasons, Syngenta cannot claim that this transfer motion is an attempt by Defendants to avoid this Court's prior rulings on the '880 and '863 patents.

3

Delaware was not proper for one of the Syngenta Companies, JC Robinson Seeds, Inc. [Exhibit 10]

On January 19, 2007, the Delaware DJ Plaintiffs filed a motion to dismiss DEKALB's infringement action against them for lack of personal jurisdiction and the Syngenta Companies filed a second motion to transfer, this time seeking to sever the claims against JC Robinson and transfer the claims against the remaining Syngenta Companies to Delaware. [Exhibits 11 and 12, respectively]

The parties will appear before the E. D. Missouri for a Rule 16 scheduling conference on January 26, 2007.

## III.    SUMMARY OF THE ARGUMENT

The Court should transfer this declaratory judgment action to the E. D. Missouri for several reasons. First, there is already a prior-filed patent infringement action brought by DEKALB pending in that district against the Delaware DJ Plaintiffs for infringement of the '798 patent—the same patent that is the subject of this declaratory judgment action.[3] By transferring this case to Missouri, all of the Syngenta Companies will be before a single court.

Second, transfer to the E. D. Missouri is appropriate because it is a "district ... where it might have been brought." 28 U.S.C. § 1404(a). Specifically, both DEKALB and Monsanto have their principal places of business in St. Louis. [D.I. 1 ¶¶ 9 and 11] Thus, venue is proper in the E.D. Missouri because Defendants reside there. 28 U.S.C. § 1391.

---

[3] In contrast, there is no active case between the parties in this Court. The patent dispute concerning the '880 and '863 patents is currently on appeal before the Court of Appeals for the Federal Circuit, and the related antitrust case has been stayed pending the outcome of that appeal.

Third, transfer to the E. D. Missouri is more convenient for the parties and witnesses. A number of Defendants witnesses reside in the E. D. Missouri or regularly travel there on business. A number of the Syngenta Companies' witnesses reside in the mid-west. None of Defendants' or the Syngenta Companies' employees who might be trial witnesses reside in Delaware. As to convenience of the parties, neither the Syngenta Companies nor Defendants have places of business in Delaware. The Syngenta Companies' seed businesses are located in the mid-west, closer to the E. D. Missouri than to Delaware. Defendants' principal places of business are in St. Louis. Most additional documents that Defendants might produce in this case will be located in St. Louis, and there are no documents to be produced that are located in Delaware.

Fourth, transfer to the E. D. Missouri is in the interest of justice. DEKALB filed its action for infringement of the '798 patent in that court first. Then the Missouri court denied the Syngenta Companies' motion to transfer DEKALB's infringement action to Delaware. The motions recently filed by the Syngenta Companies (1) to dismiss and (2) to sever and transfer raise no new grounds for transfer that could not have been raised in their first motion to transfer. Accordingly, transfer to Missouri is in the interest of justice because it will prevent the Syngenta Companies from circumventing the Missouri court's order denying transfer.

Alternatively, it is appropriate for the Court, in its discretion, to decline to exercise jurisdiction over this declaratory judgment action, particularly because DEKALB's first-filed patent infringement action against the Syngenta Companies (including the Delaware DJ Plaintiffs) is already pending in Missouri. Accordingly, this

Court should dismiss this declaratory judgment action in favor of DEKALB's first-filed infringement action in the E. D. Missouri.

## IV.    STATEMENT OF FACTS

Most of the relevant facts concern the procedural posture of this case and the other cases discussed in Section II, *supra*, and will not be repeated here. Defendants additionally set forth the following facts regarding activities in the E. D. Missouri.

Both DEKALB and Monsanto have their principal place of business in St. Louis. Most of their witnesses and documents relevant to this case are located there. [Exhibit 13, ¶¶2-4] All of Monsanto and DEKALB's current business and marketing functions related to glyphosate resistant corn are conducted and coordinated in St. Louis. [Exhibit 14, ¶11] All of the work related to its current glyphosate resistant corn product, NK603, was done or coordinated in St. Louis. [*Id.*] Moreover, Monsanto's work related to GA21 was also done or coordinated in St. Louis (although DEKALB's development work was done in Illinois and Connecticut). [*Id.*]  No work related to GA21 or NK603 corn was done in Delaware. [*Id.*]  Material witnesses knowledgeable of the glyphosate resistant corn business in St. Louis include Monsanto's Dr. Fraley, Mr. Bothe,[4] Mr. Rinkenberger, Mr. Casale, and Mr. Leisure. [Exhibit 14, ¶11; Exhibit 13, ¶5]  Moreover, Syngenta has previously identified at least four other allegedly important witnesses on the development and marketing of glyphosate resistant corn who also reside in or travel regularly to St. Louis—Dr. Armstrong, Mr. Harper, Mr. Nothmann, and Mr. Spencer.[5]  [Exhibit 13, ¶5;

---

[4]  Mr. Bothe travels twice a week to St. Louis in for his job responsibilities and has a permanent office in St. Louis. [Exhibit 14, ¶11; Exhibit 13; ¶5]

[5]  While Mr. Spencer works at Monsanto's Connecticut facility, he is regularly in St. Louis on business, and would (together with Mr. Walters) be made available to testify there. [Ex. 13 at ¶5]

Exhibit 15]   Additional relevant DEKALB and Monsanto documents that might be produced in this case are also maintained in St. Louis. [Exhibit 13, ¶4]

## V.   ARGUMENT

### A.   This Declaratory Judgment Action Should Be Transferred To Missouri So That DEKALB's Patent Infringement Claims Against All Of The Syngenta Companies Can Be Litigated In One Court

#### 1.   This Declaratory Judgment Action Could Have Been Brought In Missouri

For a motion to transfer under 28 U.S.C. § 1404(a), the initial inquiry is whether the Delaware DJ Plaintiffs' declaratory judgment action might have been brought against Defendants in the E. D. Missouri. 28 U.S.C. § 1404(a); *Hoffman v. Blaski*, 363 U.S. 335 (1960). DEKALB and Monsanto's principal places of business are both located in St. Louis, i.e., Defendants reside in the E. D. Missouri and it is a proper venue for this declaratory judgment action under 28 U.S.C. § 1391. Accordingly, this action could have been brought in the E. D. Missouri.

#### 2.   Applying The First-Filed Rule, The Present Declaratory Judgment Action Should Be Transferred To Missouri

The Delaware DJ Plaintiffs filed this declaratory judgment action alleging that the '798 patent was invalid and not infringed by GA21 over six months *after* DEKALB filed its patent infringement suit in Missouri against the Syngenta Companies for infringement of the same '798 patent. "The interests of judicial economy dictate that an action involving the same patents-in-suit and most of the same parties should not proceed simultaneously in two different district courts." *Air Prods. & Chems., Inc. v. MG Nitrogen Servs.*, 133 F. Supp. 2d 354, 357 (D. Del. 2001).

The Third Circuit has adopted the "first-filed rule" where "in all cases of federal concurrent jurisdiction the court which first had possession of the subject matter must

decide it." *Arrow Commc'n Labs., Inc. v. John Mezzalingua Assocs., Inc.*, C.A. No. 05-357-SLR, 2005 WL 2786691, at *3 (D. Del. Oct. 26, 2005) (quoting *Crosley Corp. v. Hazeltine Corp.*, 122 F.2d 925, 929 (3d Cir. 1941)); *see also E.E.O.C. v. University of Pennsylvania*, 850 F.2d 969, 971 (3d Cir. 1988) ("The first-filed rule encourages sound judicial administration and promotes comity among federal courts of equal rank"); *Air Prods.*, 133 F. Supp. 2d at 356-57 (D. Del. 2001) (applying the first-filed rule in granting motion to transfer.) "Invocation of the rule will usually be the norm, not the exception."); *Arrow Commc'n*, at *3; *see E.E.O.C.*, 850 F.2d at 976 ("exceptions to the rule are rare"). The Federal Circuit acknowledges the first-to-file rule as well. *Air Prods.*, 133 F. Supp. 2d at 356; *Kahn v. General Motors Corp.*, 889 F.2d 1078, 1081 (Fed. Cir. 1989) ("as a principle of sound judicial administration, the first suit should have priority, absent special circumstances").

Applying the first-filed rule, the present case should be transferred to the E. D. Missouri to be consolidated with DEKALB's pending patent infringement case. The burden is on the Delaware DJ Plaintiffs to show exceptional circumstances for why this rule should not apply. *See Air Prods.*, 133 F. Supp. 2d at 356. Not only do exceptional circumstances not exist here, the other factors considered by courts in deciding motions to transfer weigh in favor of transferring the case to Missouri.

### 3.    The Interests Of Justice Favor Transfer To Missouri

In deciding whether to transfer a case, a court will consider "the convenience of parties and witnesses, [and] the interests of justice." 28 U.S.C. § 1404(a); *see Arrow Commc'n*, at *1-2. Here, the interest of justice favors transfer. DEKALB filed its action for infringement of the '798 patent in Missouri first. The Missouri court then denied the Syngenta Companies' motion to transfer DEKALB's infringement action to Delaware.

8

The motions recently filed by the Syngenta Companies to dismiss and to sever and transfer (in which Syngenta asked the Missouri court "to reconsider transferring DeKalb's claims") raise no new grounds for transfer that could not have been raised in their first motion to transfer, and for that reason alone, are improper.  As the Missouri court recently stated in *Jackson v. United States*:

> Motions for reconsideration serve a limited function:  to correct manifest errors of law or fact or to present newly discovered evidence. (citations omitted)    Moreover, a motion to reconsider may not be used to raise arguments which could have been raised prior to the Court's dismissal of the action.

2006 WL 839179 (E.D. Mo. Mar. 24, 2006); *see also Cooley v. DaimlerChrysler Corp.*, 281 F. Supp. 2d 979, 987 (E.D. Mo. 2003).

Here, the Syngenta Companies' recent motions to dismiss and to sever or transfer fail to present *any* newly discovered evidence.  Significantly, all of the evidence relied upon in their newly-filed motions was in their possession long before they filed the original motion to transfer on November 20, 2006.  Nor do the recent Missouri motions seek to correct manifest errors of law or fact in the Missouri court's decision denying transfer.  Accordingly, transfer to Missouri is in the interest of justice because it will prevent the Syngenta Companies from circumventing the Missouri court's order denying transfer.

### 4. The Convenience Of The Witnesses And Parties Favors Transfer To Missouri

As to the convenience of the witnesses, many of Defendants' witnesses either reside and work in the St. Louis area or are regularly in the St. Louis area on business. As explained above, the St. Louis witnesses knowledgeable of Defendants' glyphosate resistant corn business include Dr. Fraley, Mr. Bothe, Mr. Rinkenberger, Mr. Casale, Mr.

Leisure, and other witnesses previously identified by Syngenta as relevant to GA21 corn. Most of the Syngenta Companies' witnesses reside in the mid-west, not Delaware.[6] Thus, the convenience of the witnesses favors transfer to Missouri.

As for the convenience of the parties, the E. D. Missouri is much more convenient for DEKALB and Monsanto because St. Louis is where both DEKALB and Monsanto have their principal places of business. Moreover, the primary location of additional Monsanto and DEKALB documents related to glyphosate resistant corn that might be produced in this case are located in St. Louis. Defendants keep no such records in Delaware.

While DEKALB sued in its home forum in the first action, the Delaware DJ Plaintiffs filed this declaratory judgment action away from their "home turf." Three of the four are incorporated and have their principal place of business in Illinois; only Syngenta Biotechnology, Inc. is incorporated in Delaware, but even it has its principal place of business in North Carolina. [D.I. 1] Thus, the Delaware DJ Plaintiffs' choice of forum is entitled to less deference than DEKALB's choice as plaintiff to bring suit in Missouri. *Automotive Techs. Int'l v. American Honda Motor Co.*, C.A. No. 06-187 GMS, 2006 WL 3783477 (D. Del. Dec. 21, 2006) (affording less deference to plaintiff's choice of Delaware as a forum when it was not plaintiff's "home turf"). And because the

---

[6] Syngenta may argue that one third party witness who resides in Delaware, Dr. Klein, is not subject to a trial subpoena from the Missouri court, and, for that reason alone, Delaware is more convenient for the witnesses. This argument ignores that Dr. Klein's deposition has been videotaped, which allows a fair and adequate presentation of his testimony to the jury. It also ignores that Dr. Klein is an employee of DuPont, which has entered into a joint venture with Syngenta to market glyphosate resistant corn in competition with Defendants, a relationship that would facilitate Dr. Klein's appearance at trial in Missouri. [Exhibits 16, 17, 18] Indeed, Dr. Klein has already cooperated with the Syngenta Companies by agreeing to meet with Syngenta's counsel prior to his deposition in the earlier Delaware case. [Exhibit 19, pp. 7-8]

Delaware Plaintiffs' principal places of business are in Illinois and North Carolina, documents which they will produce in this case are not located in Delaware. Moreover, all of the Delaware DJ Plaintiffs are related to Syngenta Seeds, Inc., a defendant in the Missouri case, and all are represented by the same attorneys. Thus, the convenience of the parties favors transfer of this action to the E. D. Missouri.

**B.    Alternatively, This Court Should, In Its Discretion, Decline To Exercise Jurisdiction Over This Declaratory Judgment Action**

Based on the foregoing, Defendants contend that transfer of this action to Missouri is the preferred course. In the event that this Court elects not to transfer this action to the E. D. Missouri, in the alternative, Defendants request this Court to decline to exercise jurisdiction over this declaratory judgment action.

A district court may, in its discretion, decline to exercise jurisdiction over a declaratory judgment action. *Crosley Corp. v. Westinghouse Elec. & Mfg. Co.*, 130 F.2d 474-46 (3d Cir. 1942) ("We do not overlook the fact that the jurisdiction of the district court under the Declaratory Judgment Act, 28 U.S.C.A. § 400, is discretionary"); *Telectronics Pacing Sys., Inc. v. Ventritex, Inc.*, 982 F.2d 1520, 1526 (Fed. Cir. 1992). It is particularly appropriate for a court, in the exercise of its discretion, to decline declaratory judgment jurisdiction when the same issues and parties are involved in another pending suit. *Crosley*, 130 F.2d at 475.

That is the case here. All of the Syngenta Companies are before the Missouri court. DEKALB's first-filed action for infringement of the '798 patent should go forward, and this declaratory judgment action should be dismissed.

## VI.    CONCLUSION

For all of the above reasons, Defendants DEKALB and Monsanto respectfully request that the Court transfer this action to the E. D. Missouri so that the parties' claims regarding the '798 patent can be litigated in one court with all parties present. Alternatively, Defendants request that the Court in its discretion decline to exercise jurisdiction over this declaratory judgment action and dismiss it.

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Susan K. Knoll
Thomas A. Miller
Steven G. Spears
HOWREY LLP
1111 Louisiana, 25th Floor
Houston, TX  77002
Tel: (713) 787-1400

Dated:  January 25, 2007
Public Version Dated:  February 1, 2007
775810 / 31144

By:    /s/ David E. Moore
        Richard L. Horwitz (#2246)
        David E. Moore (#3983)
        Hercules Plaza, 6th Floor
        1313 N. Market Street
        Wilmington, DE  19801
        Tel: (302) 984-6000
        rhorwitz@potteranderson.com
        dmoore@potteranderson.com

*Attorneys for Defendants*

12

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### <u>CERTIFICATE OF SERVICE</u>

I, David E. Moore, hereby certify that on February 1, 2007, the attached

document was hand delivered on the following persons and was electronically filed with

the Clerk of the Court using CM/ECF which will send notification of such filing(s) to the

following and the document is available for viewing and downloading from CM/ECF:

John W. Shaw
Young Conaway Stargatt & Taylor, L.L.P.
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801

I hereby certify that on February 1, 2007, I have Electronically Mailed the

foregoing document(s) to the following non-registered participants:

Michael J. Flibbert
Finnegan, Henderson, Farabow,
    Garrett & Dunner, L.L.P.
901 New York Ave., NW
Washington, DC 20001-4413
michael.flibbert@finnegan.com

<div align="right">

/s/ David E. Moore
Richard L. Horwitz
David E. Moore
Potter Anderson & Corroon LLP
Hercules Plaza – Sixth Floor
1313 North Market Street
Wilmington, DE 19801
(302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

</div>

774535 / 31144

# EXHIBIT 1

FILED

AUG ~ 9 2006

U. S. DISTRICT
EASTERN DISTRICT COURT
DISTRICT OF MO

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI

DEKALB GENETICS CORPORATION,

      Plaintiff,

     v.

SYNGENTA SEEDS, INC.,
SYNGENTA BIOTECHNOLOGY, INC.,
GOLDEN HARVEST SEEDS, INC.,
GARWOOD SEED CO.,
GOLDEN SEED COMPANY, L.L.C.,
SOMMER BROS. SEED COMPANY, ,
THORP SEED CO.,
JC ROBINSON SEEDS, INC. AND
GARST SEED COMPANY

      Defendants.

Case # _____

**4  06CV01191MLM**

**JURY TRIAL DEMANDED**

### COMPLAINT

    Plaintiff, DEKALB Genetics Corporation ("DEKALB"), files this complaint against Defendants Syngenta Seeds, Inc., Syngenta Biotechnology, Inc., Golden Harvest Seeds, Inc., Garwood Seed Co., Golden Seed Company, L.L.C., Sommer Bros. Seed Company, Thorp Seed Co., JC Robinson Seeds, Inc. and Garst Seed Company (collectively "Defendants"), and alleges as follows:

### THE PARTIES

    1.    Plaintiff DEKALB Genetics Corporation is a corporation organized and existing under the laws of the State of Delaware with a principal place of business at 800 North Lindbergh Boulevard, St. Louis, Missouri 63167. DEKALB is a wholly owned subsidiary of Monsanto Company ("Monsanto").

2425082.01

2.      On information and belief, Defendant Syngenta Seeds, Inc. ("Syngenta Seeds") is a corporation organized and existing under the laws of the State of Delaware, with offices located at 7500 Olson Memorial Highway, Golden Valley, Minnesota 55427.

3.      On information and belief, Defendant Syngenta Biotechnology, Inc. ("Syngenta Biotechnology") is a corporation organized and existing under the laws of the State of Delaware, with offices located at 3054 Cornwallis Road, Research Triangle Park, North Carolina 27709-2257.

4.      On information and belief, Defendant Golden Harvest Seeds, Inc. is a corporation organized and existing under the laws of the Delaware, with its principal place of business in Bloomington, Illinois.

5.      On information and belief, Golden Harvest is an organization consisting of five (5) companies ("Golden Harvest Companies") related through common ownership of, and financial interest in, Golden Harvest Seeds, Inc.  The Golden Harvest Companies are identified in the following paragraphs 6-10.

6.      On information and belief, Defendant Garwood Seed Co. is a corporation organized and existing under the laws of the State of Illinois, with its principal place of business in Stonington, Illinois.

7.      On information and belief, Defendant Golden Seed Company, L.L.C. is a limited liability company organized and existing under the laws of the State of Illinois, with its principal place of business in Cordova, Illinois.

8.      On information and belief, Defendant Sommer Bros. Seed Company is a corporation organized and existing under the laws of the State of Illinois, with its principal place of business in Pekin, Illinois.

9.     On information and belief, Defendant Thorp Seed Co. is a corporation organized and existing under the laws of the State of Illinois, with its principal place of business in Clinton, Illinois.

10.     On information and belief, Defendant JC Robinson Seeds, Inc. is a corporation organized and existing under the laws of the State of Nebraska, with its principal place of business in Waterloo, Nebraska.

11.     On information and belief, Defendant Garst Seed Company is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Slater, Iowa.

### JURISDICTION AND VENUE

12.     This is an action for patent infringement arising under the Patent Laws of the United States, Title 35, United States Code § 1 et seq.  Subject matter jurisdiction is proper under 28 U.S.C. §§ 1331 and 1338.

13.     Venue is proper in this Court under 28 U.S.C. §§ 1391 and 1400(b).

### BACKGROUND

14.     Plaintiff DEKALB, is a leader in the development of crops that have been genetically engineered to express new traits of value to farmers, and has developed corn containing genes that confer resistance to the herbicide glyphosate.  Glyphosate is a commercial herbicide that kills plants by binding to a critical enzyme in the plant called "EPSPS."  Monsanto Company sells a glyphosate herbicide under the trademark Roundup®.  Genetically engineered products made by Monsanto Company that have the glyphosate resistance trait, including DEKALB branded corn, are sold under the trademark Roundup Ready®.  Roundup Ready® products have been a recognized commercial success.  Since the introduction of Roundup

Ready® crops in 1996, farmers have increased the number of acres they plant in the United States with Roundup Ready® products.

15.     Recognizing the value of DEKALB's glyphosate resistance technology, Defendants have attempted to make, made, imported into the United States, offered to sell, sold, or used within the United States, glyphosate resistant corn and have conspired with others to make, import into the United States, offer to sell, sell, or use within the United States, glyphosate resistant corn, including corn containing the GA21 event, and/or corn sold under the name Agrisure GT in violation of DEKALB's patent rights.

### THE INFRINGEMENT

16.     Plaintiff realleges and incorporates by reference each of paragraphs 1-16 above as if set forth herein.

17.     DEKALB has been the owner of all right, title and interest to and under United States Patent No. 5,554,798 entitled "Fertile Glyphosate-Resistant Transgenic Corn Plants" and naming Ronald C. Lundquist and David A. Walters as inventors.  U.S. Patent No. 5,554,798 ("the '798 Patent") was duly and legally issued to DEKALB on September 10, 1996.  A copy of the patent is attached as Exhibit 1 to this Complaint.  For example, claim 1 of the '798 patent recites:

> "A fertile transgenic zea mays plant containing an isolated heterologous DNA construct encoding EPSP synthase wherein said DNA construct is expressed so that the plant exhibits resistance to normally toxic levels of glyphosate, wherein said resistance is not present in a zea mays plant not containing said DNA construct, and wherein said DNA construct is transmitted through a complete normal sexual cycle of the transgenic plant to the progeny generation."

18.     Defendants do not have any license or other right to practice the claims of the '798 for the products that are the subject of this action.

2425082.01                              4

19.     Upon information and belief, Defendants have infringed and continue to infringe one or more claims of the '798 Patent by at least making corn containing genes that confer resistance to the herbicide glyphosate and importing into the United States, or offering to sell, selling, or using within the United States, corn containing genes that confer resistance to the herbicide glyphosate; and will continue to do so unless enjoined by this Court.

20.     Upon information and belief, Defendants have infringed one or more claims of the '798 Patent by at least inducing others and contributing to the infringement by others.

21.     Defendants' acts of infringement of the '798 Patent, upon information and belief, have been carried out in deliberate and willful disregard of DEKALB's patent rights.

## JURY DEMAND

22.     Pursuant to Rule 38(b), Fed. R. Civ. P., Plaintiff requests a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff DEKALB Genetics Corporation prays for the following relief:

A.     A judgment that Defendants have infringed one or more claims of the '798 Patent;

B.     A judgment that Defendants have willfully and deliberately infringed one or more claims of the '798 Patent;

C.     A declaration by the Court that any making, using, selling or offering for sale by Defendants of glyphosate resistant corn products that are within the scope of one or more claims of the '798 Patent would constitute an act of infringement of the '798 Patent;

D.     A declaration by the Court that the importation into the United States, or offering for sale, selling or using within the United States, of corn containing genes that confer resistance to the herbicide glyphosate, would constitute an act of infringement of the '798 Patent;

E.     A preliminary and final injunction enjoining Defendants and all those in privy with them from infringing, from inducing infringement, and from contributing to the infringement of one or more claims of the '798 Patent;

F.     An award of compensatory and exemplary damages, but not less than a reasonable royalty, resulting from Defendants' infringement, including allowance of multiplied damages based on Defendants' willful and deliberate infringement;

G.     An award of interest, costs, and attorneys' fees; and

H.     Such other and further relief as this Court shall deem just and proper.

Dated:  August 9, 2006

Respectfully submitted,

HUSCH & EPPENBERGER, LLC

By: _____
    Joseph P. Conran, E.D.Mo. # 6455
    joe.conran@husch.com
    Thomas M. Dee, E.D.Mo. # 2956
    tom.dee@husch.com
    Dutro E. Campbell, II, E.D.Mo. 83825
    bruce.campbell@husch.com
    190 Carondelet Plaza # 600
    St. Louis, MO 63105
    (314) 480-1500 (Telephone)
    (314) 480-1530 (Facsimile)

HOWREY LLP
Susan K. Knoll
Steven G. Spears
1111 Louisiana, 25th Floor
Houston, TX 77002-5242
Telephone: (713) 787-1400
Facsimile:  (713) 787-1440
Email: knolls@howrey.com
Email:  spearss@howrey.com

*Attorneys For Plaintiff*
*DEKALB Genetics Corporation*

6

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| DEKALB GENETICS CORPORATION, | |
| Plaintiff, | |
| v. | Case # _____ |
| SYNGENTA SEEDS, INC.,<br>SYNGENTA BIOTECHNOLOGY, INC.,<br>GOLDEN HARVEST SEEDS, INC.,<br>GARWOOD SEED CO.,<br>GOLDEN SEED COMPANY, L.L.C.,<br>SOMMER BROS. SEED COMPANY, ,<br>THORP SEED CO.,<br>JC ROBINSON SEEDS, INC. AND<br>GARST SEED COMPANY | JURY TRIAL DEMANDED |
| Defendants. | |

## COMPLAINT

Plaintiff, DEKALB Genetics Corporation ("DEKALB"), files this complaint against Defendants Syngenta Seeds, Inc., Syngenta Biotechnology, Inc., Golden Harvest Seeds, Inc., Garwood Seed Co., Golden Seed Company, L.L.C., Sommer Bros. Seed Company, Thorp Seed Co., JC Robinson Seeds, Inc. and Garst Seed Company (collectively "Defendants"), and alleges as follows:

### THE PARTIES

1.      Plaintiff DEKALB Genetics Corporation is a corporation organized and existing under the laws of the State of Delaware with a principal place of business at 800 North Lindbergh Boulevard, St. Louis, Missouri 63167. DEKALB is a wholly owned subsidiary of Monsanto Company ("Monsanto").

2425082.01

2.      On information and belief, Defendant Syngenta Seeds, Inc. ("Syngenta Seeds") is a corporation organized and existing under the laws of the State of Delaware, with offices located at 7500 Olson Memorial Highway, Golden Valley, Minnesota 55427.

3.      On information and belief, Defendant Syngenta Biotechnology, Inc. ("Syngenta Biotechnology") is a corporation organized and existing under the laws of the State of Delaware, with offices located at 3054 Cornwallis Road, Research Triangle Park, North Carolina 27709-2257.

4.      On information and belief, Defendant Golden Harvest Seeds, Inc. is a corporation organized and existing under the laws of the Delaware, with its principal place of business in Bloomington, Illinois.

5.      On information and belief, Golden Harvest is an organization consisting of five (5) companies ("Golden Harvest Companies") related through common ownership of, and financial interest in, Golden Harvest Seeds, Inc.  The Golden Harvest Companies are identified in the following paragraphs 6-10.

6.      On information and belief, Defendant Garwood Seed Co. is a corporation organized and existing under the laws of the State of Illinois, with its principal place of business in Stonington, Illinois.

7.      On information and belief, Defendant Golden Seed Company, L.L.C. is a limited liability company organized and existing under the laws of the State of Illinois, with its principal place of business in Cordova, Illinois.

8.      On information and belief, Defendant Sommer Bros. Seed Company is a corporation organized and existing under the laws of the State of Illinois, with its principal place of business in Pekin, Illinois.

9.    On information and belief, Defendant Thorp Seed Co. is a corporation organized and existing under the laws of the State of Illinois, with its principal place of business in Clinton, Illinois.

10.    On information and belief, Defendant JC Robinson Seeds, Inc. is a corporation organized and existing under the laws of the State of Nebraska, with its principal place of business in Waterloo, Nebraska.

11.    On information and belief, Defendant Garst Seed Company is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Slater, Iowa.

## JURISDICTION AND VENUE

12.    This is an action for patent infringement arising under the Patent Laws of the United States, Title 35, United States Code § 1 et seq. Subject matter jurisdiction is proper under 28 U.S.C. §§ 1331 and 1338.

13.    Venue is proper in this Court under 28 U.S.C. §§ 1391 and 1400(b).

## BACKGROUND

14.    Plaintiff DEKALB, is a leader in the development of crops that have been genetically engineered to express new traits of value to farmers, and has developed corn containing genes that confer resistance to the herbicide glyphosate. Glyphosate is a commercial herbicide that kills plants by binding to a critical enzyme in the plant called "EPSPS." Monsanto Company sells a glyphosate herbicide under the trademark Roundup®. Genetically engineered products made by Monsanto Company that have the glyphosate resistance trait, including DEKALB branded corn, are sold under the trademark Roundup Ready®. Roundup Ready® products have been a recognized commercial success. Since the introduction of Roundup

2425082.01                                3

Ready® crops in 1996, farmers have increased the number of acres they plant in the United States with Roundup Ready® products.

15.    Recognizing the value of DEKALB's glyphosate resistance technology, Defendants have attempted to make, made, imported into the United States, offered to sell, sold, or used within the United States, glyphosate resistant corn and have conspired with others to make, import into the United States, offer to sell, sell, or use within the United States, glyphosate resistant corn, including corn containing the GA21 event, and/or corn sold under the name Agrisure GT in violation of DEKALB's patent rights.

## THE INFRINGEMENT

16.    Plaintiff realleges and incorporates by reference each of paragraphs 1-16 above as if set forth herein.

17.    DEKALB has been the owner of all right, title and interest to and under United States Patent No. 5,554,798 entitled "Fertile Glyphosate-Resistant Transgenic Corn Plants" and naming Ronald C. Lundquist and David A. Walters as inventors.  U.S. Patent No. 5,554,798 ("the '798 Patent") was duly and legally issued to DEKALB on September 10, 1996.  A copy of the patent is attached as Exhibit 1 to this Complaint.  For example, claim 1 of the '798 patent recites:

> "A fertile transgenic zea mays plant containing an isolated heterologous DNA construct encoding EPSP synthase wherein said DNA construct is expressed so that the plant exhibits resistance to normally toxic levels of glyphosate, wherein said resistance is not present in a zea mays plant not containing said DNA construct, and wherein said DNA construct is transmitted through a complete normal sexual cycle of the transgenic plant to the progeny generation."

18.    Defendants do not have any license or other right to practice the claims of the '798 for the products that are the subject of this action.

2425082.01                                  4

19.    Upon information and belief, Defendants have infringed and continue to infringe one or more claims of the '798 Patent by at least making corn containing genes that confer resistance to the herbicide glyphosate and importing into the United States, or offering to sell, selling, or using within the United States, corn containing genes that confer resistance to the herbicide glyphosate; and will continue to do so unless enjoined by this Court.

20.    Upon information and belief, Defendants have infringed one or more claims of the '798 Patent by at least inducing others and contributing to the infringement by others.

21.    Defendants' acts of infringement of the '798 Patent, upon information and belief, have been carried out in deliberate and willful disregard of DEKALB's patent rights.

## JURY DEMAND

22.    Pursuant to Rule 38(b), Fed. R. Civ. P., Plaintiff requests a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff DEKALB Genetics Corporation prays for the following relief:

A.    A judgment that Defendants have infringed one or more claims of the '798 Patent;

B.    A judgment that Defendants have willfully and deliberately infringed one or more claims of the '798 Patent;

C.    A declaration by the Court that any making, using, selling or offering for sale by Defendants of glyphosate resistant corn products that are within the scope of one or more claims of the '798 Patent would constitute an act of infringement of the '798 Patent;

D.    A declaration by the Court that the importation into the United States, or offering for sale, selling or using within the United States, of corn containing genes that confer resistance to the herbicide glyphosate, would constitute an act of infringement of the '798 Patent;

E.  A preliminary and final injunction enjoining Defendants and all those in privy with them from infringing, from inducing infringement, and from contributing to the infringement of one or more claims of the '798 Patent;

F.  An award of compensatory and exemplary damages, but not less than a reasonable royalty, resulting from Defendants' infringement, including allowance of multiplied damages based on Defendants' willful and deliberate infringement;

G.  An award of interest, costs, and attorneys' fees; and

H.  Such other and further relief as this Court shall deem just and proper.

Dated: August 9, 2006

Respectfully submitted,

HUSCH & EPPENBERGER, LLC

By: *Thomas M. Dee*

Joseph P. Conran, E.D.Mo. # 6455
joe.conran@husch.com
Thomas M. Dee, E.D.Mo. # 2956
tom.dee@husch.com
Dutro E. Campbell, II, E.D.Mo. 83825
bruce.campbell@husch.com
190 Carondelet Plaza # 600
St. Louis, MO 63105
(314) 480-1500 (Telephone)
(314) 480-1530 (Facsimile)

HOWREY LLP
Susan K. Knoll
Steven G. Spears
1111 Louisiana, 25th Floor
Houston, TX 77002-5242
Telephone: (713) 787-1400
Facsimile: (713) 787-1440
Email: knolls@howrey.com
Email: spearss@howrey.com

*Attorneys For Plaintiff*
*DEKALB Genetics Corporation*

2425082.01

6

US005554798A

# United States Patent [19]

## Lundquist et al.

[11] Patent Number: 5,554,798

[45] Date of Patent: Sep. 10, 1996

[54] FERTILE GLYPHOSATE-RESISTANT TRANSGENIC CORN PLANTS

[75] Inventors: **Ronald C. Lundquist**, Minnetonka; **David A. Walters**, Bloomington, both of Minn.

[73] Assignee: **DeKalb Genetics Corporation**, St. Paul, Minn.

[21] Appl. No.: **441,073**

[22] Filed: **May 15, 1995**

### Related U.S. Application Data

[63] Continuation of Ser. No. 508,045, Apr. 11, 1990, Pat. No. 5,484,956, which is a continuation-in-part of Ser. No. 467, 983, Jan. 22, 1990, abandoned.

[51] Int. Cl.⁶ ............................. A01H 4/00; C12N 15/05

[52] U.S. Cl. ......................... 800/205; 800/DIG. 56; 435/172.3; 435/172.1; 435/240.5; 435/240.45; 536/23.71

[58] Field of Search ............................ 800/205, 250, 800/DIG. 56; 435/172.3, 172.1

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 4,370,160 | 1/1983 | Ziemelis ............................ 71/117 |
| 4,399,216 | 8/1983 | Axel et al. ............................ 435/6 |
| 4,535,060 | 8/1985 | Comai ............................ 435/172.3 |
| 4,559,301 | 12/1985 | Turner ............................ 435/76 |
| 4,559,302 | 12/1985 | Ingolis ............................ 435/172.3 |
| 4,581,847 | 4/1986 | Hibberd et al. ............................ 47/58 |
| 4,634,665 | 1/1987 | Axel et al. ............................ 435/68 |
| 4,642,411 | 2/1987 | Hibberd et al. ............................ 800/1 |
| 4,665,030 | 5/1987 | Close ............................ 435/240 |
| 4,666,844 | 5/1987 | Cheng ............................ 435/240 |
| 4,683,202 | 7/1987 | Mullis ............................ 435/91 |
| 4,727,028 | 2/1988 | Santerre et al. ............................ 435/240.2 |
| 4,743,548 | 5/1988 | Crossway et al. ............................ 435/172.3 |
| 4,761,373 | 8/1988 | Anderson et al. ............................ 435/172.3 |
| 4,806,483 | 2/1989 | Wang ............................ 435/240.49 |
| 4,940,835 | 7/1990 | Shah et al. ............................ 800/205 |
| 4,971,908 | 11/1990 | Kishore et al. ............................ 435/172.1 |
| 5,001,060 | 3/1991 | Peacock et al. ............................ 435/172.3 |
| 5,004,863 | 4/1991 | Umbeck ............................ 800/205 |
| 5,015,580 | 5/1991 | Christou et al. ............................ 435/172.3 |
| 5,034,322 | 7/1991 | Rogers et al. ............................ 435/172.3 |
| 5,049,500 | 9/1991 | Arntzen et al. ............................ 435/172.3 |
| 5,094,945 | 3/1992 | Comai ............................ 435/172.3 |
| 5,110,732 | 5/1992 | Benfey et al. ............................ 435/172.3 |
| 5,134,074 | 7/1992 | Gordon et al. ............................ 435/240.4 |
| 5,177,010 | 1/1993 | Goldman et al. ............................ 435/172.3 |
| 5,187,073 | 2/1993 | Goldman et al. ............................ 435/172.3 |
| 5,188,642 | 2/1993 | Shah et al. ............................ 47/58 |
| 5,188,958 | 2/1993 | Moloney et al. ............................ 435/240.4 |
| 5,250,515 | 10/1993 | Fuchs et al. ............................ 514/12 |
| 5,254,799 | 10/1993 | DeGreve et al. ............................ 800/205 |
| 5,258,300 | 11/1993 | Glassman et al. ............................ 435/240.4 |
| 5,268,463 | 12/1993 | Jefferson ............................ 536/23.7 |
| 5,290,924 | 3/1994 | Last et al. ............................ 536/24.1 |
| 5,302,523 | 4/1994 | Coffee et al. ............................ 435/172.1 |
| 5,350,689 | 9/1994 | Shillito et al. ............................ 435/240.47 |
| 5,352,605 | 11/1994 | Fraley et al. ............................ 435/240.4 |
| 5,371,003 | 12/1993 | Murray et al. ............................ 435/172.3 |
| 5,405,765 | 4/1995 | Vasil et al. ............................ 435/172.3 |

#### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 80893/87 | 12/1988 | Australia ............... | C12N 15/00 |
| 0126537A2 | 4/1983 | European Pat. Off. ...... | A61K 9/52 |
| 0131623B1 | 1/1984 | European Pat. Off. ...... | C12N 15/11 |
| 0141373A3 | 5/1985 | European Pat. Off. ...... | A01G 7/00 |
| 0154204A2 | 9/1985 | European Pat. Off. ...... | C12N 15/00 |
| 0160390A2 | 11/1985 | European Pat. Off. ...... | A01H 15/10 |
| 0193259A1 | 9/1986 | European Pat. Off. ...... | C12N 15/00 |
| 0204549A2 | 10/1986 | European Pat. Off. ...... | C12N 15/00 |
| 0202668A2 | 11/1986 | European Pat. Off. ...... | C12N 5/02 |
| 0242236A1 | 10/1987 | European Pat. Off. ...... | C12N 15/00 |
| 0242246A1 | 1/1987 | European Pat. Off. ...... | C12N 15/00 |
| 0289352A1 | 1/1988 | European Pat. Off. ...... | C12N 15/00 |
| 0257472A2 | 3/1988 | European Pat. Off. ...... | C12N 15/00 |
| 0262971A2 | 5/1988 | European Pat. Off. ...... | A01H 1/02 |
| 0271408 | 6/1988 | European Pat. Off. ...... | C12N 15/00 |
| 0270356A2 | 6/1988 | European Pat. Off. ...... | C12N 15/00 |
| 0275069A2 | 7/1988 | European Pat. Off. ...... | C12N 15/00 |
| 0280400A2 | 8/1988 | European Pat. Off. ...... | A01C 1/06 |
| 0282164A2 | 9/1988 | European Pat. Off. ...... | C12N 5/00 |
| 0292435A1 | 11/1988 | European Pat. Off. ...... | C12N 15/00 |
| 0289479A2 | 11/1988 | European Pat. Off. ...... | C12N 15/00 |
| 0290395A2 | 11/1988 | European Pat. Off. ...... | C12N 15/00 |
| 0301749A2 | 2/1989 | European Pat. Off. ...... | C12N 15/00 |
| 0353908A2 | 7/1989 | European Pat. Off. ...... | C12N 15/29 |
| 0334539A2 | 9/1989 | European Pat. Off. ...... | C12N 15/00 |
| 0331855A2 | 9/1989 | European Pat. Off. ...... | C12M 3/00 |
| 0348348A2 | 12/1989 | European Pat. Off. ...... | A01N 65/00 |
| 0385962A1 | 2/1990 | European Pat. Off. ...... | C12N 15/82 |
| 0360750A2 | 3/1990 | European Pat. Off. ...... | C12N 15/29 |
| 0359617A2 | 3/1990 | European Pat. Off. ...... | C12N 15/53 |
| 0408403A1 | 5/1990 | European Pat. Off. ...... | C12N 15/32 |
| 0422174A1 | 4/1991 | European Pat. Off. ...... | C12N 15/32 |
| 0424047A1 | 4/1991 | European Pat. Off. ...... | C12N 15/87 |
| 0459643A2 | 5/1991 | European Pat. Off. ...... | C12N 15/82 |
| 0442175A1 | 8/1991 | European Pat. Off. ...... | A01H 1/02 |
| 0452269A2 | 11/1991 | European Pat. Off. ...... | C12N 15/82 |
| 0469273A1 | 2/1992 | European Pat. Off. ...... | C12N 15/82 |
| 0485970A3 | 5/1992 | European Pat. Off. ...... | C12N 15/82 |

(List continued on next page.)

### OTHER PUBLICATIONS

"Dekalb Researchers Produce Fertile Corn Plants with Foreign Genes," *ARI Newsletter* (Oct./Nov. 1990).

"Genetic Engineering Advance Announced for Corn Plants," *Investor's Daily*, (Apr. 19, 1990).

"Genetically Engineered Corn: Breakthrough Brings Market Closer," *Genetic Technology News*, 8–11 (Oct. 1990).

"Keystone Crops," *Agricultural Genetics Report*, (Mar./Apr. 1990).

(List continued on next page.)

*Primary Examiner*—Gary Benzion

*Attorney, Agent, or Firm*—Schwegman, Lundberg, Woessner & Kluth, P.A.

[57] **ABSTRACT**

Fertile transgenic *Zea mays* (corn) plants which stably express heterologous DNA which is heritable are provided along with a process for producing said plants. The preferred process comprises the microprojectile bombardment of friable embryogenic callus from the plant to be transformed. The process may be applicable to other graminaceous cereal plants which have not proven stably transformable by other techniques.

**6 Claims, 6 Drawing Sheets**

EXHIBIT

A

JTX-2

**5,554,798**

Page 2

## FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 0589110A1 | 3/1994 | European Pat. Off. | A01N 63/02 |
| 2661421 | 11/1991 | France | C12N 15/09 |
| 0018970 | 9/1882 | Germany . | |
| 3738874A1 | 11/1988 | Germany | A01H 1/06 |
| 4013099A1 | 10/1991 | Germany | C12N 15/82 |
| 61-134343 | 5/1984 | Japan . | |
| 8801444 | 1/1990 | Netherlands | C12N 15/87 |
| 2159173 | 11/1985 | United Kingdom | C12N 15/00 |
| WO85/01856 | 5/1985 | WIPO | A01B 76/00 |
| WO85/02973 | 7/1985 | WIPO | A01J 7/00 |
| WO85/02972 | 7/1985 | WIPO | A01C 1/06 |
| WO87/04181 | 7/1987 | WIPO | C12N 1/00 |
| WO87/05629 | 9/1987 | WIPO | C12N 15/00 |
| WO89/04371 | 5/1989 | WIPO | C12N 21/00 |
| WO89/12102 | 12/1989 | WIPO | C12N 15/00 |
| WO89/11789 | 12/1989 | WIPO | A01H 1/00 |
| WO90/01869 | 3/1990 | WIPO | A01H 1/00 |
| WO90/02801 | 3/1990 | WIPO | C12N 15/32 |
| WO90/10691 | 8/1990 | WIPO | C12N 5/00 |
| WO90/10725 | 9/1990 | WIPO | C23C 16/00 |
| WO91/02071 | 2/1991 | WIPO | C12N 15/82 |
| WO91/04323 | 4/1991 | WIPO | C12N 9/10 |
| WO91/00183 | 5/1991 | WIPO . | |
| WO91/10725 | 7/1991 | WIPO | C12N 5/00 |
| WO91/16432 | 10/1991 | WIPO | C12N 15/31 |
| WO92/06205 | 4/1992 | WIPO | C12N 15/82 |
| WO92/09696 | 6/1992 | WIPO | C12N 15/82 |
| WO92/12250 | 7/1992 | WIPO | C12N 15/82 |
| WO92/19731 | 11/1992 | WIPO | C12N 15/00 |
| WO93/07278 | 4/1993 | WIPO | C12N 15/82 |
| WO93/08682 | 5/1993 | WIPO | A01H 1/00 |
| WO93/14210 | 7/1993 | WIPO | C12N 15/82 |
| WO93/19190 | 9/1993 | WIPO | C12N 15/82 |
| WO93/21335 | 10/1993 | WIPO | C12N 15/87 |

## OTHER PUBLICATIONS

Chan, M.–T., et al., "Agrobacterium–Mediated Production of Transgenic Rice Plants Expressing a Chimeric α–Amylase Promoter/β–Glucuronidase Gene," Plant Mol. Biol., 22, 491–506 (1993).

Hiei, Y., et al., "Efficient Transformation of Rice (Oryza sativa L.) Mediated by Agrobacterium and Sequence Analysis of the Boundaries of the T–DNA," The Plant J., 6, 271–282 (1994).

Abstract, 35th Annual Maize Genetics Conference, In Vitro Cellular and Devel. Biol., 28:(3) (1992).

"Bullets Transform Plant Cells," Agricell Report, 9, 5, (Jul. 1987).

"BioTechnica Applies for Field Test of Genetically Engineered Corn," Genetic Technology News, 10(3), (Mar. 1990).

Catalog, Handbook of Fine Chemicals, Aldrich Chem. Co., p. 508 (1988).

"Chipping Away at Old Weed Enemies," Farm Science Outlook, Prairie Farmer 162, 34 (Feb. 20 1990).

"Corn Transformers Multiply," BioTechnol., 8, 490 (Jun. 1990).

"Cornell U. Gene Gun Hits Biotech Bullseye," Agriculture Technology, p. 13.

"Dalapon," Merck Index, 11th edition, S. Budavae, (ed.), Merck and Co., pp. 405–406 (1989).

Dialog Search of Japanese Patent No. 61–134343 (1986).

EPO Notice Regarding Publication of Bibliographic Data for EPO 0485506 (1992).

"Genes Guns Succeed in Altering Corn," Biotechnology News, p. 2 (Apr. 1990).

"Herbicide–Resistant Corn" CT Academy of Science and Engineering, Case Reports, 5(4), 6 (1990).

International Search Report, PCT/US 90/04462, mailed Jan. 15, 1991.

International Search Report, PCT/US 90/09699, mailed Aug. 16, 1995.

International Society for Plant Molecular Biology, Program and Abstract. Molecular Biology of Plant Growth and Development, Tuson, Arizona, Oct. 6–11 (1991).

Patent Family Record for Australian Patent 87 80 893.

"Plant Science Research, Inc. Achieves Successful Transformation of Corn," Genetic Engineering News, 10(3), 3 (March 1990).

"Shotgunning DNA into Cells," Genetic Engineering News, (Jul./Aug. 1987).

"Sticky Ends," Genetic Engineering News, 10(5), 1 (May 1990).

"Teams from USDA/Monsanto and DeKalb Genetically Engineer Corn," Genetic Technology News, 10(5) (May 1990).

"Two Teams Succeed in Putting Foreign Genes in Corn Plants," Genetic Engineering Letter, 10(8), 3 (Apr. 24, 1990).

"USDA Approves More Field Tests," Genetic Technology News, 11(7), 12 (Jul. 1991).

"USDA Approves Field Test for BioTechnica's Genetically Engineered Corn," Genetic Technology News, 10(7), 6 (Jul. 1990).

Adang, M. J., et al., "Characterized Full–Length and Truncated Plasmid Clones of the Crystal Protein of Bacillus thuringiensis subsp. kurstaki HD–73 and Their Toxicity to Manduca sexta," Gene, 36, 289–300 (1985).

Ahokas, H. "Transfection of Germinating Barley Seed Electrophoretically with Exogenous DNA," Theor. Appl. Genet., 77, 469–472 (1989).

Ahokas, H. "Electrophoretic transfection of cereal grains with exogenous nucleic acid," Soc. Biochem. Biophys. Microbio. Fen., Biotieteen Paivat (Bioscience Days), Abstracts, Technical University of Helsinki, Espoo, p. 2 (1989).

Akella, V., et al., "Expression in Cowpea Seedings of Chimeric Transgene after Electroporation into Seed–Derived Embryos," Plant Cell Rep., 12, 110–117 (1993).

Altenbach, S. B., et al., "Enhancement of the Methionine Content of Seed Proteins by the Expression of a Chimeric Gene Encoding a Methionine–Rich Protein in Transgenic Plants," Plant. Mol. Biol., 13, 513–522 (1989).

Altenbach, S. B., et al., "Cloning and Sequence Analysis of a cDNA Encoding a Brazil Nut Protein Exceptionally Rich in Methionine," Plant Mol. Biol., 8, 239–250 (1987).

Ampe, C., et al., "The Amino–Acid Sequence of the 2S Sulphur–Rich from Seed of Brazil Nut (Bertholletia excelsa H.B.K.)," Eur. J. Biochem., 159, 597–604 (1986).

Armstrong, C. L., et al., "Establishment and Maintenance of Friable, Embryogenic Maize Callus and the Involvement of L–Proline," Planta, 164, 207–214 (1985).

Armstrong, C. L., et al., "Genetic and cytogenetic variation in plants regenerated from organogenic and friable, embryonic tissue cultures of maize," Biological Abstracts, vol. 85, Abstract No. 117662 (1988).

Aves, K., et al., "Transformation of an Elite Maize Inbred Through Microprojectile Bombardment of Regenerable Embryonic Callus," In Vitro Cell. Develop. Biol., 28A, p. 124A, Abstract No. P–1134 (1992).

5,554,798
Page 3

Bao–Jian, L., et al., "Introduction of Foreign Genes into the Seed Embryo Cells of Rice by Electroinjection and the Regeneration of Transgenic Rice Plants," Science in China, 34, 925–931 (1991).

Barker, R. F., et al., "Nucleotide Sequence of the T–DNA Region from the Agrobacterium tumefaciens Octopone Ti Plasmid pTil5955," Plant Mol. Biol., 2, 335–350 (1983).

Beerman, F., et al., "Tyrosinase as a Marker for Transgenic Mice," Nuc. Acids. Res., 19, 958 (1991).

Belanger, F. C., et al., "Molecular Basis for Allelic Polymorphism of the Maize Globulin–1 Gene" Genetics, 129, 863–872 (1991).

Benner, M. S., et al., "Genetic Analysis of Methionine–Rich Storage Protein Accumulation in Maize," Theor. Appl. Genet., 78, 761–767 (1989).

Bevan, M., et al., "A Chimaeric Antibiotic Resistance Gene as a Selectable Marker for Plant Cell Transformation," Nature, 304, 184–187 (1983).

Bevan, M., et al., "Structure and Transcription of the Nopaline Synthase Gene Region of T–DNA," Nuc. Acids Res., 11, 369–385 (1983).

Binns, A. N., "Agrobacterium–mediated gene delivery and the biology of host range limitations," Physiologia Plantarium, 79, 135–139 (1990).

Bishop, J. E., "Two Teams Plane Genes into Corn," The Wall Street Journal, B1 (Apr. 1990).

Booy, G., et al., "Attempted Pollen—Mediated Transformation of Maize," J. Plant Physiol., 135, 319–324 (1989).

Boulton, M. I., et al., "Specificity of Agrobacterium—mediated delivery of maize streak virus DNA to members of the Gramineae," Plant Molecular Biology, 12, 31–40 (1989).

Brill, W. J., "Agricultural Microbiology," Scientific American, 245(3), 199–215 (Sep. 1981).

Brunke, K. J., et al., "Insect Control with Genetically Engineered Crops," Trends in Biotechnol., 9, 197–200 (1991).

Buchanan–Wollaston, V., et al., "Detoxification of the Herbicide Dalapon by Transformed Plants," J. of Cell. Biochem., 13D, p. 330, Abstract No. M503 (1989).

Callis, J., et al., "Introns Increase Gene Expression in Cultures Maize Cells," Genes and Development, 1, 1183–1200 (1987).

Cao, J., et al., "Transformation of Rice and Maize Using the Biolistic Process," In: Plant Gene Transfer, Alan R. Liss, Inc., pp. 21–33 (1990).

Carpita, N. C., "The Biochemistry of "Growing" Cell Walls," In: Physiology of Cell Expansion During Plant Growth, Cosgrove, D. J., et al., (eds.) Am. Soc. Plant Physiol., pp. 28–100 (1987).

Chandler, V. L., et al., "Two Regulatory Genes of the Maize Anthocyanin Pathway are Homologous: Isolation of B Utilizing R Genomic Sequences," The Plant Cell, 1, 1175–1183 (1989).

Chasan, R., "Transforming Maize Transformation," The Plant Cell, 4, 1463–1464 (1992).

Chourey, P. S., et al., "Callus Formation from Protoplasts of a Maize Cell Culture," Theor. Appl. Genet., 59, 341–344 (1981).

Christou, P., et al., "Opine Synthesis in Wild—Type Plant Tissue," Plant Physiol., 82, 218–221 (1986).

Christou, P., et al., "Soybean Genetic Engneering—Commercial Production of Transgenic Plants," Trends Biotechnol., 8, 145–151 (1990).

Christou, P., et al., "Cotransformation Frequencies of Foreign Genes in Soybean Cell Cultures," Theor. Appl. Genet., 79, 337–341 (1990).

Christou, P., et al., "Genetic Transformation of Crop Plants Using Microprojectile Bombardment," The Plant Journal, 2, 275–281 (1992).

Christou, P., et al., "Stable Transformation of Soybean Callus by DNA—Coated Gold Particles," Plant Physiol., 87, 671–674 (1988).

Chu, C.–C., et al., Establishment of an Efficient Medium for Anther Culture of Rice Through Comparative Experiments on the Nitrogen Sources," Sci. Sin. (Peking), 13, 659–668 (1975).

Clark, B., "Biotech Advance in Corn: Gunslinging Researchers Fire Marker Genes in to Corn," AG Consultant, 46(7), 12(Jul. 1990).

Cocking, F., et al., "Gene Transfer in Cereals," Science, 236, 1259–1262 (1987).

Coe et al., "The Genetics of Corn" In: Corn and Corn Improvement, 2nd edition, Sprague, G. F., (ed.), American Soc. Agronomy, Inc, Madison, WI, p. 138 (1977).

Comai, L., et al., "Expression in Plants of a Mutant aroA Gene from Salmonella typhimurium Confers Tolerance to Glyphosate," Nature, 317, 741–744 (Oct., 1985).

Creissen, G., et al., "Agrobacterium— and Microprojectile—Mediated Viral DNA Delivery into Barley Microspore Derived–Cultures," Plant Cell Rep., 8, 680–683 (Apr. 1990).

Crossway, A., et al., "Integration of foreign DNA following microinjection of tobacco mesophyll protoplasts," Mol. Gen. Genet., 202, 179–185 (1986).

D'Halluin, K., et al., "Transgenic Maize Plants by Tissue Electroporation," The Plant Cell, 4, 1495–1505 (1992).

Darvill, A., et al., "The Primary Cell Walls of Flowering Plants," In: The Biochemistry of Plants, vol. 1, pp. 91–162 (1980).

Dauce–LeReverand, B., et al., "Improvement of Escherichia coli Strains Overproducing Lysine Using Recombinant DNA Techniques," Eur. J. Appl. Microbiol. Biotechnol., 15, 227–231 (1982).

De Block, M., et al., "Engineering herbicide resistance on plants by expression of a detoxifying enzyme," EMBO J., 6, 2513–2518 (1987).

De Greef, W., et al., "Evaluation of herbicide resistance in transgenic crops under field conditions," Bio/Technol., 7, 61–64 (1989).

Dekeyser, R. A., et al., "Evaluation of Selectable Markers for Rice Transformation," Plant Physiol., 90, 217–223 (1989).

Dekeyser, R. A., et al., "Transient Gene Expression in Intact and Organized Rice Tissues," The Plant Cell, 2, 591–602, (1990).

DeWald et al., "Plant regeneration from inbred maize suspensions," VIIth International Congress on Plant Tissue and Cell Culture, p. 12, Abstract No. A1–36 (Jun. 24–29, 1990).

DeWet, J. M. J., et al., "Exogenous gene transfer in maize (Zea mays) using DNA–treated pollen," In: The experimental manipulation of ovule tissues, Chapman, G. P., et al., (eds.), Longman, New York, pp. 197–209 (1985).

DeWet, J. R. et al., "Cloning of Firefly Luciferase cDNA and the Expression of Active Luciferase in Escherichia coli," Proc. Nat. Acad. Sci. USA, 82, 7870–7873 (1985).

5,554,798

Page 4

Donn, G., et al., "Stable Transformation of Maize with a Chimaeric, Modified Phosphinothricin–Acetyltransferase Gene from *Streptomyces viridochromogenes*," Abstracts, VIIth International Congress Plant Tissue Cell Culture, p. 53, Abstract No. A2-38 (Jun. 24–29, 1990).

Dupuis, I., et al., "Gene Transfer to Maize Male Reproductive Structure by Particle Bombardment of Tassel Primordia," *Plant Cell Rep.*, 12, 607 (1993).

Ellis, J. G., et al., "Does the OCS–Element Occur as a Functional Component of the Promoters of Plant Genes?" *EMBO J.*, 6, 3203–3208 (1987).

Evans, D. A., et al., "Somaclonal Variation—Genetic Basis and Breeding Applications," *Trends Genet.*, 5, 46–50 (1989).

Fennel, A., et al., "Electroporation and PEG Delivery of DNA into Maize Microspores," *Plant Cell Reports*, 11, 567–570 (1992).

Fitzpatrick, T., "Pleiotrophic Gene Found in Barley Plant," *Genetic Engineering News*, 13, 1 (1993).

Franz, P., et al., "Cytodifferentiation during callus initiation and somatic embryogenesis in *Zea mays* L.," Ph.D. thesis, U. of Wageningen Press, The Netherlands (1988).

Freeling, J. C., et al., "Developmental Potentials of Maize Tissue Cultures," *Maydica*, XXI, 97–112 (Jul. 1977).

Freiberg, "More Researchers Discover Corn Transformation Technology," *AG Biotechnology News*, p. 26 (1990).

Fromm, M. E., et al., "Inheritance and Expression of Chimeric Genes in the Progeny of Transgenic Maize Plants," *BioTechnol.*, 8, 833–839 (1990).

Fromm, M. E., et al., "Stable Transformation of Maize after Gene Transfer by Electroporation," *Nature*, 319, 791–793 (1986).

Fromm, M., et al., "Expression of Genes Transfected into Monocot and Dicot Plant Cells by Electroporation," *Proc. Nat. Acad. Sci. USA*, 82, 5824–5628 (1985).

Fry, S. C., "Introduction to the Growing Cell Wall," In: *The Growing Plant Cell Wall: Chemical and Metabolic Analysis*, Longman Scientific and Technical, New York, pp. 1–5, 102–109 (1988).

Geiser, M., et al., "The Hypervariable Region on the Genes Coding for Entomopathogenic Crystal Proteins of *Bacillus thuringiensis*: Nucleotide Sequence of the *kurhd1* gene of subsp. *kurstaki* HD1," *Gene*, 48, 109–118 (1986).

Goff, S. A., et al., "Plant Regeneration of Anthocyanin Biosynthetic Genes Following Transfer of B Regulatory Genes into Maize Tissues," *EMBO J.*, 9, 2517–2522 (1990).

Gordon–Kamm, W. J., et al., "Stable Transformation of Embryonic Maize Cultures by Microprojectile Bombardment," *J. Cellular Biochem.*, 13D, p. 259, Abstract No. M122 (1989).

Gordon–Kamm, W. J., et al., "Transformation of Maize Cells and Regeneration of Fertile Transgenic Plants," *The Plant Cell*, 2, 603–618 (1990).

Gould, J., et al., "Transformation of the Graminae by *Agrobacterium tumefaciens*," Int. Soc. Plant Mol. Biol. 3rd Int. Congress, Abstract No. 1277 (1991).

Gould, O., et al., "Shoot Tip Culture as a Potential Transformation System," Abstracts, Beltwide cotton production research conferences, New Orleans, LA, p. 91 (1988).

Gould, J., et al., "Transformation of *Zea mays* L. Using *Agrobacterium tumefaciens* and the Shoot Apex," *Plant Physiol.* 95, 426–434 (1991).

Graves, A., et al., "The Transformation of *Zea mays* seedings with *Agrobacterium tumefaciens*," *Plant Mol. Biol.*, 7, 43–50 (1986).

Green, C., et al., "Plant Regeneration from Tissue Cultures of Maize," *Crop. Sci.*, 15, 417–421 (1975).

Green, C., et al., "Plant Regeneration in Tissue Cultures of Maize," In: *Maize for Biological Research*, Sheridan, W. F., (ed.) Plant Mol. Biol. Assoc., pp. 367–372 (1982).

Green, C., et al., "Somatic Cell Genetic Systems, in Corn," In: *Advances in Gene Technology: Molecular Genetics of Plant and Animals*, Academic Press, Inc., pp. 147–157 (1983).

Grimsley, N., et al., "DNA Transfer from Agrobacterium to *Zea mays* or *Brassica* by Agroinfection is Dependent on Bacterial Virulence Functions," *Mol. Gen. Genet.*, 217, 309–316 (1989).

Gritz, L., et al., "Plasmid—Encoded Hygromycin B Resistance: The Sequence of Hygromycin B Phosphotransferase Gene and Its Expression in *Escherichia coli* and *Saccharomyces cerevisiae*," *Gene*, 25, 179–188 (1983).

Guerineau, F., et al., "Sulfonamide Resistance Gene for Plant Transformation," *Plant Molecular Biology*, 15, 127–136 (1990).

Guilley, H., et al., "Transcription of Cauliflower Mosaic Virus DNA: Detection of Promoter Sequences, and Characterization of Transcripts," *Cell*, 30, 763–773 (Oct. 1982).

Gunset, G., "Genetic Advance May Transform Corn," *Chicago Tribune* (Apr. 19, 1990).

Gunset, G., "Corn Farmers See Economic, Environmental Gold in Designer Genes," *Chicago, Tribune* (Jan. 21, 1991).

Hallauer, A. R., et al., "Corn Breeding," In: *Corn and Corn Improvement*, 3rd edition, Sprague, G. F., et al., (eds.). Agronomy Soc. Amer., pp. 463–564 (1988).

Haughn, G. W., "Transformation with a Mutant Arabidopsis Acetolactate Synthase Gene Renders Tobacco Resistant to Sulfonylurea Herbicides," *Mol. Gen. Genet.*, 211, 266–271 (1988).

Hauptman, R. M., et al., "Evaluation of Selectable Markers for Obtaining Stable Transformants on the Gramineae," *Plant Physiol.*, 86, 602–606 (1988).

Hoffman, L. M., et al., "A Modified Storage Protein is Synthesized, Processed, and Degraded in the Seeds of Transgenic Plants," *Plant Mol. Biol.*, 11, 717–729 (1988).

Hoffman, L. M., et al., "Synthesis and Protein Body Deposition of Maize 15kD Zein in Transgenic Tobacco Seeds," *EMBO J.*, 6, 3213–3221 (1987).

Hofte, H., et al., "Insecticidal Crystal Proteins of *Bacillus thuringiensis*," *Microbiol. Rev.*, 53, 242–255 (1989).

Hong, B., et al., "Developmental and Organ—Specific Expression of an ABA—and Stress–Induced Protein in Barley," *Plant Mol. Biol.*, 18, 663–674 (1992).

Hooykaas, P. J. J., "Transformation of plant cell via Agrobacterium," *Plant Mol. Biol.*, 13, 327–336 (1989).

Horn, M., et al., "Transgenic Plants of Orchard Grass (*Dactylis glomerata* L.) from Protoplasts," *Chem. Abstracts*, 110, p. 208, Abstract no. 89869a (1989).

Horn, M., et al., "Transgenic Plants of Orchard grass (*Dactylis glomerata* L.) from Protoplasts," *Plant Cell Reports*, 7, 469 (1988).

Howe, A., et al., "Development of Glyphosphate as a Selectable Marker for the production of Fertile Transgenic Corn Plants," *In Vitro Cell Develop. Biol.*, 28A, p. 124A, Abstract No. P–1136 (Jul.–Aug. 1992).

Huang, Y., et al., "Factors Influencing Stable Transformation of Maize Protoplasts by Electroporation," *Plant Cell, Tissue and Organ Culture*, 18, 281 (1989).

Imbrie–Milligan, C., et al., "Microcallus Growth from Maize Protoplasts," *Planta*, 171, 58–64 (1987).

5,554,798
Page 5

Jahne, A., et al., "Regeneration of Fertile Plants from Protoplasts Derived from Embryogenic Cell Suspensions of Barley (Hordeum vulgare L.)," Plant Cell Rep., 10, 1–6 (1991).

Jayne, S., et al., "Analysis of Elite Transgenic Maize Plants Produced by Microprojectile Bombardment," Program and Abstracts, Int. Soc. for Plant Mol. Biol., 3rd Int. Cong., Abstract No. 338 (Oct. 6–11, 1991).

Jefferson, R., et al., "β-Glucuronidase from Escherichia coli as a Gene-Fusion Marker," Proc. Nat. Acad. Sci. USA, 83, 8447–8451 (1986).

Jefferson, R., et al., "GUS Fusions: β-Glucuronidase as a Sensitive and Versatile Gene Fusion Marker in Higher Plants," EMBO J., 6, 3901–3907 (1987).

Jefferson, R., "Assaying chimeric genes in plants: the GUS gene fusion system," Plant Mol. Biol. Rep., 5, 387–405 (1987).

Jones, H., et al., "Recent Advances in Plant Electroporation," Oxford Surveys of Plant Molecular and Cell Biol., 4, 347–357 (1987).

Jones, H., et al., "Transient Gene Expression in Electroporated Solanum Protoplasts," Plant Mol. Biol., 13, 503–511 (1989).

Kaeppler, H. F., et al., "Silicon Carbide Fiber-Mediated DNA Delivery into Plant Cells," Plant Cell Rep., 9, 415–418 (1990).

Kamo, K., et al., "Establishment and Characterization of Long-Term Embryonic Maize Callus and Cell Suspension Cultures," Plant Sci., 45, 111–117 (1986).

Kamo, K., et al., "Regeneration of Zea mays L. from Embryogenic Callus," Bot. Gaz., 146, 327–334 (1985).

Kao, K. N., et al., "Nutritional Requirements for Growth of Vicia hajastana Cells and Protoplasts at a Very Low Population Density in Liquid Media," Planta, 126, 105–110 (1978).

Kartha, K., et al., "Transient Expression of Chloramphenicol Acetyl Transferase (CAT) Gene in Barley Cell Cultures and Immature Embryos Through Microprojectile Bombardment," Plant Cell Rep., 8, 429–432 (1989).

Kay, R., et al., "Duplication of CaMV 35S Promoter Sequences Creates a Strong Enhancer for Plant Genes," Science, 236, 1299–1302 (Jun. 5, 1987).

Kirihara, J., et al., "Differential Expression of a Gene for a Methionine-Rich Storage Protein in Maize," Mol. Gen. Genet., 211, 477–484 (1988).

Kirihara, J., et al., "Isolation and Sequence of a Gene Encoding a Methionine-Rich 10-kD Zein Protein from Maize," Gene, 71, 359–370 (1988).

Klein, T., et al., "Transfer of Foreign Genes into Intact Maize Cells with High-Velocity Microprojectiles," Proc. Nat. Acad. Sci. USA, 85, 4305–4309 (1988).

Klein, T. M., et al., "Factors Influencing Gene Delivery into Zea mays Cells by High Velocity Microprojectiles," Bio/Tec 6, 559–563 (1988).

Klein, T. M., et al., "High-Velocity Microprojectiles for Delivering Nucleic Acids to Living Cells," Nature, 327, 70–73 (1987).

Klein, T., et al., "Genetic Transformation of Maize Cell by Particle Bombardment and the Influence of Methylation on Foreign Gene Expression," In: Gene Manipulation in Plant Improvement II, Gustafson, J. P., (ed.), Plenum Press, NY, pp. 265–266 (1990).

Klein, T., et al., "Genetic Transformation of Maize Cells by Particle Bombardment," Plant Physiol., 91, 440–444 (1989).

Klein, T., et al., "Regulation of Anthocyanin Biosynthetic Genes Introduced into Intact Maize Tissue by Microprojectiles," Proc. Nat. Acad. Sci. USA, 86, 6682–6685 (1989).

Kozak, M., "Compilation and Analysis of Sequence from the Translational Start Site in Eukaryotic mRNAs," Nuc. Acids. Res., 12, 857–871 (1984).

Kozak, M., "Point Mutations Define a Sequence Flanking the AUG Initiator Codon that Modulates Translation by Eukaryotic Ribosomes," Cell, 44, 283–292 (1986).

Koziel, M. G., et al., "Field Performance of Elite Transgenic Maize Plants Expressing an Insecticidal Protein Derived from Bacillus thuringiensis," Bio/Technol., 11, 194–200 (1993).

Kreitlow, B., "Genetic Engineering 'Breakthrough' Disputed," Cedar Rapids Gazette (Apr. 20, 1990).

Kriz, A. L., et al., "Characterization of the Maize Globulin-2 Gene and Analysis of Two Null Alleles," Biochemical Genetics, 29, 241–254 (1991).

Kuhlemeier, C., et al., "Regulation of Gene Expression in Higher Plants," Ann. Rev. Plant Physiol., 38, 234–239 (1987).

Langridge, et al., "Transformation of Cereals via Agrobacterium and the Pollen Pathway: A Critical Assessment," The Plant J., 2, 613–638 (1992).

Laursen, C. M., et al., "Production of Fertile Transgenic Maize by Electroporation of Suspension Culture Cells," Plant Mol. Biol., 24, 51–61 (1994).

Lazzeri, P., et al., "In Vitro Genetic Manipulation of Cereals and grasses," Ad. Cell Culture, 6, 291–293 (1988).

Lee, J. S., et al., "Gene Transfer into Intact cells of Tobacco by Electroporation," Korea J. Genet., 11, 65–72 (1989).

Leemans, J., "Genetic Engineering for Fertility Control," Keystone Symposium on Crop Improvement via Biotechnology: An International Perspective, Abstract No. Y016 (Apr. 10–26, 1992).

Levitt, J. "Growth Regulators" In: Introduction to Plant Physiology, The C. V. Mosby Company, St. Louis, p. 241 (1969).

Li, X.-Q., et al., "GUS Expression in Rice Tissues Using Agrobacterium-Mediated Transformation," Program and Abstracts, Int. Soc. for Plant Mol. Biol., 3rd Int. Cong., Abstract No. 385 (Oct. 6–11, 1991).

Lindsey, K., et al., "Electroporation of Cells," Physiologia Plantarum, 79, 168–172 (1990).

Lindsey, K., et al., "The Permeability of Electroporated Cells and Protoplasts of Sugar Beet," Planta, 172, 346–355 (1987).

Lindsey, K., et al., "Transient Gene Expression in Electroporated Protoplasts and Intact Cells of Sugar Beet," Plant Mol. Biol., 10, 43–52 (1987).

Lindsey, K. et al., "Stable Transformation of Sugarbeet Protoplasts by Electroporation," Plant Cell Rep., 8, 71–74 (1989).

Looker, D., "Dekalb Claims Success in Effort to Alter Genetic Makeup of Corn," Des Moines Register (Apr. 19, 1990).

Lopes, M. A., et al., "Endosperm Origin, Development, and function," The Plant Cell, 5, 1383–1399 (1993).

Lorz, H., et al., "Advances in Tissue Culture and Progress Towards Genetic Transformation of Cereals," Plant Breeding, 100, 1–25 (1988).

Lu, C., et al., "Somatic Embryogenesis in Zea mays L.," Theor. Appl. Genet., 62, 109–112 (1982).

Lu, C., et al., "Improved Efficiency of Somatic Embryogenesis and Plant Regeneration on Tissue Cultures of Maize (*Zea mays* L.)," *Theor. Appl. Genet.*, 66, 285–289 (1983).
Ludwig, S., et al., "A Regulatory Gene as a Novel Visible Marker for Maize Transformation," *Science*, 247, 449–450 (1990).
Ludwig, S., et al., "High Frequency Callus Formation from Maize Protoplasts," *Theor. Appl. Genet.*, 71, 344–350 (1985).
Ludwig, S., et al., "Lc, a Member of the Maize R Gene Family Responsible for Tissue-Specific Anthocyanin Production, Encodes a Protein Similar to Transcriptional Activators and Contains the myc–Homology Region," *Proc. Nat. Acad. Sci. USA*, 86, 7092–7096 (1989).
Ludwig, S., et al., "Maize R Gene Family: Tissue—Specific Helix–Loop–Helix Proteins," *Cell*, 62, 849–851 (1990).
Luteke, H., et al., "Selection of AUG Initiation Codones Differs in Plants and Animals," *EMBO J.*, 6, 43–48 (1987).
Maas, C., et al., "A Highly Optimized Monocot Expression Cassette: Application for Barley Transformation and Barley Virus Research," Program and Abstracts, Int. Soc. Plant Mol. Biol., Abstract No. 386 (Oct. 6–11, (1991).
Maddock, S. E., et al., "Expression in Maize Plants of Wheat Germ Agglutinin, a Novel Source of Insect Resistance," Program and Abstracts, Int. Soc. Plant Mol. Biol., 3rd Int. Cong., Abstract no. 372 (Oct. 6–11, 1991).
Masumura, T., et al., "cDNA Cloning of an mRNA Encoding a Sulfur–Rich 10 kDa Prolamin Polypeptide in Rice Seeds," *Plant Mol. Biol.*, 12, 123–130 (1989).
McCabe et al., "Stable Transformation of Soybean (*Glycine max*) by Particle Acceleration," *Bio/Technol.* 6, 923–926 (1988).
McDaniel, C., et al., "Cell—Lineage Patterns in the Shoot Apical Meristem of the Germinating Maize Embryo," *Planta*, 175, 13–22 (1988).
Meadows, M., "Characterization of Cells and Protoplasts of the B73 Maize Cell Line," *Plant Sci. Lett.*, 28 337–348 (1982/83).
Mendel, R., et al., "Delivery of Foreign Genes to Intact Barley Cell by High–Belocity Microprojectiles," *Theor. Appl. Genet.*, 78, 31–34 (1989).
Messing, J., "Corn Storage Protein: A Molecular Genetic Model," Division of Energy BioSciences—Summaries of FY 1990 Activities, p. 70, Abstract No. 135 (1990).
Moffat, A. S., "Corn Transformed," *Science*, 249, 630 (Aug. 10, 1990).
Morkawa, et al., "Gene Transfer into Intact Plant Cells by Electroporation Through Cell Walls and Membranes," *Gene*, 41, 121 (1986).
Morocz, S. et al., "An Improved System to Obtain Fertile regenerants via Maize Protoplasts Isolated From a Highly Embryonic Suspension Culture," *Theor. Appl. Genet.*, 80, 721–726 (1990).
Morocz, S., et al., "Two Approaches to Rendering *Zea mays L.* Applicable to Tissue Culture Manipulations," Abstracts, VIIth Int. Cong. on Plant Tissue and Cell Culture, Amsterdam A1–102, Abstract No. 209, p. 190 (1990).
Murakami, T., et al., "The Bialaphos Biosynthetic Genes of *Streptomyces hygroscopicus*: Molecular Cloning and Characterization of the Gene Cluster," *Mol. Gen. Genet.*, 205, 42–50 (1986).
Murashige, T., et al., A Revised Medium for Rapid Growth and Bio Assays with Tobacco Tissue Cultures," *Physiol. Plant.*, 15, 473–497 (1962).
Murphy, H. L., "New Dekalb–Pfizer Seed Chief to Harvest R & D Breakthroughs," *Crain's Business Weekly*, pp. 38–39 (1990).
Murray, E. E., et al., "Codon usage in plant geners," *Nuc. Acids Res.*, 17, 477–498 (1989).
Murry, L. E., et al., "Transgenic Corn Plants Expressing MDMV Strain B Coat Protein are Reistant to Mixed Infections of Maize Dwarf Mosaic Virus and Maize Chlorotic Mottle Virus," *Bio/Technol.*, 11, 1559–1564 (1993).
Nelson, R. S., "Virus Tolerance, Plant Growth, and Field Performance of Transgenic Tomato Plants Expressing Coat Protein from Tobacco Mosaic Virus," et al., *Bio/Technol.*, 6, 403–409 (1988).
Nelson, T., "New Horses for Monocot Gene Jockeys," *The Plant Cell*, 2, 589 (1990).
Neuffer, "Growing Maize for Genetic Purposes," Maize for Biological Research, Plant Mol. Biol. Assoc., (1988).
Odell, J., et al., "Identification of DNA Sequences Required for Activity of the Cauliflower Mosaic Virus 35S Promoter," *Nature*, 313, 810–811 (1985).
Office Action dated May 30, 1989, Goldman et al., USSN 06/880,271, filed Jun. 30, 1986.
Office Action dated Mar. 8, 1990, Goldman, USSN 06/880, 271, filed Jun. 30, 1986.
Ohta, Y., "High—Efficiency Genetic Transformation of Maize by a Mixture of pollen and Exogenous DNA," *Proc. Nat. Acad. Sci. USA*, 83, 715–719 (1986).
Okta, Y., et al., "Gene Manifestation of Exogenuous DNA Applied to Self—Propagating Stigma (Gene Action Revealed in the $M_1$ and $M_2$ Generations from Self–Pollination Applying Exogenous DNA)," *Jap. J. Breed.*, 30 184–185 (1980).
Omirulleh, S., et al., "Activity of a Chimeric Promoter with the Doubled CaMV 35S Enhancer in Protoplast–Derived Cells and Transgenic Plants in Maize," *Plant Mol. Biol.*, 21, 415–428 (1993).
Ozias–Akins, P., et al., "In vitro regeneration and genetic manipulation of grasses," *Physiol. Plant.*, 73, 565–569 (1988).
Ozias–Akins, P., et al., "Progress and Limitations in the Culture of Cereal Protoplasts," *Trends in Biotechnol.* 2, 119–123 (1984).
Park, S. H., et al., "Selection of Maize Transformants from Shoot Apex cultures Cocultivated with Agrobacterium Containing the Bar Gene," *In Vitro Cell. Develop. Biol.*, 29A, p. 85A, Abstract No. P–1102 (1993).
Parker, W. B., et al., "Selection and Characterization of Sethoxydim—Tolerant Maize Tissue Cultures," *Plant Physiol.*, 92, 1220–1225 (1990).
Pederson, K., et al., "Sequence Analysis and Characterization of a Maize Gene Encoding a High–Sulfur Zein Protein of $M_r$ 15,000," *J. Biol. Chem.*, 261, 6279–6284 (1986).
Perl, A., et al., "Bacterial Dihydrodipicolinate Synthase and Desensitized Aspartate Kinase: Two Novel Selectable Markers for Plant Transformation," *Bio/Technol.*, 11, 715–718 (1993).
Perlack, F. J., et al., "Modification of the Coding Sequence Enhances Plant Expression of Insect Control Protein Genes," *Proc. Nat. Acad. Sci. USA*, 88, 3324–3328 (1991).
Phillips, R. L., et al., "Elevated Protein—Bound Methionine in Seeds of a Maize Line Resistant to Lysine Plus Threonine," *Cerial Chem.*, 62, 213–218 (1985).

5,554,798

Page 7

Phillips, R. L., et al., "Cell/Tissue Culture and In Vitro Manipulation," In: Corn and Corn Improvement, 3rd edition, Sprague, G. F., et al., (eds.), Agronomy Soc. Amer., pp. 345–387 (1988).

Pioneer HiBred International, Inc., Application Under 7 CFR 340, Release of Genetically Engineered Corn Plants, Permit No. 92–174–02, NO CBI, p. 8 (Nov. 3, 1992).

Pioneer HiBred International, Inc., Application Under 7 CFR 340, Release of Genetically Engineered Corn Plants, Permit No. 92–330–01, CBI–Deleted, p. 13 (Apr. 13, 1993).

Phillps, R. L., et al., "Elevated Protein—Bound Methionine in Seeds of a Maize Line Resistant to Lysine plus Threonine," Cereal Chem., 62, 213–218 (1985).

Pioneer's Application for Release in the Environment Under 7CFR 340, Corn Plants Genetically Engineered to Express Wheat Germ Agglutinin (WGA) Genes, in Order to Confer Resistance to the European Corn Borer (Ostrinia nubilalis) and Tolerance to Glufosinate Herbicides, 92–022–02, No CBI Copy, p. 11 (May 4, 1992).

Pochlman, J. "Breeding Corn (Maize)," In: Breeding Field Crops, 3rd edition, AVI Publishing Co., Westport CN, pp. 452 (1986).

Poehlman, J. Breeding Corn (Maize), "In: Breeding Field Crops, 3rd edition, AVI Publishing Co., Westport CN, pp. 469–471, 477–481 (1986).

Potrykus. I., et al., "Callus Formation from Cell Culture Protoplast of Corn (Zea mays L.)," Theor. Appl. Genet., 54, 209–214 (1979).

Potrykus, I., "Gene Transfer to Cereals: An Assessment," Bio/Technol., 8, 535–542 (Jun. 1990).

Potrykus. I., "Gene Transfer to Cereals: An Assessment," Trends Biotechnol, 7, 269–273 (Oct. 1989).

Potrykus, I., et al., "Callus formation from stem protoplasts of corn (Zea mays L)" Mol. Gen. Genet., 156, 347–350 (1977).

Potter, et al., "Enhancer—Dependent Expression of Human K Immunoglobulin Genes Introduced into Mouse Pre–B Lymphocytes by Electroporation," Proc. Nat. Acad. Sci. USA, 81, 7161 (1984).

Prioli, L. M., et al., "Plant Regeneraton and Recovery of Fertile Plants from Protoplasts of Maize (Zea mays L.)," Bio/Technol., 7, 589–594 (Jun. 1989).

Puite, K. J., et al., "Electrofusion, a Simple and Reproducible Technique in Somatic Hybridization of Nicotiana plumbaginifolia mutants," Plant Cell Rep., 4, 274–276 (1985).

Rasmussen, J. L., "Biolistic Transformation of Tobacco and Maize Suspension Cells Using Bacterial Cells as Microprojectiles," Plant Cell Rep. 13, 212–217 (1994).

Rhodes, C. A., et al., "Genetically Transformed Maize Plants from Protoplasts," Science, 240, 204–207 (Apr. 8, 1988).

Rhodes, C. A., et al., "Plant Regeneration from Protoplasts Isolated from Embryonic Maize Cell Cultures," Bio/Technol, 6, 56–60 (Jan. 1988).

Rhodes, C. A., "Corn: From Protoplasts to Fertile Plants," Bio/Technol., 7, 548 (Jun. 1989).

Richaud, F., et al., "Chromosomal Location and Nucleotide Sequence of the Escherichia coli dapA Gene," Biol. Abstracts, 82, p. AB–391, Abstract No. 3396 (1986).

Richaud, F., et al., "Chromosomal Location and Nucleotide Sequence of the Escherichia coli dapA Gene," J. Bacteriol, 166, 297–300 (1986).

Robbins–Roth et al., "They Make it Happen in Biotech," Bioworld, pp. 30–36 (Nov./Dec. 1990).

Robertson, D. S., "Loss of Mu Mutator Activity when Active Mu Systems are Transferred to Inbred Lines," Maize Genetics Coop, Newsletter, 60, 10 (1986).

Ross, M. C., et al., "Transient and Stable Transgenic Cells and Calli of Tobacco and Maize Following Microprojectile Bombardment," J. Cell. Biochem., 13D, p. 268, Abstract No. M149 (1989).

Sahi, S. V., et al., "Metabolites in Maize Which Affect Virulence Induction in Agrabacterium tunefaciens," Plant Physiol, Supplement, p. 86, Abstract No. 514, (1989).

Sanford, J. C., "Biolistic Plant Transformation," Physiol. Plant., 79, 206–209 (1990).

Sanford, J. C., "The Biolistic Process," Trends Biotechnol., 6, 299–302 (1988).

Sanford, J. C., et al., "Attempted Pollen—Mediated Plant Transformation Employing Genomic Donor DNA," Theor. Appl. Genet., 69, 571–574 (1985).

Sanford, J. C, et al., "Delivery of Substances into Cells and Tissues Using a Particle Bombardment Process," Particulate Sci. Technol., 5, 27–37 (1987).

Sass, "Morphology: Development of the Caryopsis" In: Corn and Corn Improvement, 2nd edition, Sprague, G. F., (ed.), American Soc. Agronomy, p. 89, 98 (1977).

Schmidt, A., et al., "Media and environmental effects of phenolics production from tobacco cell cultures," chem. Abstracts, 110, p. 514, Abstract No. 230156z (1989).

Shen, W,–H., et al., "Excision of a Transposible Element form a Viral Vector Introduced into Maize Plants by Agrobinfection," The Plant J., 2, 35–42 (1992).

Shen, W.–H., et al., "Amplification and expression of the β–glucuronidase gene in maize plants by vectors based on maize streak virus," The Plant Journal, 5, 227–236 (1994).

Shigekawa, K., et al., "Electroporation of Eukaryotes and Prokaryotes: A General Approach to the Introduction of Macromolecules into Cells," Bio Techniques, 6, 742–751 (1988).

Shillito, R. D., et al., "High Efficiency Direct Gene Transfer to Plants," Bio/Technol., 3, 1099 (1985).

Shillito, R. D., et al., "Regeneration of Fertile Plants From Protoplasts of Elite Inbred Maize," Bio/Technol., 7, 581–587 (Jun. 1989).

Shimamoto, K., et al., "Fertile Transgenic Rice Plants Regenerated from Transformed Protoplasts," Nature, 338, 274–278 (1989).

Shotwell, M. A., et al., "The Biochemistry of Plants—A Comprehensive Treatise," In: The Biochemistry of Plants, vol. 15, Marcus, A., (ed.), Academic Press, Inc., San Diego, pp. 297–345 (1989).

Smith, R., et al., "Shoot apex explant for transformation," Plant Physiol., 86, p. 108, Abstract No. 646 (1988).

Soberon, X., et al., "Construction and Characterization of New Cloning Vehicles, IV, Deletion Derivatives of pBR322 and pBR325," Gene, 9, 287–305 (1980).

Songstad, D. D., et al., "Transient Expression of GUS and Anthocyanin Constructs in Intact Maize Immature Embryos Following Electroporation," Plant Cell Tissue and Organ Culture, 33, 195–201 (1993).

Spencer, T. M., et al., "Fertile Transgenic Maize," Abstracts, 7th Annual Meeting, Mid Atlantic Plant Mol. Biol. Soc. p. 30 (1990).

Spencer et al., "Bialaphos Selection of Stable Transformations from Maize Cell Culture," Theor. Appl. Genet., 79, 625–631 (May 1990).

Spencer, T. M., et al., "Segregation of Transgenes in Maize," Plant Mol. Biol., 18, 201–210 (1992).

**5,554,798**

Page 8

Spencer, T. M., et al., "Selection of Stable Transformants from Maize Suspension Cultures using the Herbicide Bialaphos," Poster presentation, FASEB Plant Gene Expression Conference, Copper Mountain, Colorado (Aug. 8, 1989).

Sprauge et al., "Corn Breeding," In: *Corn and Corn Improvement*, Sprauge, G. F., (ed.), American Society of Agronomy, Inc, Madison, WI, pp. 305, 320–323 (1977).

Steimel, D., "Corn Breeders Stalk Perfect Hybrid," *Rockford Register Star*, (Aug. 6, 1990).

Steimel, D., "New Gun Will Custom–Design Corn: Breeding Technique Expected by End of '90's Will Let Crop Grow Without Pesticides or Much Water," (Apr. 1990).

Sugiyama, M., et al., "Use of the Tyrosinase Gene from Streptomyces to Probe Promoter Sequences for *Escherichia coli*," *Plasmid*, 23, 237–241 (1990).

Suttie, J., et al., "Use of Different Selection Agents to Produce Maize Transformants of an Elite Genotype Using Microprojectile Bombardment," Program and Abstracts, Int. Soc. Plant Mol. Biol., 3rd Int. Cong., Abstract No. 426 (Oct. 6–11, 1991).

Tarczynski, M. C., et al., "Expression of a Bacterial mllD Gene in Transgenic Tobacco Leads to Production and Accumulation of Mannitol," *Proc. Nat. Acad. Sci. USA*, 89, 2600–2604 (1992).

Tarczynski, m. C., et al., "Stress Protection of Transgenic Tobacco by Production of the Osmolyte Mannitol," *Science*, 259, 508–510 (1993).

Thompson, C., et al., "Characterization of the Herbicide–Resistance Gene bar from *Streptomyces hygroscopicus*," *EMBO J.*, 6, 2519–2523 (1987).

Tomes, D. "Status of Corn Transformation," 26th Annual Corn Breeders School, Meeting Proceedings, U. Illinois, pp. 7–8 (Feb. 26–27, 1990).

Tomes, D. T., et al., "Transgenic Tobacco Plants and their Progeny Derived by Microprojectile Bombardment of Tobacco Leaves," *Plant Mol. Biol.*, 14, 261–268 (Feb. 1990).

Twell, D., et al., "Transient Expression of Chimeric Genes Delivered into Pollen by Microprojectile Bombardment," *Plant Physiol.*, 91, 1271–1274 (1989).

Ulian, E., et al., "Transformation of Plants via the Shoot Apex," *In Vitro Cell. Dev. Biol.*, 9, 951–954 (1988).

Usami, S., et al., "Absence in Monocotyledonous Plants of the Diffusible Plant Factors including T–DNA Circularization and vir Gene Expression in Agrobacterium," *Mol. Gen. Genet.*, 209, 221–226 (1987).

Vain, P., et al., "Osmotic Pretreatment Enhances Particle Bombardment–Mediated Transient and Stable Transformation of Maize," *Plant Cell Rep.*, 12, 84–88 (1993).

Vasil, I. K., "Transgenic Cereals Becoming a Reality," *Bio/Technol.*, 8, 797 (Sep. 1990).

Vasil, I. K., et al., "Culture of Protoplasts Isolated from Embryogenic Cell Suspension Cultures of Sugarcane and Maize," *IAPTC Abstracts*, p. 443 (1986).

Vasil, V., et al., "Isolation and Maintenance of Embryogenic Cell Suspension Cultures of Gramineae," In: *Cell Culture and Somatic Cell Genetics of Plants*, vol. I, Academic Press, pp. 152–158 (1984).

Vasil, V., et al., "Plant Regeneration from Friable Embryonic Callus and Cell Suspension Cultures of *Zea mays L.*," *J. Plant Physiol.*, 124, 399–408 (1986).

Walbot, V., et al., "Molecular genetics of corn," In: *Corn and Corn Improvements*, 3rd edition, Sprauge, G. F., et al., (eds.), American Soc. Agronomy, Madison, WI, pp. 389–430 (1988).

Waldron, C., et al., "Resistance to Hygromycin B," *Plant Mol. Biol.*, 5, 103–108 (1985).

Walters, D. A., et al., "Transformation and Inheritance of Hygromycin Phosphotransferase Gene in Maize Plants," *Plant Molecular Biol.*, 18, 189–200 (1992).

Wan, Y., et al., "Generation of Large Numbers of Independently Transformed Fertile Barley Plants," *Plant Physiol.*, 104, 37–48 (1994).

Wan, Y., et al., "Maize Transformation and Regeneration of Transgenic Plants by Microprojectile Bombardment of Type I Callus," Abstracts, 35th Annual Maize Genetics Conference, p. 5 (Mar. 18–21, 1993).

Wang, Y., et al., "Characterization of cis–Acting Elements Regulating Transcription from the Promoter of a Constitutively Active Rice Actin Gene," *Mol. Cell. Biol.*, 12, 3399–3406 (1992).

Wang, Y., et al., "Transient Expression of Foreign Genes in Rice, Wheat and Soybean Cells Following Particle Bombardment," *Plant Mol. Biol.*, 11, 433–439 (1988).

Weising, K., et al., "Foreign Genes in Plants: Transfer, Structure, Expression and Applications," *Ann. Rev. Genet.*, 22, 421–478 (1988).

White, J., et al., "A Cassette Containing the bar Gene of *Streptomyces hygroscopicus*: a Selectable Marker for Plant Transformation," *Nuc. Acid. Res.*, 18, 1062 (1989).

Whiteley, H. R., et al., "The Molecular Biology of Parasporal Crystal Body Formation in *Bacillus thuringiensis*, *Ann. Rev. Microbiol.*, 40, 549–576 (1986).

Wong, E. Y., et al., "*Arabidopsis thaliana* Small Subunit Leader and Transit Peptide Enhance the Expression of *Bacillus thuringiensis* Proteins in Transgenic Plants," *Plant Mol. Biol.*, 20, 81–93 (1992).

Yang, H., et al., "Production of Kanamycin Resistant Rice Tissues Following DNA Uptake into Protoplasts," *Plant Cell Rep.*, 7, 421 (1988).

Yanisch–Perron, C., et al., "Improved M13 Phage Vectors and Host Strains: Nucleotide Sequences of the M13mp18 and puC19 Vectors," *Gene*, 33, 103–119 (1985).

Yugari, Y., et al., "Coordinated End–Product Inhibition in Lysine Synthesis in *Escherichia coli*," *Biochem. Biophys. Acta*, 62, 612–614 (1962).



FIG. 1A

FIG. 1B



# FIG. 3

## PHI CALLUS



# FIG. 4

## PHI $R_o$ PLANTS



## FIG. 5

PHI R₁ GENERATION



## FIG. 6

## PH2 CALLUS





5,554,798

1

## FERTILE GLYPHOSATE-RESISTANT TRANSGENIC CORN PLANTS

### CROSS-REFERENCE TO RELATED APPLICATION

This is a continuation of application Ser. No. 07/508,045, filed Apr. 11, 1990, now U.S. Pat. No. 5,484,956, which is a continuation-in-part of U.S. patent application Ser. No. 07/467,983, filed Jan. 22, 1990, now abandoned.

### FIELD OF THE INVENTION

This invention relates to fertile transgenic plants of the species *Zea mays* (oftentimes referred to herein as maize or corn). The invention further relates to producing transgenic plants via particle bombardment and subsequent selection techniques which have been found to produce fertile transgenic plants.

### BACKGROUND OF THE INVENTION

Genetic engineering of plants, which entails the isolation and manipulation of genetic material (usually in the form of DNA or RNA) and the subsequent introduction of that genetic material into a plant or plant cells, offers considerable promise to modern agriculture and plant breeding. Increased crop food values, higher yields, feed value, reduced production costs, pest resistance, stress tolerance, drought resistance, the production of pharmaceuticals, chemicals and biological molecules as well as other beneficial traits are all potentially achievable through genetic engineering techniques. Once a gene has been identified, cloned, and engineered, it is still necessary to introduce it into a plant of interest in such a manner that the resulting plant is both fertile and capable of passing the gene on to its progeny.

A variety of methods have been developed and are currently available for the transformation of various plants and plant cells with DNA. Generally, these plants have been dicotyledonous, and some success has been reported with certain of the monocotyledonous cereals. However, some species have heretofore proven untransformable by any method. Thus, previous to this discovery, no technology had been developed which would permit the production of stably transformed *Zea mays* plants in which the transforming DNA is heritable thereof. This failure in the art is well documented in the literature and has been discussed in a number of recent reviews (Potrykus, 1989; Weising et al., 1988; Cocking et al., 1987).

European Patent Publications 270,356 (McCabe et al.) and 275,069 (Arntzen et al.) describe the introduction of DNA into maize pollen followed by pollination of maize ears and formation of seeds. The plants germinated from these seeds are alleged to contain the introduced DNA, but there is no suggestion that the introduced DNA was heritable, as has been accomplished in the present invention. Only if the DNA introduced into the corn is heritable can the corn be used in breeding programs as required for successful commercialization of transgenic corn.

Graves et al. (1986) claim Agrobacterium-mediated transformation of *Zea mays* seedlings. The evidence was based upon assays known to be unreliable.

Despite extensive efforts to produce fertile transformed corn plants which transmit the transforming DNA to progeny, there have been no reported successes. Many previous failures have been based upon gene transfer to maize pro-

2

toplasts, oftentimes derived from callus, liquid suspension culture cells, or other maize cells using a variety of transformation techniques. Although several of the techniques have resulted in successful transformation of corn cells, the resulting cells either could not be regenerated into corn plants or the corn plants produced were sterile (Rhodes et al. 1988) or, in some cases, it even turned out that the plants were, in fact, not transformed. Thus, while maize protoplasts and some other cells have previously been transformed, the resulting transformants could not be regenerated into fertile transgenic plants.

On the other hand, it has been known that at least certain corn callus can be regenerated to form mature plants in a rather straightforward fashion and that the resulting plants are often fertile. However, no stable transformation of maize callus was ever achieved, i.e., there were no techniques developed which would permit a successful stable transformation of a regenerable callus. An example of a maize callus transformation technique which has been tried is the use of Agrobacterium-mediated transfer.

The art was thus faced with a dilemma. While it was known that corn protoplast and suspension culture cells could be transformed, no techniques were available which would regenerate the transformed protoplast into a fertile plant. While it was known that corn callus could be regenerated into a fertile plant, there were no techniques known which could transform the callus, particularly while not destroying the ability of the callus both to regenerate and to form fertile plants.

Recently, a new transformation technique has been created based upon the bombardment of intact cells and tissues with DNA-coated microprojectiles. The technique, disclosed in Sanford et al. (1987) as well as in EPO Patent Publication 331,855 of J. C. Sanford et al. based upon U.S. Ser. No. 07/161,807, filed Feb. 29, 1988, has been shown effective at producing transient gene expression in some plant cells and tissues including those from onion, maize (Klein et al. 1988a), tobacco, rice, wheat, and soybean, and stable expression has been obtained in tobacco and soybeans. In fact, stable expression has been obtained by bombardment of suspension cultures of *Zea mays* Black Mexican Sweet (Klein et al. 1989) which cultures are, however, non-regenerable suspension culture cells, not the callus culture cells used in the process of the present invention.

No protocols have been published describing the introduction of DNA by a bombardment technique into cultures of regenerable maize cells of any type. No stable expression of a gene has been reported by means of bombardment of corn callus followed by regeneration of fertile plants and no regenerable fertile corn has resulted from DNA-coated microprojectile bombardment of the suspension cultures. Thus, the art has failed to produce fertile corn transformed corn plants heretofore.

A further stumbling block to the successful production of fertile transgenic maize plants has been in selecting those few transformants in such a manner that neither the regeneration capacity nor the fertility of the regenerated transformant are destroyed. Due to the generally low level of transformants produced by a transformation technique, the need for selection of the transformants is self-evident. However, selection generally entails the use of some toxic agent, e.g., herbicide or antibiotic, which may be detrimental to either the regenerability or the resultant plant fertility.

It is thus an object of the present invention to produce fertile, stably transgenic, *Zea mays* plants and seeds which

5,554,798

3

transmit the introduced gene to progeny. It is a further object to produce such stably transgenic plants and seeds by a particle bombardment and a selection process which results in a high level of viability for at least a few transformed cells. It is a further object to produce fertile stably transgenic plants of other graminaceous cereals besides maize.

## REFERENCES CITED

The references listed below are incorporated by reference herein.

Armstrong, C. L., et al. (1985) Planta 164:207–214
Callis, J., et al. (1987) Genes & Develop 1:1183–1200
Chilton & Barnes (1983) Nuc Acids Res 11:364–385
Chu, C. C., et al. (1975) Sci Sin (Peking) 18:659–668
Cocking, F., et al. (1987) Science 236:1259–1262
DeWet et al. (1985) Proc Natl Sci USA 82:7870–7873
Freeling, J. C., et al. (1976) Maydica XXI:97–112
Graves, A., et al. (1986) Plant Mol Biol 7:43–50
Green, C., et al. (1975) Crop Sci 15:417–421
Green, C., et al. (1982) Maize for Biological Research, Plant Mol Biol Assoc, pp 367–372
Gritz, L., et al. (1983) Gene 25:179–188
Guilley, H., et al. (1982) Cell 30:763–773
Hallauer, A. R., et al. (1988) Corn and Corn Improvement, 3rd ed., Agronomy Society of America, pp 469–564
Jefferson, R., et al. (1987) EMBO J 6:3901–3907
Kamo, K., et al. (1985) Bot Gaz 146:327–334
Klein, T., et al. (1989) Plant Physiol 91:440–444
Klein, T., et al. (1988a) Proc Natl Acad Sci USA 85:4305–9
Klein, T., et al. (1988b) Bio/Technology 6:559–563
Lu, C., et al. (1982) Theor Appl Genet 62:109–112
McCabe, D., et al. (1988) Bio/Technology 6:923–926
Murashige, T., et al. (1962) Physiol Plant 15:473–497
Neuffer, M., (1982) Maize for Biological Research, Plant Mol Biol Assoc, pp 19–30
Phillips, R., et al. (1988) Corn and Corn Improvement, 3rd ed., Agronomy Society of America, pp 345–387
Potrykus, I. (1989) Trends in Biotechnology 7:269–273
Rhodes, C. A., et al. (1988) Science 240:204–7
Sambrook, J., et al. (1989) Molecular Cloning: A Laboratory Manual, 2nd ed., Cold Spring Harbor Laboratory Press
Sanford, J., et al. (1987) J Part Sci & Techn 5:27–37
Weising, K., et al. (1988) Ann Rev of Genetics 22:421–478
Yanisch-Perron, L., et al. (1985) Gene 33:109–119

## SUMMARY OF THE INVENTION

The present invention relates to fertile transgenic Zea mays plants containing heterologous DNA, preferably chromosomally integrated heterologous DNA, which is heritable by progeny thereof.

The invention further relates to all products derived from transgenic Zea mays plants, plant cells, plant parts, and seeds.

The invention further relates to transgenic Zea mays seeds stably containing heterologous DNA and progeny which have inherited the heterologous DNA. The invention further

4

relates to the breeding of transgenic plants and the subsequent incorporation of heterologous DNA into any Zea mays plant or line.

The invention further relates to a process for producing fertile transgenic Zea mays plants containing heterologous DNA. The process is based upon microprojectile bombardment, selection, plant regeneration, and conventional backcrossing techniques.

The invention further relates to a process for producing fertile transformed plants of graminaceous plants other than Zea mays which have not been reliably transformed by traditional methods such as electroporation, Agrobacterium, injection, and previous ballistic techniques.

The invention further relates to regenerated fertile mature maize plants obtained from transformed embryogenic tissue, transgenic seeds produced therefrom, and R1 and subsequent generations.

In preferred embodiments, this invention produces the fertile transgenic plants by means of a DNA-coated microprojectile bombardment of clumps of friable embryogenic callus, followed by a controlled regimen for selection of the transformed callus lines.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1A shows a map of plasmid vector pHYGI1 utilized in Example I. FIG. 1B shows the relevant part of pHYGI1 encompassing the HPT coding sequence and associated regulatory elements. The base pair numbers start from the 5' nucleotide in the recognition sequence for the indicated restriction enzymes, beginning with the EcoRI site at the 5' end of the CaMV 35S promoter.

FIG. 2 shows a map of plasmid vector pBII221 utilized in Example I.

FIG. 3 is a Southern blot of DNA isolated from the PH1 callus line and an untransformed control callus line.

FIG. 4 is a Southern blot of leaf DNA isolated from Ro plants regenerated from PH1 and untransformed callus.

FIG. 5 is a Southern blot of leaf DNA isolated from R1 progeny of PH1 Ro plants and untransformed Ro plants.

FIG. 6 is a Southern blot of DNA isolated from the PH2 callus line and an untransformed control callus line.

## DESCRIPTION OF THE PREFERRED EMBODIMENTS

The present invention is directed to the production of fertile transgenic plants and seeds of the species Zea mays and to the plants, plant tissues, and seeds derived from such transgenic plants, as well as the subsequent progeny and products derived therefrom. The transgenic plants produced herein include all plants of this species, including field corn, popcorn, sweet corn, flint corn and dent corn.

"Transgenic" is used herein to include any cell, cell line, callus, tissue, plant part or plant, the genotype of which has been altered beneficially by the presence of heterologous DNA that was introduced into the genotype by a process of genetic engineering, or which was initially introduced into the genotype of a parent plant by such a process and is subsequently transferred to later generations by sexual or asexual cell crosses or cell divisions. As used herein, "genotype" refers to the sum total of genetic material within a cell, either chromosomally, or extrachromosomally borne. Therefore, the term "transgenic" as used herein does not encompass the alteration of the genotype of Zea mays by conventional plant breeding methods or by naturally occurring

5,554,798

5

events such as random cross-fertilization or spontaneous mutation.

By "heritable" is meant that the DNA is capable of transmission through a complete sexual cycle of a plant, i.e., it is passed from one plant through its gametes to its progeny plants in the same manner as occurs in normal corn.

The transgenic plants of this invention may be produced by (i) establishing a regenerable cell culture, preferably a friable embryogenic callus from the plant to be transformed, (ii) transforming said cell culture by a microprojectile bombardment technique, (iii) controllably identifying or selecting transformed cells, and (iv) regenerating fertile transgenic plants from the transformed cells. Some of the plants of this invention may be produced from the transgenic seed produced from the fertile transgenic plants using conventional crossbreeding techniques to develop transgenic elite lines and varieties, or commercial hybrid seed containing heterologous DNA.

I. Plant Lines and Tissue Cultures

The cells which have been found particularly useful to produce the fertile transgenic maize plants herein are those callus cells which are regenerable, both before and after undergoing a selection regimen as detailed further below. Generally, these cells will be derived from meristematic tissue which contain cells which have not yet terminally differentiated. Such tissue in graminaceous cereals in general and in maize, in particular, comprise tissues found in juvenile leaf basal regions, immature tassels, immature embryos, and coleoptilar nodes. Preferably, immature embryos are used. Methods of preparing and maintaining callus from such tissue and plant types are well known in the art and details on so doing are available in the literature, c.f. Phillips et al. (1988), the disclosure of which is hereby incorporated by reference.

The specific callus used must be able to regenerate into a fertile plant. The specific regeneration capacity of particular callus is important to the success of the bombardment/selection process used herein because during and following selection, regeneration capacity may decrease significantly. It is therefore important to start with cultures that have as high a degree of regeneration capacity as possible. Callus which is more than about 3 months and up to about 36 months of age has been found to have a sufficiently high level of regenerability and thus is preferred. The regenerative capacity of a particular culture may be readily determined by transferring samples thereof to regeneration medium and monitoring the formation of shoots, roots and plantlets. The relative number of plantlets arising per petri dish or per gram fresh weight of tissue may be used as a rough quantitative estimate of regeneration capacity. Generally, a culture which will produce at least one plant per gram of callus tissue is preferred.

While maize callus cultures can be initiated from a number of different plant tissues, the cultures useful herein are preferably derived from immature maize embryos which are removed from the kernels of an ear when the embryos are about 1–3 mm in length. This length generally occurs about 9–14 days after pollination. Under aseptic conditions, the embryos are placed on conventional solid media with the embryo axis down (scutellum up). Callus tissue appears from the scutellum after several days to a few weeks. After the callus has grown sufficiently, the cell proliferations from the scutellum may be evaluated for friable consistency and the presence of well-defined embryos. By "friable consis-

6

tency" it is meant that the tissue is easily dispersed without causing injury to the cells. Tissue with this morphology is then transferred to fresh media and subcultured on a routine basis about every two weeks.

The callus initiation media is solid because callus cannot be readily initiated in liquid medium. In preferred embodiments, the initiation/maintenance media is typically based on the N6 salts of Chu et al. (1975) as described in Armstrong et al. (1985) or the MS salts of Murashige et al. (1962). The basal medium is supplemented with sucrose and 2,4-dichlorophenoxyacetic acid (2,4-D). Supplements such as L-proline and casein hydrolysate have been found to improve the frequency of initiation of callus cultures, morphology, and growth. The cultures are generally maintained in the dark, though low light levels may also be used. The level of synthetic hormone 2,4-D, necessary for maintenance and propagation, should be generally about 0.3 to 3.0 mg/l.

Although successful transformation and regeneration has been accomplished herein with friable embryogenic callus, this is not meant to imply that other transformable regenerable cells, tissue, or organs cannot be employed to produce the fertile transgenic plants of this invention. The only actual requirement for the cells which are transformed is that after transformation they must be capable of regeneration of a plant containing the heterologous DNA following the particular selection or screening procedure actually used.

II. DNA Used for Transformation

As used herein, the term "heterologous DNA" refers to a DNA segment that has been derived or isolated from one genotype, preferably amplified and/or chemically altered, and later introduced into a Zea mays genotype that may be the same Zea mays genotype from which the DNA was first isolated or derived. "Heterologous DNA" also includes completely synthetic DNA, and DNA derived from introduced RNA. Generally, the heterologous DNA is not originally resident in the Zea mays genotype which is the recipient of the DNA, but it is within the scope of the invention to isolate a gene from a given Zea mays genotype, and to subsequently introduce multiple copies of the gene into the same genotype, e.g., to enhance production of an amino acid.

Therefore, "heterologous DNA" is used herein to include synthetic, semi-synthetic, or biologically derived DNA which is introduced into the Zea mays genotype, and retained by the transformed Zea mays genotype. The DNA includes but is not limited to, non-plant genes such as those from bacteria, yeasts, animals or viruses; modified genes, portions of genes, chimeric genes, as well as genes from the same or different Zea mays genotype.

The heterologous DNA used for transformation herein may be circular or linear, double-stranded or single-stranded. Generally, the DNA is in the form of a plasmid and contains coding regions of beneficial heterologous DNA with flanking regulatory sequences which promote the expression of the heterologous DNA present in the resultant corn plant. For example, the heterologous DNA may itself comprise or consist of a promoter that is active in Zea mays, or may utilize a promoter already present in the Zea mays genotype that is the transformation target.

The compositions of and method for constructing heterologous DNA which can transform certain plants is well known to those skilled in the art, and the same compositions and methods of construction may be utilized to produce the heterologous DNA useful herein. The specific composition

5,554,798

**7**

of the DNA is not central to the present invention and the invention is not dependent upon the composition of the specific transforming DNA used. Weising et al. (1988), describes suitable transforming DNA components, which include promoters, polyadenylation sequences, selectable marker genes, reporter genes, enhancers, introns, and the like, as well as provides suitable references for compositions therefrom e.g., on Table 1.

**8**

Suitable heterologous DNA for use herein includes all DNA which provides for, or enhances, a beneficial feature of the resultant transgenic corn plant. The DNA may encode proteins or antisense RNA transcripts in order to promote increased food values, higher yields, pest resistance, disease resistance, and the like. For example, the DNA can encode a bacterial dad A for increased lysine production; *Bacillus thuringiensis* (BT) t-endotoxin or protease inhibitor for insect resistance; bacterial EPSP synthase for resistance to

TABLE 1

| | | | Selectable marker and reporter genes in plant genetic transformation | | |
|---|---|---|---|---|---|
| | | | | Useful as | |
| Gene | Origin | Encoded enzyme | Selectable marker | Scorable reporter | Resistance against |
| Neomycin phosphotransferase gene II (nptII) | Tn5 | neomycin phosphotransferase | ++ | + | neomycin kanamycin G-418[1] |
| Neomycin phosphotransferase gene I (nptI) | Nn601 | neomycin phosphotransferase | + | + | neomycin kanamycin G-418[2] |
| Chloramphenicol acetyltransferase gene (cat) | Tn9 | chloramphenicol acetyltransferase | (+) | ++ | chloramphenicol[3] |
| Bacterial DHFR gene | plasmid R67 | dihydrofolate reductase | + | + | methotrexate[4] |
| Mutated c-DNA of a mouse DHFR gene | mouse | dihydrofolate reductase | ++ | + | methotrexate[5] |
| Octopine synthase gene (ocs) | T-DNA | octopine synthase | + | ++ | toxic opine precursor analogues, i.e. aminoethylcysteine[6] |
| Nopaline synthase gene (nos) | T-DNA | nopaline synthase | − | ++ | —[7] |
| Hygromycin phosphotransferase gene (hpt) | E. coli | hygromycin phosphotransferase | ++ | − | hygromycin B[8] |
| Bleomycin resistance gene | Tn5 | ? | + | − | bleomycin[9] |
| Streptomycin phosphotransferase gene | Tn5 | streptomycin phosphotransferase | (+) | (+) | streptomycin[10] |
| | | | control plants are not killed by streptomycin | | |
| aroA gene | Salmonella typhimurium | EPSP synthase | ++ | − | glyphosate[11] |
| bar gene | Streptomyces hygroscopicus | phosphinothricin acetyltransferase | ++ | − | phosphinothricin, bialophos[12] |
| β-galactosidase gene | E. coli | β-galactosidase | − | + | —[13] |
| Glucuronidase gene (GUS) | E. coli | glucuronidase | − | ++ | —[14] |
| Bacterial luciferase gene | Vibrio harveyi | luciferase | − | ++ | —[15] |
| Firefly luciferase gene | Photonus pyralis | luciferase | − | ++ | —[16] |

Only some representative references were chosen in case of nptII, nos, ocs and cat genes.
Abbreviations
Tn - transposon
DHFR - dihydrofolate reductase
EPSP synthase - 5-enolpyruvylshikimate-3-phosphate synthase
[1]M. Bevin et al., Nature, 304, 185 (1983); M. DeBlock et al., EMBO J., 8, 1681 (1984); I. Herrera-Estrella et al., EMBO J., 2, 987 (1983).
[2]R. T. Fraley et al., PNAS USA, 80, 1803 (1983); H. Fraszak et al., Nucl. Acids Res., 14, 5857 (1986).
[3]M. DeBlock et al., EMBO J., 3, 1681 (1984); I. Herrera-Estrella et al., Nature, 303, 209 (1983).
[4]N. Brisson et al., Nature, 310, 511 (1984); M. DeBlock et al., Ibid., I. Herrera-Estrella et al., EMBO J., 2, 987 (1983)
[5]D. A. Eichholtz et al., Somat. Cell. Mol. Genet., 13, 67 (1987).
[6]G. A. Dahl et al., Theor. Appl. Genet., 66, 233 (1983); M. De Geve et al., Nature. 300, 752 (1982); A. Hockema et al., Plant Mol. Biol., 5, 85 (1985); M. G. Koziel et al., J. Mol. Appl. Genet., 2, 549 (1981).
[7]J. D. G. Jones et al., EMBO J., 4, 2411 (1985); C. H. Shaw et al., Nuc. Acids Res., 14, 6003 (1986); P. Zambryski et al., EMBO J., 2, 2443 (1983).
[8]A. M. Lloyd et al., Science, 234, 464 (1986); P. L M. Van den Hazen et al., Plant MOL. Biol., 5, 299 (1985); C. Waldron et al., Plant Mol. Biol., 5, 103 (1985).
[9]J. Hille et al., Plant Mol. Biol., 7, 171 (1986).
[10]J. D. G. Jones et al., Mol. Gen. Genet., 210, 86 (1987).
[11]L. Comai et al., Nature, 317, 741 (1985); J. J. Inflanti et al., Biotechnology, 5, 726 (1987).
[12]M. DeBlock et al., EMBO J., 6, 2513 (1987); C. I. Thompson et al., EMBO J., 6, 2519 (1987).
[13]G. Helmer et al., Biotechnology, 2, 520 (1984).
[14]D. R. Gallie et al., Nuc. Acids Res., 15, 3693 (1987); R. A. Jefferson et al., EMBO J., 6, 1901 (1987).
[15]C. Koncz et al., Mol. Gen. Genet., 204, 383 (1986).
[16]D. W. Ow et al., Science, 234, 856 (1986); D. W. Ow et al., PNAS USA, 84, 4870 (1987); C. D. Riggs et al., Nucl. Acids Res., 15, 8115 (1987).

Sambrook et al. (1989) provides suitable methods of construction.

Generally, the heterologous DNA will be relatively small, i.e., less than about 30 Kb to minimize any susceptibility to physical, chemical, or enzymatic degradation which is known to increase as the size of the DNA increases.

glyphosate herbicides; and chitinase or glucan endo-1,3-B-glucosidase for fungicidal properties. Aside from DNA sequences that serve as transcription units or portions thereof, useful DNA may be untranscribed, serving a regulatory or a structural function. Also, the DNA may be introduced to act as a genetic tool to generate mutants and/or

5,554,798

9

assist in the identification, genetic tagging, or isolation of segments of corn DNA. Additional examples may be found in Weising, supra.

The heterologous DNA to be introduced into the plant further will generally contain either a selectable marker or a reporter gene or both to facilitate identification and selection of transformed cells. Alternatively, the selectable marker may be carried on a separate piece of DNA and used in a co-transformation procedure. Both selectable markers and reporter genes may be flanked with appropriate regulatory sequences to enable expression in plants. Useful selectable markers are well known in the art and include, for example, antibiotic and herbicide resistance genes. Specific examples of such genes are disclosed in Weising et al., supra. A preferred selectable marker gene is the hygromycin B phosphotransferase (HPT) coding sequence, which may be derived from E. coli and which confers resistance to the antibiotic hygromycin B. Other selectable markers include aminoglycoside phosphotransferase gene of transposon Tn5 (AphII) which encodes resistance to the antibiotics kanamycin, neomycin, and G418, as well as those genes which code for resistance or tolerance to glyphosate, 1,2-dichloropropionic acid methotrexate, imidazolinones, sulfonylureas, bromoxynil, phosphonothricin and the like. Those selectable marker genes which confer herbicide resistance or tolerance are also of commercial utility in the resulting transformed plants.

Reporter genes which encode for easily assayable marker proteins are well known in the art. In general, a reporter gene is a gene which is not present in or expressed by the recipient organism or tissue and which encodes a protein whose expression is manifested by some easily detectable property, e.g., phenotypic change or enzymatic activity. Examples of such genes are provided in Weising et al., supra. Preferred genes include the chloramphenicol acetyl transferase gene from Tn9 of E. coli, the beta-glucuronidase gene of the uidA locus of E. coli, and the luciferase genes from firefly Photinus pyralis.

The regulatory sequences useful herein include any constitutive, inducible, tissue or organ specific, or developmental stage specific promoter which can be expressed in the particular plant cell. Suitable such promoters are disclosed in Weising et al., supra. The following is a partial representative list of promoters suitable for use herein: regulatory sequences from the T-DNA of Agrobacterium tumefaciens, including mannopine synthase, nopaline synthase, and octopine synthase; alcohol dehydrogenase promoter from corn; light inducible promoters such as, ribulose-biphosphate-carboxylase small subunit gene from a variety of species; and the major chlorophyll a/b binding protein gene promoter; 35S and 19S promoters of cauliflower mosaic virus; developmentally regulated promoters such as the waxy, zein, or bronze promoters from maize; as well as synthetic or other natural promoters which are either inducible or constitutive, including those promoters exhibiting organ-specific expression or expression at specific development stage(s) of the plant.

Other elements such as introns, enhancers, polyadenylation sequences and the like, may also be present on the DNA. Such elements may or may not be necessary for the function of the DNA, although they can provide a better expression or functioning of the DNA by affecting transcription, stability of the mRNA, or the like. Such elements may be included in the DNA as desired to obtain the optimal performance of the transforming DNA in the plant. For example, the maize AdhIS first intron may be placed between the promoter and the coding sequence of a particu-

10

lar heterologous DNA. This intron, when included in a DNA construction, is known to generally increase expression of a protein in maize cells. (Callis et al. 1987) However, sufficient expression for a selectable marker to perform satisfactorily can often be obtained without an intron. (Klein et al., 1989) An example of an alternative suitable intron is the shrunken-1 first intron of Zea mays. These other elements must be compatible with the remainder of the DNA constructions.

To determine whether a particular combination of DNA and recipient plant cells are suitable for use herein, the DNA may include a reporter gene. An assay for expression of the reporter gene may then be performed at a suitable time after the DNA has been introduced into the recipient cells. A preferred such assay entails the use of the E. coli beta-glucuronidase (GUS) gene (Jefferson et al. 1987). In the case of the microprojectile bombardment transformation process of the present invention, a suitable time for conducting the assay is about 2–3 days after bombardment. The use of transient assays is particularly important when using DNA components which have not previously been demonstrated or confirmed as compatible with the desired recipient cells.

### III. DNA Delivery Process

The DNA can be introduced into the regenerable maize cell cultures, preferably into callus cultures via a particle bombardment process. A general description of a suitable particle bombardment instrument is provided in Sanford et al. (1987), the disclosure of which is incorporated herein by reference. While protocols for the use of the instrument in the bombardment of maize non-regenerable suspension culture cells are described in Klein et al. (1988a, 1988b, and 1989), no protocols have been published for the bombardment of callus cultures or regenerable maize cells.

In a microprojectile bombardment process, also referred to as a biolistic process, the transport of the DNA into the callus is mediated by very small particles of a biologically inert material. When the inert particles are coated with DNA and accelerated to a suitable velocity, one or more of the particles is able to enter into one or more of the cells where the DNA is released from the particle and expressed within the cell. While some of the cells are fatally damaged by the bombardment process, some of the recipient cells do survive, stably retain the introduced DNA, and express it.

The particles, called microprojectiles, are generally of a high density material such as tungsten or gold. They are coated with the DNA of interest. The microprojectiles are then placed onto the surface of a macroprojectile which serves to transfer the motive force from a suitable energy source to the microprojectiles. After the macroprojectile and the microprojectiles are accelerated to the proper velocity, they contact a blocking device which prevents the macroprojectile from continuing its forward path but allows the DNA-coated microprojectiles to continue on and impact the recipient callus cells. Suitable such instruments may use a variety of motive forces such as gunpowder or shock waves from an electric arc discharge (Swain et al. 1988). An instrument in which gunpowder is the motive force is currently preferred and such is described and further explained in Sanford et al. (1987), the disclosure of which is incorporated herein by reference.

A protocol for the use of the gunpowder instrument is provided in Klein et al. (1988a, b) and involves two major steps. First, tungsten microprojectiles are mixed with the DNA, calcium chloride, and spermidine free base in a

5,554,798

11

specified order in an aqueous solution. The concentrations of the various components may be varied as taught. The preferred procedure entails exactly the procedure of Klein et al. (1988b) except for doubling the stated optimum DNA concentration. Secondly, the DNA-coated microprojectiles, macroprojectiles, and recipient cells are placed in position in the instrument and the motive force is applied to the macroprojectiles. Parts of this step which may be varied include the distance of the recipient cells from the end of the barrel as well as the vacuum in the sample chamber. The recipient tissue is positioned 5 cm below the stopping plate tray.

The callus cultures useful herein for generation of transgenic plants should generally be about midway between transfer periods, and thus, past any "lag" phase that might be associated with a transfer to a new media, but also before reaching any "stationary" phase associated with a long time on the same plate. The specific tissue subjected to the bombardment process is preferably taken about 7–10 days after subculture, though this is not believed critical. The tissue should generally be used in the form of pieces of about 30 to 80, preferably about 40 to 60, mg. The clumps are placed on a petri dish or other surface and arranged in essentially any manner, recognizing that (i) the space in the center of the dish will receive the heaviest concentration of metal-DNA particles and the tissue located there is likely to suffer damage during bombardment, and, (ii) the number of particles reaching a cell will decrease (probably exponentially) with increasing distance of the cell from the center of the blast so that cells far from the center of the dish are not likely to be bombarded and transformed. A mesh screen, preferably of metal, may be laid on the dish to prevent splashing or ejection of the tissue. The tissue may be bombarded one or more times with the DNA-coated metal particles.

IV. Selection Process

Once the calli have been bombarded with the DNA and the DNA has penetrated some of the cells, it is necessary to identify and select those cells which both contain the heterologous DNA and still retain sufficient regenerative capacity. There are two general approaches which have been found useful for accomplishing this. First, the transformed calli or plants regenerated therefrom can be screened for the presence of the heterologous DNA by various standard methods which could include assays for the expression of reporter genes or assessment of phenotypic effects of the heterologous DNA, if any. Alternatively, and preferably, when a selectable marker gene has been transmitted along with or as part of the heterologous DNA, those cells of the callus which have been transformed can be identified by the use of a selective agent to detect expression of the selectable marker gene.

Selection of the putative transformants is a critical part of the successful transformation process since selection conditions must be chosen so as to allow growth and accumulation of the transformed cells while simultaneously inhibiting the growth of the non-transformed cells. The situation is complicated by the fact that the vitality of individual cells in a population is often highly dependent on the vitality of neighboring cells. Also, the selection conditions must not be so severe that the plant regeneration capacity of the callus cells and the fertility of the resulting plant are precluded. Thus, the effects of the selection agent on cell viability and morphology should be evaluated. This may be accomplished by experimentally producing a growth inhibition curve for the given selective agent and tissue being transformed

12

beforehand. This will establish the concentration range which will inhibit growth.

When a selectable marker gene has been used, the callus clumps may be either allowed to recover from the bombardment on non-selective media, or preferably, directly transferred to media containing that agent.

Selection procedures involve exposure to a toxic agent and may employ sequential changes in the concentration of the agent and multiple rounds of selection. The particular concentrations and cycle lengths are likely to need to be varied for each particular agent. A currently preferred selection procedure entails using an initial selection round at a relatively low toxic agent concentration and then later round(s) at higher concentration(s). This allows the selective agent to exert its toxic effect slowly over a longer period of time. Preferably, the concentration of the agent is initially such that about a 5–40% level of growth inhibition will occur, as determined from a growth inhibition curve. The effect may be to allow the transformed cells to preferentially grow and divide while inhibiting untransformed cells, but not to the extent that growth of the transformed cells is prevented. Once the few individual transformed cells have grown sufficiently, the tissue may be shifted to media containing a higher concentration of the toxic agent to kill essentially all untransformed cells. The shift to the higher concentration also reduces the possibility of non-transformed cells habituating to the agent. The higher level is preferably in the range of about 30 to 100% growth inhibition. The length of the first selection cycle may be from about 1 to 4 weeks, preferably about 2 weeks. Later selection cycles may be from about 1 to about 12 weeks, preferably about 2 to about 10 weeks. Putative maize transformants can generally be identified as proliferating sectors of tissue among a background of non-proliferating cells. The tissue may also be cultured on non-selective media at various times during the overall selection procedure.

Once a callus sector is identified as a putative transformant, transformation can be confirmed by phenotypic and/or genotypic analysis. If a selection agent is used, an example of phenotypic analysis is to measure the increase in fresh weight of the putative transformant as compared to a control on various levels of the selective agent. Other analyses that may be employed will depend on the function of the heterologous DNA. For example, if an enzyme or protein is encoded by the DNA, enzymatic or immunological assays specific for the particular enzyme or protein may be used. Other gene products may be assayed by using a suitable bioassay or chemical assay. Other such techniques are well known in the art and are not repeated here. The presence of the gene can also be confirmed by conventional procedures, i.e., Southern blot or polymerase chain reaction (PCR) or the like.

V. Regeneration of Plants and Production of Seed

Cell lines which have been shown to be transformed must then be regenerated into plants and the fertility of the resultant plants determined. Transformed lines which test positive by genotypic and/or phenotypic analysis are then placed on a media which promotes tissue differentiation and plant regeneration. Regeneration may be carried out in accordance with standard procedures well known in the art. The procedures commonly entail reducing the level of auxin which discontinues proliferation of a callus and promotes somatic embryo development or other tissue differentiation. One example of such a regeneration procedure is described

5,554,798

13

in Green et al. (1982). The plants are grown to maturity in a growth room or greenhouse and appropriate sexual crosses and selfs are made as described by Neuffer (1982).

Regeneration, while important to the present invention, may be performed in any conventional manner. If a selectable marker has been transformed into the cells, the selection agent may be incorporated into the regeneration media to further confirm that the regenerated plantlets are transformed. Since regeneration techniques are well known and not critical to the present invention, any technique which accomplishes the regeneration and produces fertile plants may be used.

## VI. Analysis of R1 Progeny

The plants regenerated from the transformed callus are referred to as the R0 generation or R0 plants. The seeds produced by various sexual crosses of the R0 generation plants are referred to as R1 progeny or the R1 generation. When R1 seeds are germinated, the resulting plants are also referred to as the R1 generation.

To confirm the successful transmission and inheritance of the heterologous DNA in the sexual crosses described above, the R1 generation should be analyzed to confirm the presence of the transforming DNA. The analysis may be performed in any of the manners such as were disclosed above for analyzing the bombarded callus for evidence of transformation, taking into account the fact that plants and plant parts are being used in place of the callus.

## VII. Establishment of the Heterologous DNA in Other Maize Varieties

Fertile, transgenic plants may then be used in a conventional maize breeding program in order to incorporate the introduced heterologous DNA into the desired lines or varieties. Conventional breeding programs employ a conversion process (backcrossing). Methods and references for convergent improvement of corn are given by Hallauer et al., (1988) incorporated herein by reference. Briefly, conversion is performed by crossing the initial transgenic fertile plant to normal elite inbred lines. The progeny from this cross will segregate such that some of the plants will carry the heterologous DNA whereas some will not. The plants that do carry the DNA are then crossed again to the normal plant resulting in progeny which segregate once more. This backcrossing process is repeated until the original normal parent has been converted to a line containing the heterologous DNA and also possessing all other important attributes originally found in the parent. Generally, this will require about 6–8 generations. A separate backcrossing program will be generally used for every elite line that is to be converted to a genetically engineered elite line.

Generally, the commercial value of the transformed corn produced herein will be greatest if the heterologous DNA can be incorporated into many different hybrid combinations. A farmer typically grows several varieties of hybrids based on differences in maturity, standability, and other agronomic traits. Also, the farmer must select a hybrid based upon his physical location since hybrids adapted to one part of the corn belt are generally not adapted to another part because of differences in such traits as maturity, disease, and insect resistance. As such, it is necessary to incorporate the heterologous DNA into a large number of parental lines so that many hybrid combinations can be produced containing the desirable heterologous DNA.

14

Corn breeding and the techniques and skills required to transfer genes from one line or variety to another are well known to those skilled in the art. Thus, introducing heterologous DNA into other lines or varieties can be readily accomplished by these breeding procedures whether or not they generate the appropriate calli.

## VIII. Uses of Transgenic Plants

The transgenic plants produced herein are expected to be useful for a variety of commercial and research purposes. Transgenic plants can be created for use in traditional agriculture to possess traits beneficial to the grower (e.g., agronomic traits such as pest resistance or increased yield), beneficial to the consumer of the grain harvested from the plant (e.g., improved nutritive content in human food or animal feed), or beneficial to the food processor (e.g., improved processing traits). In such uses, the plants are generally grown for the use of their grain in human or animal foods. However, other parts of the plants, including stalks, husks, vegetative parts, and the like, may also have utility, including use as part of animal silage or for ornamental purposes (e.g., Indian corn). Often, chemical constituents (e.g., oils or starches) of corn and other crops are extracted for foods or industrial use and transgenic plants may be created which have enhanced or modified levels of such components. The plants may also be used for seed production for a variety of purposes.

Transgenic plants may also find use in the commercial manufacture of proteins or other molecules encoded by the heterologous DNA contained therein, where the molecule of interest is extracted or purified from plant parts, seeds, and the like. Cells or tissue from the plants may also be cultured, grown in vitro, or fermented to manufacture such molecules, or for other purposes (e.g., for research).

The transgenic plants may also be used in commercial breeding programs, or may be crossed or bred to plants of related crop species. Improvements encoded by the heterologous DNA may be transferred, e.g., from corn cells to cell of other species, e.g., by protoplast fusion.

The transgenic plants may have many uses in research or breeding, including creation of new mutant plants through insertional mutagenesis, in order to identify beneficial mutants that might later be created by traditional mutation and selection. The methods of the invention may also be used to create plants having unique "signature sequences" or other marker sequences which can be used to identify proprietary lines or varieties.

The following non-limiting examples are illustrative of the present invention. They are presented to better explain the general procedures which were used to prepare the fertile Zea mays plants of this invention which stably express the heterologous DNA and which transmit that DNA to progeny. All parts and percents are by weight unless otherwise specified. It must be recognized that a specific transformation event is a function of the amount of material subjected to the transformation procedure. Thus, when individual situations arise in which the procedures described herein do not produce a transformed product, repetition of the procedures will be required.

## EXAMPLE I.

Fertile transgenic Zea mays plants which contain heterologous DNA which is heritable were prepared as follows:

5,554,798

## 15

### I. Initiation and maintenance of maize cell cultures which retain plant regeneration capacity

Friable, embryogenic maize callus cultures were initiated from hybrid immature embryos produced by pollination of inbred line A188 plants (University of Minnesota, Crop Improvement Association) with pollen of inbred line B73 plants (Iowa State University). Ears were harvested when the embryos had reached a length of 1.5 to 2.0 mm. The whole ear was surface sterilized in 50% w/v commercial bleach (2.63% w/v sodium hypochlorite) for 20 min. at room temperature. The ears were then washed with sterile, distilled, deionized water. Immature embryos were aseptically isolated and placed on nutrient medium initiation/maintenance media with the root/shoot axis exposed to the medium. Initiation/maintenance media (hereinafter referred to as "F medium") consisted of N6 basal media (Chu 1975) with 2% (w/v) sucrose, 1.5 mg per liter 2,4-dichlorophenoxyacetic acid (2,4-D), 6 mM proline, and 0.25% Gelrite (Kelco, Inc., San Diego). The pH was adjusted to 5.8 prior to autoclaving. Unless otherwise stated, all tissue culture manipulations were carried out under sterile conditions.

The immature embryos were incubated at 26° C. in the dark. Cell proliferations from the scutellum of the immature embryos were evaluated for friable consistency and the presence of well-defined somatic embryos. Tissue with this morphology was transferred to fresh media 10 to 14 days after the initial plating of the immature embryos. The tissue was then subcultured on a routine basis every 14 to 21 days. Sixty to eighty milligram quantities of tissue were removed from pieces of tissue that had reached a size of approximately one gram and transferred to fresh media. Subculturing always involved careful visual monitoring to be sure that only tissue of the correct morphology was maintained. The presence of somatic embryos ensured that the cultures would give rise to plants under the proper conditions. The cell culture named AB12 used in this example was such a culture and had been initiated about 1 year before bombardment.

### II. Plasmids—pCHN1-1, pHYGI1, pBII221, and pLUC-1

The plasmids pCHN1-1, pHYGI1 and pLUC-1 were constructed in the vector pBS+ (Stratagene, Inc., San Diego, Calif.), a 3.2 Kb circular plasmid, using standard recombinant DNA techniques. pCHN1-1 contains the hygromycin B phosphotransferase (HPT) coding sequence from *E. coli* (Gritz et al. 1983) flanked at the 3' end by the nopaline synthase (nos) polyadenylation sequence of *Agrobacterium tumefaciens* (Chilton and Barnes 1983). Expression is driven by the cauliflower mosaic virus (CaMV) 35S promoter (Guilley et al. 1982), located upstream from the hygromycin coding sequence. The plasmid pHYGI1 was constructed by inserting the 553 bp Bcl-BamHI fragment containing the maize AdhI5 first intron (Callis et al. 1987) between the CaMV 35S promoter and the hygromycin coding sequence of pCHN1-1. A map of pHYGI1 is provided as FIG. 1. A sample of pHYGI1 was deposited at the American Type Culture Collection, Rockville, Md., U.S.A., on Mar. 16, 1990, under the provisions of the Budapest Treaty, and assigned accession number 40774.

pBII221 contains the *E. coli* B-glucuronidase coding sequence flanked at the 5' end by the CaMV 35S promoter and at the 3' end by the nos polyadenylation sequence. The plasmid was constructed by inserting the maize AdhI5 first intron between the 35S promoter and the coding sequence of pBII221 (Jefferson et al. 1987). A map of pBII221 is provided as FIG. 2.

pLUC-1 contains the firefly luciferase coding sequence (DeWet et al. 1987) flanked at the 5' end by the CaMV 35S

## 16

promoter and at the 3' by the nos polyadenylation sequence. This plasmid was used solely as negative control DNA.

Plasmids were introduced into the embryogenic callus culture AB12 by microprojectile bombardment.

### III. DNA delivery process

The embryogenic maize callus line AB12 was subcultured 7 to 12 days prior to microprojectile bombardment. AB12 was prepared for bombardment as follows. Five clumps of callus, each approximately 50 mg in wet weight were arranged in a cross pattern in the center of a sterile 60x15 mm petri plate (Falcon 1007). Plates were stored in a closed container with moist paper towels, throughout the bombardment process. Twenty-six plates were prepared.

Plasmids were coated onto M-10 tungsten particles (Biolistics) exactly as described by Klein et al. (1988b) except that, (i) twice the recommended quantity of DNA was used, (ii) the DNA precipitation onto the particles was performed at 0° C., and (iii) the tubes containing the DNA-coated tungsten particles were stored on ice throughout the bombardment process.

All of the tubes contained 25 μl 50 mg/ml M-10 tungsten in water, 25 μl 2.5M CaCl₂, and 10 μl 100 mM spermidine free base along with a total of 5 μl 1 mg/ml total plasmid content. When two plasmids were used simultaneously, each was present in an amount of 2.5 μl. One tube contained only plasmid pBII221; two tubes contained both plasmids pHYGI1 and pBII221; two tubes contained both plasmids pCHN1-1 and pBII221; and one tube contained only plasmid pLUC-1.

All tubes were incubated on ice for 10 min., pelletized by centrifugation in an Eppendorf centrifuge at room temperature for 5 seconds, and 25 μl of the supernatant was discarded. The tubes were stored on ice throughout the bombardment process. Each preparation was used for no more than 5 bombardments.

Macroprojectiles and stopping plates were obtained from Biolistics, Inc. (Ithaca, N.Y.). They were sterilized as described by the supplier. The microprojectile bombardment instrument was obtained from Biolistics, Inc.

The sample plate tray was positioned at the position 5 cm below the bottom of the stopping plate tray of the microprojectile instrument, with the stopping plate in the slot nearest to the barrel. Plates of callus tissue prepared as described above were centered on the sample plate tray and the petri dish lid removed. A 7×7 cm square rigid wire mesh with 3×3 mm mesh and made of galvanized steel was placed over the open dish in order to retain the tissue during the bombardment. Tungsten/DNA preparation was sonicated as described by Biolistics, Inc. and 2.5 μl was pipetted onto the top of the macroprojectiles. The instrument was operated as described by the manufacturer. The bombardments which were performed are summarized on Table 2.

#### TABLE 2

| | |
|---|---|
| 2 × pBII221 prep | To determine transient expression frequency |
| 10 × pHYGI1/pBII221 | As a potential positive treatment for transformation |
| 10 × pCHN1-1/pBII221 | As a potential positive treatment for transformation |
| 4 × pLUC-1 | Negative control treatment |

The two plates of callus bombarded with pBII221 were transferred plate to F medium (with no hygromycin) and the callus cultured at 26° C. in the dark. After 2 days, this callus was then transferred plate for plate into

5,554,798

**17**

35x10 mm petri plates (Falcon 1008) containing 2 ml of GUS assay buffer which consists of 1 mg/ml 5-bromo-4-chloro-3-indolyl-beta-D-glucuronide (Research Organics), 100 mM sodium phosphate pH 7.0, 5 mM each of potassium ferricyanide and potassium ferrocyanide, 10 mM EDTA, and 0.06% Triton X-100. These were incubated at 37° C. for 3 days later which the number of blue cells was counted giving 291 and 477 transient GUS expressing cells in the two plates, suggesting that the DNA delivery process had also occurred with the other bombarded plates. These plates were discarded after counting since the GUS assay is destructive.

### IV. Selection process

Hygromycin a (Calbiochem) was incorporated into the medium by addition of the appropriate volume of filter sterilized 100 mg/ml hygromycin B in water when the media had cooled to 45° C. prior to pouring plates.

Immediately after all samples had been bombarded, callus from all of the plates treated with pHYGl1/pBII221, pCHN1-1/pBII221 and three of the plates treated with pLUC-1 were transferred plate for plate onto F medium containing 15 mg/l hygromycin B, (five pieces of callus per plate). These are referred no as round 1 selection plates. Callus from the fourth plate treated with pLUC-1 was transferred to F medium without hygromycin. This tissue was subcultured every 2–3 weeks onto nonselective medium and is referred to as unselected control callus.

After two weeks of selection, tissue appeared essentially identical on both selective and nonselective media. All callus from eight plates from each of the pHYGl1/pBII221 and pCHN1-1/pBII221 treatments and two plates of the control callus on selective media were transferred from round 1 selection plates to round 2 selection plates that contained 60 mg/l hygromycin. The round 2 selection plates each contained ten 30 mg pieces of callus per plate, resulting in an expansion of the total number of plates.

The remaining tissue on selective media, two plates each of pHYGl1/pBII221 and pCHN1-1/pBII221 treated tissue and one of control callus, were placed in GUS assay buffer at 37° C. to determine whether blue clusters of cells were observable at two weeks post-bombardment. After 6 days in assay buffer, this tissue was scored for GUS expression. The results are summarized in Table 3.

**TABLE 3**

| Treatment | Replicate | Observations |
|---|---|---|
| pLUC-1 pHYGl1/pBII221 | Plate 1 | No blue cells 1) single cells 1 four-cell cluster |
| | Plate 2 | 5 single cells |
| pCHN1-1/pBII221 | Plate 1 | 1 single cell 1 two-cell clusters |
| | Plate 2 | 5 single cells 1 two-cell cluster 2 clusters of 6–10 cells |

After 21 days on the round 2 selection plates, all viable portions of the material were transferred to round 3 selection plates containing 60 mg/l hygromycin. The round 2 selection plates, containing only tissue that was apparently dead, were reserved. Both round 2 and 3 selection plates were observed periodically for viable proliferating sectors.

After 35 days on round 3 selection plates, both the round 2 and round 3 sets of selection plates were checked for

**18**

visible sectors of callus. Two such sectors were observed proliferating from a background of dead tissue on plates treated with pHYGl1/pBII221. The first sector named 3AA was from the round 3 group of plates and the second sector named 6L was from the round 2 group of plates. Both lines were then transferred to F medium without hygromycin.

After 19 days on F medium without hygromycin, the line 3AA grew very little whereas the line 6L grew rapidly. Both were transferred again to F medium for 9 days. The lines 3AA and 6L were then transferred to F medium containing 15 mg/l hygromycin for 14 days. At this point, line 3AA was observed to be of very poor quality and slow growing. The line 6L, however, grew rapidly on F medium with 15 mg/l hygromycin; the line was then subcultured to F medium without hygromycin.

After 10 days on F medium, an inhibition study of the line 6L was initiated. Callus of 6L was transferred onto F medium containing 1, 10, 30, 100, and 250 mg/l hygromycin B. Five plates of callus were prepared for each concentration and each plate contained ten approximately 50 mg pieces of callus. One plate of unselected control tissue was prepared for each concentration of hygromycin.

It was found that the line 6L was capable of sustained growth over 9 subcultures on 0, 10, 30, 100, and 250 mg/l hygromycin. The name of the line 6L was changed at this time from 6L to PH1 (Positive Hygromycin transformant 1).

Additional sectors were recovered at various time points from the round 2 and 3 selection plates. None of these were able to grow in the presence of hygromycin for multiple rounds, i.e., two or three subcultures.

### V. Confirmation of transformed callus

To show that the PH1 callus had acquired the hygromycin resistance gene, a Southern blot of PH1 callus was prepared as follows: DNA was isolated from PH1 and unselected control calli by freezing 2 g of callus in liquid nitrogen and grinding it to a fine powder which was transferred to a 30 ml Oak Ridge tube containing 6 ml extraction buffer (7M urea, 250 mM NaCl, 50 mM Tris-HCl pH 8.0, 20 mM EDTA pH 8.0, 1% sarcosine). To this was added 7 ml of phenol:chloroform 1:1, the tubes shaken and incubated at 37° C. 15 min. Samples were centrifuged at 8K for 10 min. at 4° C. The supernatant was pipetted through miracloth (Calbiochem 475855) into a disposable 15 ml tube (American Scientific Products, C3920-15A) containing 1 ml 4.4M ammonium acetate, pH 5.2. Isopropanol, 6 ml was added, the tubes shaken, and the samples incubated at −20° C. for 15 min. The DNA was pelleted in a Beckman TJ-6 centrifuge at the maximum speed for 5 min. at 4° C. The supernatant was discarded and the pellet was dissolved in 500 μl TE-10 (10 mM Tris-HCl pH 8.0, 10 mM EDTA pH 8.0) 15 min. at room temperature. The samples were transferred to a 1.5 ml Eppendorf tube and 100 μl 4.4M ammonium acetate, pH 5.2 and 700 μl isopropanol were added. This was incubated at −20° C. for 15 min. and the DNA pelleted 5 min. in an Eppendorf microcentrifuge (12,000 rpm). The pellet was washed with 70% ethanol, dried, and resuspended in TE-1 (10 mM Tris-HCl pH 8.0, 1 mM EDTA).

The isolated DNA (10 μg) was digested with BamHI (NEB) and electrophoresed in a 0.8% w/v agarose gel at 15 V for 16 hrs in TAE buffer (40 mM Tris-acetate, 1 mM EDTA). The DNA within the gel was then depurinated by soaking the gel twice in 0.25 HCl for 15 min., denatured and cleaved by soaking the gel twice in 0.5M NaOH/1.0M NaCl 15 min., and neutralized by soaking the gel twice in 0.5M

5,554,798

19

Tris pH 7.4/3 M NaCl 30 min. DNA was then blotted onto a Nytran membrane (Shleicher & Shuell) by capillary transfer overnight in 6× SSC (20× SSC, 3M NaCl, 0.3M sodium citrate pH 7.0). The membrane was baked at 80° C. for 2 hrs under vacuum. Prehybridization treatment of the membrane was done in 6× SSC, 10× Denhardt's solution, 1% SDS, 50 µg/ml denatured salmon sperm DNA using 0.25 ml prehybridization solution per cm² of membrane. Prehybridization was carried out at 42° C. overnight.

A ³²P labelled probe was prepared by random primer labelling with an Oligo Labelling Kit (Pharmacia) as per the supplier's instructions with ³²P-dCTP (ICN Radiochemicals). The template DNA used was the 1055 bp BamHI fragment of pHYGI1, which is the HPT coding sequence. The fragment was gel purified and cut again with PstI (NEB) before labelling.

The hybridization was performed in 50% formamide, 6× SSC, 1% SDS, 50 µ/ml denatured salmon sperm DNA (Sigma), 0.05% sodium pyrophosphate and all of the isopropanol precipitated heat denatured probe (10⁷ CPM/50 ng template). The hybridization was carried out at 42° C. overnight.

The membrane was washed twice in 50 ml 6× SSC, 0.1% SDS 5 min. at room temperature with shaking, then twice in 500 ml 6× SSC, 0.1% SDS 15 min at room temperature, then twice in 500 ml 1× SSC, 1% SDS 30 min at 42° C., and finally in 500 ml 0.1× SSC, 1% SDS 60 min. at 65° C. Membranes were exposed to Kodak X-OMAT AR film in an X-OMATIC cassette with intensifying screens. As shown in FIG. 3, a band was observed for PHI callus at the expected position of 1.05 Kb, indicating that the HPT coding sequence was present. No band was observed for control callus.

To demonstrate that the hygromycin gene is incorporated into high molecular weight DNA, DNA isolated from PHI callus and control callus was treated with (i) no restriction enzyme, (ii) BamHI, as described previously, or (iii) PstI, which cuts the plasmid pHYGI1 only once within the HPT coding sequence. Samples were blotted and probed with the HPT coding sequence as described previously.

Undigested PHI DNA only showed hybridization to the probe at the position of uncut DNA, demonstrating that the hygromycin gene is incorporated into high molecular weight DNA. The expected 1.05 Kb band for PHI DNA digested with BamHi was observed, as had been shown previously. For PHI DNA digested with PstI, a 5.9 Kb band would be expected if the hygromycin gene was present on an intact pHYGI1 plasmid. Two or more bands of variable size (size dependent on the position flanking PstI sites within the host DNA would be expected if the gene was incorporated into high molecular weight DNA. Three bands were observed with approximate molecular sizes of 12, 5.1, and 4.9 Kb. This result demonstrates incorporation of the hygromycin gene into high molecular weight DNA. The intensity of the 4.9 Kb band is approximately twice as great as the other two bands, suggesting either partial digestion or possibly a tandem repeat of the HPT gene. No hybridization was observed for DNA from control callus in any of the above treatments.

These results prove that the HPT coding sequence is not present in PHI callus as intact pHYGI1 or as a small non-chromosomal plasmid. They are consistent with incorporation of the hygromycin gene into high molecular weight DNA.

VI. Plant regeneration and production of seed

PHI callus was transferred directly from all of the concentrations of hygromycin used in the inhibition study to

20

RM5 medium which consists of MS basal salts (Murashige et al, 1962) supplemented with thiamine.HCl 0.5 mg/l, 2,4-D 0.75 mg/l sucrose 50 g/l, asparagine 150 mg/l, and Gelrite 2.5 g/l (Kelco Inc., San Diego).

After 14 days on RM5 medium, the majority of PHI and negative control callus was transferred to R5 medium which is the same as RM5 medium, except that 2,4-D omitted. These were cultured in the dark for 7 days at 26° C. and transferred to a light regime of 14 hrs light and 10 hrs dark for 14 days at 26° C. At this point, plantlets that had formed were transferred to one quart canning jars (Ball) containing 100 ml of R5 medium. Plants were transferred from jars to vermiculite for 7 or 8 days before transplanting them into soil and growing them to maturity. A total of 65 plants were produced from PHI and a total of 30 plants were produced from control callus.

To demonstrate that the introduced DNA had been retained in the Ro tissue, a Southern blot was performed as previously described on BamHI digested leaf DNA from three randomly chosen Ro plants of PHI. As shown in FIG. 4, a 1.05 Kb band was observed with all three plants indicating that the HPT coding sequence was present. No band was observed for DNA from a control plant.

Controlled pollinations of mature PHI plants were conducted by standard techniques with inbred Zea mays lines A188, B73, and Oh43. Seed was harvested 45 days postpollination and allowed to dry further 1-2 weeks. Seed set varied from 0 to 40 seeds per ear when PHI was the female parent and 0 to 32 seeds per ear when PHI was the male parent.

VII. Analysis of the R1 progeny

The presence of the hygromycin resistance trait was evaluated by a root elongation bioassay, an etiolated leaf bioassay, and by Southern blotting. Two ears each from regenerated PHI and control plants were selected for analysis. The pollen donor was inbred line A188 for all ears.

A. Root elongation bioassay

Seed was sterilized in a 1:1 dilution of commercial bleach in water plus alconox 0.1% for 20 min in 125 ml Erlenmyer flasks and rinsed 3 times in sterile water and imbibed overnight in sterile water containing 50 mg/ml captan by shaking at 150 rpm.

After imbibition, the solution was decanted from the flasks and the seed transferred to flow boxes (Flow Laboratories) containing 3 sheets of H₂O saturated germination paper. A fourth sheet of water saturated germination paper was placed on top of the seed. Seed was allowed to germinate 4 days.

After the seed had germinated, approximately 1 cm of the primary root tip was excised from each seedling and plated on MS salts, 20 g/l sucrose, 50 mg/l hygromycin, 0.25% Gelrite, and incubated in the dark at 26° C. for 4 days.

Roots were evaluated for the presence or absence of abundant root hairs and root branches. Roots were classified as transgenic (hygromycin resistant) if they had root hairs and root branches, and untransformed (hygromycin sensitive) if they had limited numbers of branches. The results are shown in Table 3, hereinbelow.

B. Etiolated leaf bioassay

After the root tips were excised as described above, the seedlings of one PHI ear and one control ear were transferred to moist vermiculite and grown in the dark for 5 days.

5,554,798

21

At this point, 1 mm sections were cut from the tip of the coleoptile, surface sterilized 10 seconds, and plated on MS basal salts, 20 g/l sucrose, 2.5 g/l Gelrite with either 0 (control) or 100 mg/l hygromycin and incubated in the dark at 26° C. for 18 hrs. Each plate contained duplicate sections of each shoot. They were then incubated in a light regimen of 14 hrs light 10 hrs dark at 26° C. for 48 hrs, and rated on a scale of from 0 to 6 (all brown) for the percent of green color in the leaf tissue. Shoots were classified as untransformed (hygromycin sensitive) if they had a rating of zero and classified as transformed (hygromycin resistant) if they had a rating of 3 or greater. The results are shown in Table 1, hereinbelow.

### C. Southern blots

Seedlings from the bioassays were transplanted to soil and were grown to sexual maturity. DNA was isolated from 0.8 g of leaf tissue about 3 weeks after transplanting to soil and probed with the HPT coding sequence as described previously. Plants with a 1.05 Kb band present in the Southern blot were classified as transgenic. As shown in FIG. 5, two out of seven progeny of PH1 plant 3 were transgenic as were three out of eight progeny of PH1 plant 10. The blot results correlated precisely with data from the bioassay, confirming that the heterologous DNA was transmitted through one complete sexual life cycle. All data are summarized in Table 4.

22

All of the tubes contained 25 μl 50 mg/ml M-10 tungsten in water, 25 μl 2.5M CaCl₂, and 10 μl 100 mM spermidine free base along with a total of 5 μl 1 mg/ml total plasmid content. One tube contained only plasmid pBII221; two tubes contained only plasmid pHYGI1; and one tube contained no plasmid but 5 μl TE-1 (10 mM Tris-HCl pH 8.0, 1 mM EDTA pH 8.0).

The following bombardments were done: 2xpBII221 prep (for transient expression); 7xpHYGI1 prep (potential positive treatment); and 3xTE prep (negative control treatment).

After all the bombardments were performed, the callus from the pBII221 treatment was transferred four plate to F medium as five 50 mg pieces. After 2 days, the callus was placed into GUS assay buffer as per Example I. Numbers of transiently expressing cells were counted and found to be 686 and 845 GUS positive cells, suggesting that the particle delivery process had occurred in the other bombarded plates.

### IV. Selection of Transformed Callus

After bombardment, the callus from the pHYGI1 treatments was placed onto round 1 selection plates, F medium containing 15 mg/l hygromycin, as ten 25 mg pieces per plate (different from Example I). The same was done for two of the plates bombarded with the TE preparation (selected control callus). One plate of callus bombarded with the TE preparation was placed onto F medium with no hygromycin;

### TABLE 4

| | ANALYSIS OF PH1 R1 PLANTS | | | | | | |
|---|---|---|---|---|---|---|---|
| PH1 PLANT | ROOT ASSAY | LEAF ASSAY | BLOT | CONT PLANT | ROOT ASSAY | LEAF ASSAY | BLOT |
| 3.1 | + | ND | + | 4.1 | — | ND | ND |
| 3.2 | — | ND | — | 4.2 | — | ND | ND |
| 3.3 | — | ND | — | 4.3 | — | ND | ND |
| 3.4 | — | ND | — | 4.4 | — | ND | ND |
| 3.5 | — | ND | + | 4.5 | — | ND | ND |
| 3.6 | + | ND | + | 4.6 | — | ND | ND |
| 3.7 | — | ND | — | 4.7 | — | ND | ND |
| | | | | 2.1 | — | ND | — |
| 10.1 | + | + | + | 1.1 | — | — | — |
| 10.2 | + | + | + | 1.2 | — | — | ND |
| 10.3 | — | — | ND | 1.3 | — | — | ND |
| 10.4 | — | — | — | 1.4 | — | — | ND |
| 10.5 | — | — | — | 1.5 | — | — | ND |
| 10.6 | — | — | — | 1.6 | — | — | ND |
| 10.7 | — | — | — | 1.7 | — | — | ND |
| 10.8 | ND | + | + | 1.8 | — | — | ND |

Key: + transgenic; — = nontransgenic; ND = not done

### EXAMPLE II

The procedure of Example I was repeated with minor modifications.

#### I. Plant Lines and Tissue Cultures

The embryogenic maize callus line, AB12, was used as in Example I. The line had been initiated about 18 months before the actual bombardment occurred.

#### II. Plasmids

The plasmids pBII221 and pHYGI1 described in Example I were used.

#### III. DNA Delivery Process

Callus was bombarded exactly as in Example I except that the DNA used in the tungsten/DNA preparations differed.

this callus was maintained throughout the ongoing experiment as a source of control tissue (unselected control callus).

After 13 days, the callus on round 1 selection plates was indistinguishable from unselected control callus. All of the callus was transferred from round 1 selection plates to round 2 selection plates containing 60 mg/l hygromycin. An approximate five-fold expansion of the numbers of plates occurred.

The callus on round 2 selection plates had increased substantially in weight after 23 days, but at this time appeared close to dead. All of the callus was transferred from round 2 selection plates to round 3 selection plates containing 60 mg/l hygromycin. This transfer of all material from round 2 to round 3 selection differs from Example I in which only viable sectors were transferred and the round 2 plates reserved.

5,554,798

| 23 | 24 |

At 58 days post-bombardment, three live sectors were observed proliferating from the surrounding dead tissue. All three lines were from pHYGI1 treatments and were designated 24C, 56A, and 55A.

After 15 days on maintenance medium, growth of the lines was observed. The line 24C grew well whereas lines 55A and 56A grew more slowly. All three lines were transferred to F medium containing 60 mg/l hygromycin. Unselected control callus from maintenance medium was plated to F medium having 60 mg/l hygromycin.

After 19 days on 60 mg/l hygromycin, the growth of line 24C appeared to be entirely uninhibited, with the control showing approximately 80% of the weight gain of 24C. The line 56A was completely dead, and the line 55A was very close to dead. The lines 24C and 55A were transferred again to F 60 mg/l hygromycin as was the control tissue.

After 23 days on 60 mg/l hygromycin, the line 24C again appeared entirely uninhibited. The line 55A was completely dead, as was the negative control callus on its second exposure to F medium having 60 mg/l hygromycin.

At 88 days post-bombardment, a sector was observed proliferating among the surrounding dead tissue on the round 3 selection plates. The callus was from a plate bombarded with pHYGI1 and was designated 13E. The callus was transferred to F medium and cultured for 19 days. Portions of the callus were then transferred to (i) F medium containing 15 mg/l hygromycin, and (ii) F medium containing 60 mg/l hygromycin. Control callus was plated on F media with 15 mg/l hygromycin. After 14 days of culture, the callus line 13E appeared uninhibited on both levels of hygromycin. The control callus appeared to have about 80% of the weight gain of 13E. The callus lines were transferred to fresh media at the same respective levels of hygromycin.

### V. Confirmation of Transformed Callus

A Southern blot was prepared from BamHI-digested DNA from the line 24C. As shown in FIG. 6, a band was observed for the line 24C at the expected size of 1.05 Kb showing that the line 24C contained the HPT coding sequence. No band was observed for DNA from control tissue. The name of the callus line 24C was changed to PH2.

To demonstrate that the hygromycin gene is incorporated into high molecular weight DNA, DNA isolated from PH2 callus and control callus was treated with (i) no restriction enzyme, (ii) BamHI, as described previously, or, (iii) PstI, which cuts the plasmid pHYGI1 only once within the HPT coding sequence. Samples were blotted and probed with the HPT coding sequence as described previously.

Undigested PH2 DNA only showed hybridization to the probe at the position of uncut DNA, demonstrating that the hygromycin gene is incorporated into high molecular weight DNA. The expected 1.05 Kb band for PH2 DNA digested with BamHI was observed, as had been shown previously. For PH2 DNA digested with PstI, a 5.9 Kb band would be expected if the hygromycin gene were present on an intact pHYGI1 plasmid. Two or more bands of variable size (size dependent on the position of flanking PstI sites within the host DNA) would be expected if the gene was incorporated into high molecular weight DNA. Two bands of approximate molecular sizes of 6.0 and 3.0 Kb. This result is consistent with incorporation of the hygromycin gene into high molecular weight DNA. No hybridization was observed for DNA from control callus in any of the above treatments.

These results prove that the HPT coding sequence is not present in PH2 callus as intact pHYGI1 or as a small non-chromosomal plasmid. They are consistent with incorporation of the hygromycin gene into high molecular weight DNA.

### VI. Plant Regeneration and Production of Seed

The line PH2, along with unselected control callus, were placed onto RM5 medium to regenerate plants as in Example I. After 16 days, the callus was transferred to R5 medium as in Example I. After 25 d on R5 medium, plantlets were transferred to R5 medium and grown up for 20 days. At this point, plantlets were transferred to vermiculite for one week and then transplanted into soil where they are being grown to sexual maturity.

### EXAMPLE III

The procedure of Example II was repeated exactly except that different plasmids were used.

The plasmids pBII221 and pHYGI1 described in Example I were used as well as pMS533 which is a plasmid that contains the insecticidal *Bacillus thuringiensis* endotoxin (BT) gene fused in frame with the neomycin phosphotransferase (NPTII) gene. At a position 5' from the fusion gene are located segments of DNA from the CaMV and nopaline synthase promoters. At a position 3' from the fusion gene are segments of DNA derived from the tomato protease inhibitor I gene and the poly A region of the nopaline synthase gene.

Callus was bombarded exactly as in Example I except that the DNA used in the tungsten/DNA preparations differed. Two tubes contained plasmids pHYGI1 and pMS533 and one tube contained no plasmid but contained 5 μl TE-1 (10 mM Tris-HCl pH 8.0, 1 mM EDTA pH 8.0).

The following bombardments were done: 9xpHYGI1/pMS533 (potential positive treatment) and 2xTE prep (control treatment).

After bombardment, the callus from the pHYGI1/pMS533 treatments was placed onto round 1 selection plates, F medium containing 15 mg/l hygromycin, as ten 25 mg pieces per plate. The same was done for one of the plates bombarded with the TE preparation (selected control callus). One plate of callus bombarded with the TE preparation was placed onto F medium with no hygromycin; this callus was maintained throughout the ongoing experiment as a source of control tissue (unselected control callus).

After 12 days, the callus on round 1 selection plates appeared to show about 90% of the weight gain of the unselected control callus. All of the callus was transferred from round 1 selection plates to round 2 selection plates containing 60 mg/l hygromycin as ten 30 mg pieces per plate. After 22 days of selection on round 2 selection plates, the callus appeared completely uninhibited. All of the callus was transferred from round 2 selection plates to round 3 selection plates containing 60 mg/l hygromycin.

At 74 days post-bombardment, a single viable sector was observed proliferating from the surrounding necrotic tissue. The callus line was from pHYGI1/pMS533 treated material and was designated 86R. The callus line 86R was transferred to F medium.

After 24 days, the callus line 86R had grown well. Portions of the callus were then transferred to (i) F media containing 15 mg/l hygromycin, and (ii) F media containing

5,554,798

25

60 mg/l hygromycin. Control callus was plated on F media with 15 mg/l hygromycin.

After 19 days of culture, the callus line 86R appeared to grow rapidly and was uninhibited on both levels of hygromycin. The control callus appeared to have only about 50% of the weight gain of 86R. The callus lines were transferred to fresh media at the same respective levels of hygromycin to further test the resistance of the callus line 86R. After 26 days of culture, the callus line 86R appeared uninhibited on 60 mg/l hygromycin.

Southern blots were performed on DNA isolated from the callus line 86R and control callus to confirm the presence of the hygromycin resistance gene and to determine whether the BT gene was present.

For detection of the HPT coding sequence, DNA isolated from 86R callus and control callus was digested with the restriction enzymes BamHI, XhoI, or PstI as described in Examples I and II. After hybridization with a probe prepared from the HPT coding sequence, the following bands were observed. For the BamHI digest, bands were observed at the expected size of 1.05 Kb as well as at approximately 3.0 and 2.3 Kb. This result demonstrates that the HPT coding sequence is present in the callus line 86R. The additional bands at 3.0 and 2.3 Kb indicate that either digestion was incomplete or that multiple rearranged copies are present. For the XhoI digest, a single band was observed at approximately 5.1 Kb. Because XhoI does not cut pHYGI1, this suggests incorporation of the hygromycin construct into DNA different than pHYGI1. For the PstI digestion, a large band was observed at approximately 5.1 Kb. This band appeared to be two fragments of similar molecular weight. Two or more bands would be expected from a PstI digestion if the gene was incorporated into high molecular weight DNA. In no case was hybridization observed for DNA from control callus for any of the above-mentioned digestions.

For detection of the BT gene, a Southern blot was carried out on DNA isolated from 86R and control callus digested with the enzymes BamHI and XhoI in combination. A BamHI, XhoI co-digestion liberates the 1.8 Kb BT coding sequence from the pMS533 construction used in this transformation. The blot prepared was hybridized to a probe prepared from the 1.8 Kb BT coding sequence. A band was observed for 86R DNA at the expected size of 1.8 Kb whereas no hybridization was observed for control DNA.

26

Additional bands of much lesser intensity were also observed for 86R DNA. This result demonstrates that the BT coding sequence is present in the callus line 86R. This further demonstrates the introduction into maize of an unselected gene with potential commercial value. The name of callus line 86R was changed to CB1.

Plants are being regenerated from CB1 callus and control callus as described in Example I.

The invention has been described with reference to various specific and preferred embodiments and techniques. However, it should be understood that many variations and modifications may be made while remaining within the spirit and scope of the invention.

What is claimed is:

1. A fertile transgenic *Zea mays* plant containing an isolated heterologous DNA construct encoding EPSP synthase wherein said DNA construct is expressed so that the plant exhibits resistance to normally toxic levels of glyphosate, wherein said resistance is not present in a *Zea mays* plant not containing said DNA construct, and wherein said DNA construct is transmitted through a complete normal sexual cycle of the transgenic plant to the progeny generation.

2. The transgenic plant of claim 1 wherein the heterologous DNA construct comprises a promoter.

3. A seed produced by the transgenic plant of claim 1 which comprises said heterologous DNA construct.

4. A progeny transgenic *Zea mays* plant derived from the transgenic plant of claim 1 wherein said progeny plant expresses said heterologous DNA construct so that the progeny plant exhibits glyphosate tolerance.

5. A seed derived from the progeny plant of claim 4 wherein said seed comprises said heterologous DNA construct.

6. The transgenic plant of claim 1 wherein the plant is obtainable by a process comprising the steps of:

(i) bombarding intact regenerable *Zea mays* cells with microprojectiles coated with said heterologous DNA construct;

(ii) identifying or selecting a population of transformed cells; and

(iii) regenerating a fertile transgenic plant therefrom.

* * * * *

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

RHONE-POULENC AGRO, S.A.,          )
(Now known as Aventis Crop Science SA),  )
                                   )
            Plaintiff,             )
                                   )
      v.                           )      1:97CV1138
                                   )
MONSANTO COMPANY,                  )
(Now known as Pharmacia Corp.),    )
                                   )
            and                    )
                                   )
DEKALB GENETICS CORP.,             )
                                   )
            Defendants.            )
                                   )

### JUDGMENT

For the reasons set forth in the contemporaneously filed Memorandum

Opinion, the Director of the Patent and Trademark Office is instructed to add Rick

DeRose, Georges Freyssinet, Michel Lebrun, Bernard Leroux, and Alain Sailland as

joint inventors of U.S. Patent 6,040,497 (dated March 21, 2000). However, for

U.S. Patent 5,554,798 (dated September 10, 1996) it is determined that

conception had occurred prior to any of the applicants making a significant

inventive contribution and that their application to be added as joint inventors on

that patent is DENIED.

This the day of August 7, 2006

                          /s/ N. Carlton Tilley, Jr.
                          United States District Judge

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

RHONE-POULENC AGRO, S.A.,          )
(Now known as Aventis Crop Science SA),  )
                                    )
            Plaintiff,              )
                                    )
        v.                          )        1:97CV1138
                                    )
MONSANTO COMPANY,                   )
(Now known as Pharmacia Corp.),     )
                                    )
            and                     )
                                    )
DEKALB GENETICS CORP.,              )
                                    )
            Defendants.             )
_____)

MEMORANDUM OPINION

TILLEY, Chief Judge.

        This Memorandum Opinion states the findings of fact and conclusions of law

in connection with the trial held in this matter from August 22 to September 1,

2000.  For the reasons outlined below, the Court finds that for patent 6,040,497

Rick DeRose, Georges Freyssinet, Michel Lebrun, Bernard Leroux, and Alain

Sailland are entitled to be named as joint inventors; but for patent 5,554,798 it is

determined that conception had occurred prior to any of the applicants making a

significant inventive contribution and that their application should be denied.  The

Director of the Patent and Trademark Office will be directed to add those

individuals as joint inventors on the 497 patent.[1]

## I. PROCEDURAL HISTORY

Litigation between these parties has been extensive and complex. It has been ongoing for several years and prior proceedings include a lengthy trial on bifurcated issues. The Court's 136-page Memorandum Opinion, filed February 8, 2000 [Doc. #538], outlines the history of the case and the rulings made in connection with the previous trial.

As will be developed in this opinion, Rhône-Poulenc S.A. (now known as "Aventis CropScience S.A." but hereinafter referred to as "RPA") and DeKalb Genetics Corporation ("DeKalb") entered into a collaboration, informally in 1990 and formally in 1991, to develop glyphosate resistant corn. RPA's scientists were to find or develop genetic material which could add the trait of glyphosate resistance and DeKalb scientists were to use the material to "transform" corn by implanting it within cells which could be regenerated into fertile plants that would pass the trait to succeeding generations. During the collaboration, RPA's scientists constructed genetic material which was used by DeKalb in the transforming of corn and the regeneration and hybridizing of plants that were resistant to large, commercial applications of glyphosate.

---

[1] The title of the head of the Patent and Trademark Office changed from "Commissioner" to "Director" effective March 29, 2000. See Fina Tech., Inc. v. Ewen, 265 F.3d 1325, 1325 n.1 (Fed. Cir. 2001).

DeKalb contends that those glyphosate resistant plants, including that commercialized as "Roundup Ready®" Corn, are covered by the '497 and '798 patents.[2]  The issue currently before the Court is whether one or more of the RPA scientists – Drs. Rick DeRose, Georges Freyssinet, Michel Lebrun, Bernard Leroux, and/or Alain Sailland – should be listed as co-inventors on either or both of those patents.  Title 35 of the United States Code §256 authorizes a United States District Court to correct the inventors listed on U.S. patents.

The Court held a trial from August 22 to September 1, 2000 before an advisory jury.[3]  The jury found that for both of the patents at issue, RPA had proven the following by clear and convincing evidence: 1) that all five individuals contributed to the conception of the claims at issue[4]; 2) that the claims were the

---

[2] The two patents at issue are U.S. Patent 6,040,497 (known as the '497 patent) and U.S. Patent 5,554,798 (known as the '798 patent).  Plaintiff initially contended that joint inventors should be listed on two additional patents, U.S. patents 6,025,545 and 5,990,390.  However, the parties stipulated to the voluntary dismissal of those claims after the parties reached an agreement as to those matters [Docs. # 627 & 628].

The '497 patent claims four transformation events, including GA21 – the event upon which the glyphosate resistance of "Roundup Ready®" corn was based – which resulted from DeKalb's corn transformation process using RPA's DNA constructs.  The '798 patent claims a fertile transgenic corn plant resistant to normally toxic levels of glyphosate.

[3] RPA requested a jury trial.  DeKalb claimed there was no right to a jury trial for an inventorship issue.  The Court empaneled the advisory jury but stated that a final opinion would be issued by the Court.  Neither party objected to the use of an advisory jury.

[4] The claims at issue are claim 46 of the '497 patent and claim 1 of the '798 patent.

3

product of either a collaboration between RPA and DeKalb scientists or work under

a common direction; 3) that the contributions of the five scientists were not

insignificant in quality when measured against the dimension of the full inventions;

4) that the five individuals did more than contribute well known principles or

explain concepts that are well known or the current state of the art [Doc. # 661].

More specifically, the jury found that the five individuals contributed to the '497

patent by providing DeKalb with significant DNA constructs that were successful

at imparting glyphosate resistance in corn and which were included in the claimed

transformation events GG25, GA21, GJ11, and FI117.  In regard to the '798

patent, the jury found that the five individuals contributed to the conception of

fertile transgenic corn containing DNA constructs encoding EPSP synthase that

provide glyphosate resistance to corn.

 The parties have submitted lengthy post-trial briefs suggesting findings of

fact and conclusions of law.  After reviewing the parties' filings and reviewing the

evidence presented at trial, the Court now enters this Memorandum Opinion which

will constitute its findings of fact, made by a clear and convincing standard, and its

conclusions of law.


## II. FINDINGS OF FACT

 The findings relating to joint inventorship issues such as conception and

inventive contributions are dependent upon an understanding of the scientific

4

problem or problems the parties were trying to resolve. Parts A and B of this

section will address the object of the parties' undertaking and the pertinent science

involved.

<p style="text-align:center">A.</p>

Glyphosate, manufactured and marketed by Monsanto Company[5] as

"Roundup®", is an effective and environmentally safe herbicide. Since its toxic

action derives from the interruption of a plant's own food production occurring in

the chloroplasts, it has no injurious effect on humans or other animals, and it

biodegrades quickly in the soil. When applied in an appropriate amount, it is

effective to kill all plants with green foliage. "Roundup Ready®" corn contains

genetically engineered DNA making it resistant to glyphosate and enabling farmers

to spray an entire field of corn, killing the weeds without adversely affecting the

corn. Finding a way to impart glyphosate resistance to corn—the world's largest

cash crop—was a long-term, worldwide effort of a number of researchers.

<p style="text-align:center">B.</p>

Acting at the cellular level, the chemical structure of glyphosate allows it to

bond in the chloroplast with EPSPS enzymes and, thereby, block the enzymes'

necessary catalytic function in the plant's production of its own food.[6] When a

_____

[5] Monsanto Company is now known as Pharmacia Corporation, but
hereinafter referred to as "Monsanto."

[6] "Glyphosate inhibits the shikimic acid pathway which provides a precursor
for the synthesis of aromatic amino acids. Specifically, glyphosate curbs the

<p style="text-align:center">5</p>

plant is subjected to glyphosate in amounts sufficient to prevent it from sustaining itself, it dies.

Specifically, the "string" of amino acids comprising a naturally occurring EPSPS enzyme (also referred to as an EPSPS "protein") forms a three dimensional, coil-like shape. Within the structure of the coil there is a "hole" or "cave" where, in the absence of glyphosate, a shikimate molecule and a PEP molecule fit and become bonded to form EPSP. When glyphosate is present, a molecule of glyphosate slips into the cave and bonds with the EPSPS enzyme in such a way as to block the PEP from entering. (DeRose, Trial Tr. vol. I, 113-16, 133.)

Once it was determined that glyphosate's toxicity related to bonding with EPSPS enzymes, the research objective was to find a shape for the enzyme that would allow PEP into the cave but block glyphosate. (Padgette, Trial Tr. vol IV, 579.) Modifications in the amino acid sequence of EPSPS enzymes in one type of plant would not necessarily be effective in others. (Padgette, Trial Tr. vol IV, 584.) For example, modifications which had imparted glyphosate resistance in soybeans or in tobacco had not successfully imparted it to corn, a monocot.

Modifications of an enzyme are not made at the enzyme level but to the gene which is ultimately responsible for the creation of the enzyme. (Freyssinet, Trial Tr. vol. IV, 626-27, 687.) Genes are DNA, located within the chromosomes

---

conversion of phosphoenolpyruvate ("PEP") and 3-phosphoshikimic acid ("shikimate") to 5-enolpyruvyl-3-phosphoshikimic acid ("EPSP") by inhibiting the enzyme 5-enolpyruvyl-3-phosphoshikimate synthase ("EPSPS")." (DTX1940 at 2.)

6

in the nucleus of a cell. Each functioning gene controls a specific process going on

somewhere within the cell. An excellent description of the fundamental

biochemistry involved in this process – also supported by the testimony in this

case – is found in <u>Mycogen Plant Science, Inc. v. Monsanto Co.</u>, 61 F. Supp. 2d

199 (D. Del. 1999), adopted by, <u>Mycogen Plant Science, Inc. v. Monsanto Co.</u>,

243 F.3d 1316, 1323-24 (Fed. Cir. 2001):

> Organisms, like plants and animals, are made up of cells.
> Genes are comprised of DNA (deoxyribonucleic acid), which encodes
> the necessary information for cells to reproduce and to produce
> specific proteins.

> DNA consists of two long chains or strands that wrap around
> each other in a shape known as a double-stranded spiral helix.
> Visually, a molecule of DNA resembles a twisted ladder. The sides of
> the ladder are connected by rungs made up of pairs of molecules
> called nucleotides. Four different nucleotides, each containing one of
> the bases adenine ("A"), guanine ("G"), cytosine ("C") and thymine
> ("T"), form the particular DNA make-up of genes. A particular DNA
> molecule can be graphically represented by listing the nucleotide
> sequences making up that DNA molecule.

> Because of the nucleotides' chemical make-up, A will only pair
> with T, and C will only pair with G. This strict complementary pairing
> means that the order of the nucleotides on one side of a DNA rung
> determines the order on the other side of the rung. Therefore, each
> rung of the ladder is composed of one pair consisting of A and T, or C
> and G. Each rung is called a nucleotide pair, and the order in which
> these nucleotide pairs appear on the DNA ladder constitutes the
> genetic code for the cell.

> DNA directs cells to make proteins through a two-step process
> of transcription and translation. In the first step, transcription,
> information is transferred from DNA to an RNA, or ribonucleic acid,
> molecule. RNA that codes for a protein is called messenger RNA
> ("mRNA").

RNA is a long single strand of linked nucleotides similar to DNA. However, one of the differences between DNA and RNA is that RNA contains the base uracil ("U") in place of thymine. In transcription, specific nucleotide sequences on the DNA determine where the RNA copy begins and ends.

In the second step, translation, the nucleotide sequence of the mRNA is translated into the amino acid sequence of the corresponding protein. For this translation work, a complex structure known as a ribosome reads the mRNA nucleotide sequence and generates amino acids. These amino acids are then assembled into proteins. In this way, ribosomes carry out protein synthesis.

Ribosomes read a nucleotide sequence in sets of three nucleotides, known as codons. Each codon directs the ribosome to select a certain amino acid. For example, GCT is a codon directing the ribosome to select the amino acid alanine. Just as nucleotides are the basic units of DNA, amino acids are the basic units of proteins. Thus, a given series of codons specifies a sequence of amino acids comprising a particular protein. A protein can contain few or many amino acids. For example, some Bt pesticidal proteins contain more than 600 amino acids.

While there are 61 possible codons, there are only 20 amino acids. [FN1] Some amino acids can be specified by more than one codon. In other words, one codon can be substituted for another in the gene without changing the amino acid and resulting protein. For instance, the amino acid alanine is specified by four different codons: GCT, GCG, GCC and GCA. Two very different series of codons could produce the exact same series of amino acids. In fact, most amino acids are specified or coded by more than one codon. [FN2]

FN1. There are 61 codons because a codon is a sequence of three nucleotides. For mRNA, there are four nucleotide possibilities, A, G, C and U. Thus, three nucleotides, each consisting of four possibilities, A, G, C or U, are represented mathematically as 4³ (4 x 4 x 4), which equals 64 possible codons. Of the 64 possible codons, however, three codons, UAA, UAG and UGA, do not correspond to amino acids. Thus, there are 61 codons. See, e.g., McGraw-Hill Encyclopedia of Science & Technology, "Gene" at Vol. 7, page 740 (1997). For general information on genetics, see In re O'Farrell, 853 F.2d 894, 895-99, 7 USPQ2d 1673, 1674-77 (Fed. Cir.1988).

> FN2. Scientists variously refer to this as "redundancy" or "degeneracy" in the genetic code. The term "unique" refers to an amino acid coded by only a single codon. <u>See, e.g.</u>, <u>Amgen, Inc. v. Chugai Pharm. Co.</u>, 927 F.2d 1200, 1207-08 n. 4, 18 USPQ2d 1016, 1022 n.4 (Fed. Cir. 1991).

<u>Mycogen Plant Science</u>, 61 F. Supp. at 207-08.

A gene "encoding an EPSPS enzyme" is a gene whose nucleotide sequence, following transcription[7] in the nucleus and translation[8] in the cytoplasm, results in the specific amino acid sequence of a protein or enzyme known, immediately after translation, as an "EPSPS precursor enzyme." As the ribosome is reading the codons and adding the amino acids specified, the precursor enzyme is folding, assuming the three dimensional, coil-like shape characteristic of that species' EPSPS enzyme.

A gene coding for an EPSPS protein in a plant (as opposed to a bacterium) also codes for an amino acid sequence known as a transit peptide. The transit peptide is attached to the amino acids of the EPSPS and has the function of targeting the protein to a chloroplast and accomplishing passage through the chloroplast wall. Upon entry into the chloroplast, the transit peptide portion is cleaved, leaving the "mature" EPSPS protein. (DeRose, Trial Tr. vol I, 123-31.)

One of the important regions of a gene's nucleotide sequence is the

---

[7] In general terms, transcription is copying, by the structure known as RNA polymerase, from DNA chemistry into RNA chemistry.

[8] In general terms, translation is copying, by the ribosome, from RNA chemistry into the amino acid sequence specified by the codons of nucleotides.

promoter. The promoter is the first part of a gene and acts as the "off/on switch,"

attracting the RNA polymerase structure in the nucleus to approach and begin the

transcription phase, copying from the DNA into mRNA. The frequency with which

the promoter attracts the RNA polymerase affects the number of proteins

ultimately being translated. It also determines in what plant part the production of

that protein will be more active. For example, in humans, promoters "tell[ ] the

genes which make the hair and the fingernails to only make hair and fingernails

where fingernails and hair are supposed to be made." (DeRose, Trial Tr. vol I, 122-

24.)

These processes within a plant cell are central to the research and

development of glyphosate resistance in corn.

### C.

RPA is a worldwide manufacturer and vendor of diversified agricultural

products, and is engaged in chemical and biotechnological research and

development with particular interests in the area of weed control and crops.

Monsanto manufactures and sells a diversified line of agricultural products as well,

including herbicides, and is engaged in biotechnological research and development.

DeKalb, which became a fully-owned subsidiary of Monsanto in December 1998, is

involved in agricultural genetics and biotechnology for corn seed, and is one of the

largest corn seed suppliers in the United States.

From the mid-1980s, researchers, including those from RPA, DeKalb,

Calgene[9], and Monsanto had worked to identify a means to impart glyphosate

resistance to commercial crops so that farmers could spray an entire field with

glyphosate, kill unwanted vegetation, and leave their crop unaffected. In that time

frame, both RPA and DeKalb were collaborating with Calgene. Calgene's role was

significant at the time because Dr. Luca Comai, a Calgene scientist, had identified

CT7 (also referred to as the "aroA"), a mutagenized EPSPS gene in the bacteria

Salmonella typhymurium which showed some resistance to glyphosate. Dr. Comai

had published his work with CT7 in 1985 and hope existed that his success in

finding the gene would lead to further success in imparting glyphosate resistance

to crops. (DeRose, Trial Tr. vol. II, 308-10.)[10]

---

[9] Non-party Calgene, Inc. ("Calgene") was primarily a biogenetic research company.

[10] One of DeKalb's arguments at trial was that Dr. Comai, not the RPA scientists, should receive sole inventive credit for certain of the contributions to the inventions claimed in the patents at issue here. RPA contends that DeKalb is collaterally estopped from making this claim based on a binding arbitration that took place between Calgene and RPA. The Arbitration Award in that case, Calgene LLC v. Rhone-Poulenc Agro S.A., AAA Case No. 50T1530019099 (the "Arbitration), stated in part that neither Dr. Comai nor anyone else at Calgene contributed to the OTP, the DMMG, or RD-125. However, one of the elements of collateral estoppel is that the "determination of the issue must have been a critical and necessary part of the decision in the prior proceeding." Sedlack v. Braswell Servs. Group, Inc., 134 F.3d 219, 224 (4th Cir. 1998). Courts applying this element of collateral estoppel have found that when cases are dismissed on alternative grounds, one procedural and one substantive, the substantive ground is dicta and therefore not collaterally estopped in future litigation. See Pizlo v. Bethlehem Steel Corp., 884 F.2d 116, 119 (4th Cir. 1989) ("When a dismissal is based on two determinations, one of which would not render the judgment a bar to another action on the same claim, the dismissal should not operate as a bar.") (citing Restatement (Second) of Judgments § 20); Tuttle v. Arlington County Sch.

Dr. Comai had isolated CT7 by treating the bacteria with ethyl methane sulfonate (EMS), a compound capable of causing random changes in the DNA of the bacteria. (Freyssinet, Trial Tr. vol. IV, 594.) He identified CT7 as a gene with a mutation in which the amino acid Serine had been substituted for the amino acid Proline at the "101" position (noted as "Pro• Ser, 101"). (DeRose, Trial Tr. vol. II, 327 & vol. I, 138-39; Lebrun, Trial Tr. vol. III, 542; Freyssinet, Trial Tr. vol. IV, 666-68; Comai, Trial Tr. vol. V, 854-57.)

In the collaboration between RPA and Calgene, Calgene provided the CT7 and did most of the research to find new, more resistant genes. RPA did much of the research to develop more effective transit peptides and promoters that would enhance the resistance of the genes. In addition, RPA provided most of the funding. A Scientific Committee comprised of two members each from Calgene and RPA oversaw the scientific work of the collaboration.

When experiments with CT7 were proving unsuccessful, the Scientific Committee directed further experiments that led to the development of B808, another randomly mutagenized aroA bacterial gene. B808 encoded an EPSPS enzyme with three mutations, one of which was a Threonine to Isoleucine mutation

---

Bd., 195 F.3d 698, 704 (4th Cir. 1999). In this case, the Arbitration Award relied upon by RPA cited several different grounds – including Calgene's lack of standing to bring its claims and the expiration of the applicable New York statutes of limitations – as reasons for the denial of Calgene's claim. Because the Arbitration's discussion of Dr. Comai's contributions were alternative grounds to its denial of Calgene's claims on procedural grounds, it will not be afforded preclusive effect in this case. See id.

at the "97" position (Threo• Iso, 97). (Freyssinet, Trial Tr. vol. IV, 596, 597-98, 609; Comai, Trial Tr. vol. V, 859.) The B808 gene was more successful in vitro[11] than CT7 at imparting glyphosate resistance. More experimentation began in 1989 at both Calgene and RPA to learn whether the Threo• Iso, 97, was the substitution conferring resistance.

The use of plant EPSPS genes – in addition to bacterial EPSPS genes – for mutagenesis had been discussed from time to time both within Calgene and within RPA. (Lebrun, Trial Tr. vol. III, 521-24.) Additionally, the idea had been debated during meetings between RPA and Calgene, but Dr. Comai had never made a concrete proposal to pursue the idea. (Comai, Trial Tr. vol. V, 876-77, 886). Instead, he had elected to continue research with the Salmonella gene. (Comai, Trial Tr. vol. V, 877, 879-81, 888-89.)

At a committee meeting between Calgene and RPA, Dr. Comai suggested site mutagenesis of a wild type bacterial EPSPS gene by combining the Pro• Ser, 101 mutation from the CT7 AroA gene with the Threo• Iso, 97 mutation from the B808 randomly mutated bacterial gene. (Comai, Trial Tr. vol. V, 863-67; DTX 1477 at RPA 031676 & 031685.) At the meeting, Dr. Freyssinet proposed that RPA would mutate a maize gene. (Comai, Trial Tr. vol. V, 893; DTX 1477 at RPA 031676.)

---

[11] In vitro testing involved isolating the enzyme from the bacteria and observing reactions in a test tube.

13

As Calgene was beginning the process of combining the "97" and "101" mutations, it was discovered that B808 was toxic to the E. coli bacteria in which it was being cloned. (Freyssinet, Trial Tr. vol. IV, 616-17.) The minutes of the October 1989 RPA-Calgene Scientific Committee stated that B808 was "clearly the worst" in terms of toxicity and that "Toxicity to E. Coli is triggered by 97 thr

• ᴵsoleu mutation." (PTX 1431 at CAL 004229.) By the end of 1989, Calgene and RPA had determined that no progress had been made with the bacterial aroA genes. (PTX 1431 at CAL 004229.) Dr. Comai left Calgene, and technical collaboration between RPA and Calgene on glyphosate resistance ended in 1989.

DeKalb also had an ongoing collaboration agreement with Calgene around the same time. In 1990, RPA and DeKalb began an informal collaboration with the ultimate goal of genetically altering corn to make it commercially resistant to glyphosate. In 1991, RPA, DeKalb, and Calgene entered into an "Assignment and Assumption Agreement" (the "1991 Agreement"), in which RPA assumed Calgene's rights and obligations under DeKalb's 1985 Agreement with Calgene. RPA performed the molecular biology research work by creating various genetic constructs, initially with the CT7. Then, DeKalb "transformed" corn cells by using the microprojectile bombardment method.[12] This called for coating microprojectiles

---

[12] This method was originally described by Ronald C. Lundquist and David A. Walters, who worked for the research company Biotechnica, in a January 1990 patent application 467,983. However, through a serious of asset transfers, the application became the property of DeKalb and ultimately gave rise to the '798 patent.

such as gold particles with the new DNA, firing the particles with a "gene gun"
into a callus of embryonic maize cells on a petri dish, selecting and growing cells
which had actually integrated the new DNA, testing in vitro, regenerating
transformed cells into plants which, if fertile, would be crossed to create a second
generation (the R-1 generation) and testing R-1 plants within the greenhouse and,
then, in the field.  At each stage, DeKalb tested the transformed cells and plants
for glyphosate resistance.  Neither party had the capability to perform the other
party's role in this collaboration, and both roles were necessary in order to produce
glyphosate resistant corn.

Under this collaboration, genetic material other than the CT-7 gene was
transferred from one company to the other.  On June 17, 1991, at the first joint
meeting of RPA and DeKalb after the 1991 Agreement was signed, the companies
agreed that any material transferred between the companies would be subject to a
Confidentiality Agreement originally entered into by Calgene and DeKalb in 1984.

Experiments with CT7, however, continued to show that the CT7 gene did
not impart sufficient glyphosate resistance in corn to be useful either as a
selectable marker[13] in vitro, or to impart sufficient glyphosate resistance to a

---

[13] A selectable marker is identifiable genetic material which may be included
with other DNA in a transformation process to show which cells may have
incorporated the new DNA; however, post transformation presence of a selectable
marker would not necessarily indicate that the trait associated with the new DNA
had been imparted to any particular level.  "Useful selectable markers are well
known in the art and include, for example, antibiotic and herbicide resistance genes
. . . . Other selectable markers include . . . those genes which code for resistance

transformed corn plant that it could withstand an application of glyphosate more than one-fourth that recommended as sufficient to kill easy to control weeds[14] without being killed or stunted. (PTX 240 at DKB 040279-040281; PTX166 at DKB 056725.)

In 1988, Monsanto's European patent application, PTX 1940, disclosed, among other things, that modifying maize EPSPS DNA to encode a protein with a mutation from Glycine to Alanine at position 101 would provide some glyphosate resistance in corn. (DeRose, Trial Tr. vol. I, 168-70 & vol. II, 312-17; Quatrano, Trial Tr. vol. VI, 1006-07; DTX 1940.)

The formal collaboration between DeKalb and RPA lasted from June of 1991 to November of 1992 and included organized meetings of a Scientific Committee comprised of members from DeKalb and RPA. Throughout the collaboration, proposals were made by the Committee to determine what experiments should be done.

Consistent with Dr. Freyssinet's statement at one of the final RPA/Calgene Committee meetings, RPA scientists Lebrun, Sailland and Freyssinet had the idea of using the mutation from the CT7 bacterial aroA gene (Proline• Serine at the 101 position) and one of the three mutations from the B808 bacterial aroA gene

---

or tolerance to glyphosate." (U.S. Patent No. 5,554,798, col.9, ll.11-22.)

[14] The recommended amount is 16 ounces per acre. (PTX 240 at DKB 040279.)

(Threonine • •Isoleucine at the 97 position) in the amino acid sequence of a maize

EPSPS gene from the cell line developed by Dr. Freyssinet.[15] (Lebrun, Trial Tr. vol.

III, 525-28, 54, 548-49 & vol. IV, 572-73.)  The idea was that, perhaps, the

mutations would be more successful at imparting glyphosate resistance in RPA's

maize gene and, perhaps, the mutation from B808 would not be toxic to the maize

gene.  The gene was known as the "double mutant maize gene" ("DMMG") because

of the two mutations – Threonine • •Isoleucine at the 102 position and Proline • •

Serine at the 106 position.

Throughout the RPA/DeKalb collaboration (June 1991 to November 1992),

approximately four Scientific Committee meetings took place in which information

on projects was shared between the companies.  In November 1992, Dr. Freyssinet

attended the last of these four meetings. (Freyssinet, Trial Tr. vol. V, 733.)  At that

meeting, Dr. Freyssinet indicated that RPA would not put any further effort into

molecular biology research for glyphosate resistance but agreed to provide to

---

[15] RPA was involved in a project around 1986, independent of its
collaboration with Calgene, which sought to create a glyphosate resistant corn line
that could potentially be regenerated into glyphosate tolerant corn.  This special
corn line was not capable of producing glyphosate resistant corn, but had an
increased concentration of EPSPS genes, which allowed RPA to isolate a maize
EPSPS gene from the culture. (Freyssinet, Trial Tr. vol. IV, 613-14; see also
DeRose, Trial Tr. vol. II, 209.)  Drs. Lebrun, Sailland and Freyssinet had conceived
of the idea to try the two specific mutations in a maize EPSPS gene of that line
instead of the Salmonella gene.  Another mutation used in these experiments was
Monsanto's patented Gly• Ala mutation at the 101 position. (Lebrun, Trial Tr. vol.
III, 525-28, 548-49 & vol. IV, 572-73.)  Dr. Freyssinet contributed to the isolation
of the maize gene used for the DMMG. (DeRose, Trial Tr. vol. I, 156-59.)

DeKalb the new genetic material containing mutated EPSPS maize genes.[16]

(Freyssinet, Trial Tr. vol. V, 748.)

When Dr. Freyssinet returned from the meeting, he requested that Dr. Rick

DeRose, an RPA scientist, prepare various constructs using the single and double

mutated maize genes to send to DeKalb. Dr. DeRose prepared and sent five

different constructs to DeKalb in February 1993. Three included the new double

mutant maize gene, DMMG (Threo• Iso at 102 and Pro• Ser at 106). Two

included the single mutant (SMMG) (Gly • •Ala at 101) referred to earlier as the

Monsanto mutation. (PTX 142 at DKB 040519; DeRose, Trial Tr. vol. I, 165-68,

vol. II, 218-21 & vol. III, 419-20; Spencer, Trial Tr. vol VII, 1137-40.) The DNA

constructs comprised either the DMMG or the SMMG along with other components

variously included to target and enter the chloroplast and cut the portions - the

"met"- once in the chloroplast. Some included promoters. One of the constructs,

RD-125, contained the DMMG, a transit peptide developed by RPA known as the

"Optimized Transit Peptide" ("OTP")[17], a methionine ("met") added at the cleavage

---

[16] At the time of the November 1992 meeting, RPA had discovered from field trials in the summer of 1992 that the maize gene was giving better results in tobacco than the bacterial one. At that time (summer 1992), RPA had only tested the Monsanto Gly• Ala single mutant. In the fall of 1992, RPA knew that the maize gene was giving better results than the bacterial one. (Freyssinet, Trial Tr. vol. V, 735-36.)

[17] RPA had developed the Optimized Transit Peptide ("OTP") to enhance glyphosate resistance by better targeting the chloroplast and accomplishing a more effective cleavage site from the enzyme. Drs. Lebrun, Leroux and Sailland created the OTP and are the named inventors on the patent. (Lebrun, Trial Tr. vol. IV,

site to promote stability, and a "stop" known in the art as NOS. Dr. Freyssinet and

Dr. DeRose suggested that DeKalb also use a Rice Actin Promoter[18] in connection

with some of the constructs RPA provided. (Freyssinet, Trial Tr. vol. IV, 660-63.)

All of the constructs[19] were sent to DeKalb for the purpose of transforming corn

cells and with the goal of creating glyphosate resistant corn.

DeKalb used the gene gun transformation process to insert the various

constructs into the corn calli. The precise points at which the constructs integrate,

if at all, into the corn genome are random and cannot be controlled. After the

constructs have been introduced with the gene gun, the random but fixed

integration of the DNA into the chromosome is the transformation event and each

event is labeled individually for identification.[20] The four "key" transformation

events that resulted from insertion of RD-125 are labeled as: GA21, FI117, GJ11,

---

515-17; DTX 1257.)

[18] The Rice Actin Promoter invented and patented by Ray Wu of Cornell University was acquired by DeKalb and used with RD-125 (OTP, Met, DMMG and NOS) in the constructs that became transformation events GA21 and FI117. Other promoters - a "maize histone promoter" and a "hybrid 35S/Arabidopsis histone promoter" were also used in constructs with RD-125. Transformation event GG25, discussed supra, used a maize histone promoter and GJ11, discussed supra, used the hybrid 35S/Arabidopsis histone promoter.

[19] The other constructs – RD-123, RD-129, RD-130 and RD-131 – were sent to DeKalb in addition to RD-125. RD-125 and RD-130 created key transformation events, but RD-125 was ultimately the construct used for "Roundup Ready®" corn.

[20] The parties stipulated to the legal construction of the term "transformation event" as "a plant or seed which has a specific DNA cassette in a specific location somewhere within the chromosome of the corn cell."

and GG25.[21]

The transformation events DeKalb created using RPA's constructs were crossed with another corn line, creating a hybrid plant. (DeRose, Trial Tr. vol. II, 242.) In late 1993 and early 1994, in a greenhouse, DeKalb succeeded in growing transformed corn plants that contained RPA's RD-125 construct and were resistant to Roundup® herbicide at potentially commercial levels. Those hybrid plants were then tested in the field in Hawaii in September 1994. The field tests showed that the corn plants resulting from the four transformation events (FI117, GA21, GG25, and GJ11) were resistant to glyphosate when four times the normal commercial application rate was applied.[22] GA21 was the event of choice after extensive testing with regenerates from these four transformation events. (Armstrong, Trial Tr. vol. III, 483-84; Quatrano, Trial Tr. vol. VI, 999 ("I think in almost all cases we end up putting a particular construct in to look at its expression, whether it is GA21 or FI117 or any other construct, that one has to look at a fairly large number of regenerates to actually see or to select out those that have a fairly high expression level, due primarily, we believe, to the position in which the DNA is inserted.").)

The relevant facts concerning the patents that arose from these activities are discussed below.

---

[21] These events are claimed in the '497 patent.

[22] The normal application rate was 16 ounces per acre. Other plants in the trials were completely killed at the application rate of 16 ounces per acre.

### III. INVENTORS

Patents are presumed to be valid and name the correct inventors. <u>Canon Computer Sys., Inc. v. Nu-Kote Int'l Inc.</u>, 134 F.3d 1085, 1088-89 (Fed. Cir. 1998). This presumption can only be overcome by clear and convincing evidence. <u>See</u> <u>Applied Med. Res. Corp. v. U.S. Surgical Corp.</u>, 967 F. Supp. 867, 871 (E.D. Va. 1997); <u>Burroughs Wellcome Co. v. Barr Labs. Inc.</u>, 828 F. Supp. 1200, 1204 (E.D.N.C. 1993) (citing <u>Amax Fly Ash Corp. v. United States</u>, 514 F.2d 1041, 1047 (Cl. Ct. 1975)). However, a party may allege, as Plaintiff has here, that it was omitted from the named inventors under 35 U.S.C. §256[23]:

> Whenever...through error an inventor is not named in an issued patent and such error arose without any deceptive intention on his part, the Director may, on application of all the parties and assignees, with proof of the facts and such other requirements as may be imposed, issue a certificate correcting such error.
>
> . . . The court before which such matter is called in question may order correction of the patent on notice and hearing of all parties concerned and the Director shall issue a certificate accordingly.

---

[23] Currently, the law is that a finding that inventors have been omitted from those listed on the patent does not necessarily invalidate the patent. <u>See</u> 35 U.S.C. § 256 ("The error of omitting inventors or naming persons who are not inventors shall not invalidate the patent in which such error occurred if it can be corrected as provided in this section."); <u>see also</u> <u>Pannu v. Iolab Corp.</u>, 155 F.3d 1344, 1350 (Fed. Cir. 1998); <u>Ethicon, Inc. v. U.S. Surgical Corp.</u>, 135 F.3d 1456, 1461 (Fed. Cir. 1998) ("35 U.S.C. § 256 provides that a co-inventor omitted from an issued patent may be added to the patent by a court before which such matter is called in question.") (internal citations omitted). Additionally, in <u>Pannu v. Iolab</u>, the Federal Circuit found that a party subject to a claim of invalidity could invoke § 256 to "save" the patent. 155 F.3d at 1350. In this case, however, invalidity is not asserted.

21

Id. Here, Plaintiff has called into question the omission of scientists it alleges are joint inventors on both the '497 and the '798 patents. The only procedural requirements for a correction of inventorship action in district court are notice and an opportunity to be heard. Id.; see also Stark v. Advanced Magnetics, Inc., 119 F.3d 1551, 1553 (Fed. Cir. 1997). Both have been provided in this case. Therefore, the Court, if it is appropriate under the facts, may order correction of the patent.[24] MCV, Inc. v. King-Seely Thermos Co., 870 F.2d 1568, 1570 (Fed. Cir. 1989) ("Section 256 . . . explicitly authorizes judicial resolution of co-inventorship contests over issued patents. . .").

With respect to joint inventorship, the Federal Circuit has said:

> All that is required of a joint inventor is that he or she (1) contribute in some significant manner to the conception or reduction to practice of the invention; (2) make a contribution to the claimed invention that is not insignificant in quality, when that contribution is measured against the dimension of the full invention; and (3) do more than merely explain to the real inventors well-known concepts and/or the current state of the art.

---

[24] A correction of inventorship action involves questions of law and therefore does not require a jury trial. See Ultra-Precision Mfg., Ltd. v. Ford Motor Co., 411 F.3d 1369, 1376 (Fed. Cir. 2005). In this case, an advisory jury was empaneled and the parties were advised that the final opinion would be issued by the Court. See Tamko Roofing Prod., Inc. v. Smith Eng'g Co., 450 F.3d 822, 828 (8th Cir. 2006) (explaining when a jury sits in a solely advisory capacity the court is free to accept or reject its findings); Cox v. Babcock & Wilcox Co., 471 F.2d 13, 14 (4th Cir. 1972) (noting findings of advisory jury are merely advisory and the court must make its own findings); Sheila's Shine Prod., Inc. v. Sheila Shine, Inc., 486 F.2d 114, 122 (5th Cir. 1973) ("[The trial court] is not bound by the findings of the advisory jury, which it is free to adopt in whole or in part or to totally disregard."). Neither party in this case objected to the use of an advisory jury.

Pannu v. Iolab Corp., 155 F.3d 1344, 1351 (Fed. Cir. 1998).  Joint inventors must also be working in collaboration.  See Kimberly-Clark Corp. v. Proctor & Gamble Distrib. Co., 973 F.2d 911, 917 (Fed. Cir. 1992) (holding that joint inventorship requires some level of collaboration).  However, "[t]he question of whether a person is a joint inventor is fact specific, and no bright-line standard will suffice in every case."  Fina Oil & Chem. Co. v. Ewen, 123 F.3d 1466, 1473 (Fed. Cir. 1997).  Therefore, the facts of this case will be reviewed with respect to each patent to determine whether there is clear and convincing evidence that RPA's five scientists meet the standard for joint inventorship.

An inventorship analysis, like an infringement analysis, begins with a construction of each asserted claim.  See Markman v. Westview Instruments, Inc., 52 F.3d 967, 996 n.7 (Fed. Cir. 1995) (Mayer, J., concurring), aff'd, 517 U.S. 370 (1996).  After each asserted claim is construed, the second step is then to compare the alleged contributions of each asserted co-inventor with the subject matter of the properly construed claim to determine whether the correct inventors were named.  Ethicon, Inc. v. U.S. Surgical Corp., 135 F.3d 1456, 1460 (Fed. Cir. 1998).  Thus, the construction of each of the patents will first be discussed, followed by a determination of whether joint inventorship is appropriate under the standard set forth above.

A. The '497 Patent

1. Claim Construction

The first patent for which RPA seeks to have its five scientists declared joint

inventors is the '497 patent or "Spencer patent". For present purposes, the crucial

claim in the '497 patent is claim 46, which reads as follows:

> A glyphosate resistant, hybrid maize plant comprising a chromosomally
> integrated expression cassette comprising (a) a modified maize EPSPS
> gene encoding an EPSPS protein having isoleucine at position 102 and
> serine at position 106 and (b) a promoter active in maize operably
> linked to said EPSPS gene, wherein said hybrid maize plant comprises a
> transformation event selected from the group consisting of GA21, seed
> comprising said GA21 transformation event having been deposited as
> ATCC Accession Number 209033, FI117, seed comprising said FI117
> transformation event having been deposited as ATCC Accession
> Number 209031,GG25, seed comprising said GG25 transformation
> event having been deposited as ATCC Accession Number 209032, and
> GJ11, seed comprising said GJ11 transformation event having been
> deposited as ATCC Accession Number 209030.

('497 Patent, col.64, ll.58 - col.65, ll.4.)

The parties have agreed on the proper construction of this claim.

Specifically, they have agreed to the following construction:

> The phrase "[a] glyphosate resistant, hybrid maize plant" means
> a hybrid corn plant that provides the level of glyphosate resistance
> provided by one of the four specifically identified transformation
> events. A hybrid corn plant is a cross of two different genotypes of
> corn, which are sometimes called the "parents" of the hybrid corn
> plant.

> Because the four specifically identified transformation events
> already include (a) a modified maize EPSPS gene encoding an EPSPS
> protein having isoleucine at position 102 and serine at position 106
> and (b) a promoter active in maize operably linked to said EPSPS gene,
> the claimed hybrid corn plant must have as one of its parents one of

the four transformation events discussed below.  A transformation event is a plant or seed which has a specific DNA cassette in a specific location somewhere within the chromosome of the corn cells.

The specific transformation events are identified by the phrase "GA21, seed comprising said GA21 transformation event having been deposited as ATCC Accession Number 209033, FI117, seed comprising said FI117 transformation event having been deposited as ATCC Accession Number 209031, GG25, seed comprising said GG25 transformation event having been deposited as ATCC Accession Number 209032, and GJ11, seed comprising said GJ11 transformation event having been deposited as ATCC Accession Number 209030." The seeds of the specific transformation events are made available to the public at the American Type Culture Collection, or "ATCC," and the accession numbers identify where the seeds are indexed at the ATCC.

Because the parties have agreed to this construction, and because the construction appears consistent with the language of the claim, the Court adopts this construction in its entirety.

2.  Application - Conception and Joint Inventorship

Conception has been called the "touchstone of inventorship." Burroughs Wellcome Co. v. Barr Labs., Inc., 40 F.3d 1223, 1228 (Fed. Cir. 1994).  Courts have defined conception for the purposes of inventorship as:

'. . . the formation in the mind of the inventor, of a definite and permanent idea of the complete and operative invention, as it is hereafter to be applied in practice.' Hybertech, Inc. v. Monoclonal Antibodies, Inc., 802 F.2d 1367, 1376 (Fed. Cir. 1986) (quoting 1 Robinson on Patents 532 (1890)).  An idea is sufficiently 'definite and permanent' when 'only ordinary skill would be necessary to reduce the invention to practice, without extensive research or experimentation.' Burroughs Wellcome Co. v. Barr Labs., Inc., 40 F.3d at 1228.

Ethicon Inc., 135 F.3d at 1460.

25

DeKalb contends that since the '497 patent is for the transformation events – i.e. the moment when the DNA cassette became fixed or inserted within the respective chromosomes of each of the four events – the RPA scientists could not be joint inventors because none of them could have had a definite and permanent idea of the complete and operative invention at the time of any contribution they may have made. The DNA inserts randomly, if at all, so no one could foretell prior to the event where an insertion point might be. (Spencer, Trial Tr. vol. VIII, 1101; Sailland, Trial Tr. vol. VIII, 1203.) Specifically, whether it would confer glyphosate resistance and to what extent could not be determined until testing. (Spencer, Trial Tr. vol. VIII, 1102-03.) Nor could the plant's fertility be immediately determined. Finally, DeKalb contends that in vitro resistance did not mean resistance for the whole plant and had never translated into sufficient resistance for a corn plant to withstand the amount of glyphosate recommended to kill weeds. (Lebrun, Trial Tr. vol. III, 535; Armstrong, Trial Tr. vol. III, 492.)

The short answer to DeKalb's contention is that, in the case of persons working jointly to solve a common problem as were the teams from RPA and DeKalb, different people may contribute in different ways and at different times toward a common conception. As the Federal Circuit observed in Fina Oil:

> The issue of joint inventorship is governed by 35 U.S.C. § 116, which states, in relevant part:
> When an invention is made by two or more persons jointly, they shall apply for a patent jointly and each make the required oath, except as otherwise provided in this title. Inventors may apply for a patent jointly even though (1) they did not physically work together or

26

at the same time, (2) each did not make the same type or amount of contribution, or (3) each did not make a contribution to the subject matter of every claim of the patent.

This provision sets no explicit lower limit on the quantum or quality of inventive contribution required for a person to qualify as a joint inventor. Rather, a joint invention is simply the product of a collaboration between two or more persons working together to solve the problem addressed. Burroughs Wellcome, 40 F.3d at 1227, 32 USPQ2d at 1919. The determination of whether a person is a joint inventor is fact specific, and no bright-line standard will suffice in every case.

Conception and inventorship are questions of law, reviewed de novo, that rest on underlying facts. See Sewall, 21 F.3d at 415, 30 USPQ2d at 1358.

Nonetheless, our precedent provides guidance as to what types of acts are, or are not, sufficient in quantum and quality to establish joint inventorship. One need not alone conceive of the entire invention, for this would obviate the concept of joint inventorship. However, a joint inventor must contribute in some significant manner to the conception of the invention. See Pro-Mold & Tool Co. v. Great Lakes Plastics, Inc., 75 F.3d 1568, 1575, 37 USPQ2d 1626, 1632 (Fed. Cir.1996) (citing Sewall, 21 F.3d at 415, 30 USPQ2d at 1358-59). As such, "each inventor must contribute to the joint arrival at a definite and permanent idea of the invention as it will be used in practice." Burroughs Wellcome, 40 F.3d at 1229, 32 USPQ2d at 1921.

If a person supplies the required quantum of inventive contribution, that person does not lose his or her status as a joint inventor just because he or she used the services, ideas, and aid of others in the process of perfecting the invention. See Shatterproof Glass Corp. v. Libbey-Owens Ford Co., 758 F.2d 613, 624, 225 USPQ 634, 641 (Fed. Cir.1985). However, those others may also in appropriate circumstances become joint inventors by their contributions. In addition, a person is not precluded from being a joint inventor simply because his or her contribution to a collaborative effort is experimental. See Burroughs Wellcome, 40 F.3d at 1229, 32 USPQ2d at 1921.

The basic exercise of the normal skill expected of one skilled in the art, without an inventive act, also does not make one a joint inventor. See Sewall, 21 F.3d at 416, 30 USPQ2d at 1359. Therefore, a person will not be a co-inventor if he or she does no more than explain to the real inventors concepts that are well known and

the current state of the art. *See* Hess, 106 F.3d at 981, 41 USPQ2d at 1787. The case law thus indicates that to be a joint inventor, an individual must make a contribution to the conception of the claimed invention that is not insignificant in quality, when that contribution is measured against the dimension of the full invention.

123 F.3d at 1473.

In cases where conception does not occur until there has been a reduction to practice, a person who has contributed a significant, inventive act does not lose joint inventor status because the contribution was made prior to conception. As the Fina Oil court observed:

> Conception and reduction to practice of the entire claimed invention may be relevant to establish that a first person conceived of an invention before another person entered the scene, and that the first person is therefore the sole inventor. However, the doctrine cannot be used, as the district court did here, to show that because the first person did not conceive or reduce to practice the entire claimed invention, he or she did not at least contribute in some significant way to the ultimate conception.

Id. at 1474.

The advisory jury found that each of the five RPA scientists should be named as inventors of the '497 patent. For the reasons which follow, the Court agrees with the advisory jury's determination.

The claim construction agreed upon by the parties comprises at least the following limitations: (1) A hybrid maize plant which (2) is resistant to glyphosate and which (3) contains a modified maize EPSPS gene encoding an EPSPS protein having Isoleucine at position 102 and Serine at position 106 in addition to (4) a promoter active in maize operably linked to the modified EPSPS gene. The plant

28

(5) must have as a parent one of the four specific transformation events:  GA21, FI117, GG25, or GJ11.

The evidence clearly and convincingly shows that beginning in 1990, RPA and DeKalb engaged in a collaborative effort to create genetically engineered, glyphosate resistant corn.  (Orozco, Trial Tr. vol. III, 473.)  As observed earlier, each brought a special expertise to their project:  RPA had an expertise in identifying and synthesizing DNA constructs which had the potential to lessen the binding of glyphosate in maize EPSPS enzymes and to permit the enzyme to continue its vital function in the plant's production of its own food.  DeKalb had the transformation process of Drs. Lundquist and Walters and the consequent ability to bombard embryonic corn cells with RPA's genetic material and regenerate transformed plants containing that genetic material.  The purpose of the collaboration was to create hybrid corn plants made glyphosate resistant by incorporating modified DNA encoding EPSPS enzymes which could perform the function of catalyzing the synthesis of EPSP in the presence of glyphosate.

Although RPA determined sometime in 1992 to suspend research efforts toward isolating new DNA constructs, it had already originated and synthesized maize DNA encoding a modified maize EPSPS protein with Isoleucine at 102 and Serine at 106 (the "DMMG").  It had identified and constructed several promoters operable in maize and, particularly active in the faster growing areas of the plant –

29

tips of stems and roots – where glyphosate concentrates most.[25] (Lebrun, Trial Tr. vol. III, 517-18.) And, RPA had originated and constructed the OTP which was more effective in delivering precursor EPSPS to the maize chloroplast, transporting the EPSPS across the membrane wall, and being cleaved at the precise site than any other transit peptide in the literature at that time. (Lebrun, Trial Tr. vol. III, 508-16.)

Pursuant to their agreement, in February 1993, RPA sent several constructs containing RD-125 (the DMMG with a Met and the OTP) linked to several promoters and other regulatory elements. It was those constructs which Michael Spencer of DeKalb used in the particle gun in the Spring and Summer of 1993 to create the transformation events claimed in the '497 patent. Those events, following selection, were tested in vitro for glyphosate resistance, regenerated into plants, tested in the laboratory, crossed with another line to create the R1 generation, then taken into the field for testing with glyphosate. (Spencer, Trial Tr. vol. VIII, 1104-20.)

After the testing of the plants in a greenhouse, on February 18, 1994, DeKalb reported the following to RPA:

> [W]e have not only demonstrated that we can use the mutant maize EPSPS gene as a selectable marker in maize, but we have now

---

[25] One of these was the maize histone promoter which was "operably linked" to the DMMG in GG25. Another was the 35S/Arabidopsis histone promoter which was "operably linked" to the DMMG in GJ11. (PTX 1403 at DKB 039983.)

demonstrated tolerance in transgenic plants in the greenhouse to up to four times the field application recommended by Monsanto for tolerant corn! We will repeat these experiments in the field in the summer of 1994. It is obvious from these results that the mutant maize gene has been the key to success.

(PTX 240 at DKB 040277.)

During the subsequent field trials conducted in September 1994, each showed the ability not to be harmed from a 16 ounces per acre application of glyphosate – the recommended amount for killing weeds. GG25 (DMMG + OTP + maize histone promoter) and GJ11 (DMMG + OTP + 35S/Arabidopsis histone promoter) appeared as healthy at 64 ounces per acre as plants which had not been sprayed at all. (Spencer, Trial Tr. vol. VIII, 1162; PTX 307 at DKB 040526.) At 64 ounces, FI17 (DMMG + OTP + rice actin promoter) became "somewhat yellow", a ranking of 2 on a scale in which 3 was "yellow, twisted", 4 was "wilted, stunted" and 5 was "dead". GA21 (DMMG + OTP + rice actin promoter)[26], at 64 ounces, graded 2.5. (PTX 307 at DKB 040526.)

At that point conception was complete: hybrid plants – the offspring of two different genotypes, one parent of each being one of the four claimed transformation events, each containing a DNA cassette with a modified maize EPSPS gene encoding an EPSPS protein having Isoleucine at position 102 and Serine at position 106, and a promoter active in maize operably linked to the

---

[26] Although F117 and GA21 have the same constructs (DMMG + OTP + rice actin promoter) they are different transformation events; the DNA inserts randomly.

31

modified EPSPS gene – had demonstrated glyphosate resistance.

It is true that conception was completed without RPA or any of its scientists being informed of the successful field trials. DeKalb's proceeding with further testing and crossing with elite lines to commercialize "Roundup Ready®" corn without informing RPA was the subject of a previous jury finding that DeKalb had committed fraud, breached the collaboration agreement, and been unjustly enriched. See Rhone-Poulenc Agro, S.A. v. DeKalb Genetics Corp., 272 F.3d 1335 (Fed. Cir. 2001) (vacated and remanded for reconsideration of the amount of punitive damages in light of State Farm Mut. Auto Ins. v. Campbell, 538 U.S. 408, 123 S. Ct. 1513 (2003) by DeKalb Genetics Corp. v. Bayer CropScience, S.A., 538 U.S. 974, 123 S. Ct. 1828 (2003), opinion modified and reinstated by Rhone-Poulenc Agro, S.A. v. DeKalb Genetics Corp., 345 F.3d 1366 (Fed. Cir. 2003), cert. denied, DeKalb Genetics Corp. v. Bayer CropScience, S.A., 540 U.S. 1183, 124 S. Ct. 1423 (2004)). That, however, is a non-issue since neither the statute nor the cases relating to joint inventorship requires the simultaneous presence or awareness of all who have contributed significantly toward conception when the last piece of the conception puzzle slips into place.

It is beyond serious question that RPA scientists contributed genetic constructs which, when inserted, created the glyphosate resistance possessed by each of the transformation events. It is undisputed that RPA scientists provided the "modified maize EPSPS gene encoding an EPSPS protein having [I]soleucine at

32

position 102 and [S]erine at position 106" as well as two "promoter(s) operably linked to said EPSPS gene" claimed in the '497 patent. (PTX 142 at DKB 040519; Spencer, Trial Tr. vol. VIII, 1127, 1139.)  DeKalb argues, however, that none of the RPA scientists made a contribution of inventive significance, but rather were merely explaining and practicing the state of the art.  Thus, the next step is a consideration of the specific contributions of each of the five and a determination of whether that person made an inventive contribution which was not insignificant when measured against the dimension of the full invention.

Dr. Georges Freyssinet was the RPA glyphosate resistance project leader. Dr. Freyssinet attended the Scientific Committee meetings with both Calgene and DeKalb where attendees discussed ideas and research plans for improving resistance.  In 1989, at a Scientific Committee meeting with Calgene, Dr. Comai discussed the possibility of mutating a wild type bacterial EPSPS gene by combining the Pro• Ser, 101, mutation from the CT7 aroA gene with the Threo• Iso, 97, mutation from the B808 randomly mutated bacterial gene. (Comai, Trial Tr. vol. v, 863-68; DTX 1477 at RPA 031675, 031685.)  At the meeting, Dr. Freyssinet proposed that RPA would mutate a maize gene.  (Comai Trial Tr. vol V, 893; DTX 1477 at RPA 031676.)[27]

Although using plant genes for mutagenesis had been discussed from time to time within Calgene and debated within the Scientific Committee meetings with

_____

[27] (See also PTX 1429.)

RPA, Dr. Comai never made a concrete proposal to do so, electing instead to continue research with the Salmonella gene. (Comai, Trial Tr. vol. V, 877, 879-81, 888, 889.) It was later determined that the Threo• Iso, 97, mutation was toxic to the mutagenized bacteria and Calgene never performed the site directed mutagenesis to encode both the Threo• Iso, 97 and the Pro• Ser, 101 substitutions in a single aroA gene. (Freyssinet, Trial Tr. vol IV, 619-21; PTX 1431 at CAL 004228-004246; Lebrun Trial Tr. vol. IV, 573.) Further, transformed tobacco plants with the Threo• Iso, 97 substitution had underdeveloped roots, leading to the conclusion that the protein was not stable. (Freyssinet, Trial Tr. vol. IV, 621-22.)

At RPA in 1986, a focus had been on increasing glyphosate resistance in maize by developing a line that produced an overabundance of EPSPS enzymes. The cells of this line were more tolerant than wild type maize. In 1989 it was decided by the project team – Drs. Freyssinet, Lebrun, Leroux and Sailland – to use cells preserved from this line for site directed mutagenesis. Starting in late 1989, Michel Lebrun spent about one year isolating the EPSPS gene from the cDNA. (Freyssinet, Trial Tr. vol. IV, 613, 626-28.) The gene was then sequenced and it was determined that there were three nucleotide and three amino acid changes from that published by Monsanto in 1988. (Lebrun, Trial Tr. vol. III, 563-64; DTX 1620 at RPA 016933.) At a meeting in Lyon, a decision was made by the four team members to combine, two by two, the Threo• Iso, Pro• Ser, and Gly• Ala

34

mutations in the conserved region around amino acid position 100. They decided to start by making eight variants, one with the specific mutations resulting in Threo• Iso, 102, and Pro• Ser, 106 (the "DMMG"), even though the Threo• Iso substitution had proven toxic when made in bacteria. They also decided to make a single mutation resulting in a Gly• Ala, at position 101 and another single mutation with a Pro• Ser at position 106. (Freyssinet, Trial Tr. vol. IV, 627; Lebrun, Trial Tr. vol. IV, 572, 573; DTX 1944 at RPA 008138.)

It was, therefore, the idea of Drs. Freyssinet, Lebrun, Sailland and Leroux to combine the mutations resulting in Threo• Iso, 102, and Pro• Ser, 106, in a maize cell. While Monsanto had mutagenized a maize gene, made hundreds of thousands of mutations in EPSPS genes, and a number of changes in the 101, 102, 105 and 106 region of plant genes, it had never combined the Threo• Iso, 102, and Pro• Ser, 106. (Padgette, Trial Tr. vol. IV, 581, 584-85.) While Dr. Comai had broached, both during and prior to the collaboration with RPA, the advisability of using plant genes, the possibility had never matured beyond debate. Also, while Dr. Comai had suggested the combination in bacteria of Threo• Iso, 97, and Pro• Ser, 101 – the equivalent amino acid positions in *Salmonella* to 102 and 106 in maize, the combination was not made after it was determined that the substitution of Isoleucine at position 97 had a toxic effect on the host bacteria.

The DMMG was essential to glyphosate resistance in each of the transformation events: it had the physical structure to block the glyphosate

molecule while allowing entrance of the PEP, resulting in an EPSPS enzyme able to perform its life sustaining function in the presence of considerable amounts of glyphosate.

Drs. Freyssinet, Leroux and DeRose originated and synthesized the maize histone promoter which was "operably linked" to the DMMG in GG25. Dr. Freyssinet and Dr. Leroux also originated and synthesized the 35S/Arabidopsis histone promoter which was "operably linked" to the DMMG in GJ11. The promoter controls the transcription phase by attracting the RNA polymerase and it also directs where in the plant the gene will be expressed. It was important to have a promoter that would produce a lot of EPSPS, especially in the areas of the corn plant where glyphosate accumulates – tips of stems and roots. (Lebrun, Trial Tr. vol. III, 516-18; DeRose, Trial Tr. vol. I, 141-42, 146.)

Drs. Lebrun, Leroux and Sailland originated and synthesized the OTP, the "optimized transit peptide", which targets the chloroplast for the EPSPS precursor protein and accomplishes entry through the chloroplast wall before being cleaved from what then becomes the mature EPSPS protein or enzyme. DeKalb contends that the OTP was a prior art element and should not be considered an inventive contribution to these transformation events. The OTP, however, had been sent to DeKalb in 1991 as an integral portion of a construct (with the 35S/Arabidopsis histone promoter and the CT7) as a part of the RPA/DeKalb joint effort toward creating glyphosate resistant corn. (PTX 53 at DKB 009830.) And, Dr. Lebrun

36

had discussed the OTP with DeKalb scientists at a Scientific Committee meeting in

October, 1991. (PTX 55 at DKB 026454; Lebrun Trial Tr. vol. III, 519.) While

Drs. Leroux, Lebrun and Sailland applied for a French patent on the OTP in March

of 1991, the OTP was not disclosed to the public until September 11, 1992. (DTX

1257.) Because they were the inventors and were working collaboratively with

DeKalb, they would not have been simply explaining prior art when the OTP was

sent to DeKalb with the DMMG in February, 1993. In re Katz, 687 F.2d 450

(CCPA 1982); see also Pannu, 155 F.3d at 1344 (holding Pannu was at least a co-

inventor because he and the other purported inventor had worked collaboratively

and Pannu had conceived of significant aspects of the invention although he had

discussed his ideas with others more than a year earlier than he did with the other

purported inventor).

Considering the extensive but unavailing efforts of other researchers in the

field to modify DNA and alter the structure of the EPSPS enzyme so that it would

block the glyphosate molecule, yet allow the PEP to bond with the shikimate and

form EPSP, there is no doubt that the RPA constructs were the most significant

genetic development in the effort to create glyphosate resistant maize. It is

determined that each of the contributions enumerated above are inventive and

significant when compared to the invention as a whole. Each was vital to the

creation of glyphosate resistance in at least one of the four transformation events

and each of the five individual RPA scientists should be added as co-inventors on

37

the '497 patent.

It is further determined, however, that the following contributions cited by RPA do not rise to the level of inventive significance.

Dr. Freyssinet's informing DeKalb at the first Scientific Committee meeting in June, 1991 about the probable efficacy of the rice actin promoter in maize, (see DTX 290 at DKB 026532), was an explanation of the state of the art, not an inventive contribution. See Hess v. Advanced Cardiovascular Sys. Inc., 106 F.3d 976, 981 (Fed. Cir. 1997).

Dr. DeRose's addition of the Met to the OTP-DMMG junction and his modification of the OTP by adding restrictor sites for easier addition or removal of promoters certainly contributed to the probable effectiveness of the constructs but constituted practicing the state of the art. There is no showing that either were inventive contributions. As he testified, the literature at the time reported the effectiveness of a Methionine in prolonging the stability of proteins. (DeRose, Trial Tr. vol. II, 222-23.) There is no evidence to support a finding by clear and convincing evidence that adding restrictor sites was novel and there was evidence that it was not. (Spencer, Trial Tr. vol. VIII, 1137-38.)

Nor does the evidence support a finding of an inventive aspect in Dr. DeRose's combination of elements for the various constructs sent in February, 1993. According to his testimony, the ideas for combining OTP with the DMMG and, then, with different promoters were attributable variously to Drs. Freyssinet,

Lebrun, Leroux and Sailland.  (DeRose, Trial Tr. vol. II, 221, 222, 226.)

Similarly, while Dr. Lebrun's contribution of isolating the maize EPSPS gene was central to obtaining the DNA to be mutagenized, there is no showing that it was more than a state of the art undertaking.

### B.  The '798 patent

#### 1.  Claim Construction

The second patent for which RPA seeks to have its five scientists declared joint inventors is the '798 patent.  Claim 1 of the '798 patent reads:

> A fertile transgenic *Zea mays* plant containing an isolated heterologous DNA construct encoding EPSP synthase wherein said DNA construct is expressed so that the plant exhibits resistance to normally toxic levels of glyphosate, wherein said resistance is not present in a *Zea mays* plant not containing said DNA construct, and wherein said DNA construct is transmitted through a complete normal sexual cycle of the transgenic plant to the progeny generation.

('798 Patent, col.26, ll.15-23.)  The parties stipulated to all of the claim construction except as to how to construe the following language in the claim: "the plant exhibits resistance to normally toxic levels of glyphosate, wherein said resistance is not present in a *Zea mays* plant not containing said DNA construct." The Court ultimately construed that language and instructed the advisory jury that the terms effectively meant that an amount of glyphosate normally sufficient to kill a non-transgenic corn plant would have no effect upon the transgenic plant.  This, then, was construed as the transformed plant having total resistance or immunity to an amount of glyphosate which would normally kill non-transgenic corn.  The

advisory jury found that the five RPA scientists had contributed to the conception of: 1) fertile transgenic corn containing DNA constructs encoding non-bacterial mutated plant EPSP synthases; and 2) fertile transgenic corn containing DNA constructs encoding EPSP synthases that provide glyphosate resistance to corn.

After further consideration, the Court believes it improperly construed the claim at issue and, therefore, improperly instructed the advisory jury. This section discusses the construction read to the jury, the construction now adopted, the basis for the Court's interpretations and the effect on the claims of the plaintiffs to be added as inventors on the '798 patent.[28]

a.

The procedure for claim construction is well known. The first step is an examination of the intrinsic evidence which includes: (1) the language of the claims themselves; (2) the patent's specification; and (3) the patent's prosecution history. Markman, 52 F.3d at 979. This intrinsic evidence is the "most significant source of the legally operative meaning of the disputed claim language." Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996).

Thus, a district court should "[f]irst . . . look to the words of the claims themselves, both asserted and nonasserted, to define the scope of the patented

_____

[28] Because the jury empaneled in this case was advisory, the district court is ultimately responsible for the findings of fact and conclusions of law. See In re Incident Aboard D/B Ocean King v. Ocean Drilling and Exploration Co., 758 F.2d 1063, 1071 (5th Cir. 1985) ("[A]ny errors relating to rulings before the [advisory] jury and instructions to the [advisory] jury need not be considered.") (citing cases).

invention." Id. The court is then to look to the specification of the patent which contains a written description of the invention which must be clear and complete enough to enable those of ordinary skill in the art to make and use the invention. Id. Finally, the prosecution history, often referred to as the "file wrapper," should be considered by the court. Id. The prosecution history contains the complete record of all of the proceedings before the Patent and Trademark Office. The prosecution history is often of "critical signification in determining the meaning of the claim" because it includes any express representations made by the applicant regarding the scope of the claims. Id.; see also Southwall Tech. Inc. v. Cardinal IG Co., 54 F.3d 1570, 1576 (Fed. Cir. 1995) ("The prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during the prosecution.") (citations omitted). However, "[a]lthough the prosecution history can and should be used to understand the language used in the claims, it . . . cannot 'enlarge, diminish, or vary' the limitations in the claims." Markman, 52 F.3d at 980 (quoting Goodyear Dental Vulcanite Co. v. Davis, 102 U.S. 222, 227 (1880)).

When the intrinsic evidence fails to resolve the ambiguity in the disputed term, extrinsic evidence may be considered. See, e.g., Pall Corp. v. Micron Separations, Inc., 66 F.3d 1211, 1216 (Fed. Cir. 1995) ("Extrinsic evidence may also be considered, if needed to assist in determining the meaning or scope of technical terms in the claims.") (citations omitted, emphasis added); Vitronics

41

Corp., 90 F.3d. at 1583 (explaining that it is only proper to rely on extrinsic evidence if the analysis of the intrinsic evidence fails to resolve the ambiguity in the disputed claim term). Extrinsic evidence includes evidence outside of the patent and its prosecution history, such as expert testimony, the inventor's testimony, dictionaries, and learned treatises. Markman, 52 F.3d at 980-81 (suggesting this is not an exhaustive list and that any evidence that is helpful may be admitted as extrinsic evidence). However, if this evidence is necessary, it can only be used by the court to aid its understanding of the patent, and not to vary or contradict the terms as used in the claims. See id. at 981; Vitronics Corp., 90 F.3d at 1583 ("Allowing the public record to be altered or changed by extrinsic evidence introduced at trial, such as expert testimony, would make [the public's right to rely on the public record] meaningless"); Southwall, 54 F.3d at 1578 ("A patentee may not proffer an interpretation for the purposes of litigation that would alter the indisputable public record consisting of the claims, the specification and the prosecution history . . . .").

Finally, if extrinsic evidence does not resolve the ambiguity, there are various canons of construction that can be used to arrive at an interpretation. See, e.g., Katz v. AT&T Corp., 63 F. Supp. 2d 583, 589 (E.D. Pa. 1999) ("To complete the task of claim construction, a court may draw on the canons of construction that can be sifted from the decisions of the Court of Appeals for the Federal Circuit spanning before Markman and beyond."); 5A Chisum on Patents, § 18.03 [2][a]

42

(citing examples of canons commonly used in construing patent claims).

<div align="center">b.</div>

The first disagreement by the parties centers around the meaning of the word "resistance". RPA argues that "resistance" means something like immunity; that a non-transgenic plant would die from application of a normally lethal amount of glyphosate while the transgenic plant would remain unharmed (the construction given the advisory jury). DeKalb, on the other hand, contends that "resistance" is inherently comparative; that a plant exhibits "resistance" to glyphosate if it suffers even slightly less harm from an application of glyphosate than do normal corn plants.

The starting point, then, is an examination of the intrinsic evidence, here the patent claim language, the specification, and the prosecution history. RPA points to the prosecution history where the terms "resistance" and "partial resistance" each appear. (Pros. Hist. '798 Patent at 804[29], 812[30].) RPA argues that the

_____

[29] In an Interview Summary dated May 24, 1996, the patent examiner states: "The declaration clearly evidences that a person of ordinary skill in the art, employing the methods disclosed in the specification, would have obtained a transgenic corn plant expressing EPSP synthase at levels sufficient to obtain resistance or partial resistance to glyphosate at leaves that would normally kill corn." (Pros. Hist. '798 Patent at 804 (emphasis added).)

[30] T. Michael Spencer, a DeKalb scientist, filed a Declaration dated August 12, 1993 in which he provided information about two examples of experiments. (See Pros. Hist. '798 Patent at 807-15.) Example One discussed experiments with versions of the aroA gene in which Spencer concluded that "a low level of expression of the aroA gene had been attained which provides partial resistance to herbicide application." (Pros. Hist. '798 Patent at 812 (emphasis added).) In

<div align="center">43</div>

concept of "partial resistance" would have no meaning unless "resistance" were interpreted as complete or absolute resistance. See Phillips v. AWH Corp., 415 F.3d 1303, 1314 (Fed. Cir. 2005) (explaining that the term "steel baffles" strongly implies that the term "baffles" does not inherently mean objects made of steel); Minebea Co. v. Think Outside, Inc., 159 Fed. Appx. 197, 202 (Fed. Cir. 2006) (explaining that because the claim provides that certain structures will "slide in addition to pivot" sliding motion should not be subsumed into pivoting motion).

However, after reviewing the specification, the prosecution history, and the arguments of counsel, it is determined that the intrinsic evidence substantially supports DeKalb's view that, as used in claim 1, "resistance" should be accorded its broader meaning, i.e. that a transgenic plant is "herbicide resistant" even if it is severely harmed by herbicides, so long as it is less harmed than the non-transgenic version of the plant would be at the same applied level of glyphosate.

For example, the specification – which does not describe a transformation in which glyphosate resistance was the trait being conferred – does describe a transformation which used the process claimed in the original application for conferring a trait for hygromycin resistance and also describes the testing for evidence that the DNA encoding hygromycin resistance had been inserted and passed to the R1 generation. In the test, the tissue was subjected to hygromycin

---

contrast, Example Two, which discussed experiments with the mutant maize ESPS gene, concluded that glyphosate resistance had been conferred. (Pros. Hist. '798 Patent at 815 (emphasis added).)

and then scored from 0 to 6; 0 being all brown and 6 being all green. ('798

Patent, col.21, ll.6-12.) Those scoring from 3 to 6 were classified as "hygromycin

resistant". ('798 Patent, col.21, ll.6-12.) Significantly, the tissue scored at 3, 4,

and 5 – each being classified as "resistant" – would be less than all green with a 3

being more brown than green. Thus, the specification itself ascribes a meaning to

the term "resistance" much broader than total resistance or immunity.

Additionally, the prosecution history contains several statements by DeKalb

through its attorneys which suggest the understanding of "resistance" intended in

the application. First, the prosecution history contains a reference by DeKalb's

patent attorney to a declaration by T. Michael Spencer, one of DeKalb's scientists.

(Pros. Hist. '798 Patent at 416.) The attorney contends that the declaration

shows that "resistance to glyphosate" has been imparted to corn plants. Read

together with the declaration itself which discusses the production of transgenic

corn plants that are severely harmed by glyphosate, though somewhat less so that

normal corn plants, it is clear that the attorney is using the term "resistance" in a

broad sense.[31] (Pros. Hist. '798 Patent at 807-15.)

Second, the Amendment filed by DeKalb's attorneys on February 22,

1996[32], contains a description of resistance that strongly suggests inclusion of

---

[31] The same sense in which clothing that is not waterproof is sometimes called "water resistant."

[32] The Amendment was sent February 19, 1996, but does not appear to have been filed until several days later.

45

more than just immunity. That Amendment states: "The DNA construct is expressed so that the transgenic plant exhibits tolerance or resistance to glyphosate at levels that render it identifiable over the corresponding untransformed corn plant which does not comprise the heterologous DNA." (Pros. Hist. '798 Patent at 748-49.) The DeKalb attorney's statement conveys an understanding of resistance that includes the transgenic plant being harmed, but less so than the non-transgenic corn, and not that of immunity.

Such statements, made by the patent applicant himself, are strong evidence of the meaning intended in the claim language. See Markman, 52 F.3d at 980 ("Th[e] construction of the patent is confirmed by the avowed understanding of the patentee, expressed by him, or on his behalf, when his application for the original patent was pending . . . . [W]hen a patent bears on its face a particular construction, inasmuch as the specification and claim are in the words of the patentee, . . . such construction may be confirmed by what the patentee said when he was making his application.") (citing Goodyear Dental, 102 U.S. at 227).

There is no suggestion in the prosecution history that DeKalb, in its communications with the Patent Office, ever agreed to or was asked to limit the meaning of resistance to full or total resistance. In this context, it is interesting to note that the cited use of the phrase "resistance or partial resistance" was that of the patent examiner who at the time was necessarily using both as fulfilling the limitation of "resistance" in claim 1. The patent examiner's Interview Summary

46

dated May 24, 1996 contains the following statement:

> The specification does not clearly evidence the effects of the
> expression of EPSP synthase in transgenic corn plants in the absence
> of [sic] Spencer declaration, the orginal [sic] filed in parent application
> 07/508,045, of the instant continuation application.  Applicants'
> attorney submitted said declaration for review in this interview.  The
> declaration clearly evidences that a person of ordinary skill in the art,
> employing the methods disclosed in the specification, would have
> obtained a transgenic corn plan expressing EPSP synthase at levels
> sufficient to obtain <u>resistance or partial resistance</u> to glyphosate at
> levels that would normally kill corn . . . . Actual reduction to practice
> is viewed as the completion of the conception of the invention (Fiers
> v. Sugano 25 USPQ2d 1601 (Fed Cir. 1993)).

(Pros. Hist. '798 Patent at 804 (emphasis added).)  As is evident from this

statement, the patent examiner put great weight in the information contained in

the Spencer declaration.  The Spencer declaration described one example of a

transformation in which Comai's CT7, aroA bacterial gene, was biolistically

implanted into embryonic cells, a plant regenerated and crossed with a non-

transgenic plant.  Plants of the R1 generation were then subjected to applications

of 2, 4, 8 and 16 ounces of glyphosate.  At the two ounce level, all lived; at the

eight and sixteen ounce levels all died.  At the four ounce level some died and

those that lived were stunted.  The example was cited in the declaration as

illustrating that "a low level of expression of the aroA gene had been attained

which provides <u>partial</u> <u>resistance</u> to herbicide application." (Pros. Hist. '798 Patent

at 811-12 (emphasis added).)  Example Two described transformation using RPA's

construct of the DMMG and the OTP constructs, but only through the <u>in</u> <u>vitro</u>

stage.  Following microprojectile bombardment and a selection process in which

47

glyphosate was used in the growth medium as a selectable marker, Southern blot

hybridization showed that both callus lines tested had incorporated the new DNA.

This was cited in the Spencer Declaration as a clear demonstration of the

"introduction and expression in cultured maize cells and plants of an ESPS gene

which confers glyphosate resistance." (Pros. Hist. '798 Patent at 815 (emphasis

added).) The use of the term "glyphosate resistance" in the second example

describing the in vitro analysis of a cell line and not a plant was not inconsistent

with the use of the term "partial resistance" as it was applied to the testing of a

fertile, transgenic plant of the R1 generation in the first example. Both were

consistent with the use accorded the term "resistant" in the specification when

"hygromycin resistant" tissue was defined to include all shoots scoring from 3 to 6

after being exposed to hygromycin. ('798 Patent, col.21, ll.5-13.)

<div align="center">c.</div>

This, however, does not completely define the key phrase in question:

"exhibits resistance to normally toxic levels of glyphosate." In addition to an

interpretation of what "resistance" means, it is also necessary to construe the

second part of this phrase, specifically what levels of glyphosate would be

"normally toxic".

When construing patent claims, the Court does not presume any of the

words of the claim to be superfluous. See Elekta Instruments S.A. v. O.U.R.

Scientific Int'l, Inc., 214 F.3d 1302, 1307 (Fed. Cir. 2000). Therefore, the words

"toxic" and the word "normally" must both be given a meaning. Both parties agree that "normally toxic" should be interpreted broadly as a differential and not a specific level or amount of glyphosate.[33] However, the question remains as to whether "normally toxic" requires that the non-transgenic corn plant is killed or merely harmed by the application of the glyphosate.

The plain meaning of "toxic" suggests something less is required than the plant actually being killed. Rather, the word "toxic" is generally equated with the word "poison". See Webster's New Universal Unabridged Dictionary 2003 (defining "toxic" as "acting as or having the effect of a poison; poisonous"). "Poison", however, is defined in the following manner, "a substance with an inherent property that tends to destroy life or impair health." Id. at 1495. Thus, the word "toxic" likely covers both harm to the plant, as well as death to the plant.

This definition of "toxic" is supported by the patent specification as well. In column 12 the specification uses the word "toxic" in a way that suggests that something can be "toxic" at varying levels. ('798 Patent, col.12, ll.7-25.) For example, the specification discusses exposure to a toxic agent first at a "relatively low toxic agent concentration" which should result in "about a 5-40% level of growth inhibition . . ." ('798 Patent, col.12, ll.11-18.) It then discusses exposure

---

[33] The parties disagree regarding what the differential should be: DeKalb arguing that it should be the amount that would effectively kill a plant (Hr'g Tr. 54, Aug. 31, 2000), and RPA arguing it should be the amount that would harm a plant (Hr'g Tr. 55, Aug. 31, 2000.)

of a toxic agent at a higher concentration to "kill essentially all untransformed cells" and resulting in a "30 to 100% growth inhibition." ('798 Patent, col.12, ll.23-29.)  Thus, although not referring directly to the process described in claim 1, the specification clearly uses the word toxic to mean harming as well as killing the subject of the application.  Applied to the application of glyphosate to non-transgenic corn, as described in claim 1, toxic would refer to an amount of glyphosate that would harm or make sick the non-transgenic corn plant.[34]

In this case "normally" refers to the amount of the glyphosate that would cause this harm, but it likely does not mean any amount of glyphosate conceivable. Rather "normally" in this sense logically correlates to the amount of glyphosate that would, if applied, at least make the non-transgenic corn plants sick or have some other adverse affect.  Thus, the term "normally" should be construed as the amount of glyphosate that, under similar circumstances, is usually enough to adversely affect or harm a non-transgenic corn plant.  This construction addresses DeKalb's concerns that the amount of glyphosate that is normally applied varies depending on the geographic location of the plants, the stage of growth at which the glyphosate is applied, and other factors that may affect the amount that would

---

[34] The patent examiner, however, makes a comment in the patent history on May 24, 1996, that is contrary to this construction.  (Pros. Hist. '798 Patent at 804) (stating that the invention had been reduced to practice based in part on the ability to obtain resistance or partial resistance at "levels that would normally *kill* corn") (emphasis added).  However, because the patent history is not to be used to "enlarge, diminish, or vary the limitations in the claims," the patent examiner's comments are not instructive.  Markman, 52 F.3d at 980 (citations omitted).

harm a plant.

However, given the meaning accorded the word "resistance" in section (b),
supra, whether "normally toxic" refers to a lethal or non-lethal application of
glyphosate is of no consequence in determining whether any of the five applicants
in this case should be added as inventors.

2. Application - Conception and Joint Inventorship

According to the Prosecution History, the examiner accepted the Spencer
Declaration, necessarily Example One, as evidencing a reduction to practice of the
limitations contained in claim 1. Example One described April 1993 field testing of
fertile transgenic plants of the R1 generation containing DNA constructs with Dr.
Comai's CT7, aroA, bacterial EPSPS gene. As discussed earlier, plants were
sprayed with glyphosate applications of 2, 4, 8 and 16 ounces per acre. According
to DeKalb's May 10, 1993 research report:

> All plants were killed in the 8oz. and 16 oz. treatments. These are the
> lowest rates currently recommended by Monsanto for easy to control
> weeds. Greg Parker estimates that the recommended rate of control of
> weeds in transgenic corn may be 16 oz/A. The 2oz rate did not kill
> any plants, but their size and rate of growth were stunted. The 4oz
> rate killed some of the plants, while the growth of others were severely
> stunted. The ratio of dead plants to slow growing plants was 3:1.

(PTX166 at DKB 056731.)

Thus, in April 1993, DeKalb researchers had established through
transformation, regeneration and crosses:

> [a] fertile transgenic *Zea mays* plant containing an isolated
> heterologous DNA construct encoding EPSP synthase wherein said

51

DNA construct is expressed so that the plant exhibits resistance to
normally toxic levels of glyphosate wherein said resistance is not
present in a *Zea mays* plant not containing said DNA construct, and
wherein said DNA construct is transmitted through a complete normal
sexual cycle of the transgenic plant to the progeny generation.

('798 Patent, col.26, ll.15-23.)

Conception could have occurred no later than an actual reduction to practice,
April 1993. This was at a time when the RPA constructs were becoming the new
focus of DeKalb's glyphosate resistance research, following initial microprojectile
bombardment and selection, but before any plants had been regenerated. (PTX166
at DKB 056726-28). Insofar as the '798 patent is concerned, conception had
occurred prior to the making of significant inventive contributions by the RPA
scientists. Without further research, i.e. regeneration, crossing and testing, the idea
that the trait of glyphosate resistance could be conferred to fertile transgenic maize
plants with constructs containing the DMMG or DMMG and OTP was theoretical.
There was no evidence that RPA had actually tested the efficacy of constructs
containing the DMMG or DMMG and OTP before – or after – sending them to
DeKalb. It was unknown in April 1993 whether the shape of the maize EPSPS coil,
altered by replacement of Serine for Proline at position 102 and Isoluceine for
Threonine at position 106 would disrupt the bonding of glyphosate in a plant;
experience in the art had shown that what worked in the test tube or petri dish
often did not work in the plant. And since the point of actual insertion of DNA
within the genome was random and could well be determinative of the gene's

expression and even the plant's subsequent fertility, a conception which included the DMMG or DMMG and OTP (RPA's contributions) could not have occurred until after April 1993. See Fiers, 984 F.2d at 1168-69.

Because conception had occurred prior to any of the applicants making a significant inventive contribution, the applications of the RPA scientists to be added as joint inventors to the '798 patent shall be denied.

## IV.  EQUITABLE ESTOPPEL

Despite the above reasons for adding the RPA scientists as inventors to the '497 patent, DeKalb argues that communications between RPA and DeKalb during the time of DeKalb's successes with the DMMG show that RPA should be equitably estopped from asserting joint inventorship.  Specifically, DeKalb contends that the letters exchanged between it and RPA in the fall of 1993 form the basis for equitable estoppel in this case because the communications notified RPA that DeKalb was writing the patents.  The facts surrounding these exchanges and the application of the doctrine of equitable estoppel will be discussed in turn below.

### A.

Throughout 1993, Dr. DeRose at RPA kept in contact with the scientists

from DeKalb, including Michael Spencer[35] and Dr. Chris Flick.[36]  Dr. DeRose visited

DeKalb's lab in August of 1993 and toured the laboratory and greenhouses.

(DeRose, Trial Tr, vol. I, 173-74.)  Moreover, in 1993 and 1994, DeKalb kept RPA

informed about various early phases of testing the constructs, and asked for RPA's

permission to use the DMMG or the DMMG and OTP (RD-125) as a selectable

marker in transformations with other genetic material.

The initial communication of the exchanges between DeKalb and RPA was on

August 5, 1993 when Douglas Fisher, Deputy General Counsel of DeKalb, wrote to

John Power of RPA about several matters.  The portion pertinent to this inquiry,

with emphasis added, reads as follows:

August 5, 1993

Mr. John Power
Clause, S.A.
1, Avenue Lucien Clause
91221 Bretigny Sur Orge Cedex
FRANCE
                                        VIA FACSIMILE

Dear John:

I will be out August 2-5.  Here are some items I want you to consider:
     1.  RPA Genes.  Attached is a copy of a declaration we intend to file
     this week in the U.S. Patent Office in support of our corn
     transformation patent.  Similar information would be in the application.

---

[35] Spencer was hired by DeKalb to work on corn transformation and is the
named inventor on the '497 patent.

[36] Dr. Flick also worked for DeKalb on corn transformation and was
Spencer's supervisor during the collaboration with RPA.

The genes referred to were obtained by us from RPA and RPA designed the mutations. This information would be confidential until any patent issues, which is not in the immediate future . . . .

Sincerely,

Douglas A. Fisher
Deputy General Counsel

tkr
cc: Chris Flick
    Catherine Mackey
    Tom Rice
    John Witmer

(DTX 595 at RPA 024235-36 (emphasis added).)

The ten page document which, with insubstantial changes, was filed with the Patent Office as the "Spencer Declaration" stated that: glyphosate is an effective herbicide for post emergence control of weeds in corn production, that corn itself lacks resistance to glyphosate, that development of novel corn lines possessing "glyphosate-resistance genes" is made possible by employing corn transformation methods and that "glyphosate-resistance genes" may also be employed as selectable markers[37] for identification of transformed plants and cell lines. (DTX 595 at RPA 024239-48.) The declaration continued:

---

[37]As described earlier, the DMMG when attached to other genetic material was usable as a selectable marker to demonstrate which transformed cells had incorporated the new DNA. Following the transformation procedure, all embryonic cells bombarded by the microprojectiles coated with the new DNA would be placed on a medium containing glyphosate. Those which lived would have necessarily incorporated the new DNA somewhere within their chromosomes. DeKalb had never been successful in using the aroA gene as a selectable marker because it did not provide sufficient tolerance to glyphosate. (PTX 166 at DKB 056725.)

55

Glyphosate inhibits the action of the enzyme EPSP-synthase which is active in the aromatic amino acid biosynthetic pathway. Inhibition of this enzyme leads to starvation for the amino acids phenylalanine, tyrosine, and tryptophan and secondary metabolites derived thereof. U.S. Patent 4,535,060 describes mutations of the EPSP-synthase encoding gene of *Salmonella typhimurium* (aroA) which confer resistance to glyphosate. The EPSP-synthase gene was also cloned from *Zea mays* and mutations similar to those found in a glyphosate resistant aroA gene were introduced in vitro. Two examples are described below of the introduction of these genes into corn to confer glyphosate resistance. In the second example the gene is employed as a selectable marker.

(DTX 595 at RPA 024239 (underline emphasis added).)

The text of Example One discusses DeKalb's efforts at transforming corn cells with the aroA (CT7), growing the cells into a mature plant which was crossed with a non-transformed inbred plant, and developing kernels from which embryos were isolated and cultured until plants developed. The declaration text describes how resulting offspring were field tested with applications of two, four, eight and sixteen ounces of glyphosate per acre and states: "All plants were killed in the 8 oz and 16 oz treatments (normal field application rates for weed control). At 4 oz/A a portion of the transformed plants were killed and a portion were stunted in growth. The ratio of dead plants to slow growing plants was 3:1 (Table 14) indicating that there was a low level of expression of the aroA gene providing partial resistance to herbicide application." (DTX 595 at RPA 024242.)

Example Two discusses transformation studies "conducted using two mutant maize EPSP-synthase genes," the RPA constructs. (DTX 595 at RPA 024243; PTX166 at DKB 056726.) The text discusses using various combinations of the

56

two mutant maize genes with different promoters to bombard corn cells, the

growing of the resultant transformed cells using glyphosate as the selection agent,

and the use of Southern blot tests to confirm that the mutant maize genes had been

introduced into the corn plant cells. The text concludes with the paragraph:

> The above two examples clearly demonstrate the introduction and
> expression in cultured maize cells of EPSP-synthase genes conferring
> glyphosate resistance. Moreover, glyphosate was successfully used as
> the selection agent for identification of the transformed cell lines.
> Regeneration of plants from the transformed cell lines is in progress.

(DTX 595 at RPA 024248.)

Apparently RPA did not respond before Dr. Catherine Mackey wrote to Dr.

Freyssinet of RPA on August 12, 1993. Dr. Mackey reiterated the information in

the August 5 letter noting that "In the course of prosecution of one of our corn

transformation patent applications, we have been asked by the examiner to provide

evidence of expression of various transgenes in corn . . . . Since this [declaration]

contains confidential information of Rhone-Poulenc, your permission is requested to

include this information in the declaration." (DTX 599 at RPA 020678 (emphasis

added).) The letter attached an insubstantially different draft of the declaration.

The next day, DeKalb wrote to RPA to clarify some information conveyed in

the previous day's correspondence. (DTX 608 at RPA 020684.) DeKalb again

referenced its "corn transformation patents" and stated that it did not see any

reason why RPA "would be concerned about the disclosure of this information to

the US Patent Office" but noted that it needed RPA's permission to disclose the

information under the Confidentiality Agreement. (DTX 608 at RPA 020684.)

A few days later, Dr. Freyssinet responded, granting permission for DeKalb to use RPA's constructs "to examplify [sic] your patent on corn transformation" with some conditions. (DTX 617 at DKB 017134.) One of those conditions was that DeKalb would provide similar information to support RPA's patents on promoters.

On September 27, Dr. Freyssinet wrote to Dr. Mackey requesting information about DeKalb's results using RPA's genes. (DTX 1828 at DKB 017133.) Apparently not having heard from DeKalb, Dr. Freyssinet reiterated his request on November 10. (Pl.'s Third Mot. In Limine, Ex. F.)

Two days later, on November 12, 1993 Dr. Flick responded – not with further information about test results using RPA's genes – but stating that DeKalb's patent attorneys gave permission for DeKalb to release the information RPA requested "as long as the subject of your patent applications do not overlap ours, i.e., our claims are to the fertile transgenic corn containing these promoters and genes. If your claims are to the genes and promoters there is no problem at all." (DTX 1646 at RPA 023436.)

Finally, on November 30, Dr. Freyssinet wrote Dr. Flick to confirm that "[RPA's] claims will be for genes and promoters and not to fertile transgenic corn."[38] (DTX 1647 at RPA 023434.) Dr. Flick then forwarded the requested

---

[38] On one version of the November 12 DeKalb letter, RPA's Dr. Rick DeRose wrote some comments which reflected his view of the claims. DeKalb argues that these comments support its equitable estoppel defense; however, Dr. DeRose's

information to RPA while again reiterating that RPA may use the information "as

long as there are no claims to fertile maize plants." (DTX 43 at RPA 020702.)

During his deposition, Dr. Flick testified about the substance of these

communications.

> Q: Looking at these same exhibits, and any associated discussions that
> you had with anyone from RPA, did you understand that DeKalb was
> entitled to file patent applications to obtain patents that included
> claims that incorporated RPA's inventors' contributions without naming
> the RPA inventors?
>
>            * * *
>
> Dr. Flick: I don't really know what my understanding was then. I don't
> know that I was concerned about inventorship.
>
>            * * *
>
> Q: Dr. Flick, looking at these exhibits, and considering also the--any
> associated discussions that you had, do you have any understanding
> as to whether or not these exhibits or your recollections of discussions
> have any bearing on whether or not RPA's inventors should be
> included as joint inventors on any of these four patents?
>
>            * * *
>
> Dr. Flick: I don't really have an opinion one way or the other about the
> inventorship. That's something, as I said before, that I've always left
> to outside counsel to determine. I don't think I can give you an answer
> to the question, really.
>
> Q: Is it fair to say that you and Dr. Freyssinet never agreed in 1993 as
> to who should own or who should be the named inventors on any
> patents that issued?

---

comments were part of internal RPA communications, were not communicated to
DeKalb, and could not, therefore, mislead DeKalb and be a factor in the
consideration of equitable estoppel. See infra, Part B.

59

Dr. Flick: I don't recall having that discussion with him, but I don't
think that I would have been the person who would have had that
discussion if it occurred. I was not a business person at that time. I
was not in management. That's something that I think would have
happened at a higher level than me.

(Pl.'s Third Mot. In Limine at Ex. J; Dep. of Dr. Christopher Flick, June 21, 2000 at

864-66.)

In late 1993 and early 1994, in a greenhouse, DeKalb had succeeded in

growing transformed corn plants that contained RPA's RD-125 construct and were

resistant to Roundup® herbicide at potentially commercial levels. As mentioned

earlier, on February 18, 1994, several months after these letters were exchanged,

DeKalb informed RPA for the first time that "[W]e have not only demonstrated that

we can use the mutant maize EPSPS gene as a selectable marker in maize, but we

have now demonstrated tolerance in transgenic plants in the greenhouse to up to

four times the field application recommended by Monsanto for tolerant corn! We

will repeat these experiments in the field in the summer of 1994. It is obvious from

these results that the mutant maize gene has been the key to success." (PTX 240

at DKB 040277.)

Dr. Freyssinet of RPA responded with a three sentence letter stating: "I thank

you for the report on development of glyphosate resistant corn. The results look

good[.] I hope they will be confirmed by the field experiments." (PTX 242 at DKB

017113.) Then, on March 10, 1994, DeKalb sent RPA another letter that once

again mentioned the summer field trials and the gains in glyphosate tolerance

DeKalb had achieved in the greenhouse with RD-125. (PTX 245 at DKB 017108-09.) In addition, that letter requested RPA's opinion regarding the use of RD-125 for other projects, and also requested a response to the "many questions" that need to be answered regarding the "recent successes" of RD-125. (PTX 245 at DKB 017108-09.)

DeKalb conducted field tests in the summer of 1994, and on September 6, 1994, DeKalb received results from the tests that indicated that corn plants containing RPA's RD-125 were resistant to four times the normal level of Roundup® herbicide. The report from the field testing was not sent to RPA. Rather, on September 7, 1994, Dr. Chris Flick of DeKalb sent RPA a letter which stated, in its entirety, that:

> As the results that we have obtained in maize with the glyphosate resistant double mutant maize gene provided by RPA to DeKalb have been very encouraging, we are interested in whether this gene would also function as a selectable marker in soybeans. Is it possible for DeKalb to use this gene in soybeans as a selectable marker?
>
> I will await your answer.

(PTX 310 at RPA 021092.)

In 1994, these letters were the extent of the communications between DeKalb and RPA regarding RD-125 and its introduction into corn lines.

DeKalb never informed RPA directly about the field success of RD-125.[39]

---

[39] DeKalb's failure to inform RPA of its successes was an issue in the first phase of this case. On April 21, 1999, at the end of the first phase, a jury found that RPA agreed to allow DeKalb to use the RD-125 construct in return for

RPA's first indication that DeKalb had achieved positive results beyond the initial lab

tests reported in February 1994 was in December of 1996. Yet, it was not until

the Fall of 1997, when Dr. DeRose saw DeKalb's APHIS application for sale of a

commercial product, that RPA became aware of DeKalb's commercialization of that

material.

<div align="center">B.</div>

The elements of an equitable estoppel defense were established in an *en banc*

opinion of the Federal Circuit in A.C. Aukerman Co. v. R.L. Chaides Constr. Co.,

960 F.2d 1020 (Fed. Cir. 1992).[40]  The court held the elements to be:

---

DeKalb's agreement to provide the results of its testing to RPA. The jury found
that this agreement existed in three forms: as an oral contract made between Dr.
Freyssinet of RPA and Dr. Mackey of DeKalb at the November 1992 meeting; as an
implied contract formed by the parties' conduct after the meeting; and as a
modification of agreements made in 1985 and 1991. Moreover, the jury found
that DeKalb breached this agreement by not providing the results of the Hawaii
field tests in the summer of 1994, and that this breach caused RPA to enter
another agreement on different terms than it otherwise would have. The jury also
found that DeKalb fraudulently induced RPA to enter the 1994 Agreement on the
terms that it did.

[40] RPA contends that the elements of equitable estoppel derive from MCV,
Inc. v. King-Seeley Thermos Co., 870 F.2d 1568 (Fed. Cir. 1989). Those elements
were first set forth in Jamesbury Corp. v. Litton Indus. Prods., Inc., 839 F.2d
1544, 1553-54 (Fed. Cir. 1988). While RPA is correct that MCV involved a claim
of correction of inventorship and Aukerman involved a patent infringement claim,
Aukerman "expressly overruled" the equitable estoppel elements used in both
Jamesbury and MCV. 960 F.2d at 1042. There was no reservation or limitation
to the overruling nor is there any evidence that the test set out by the Aukerman
court was to apply only in patent infringement cases. In fact, the Aukerman test
has been used by several courts to evaluate an equitable estoppel claim in the
context of a claim of joint inventorship. See, e.g., Pannu, 96 F. Supp. 2d at 1368;
Ellison Educ. Equip., Inc. v. Chen, 2004 WL 3154592, at *5 (C.D. Cal. Dec. 21,

> 1) The actor, who usually must have knowledge of the true facts, communicates something in a misleading way, either by words, conduct, or silence. 2) The other relies upon that communication. 3) And the other would be harmed materially if the actor is later permitted to assert any claim inconsistent with his earlier conduct.

Id. at 1041 (quoting D.B. Dobbs, Handbook on the Law of Remedies § 2.3, at 42 (1973)). Absent special circumstances, the party attempting to show equitable estoppel has the burden of proving each of the three elements by a preponderance of the evidence.[41] Aukerman, 960 F.2d at 1046. Here, DeKalb bears that burden.

Because DeKalb relies primarily on the 1993 letters to prevail, that correspondence would have to show that: 1) RPA made a misleading statement to the effect that it would not seek to include any of its employees as inventors on a patent for the same claims that are at issue in this case; 2) DeKalb relied on that miscommunication; and 3) DeKalb would be materially harmed if RPA is allowed to proceed with its claims. Here, DeKalb has failed to establish any of the elements of the Aukerman test.

In the several letters which were exchanged between the parties in 1993, DeKalb described the subject of its patent or its claims as: "our corn transformation

---

2004); Williams Serv. Group, Inc. v. O.B. Cannon & Son, Inc., 1994 WL 13850, at *4 (E.D. Pa. Jan. 19, 1994).

[41] While fraud or intentional misconduct qualify as special circumstances, see Aukerman, 960 F.2d at 1046, and there has been an allegation of fraud in this case, the Court need not address whether any higher standard should apply because DeKalb has failed to meet the less stringent preponderance of the evidence test.

patent" (Aug. 5, 12 and 13 letters); "fertile transgenic corn containing [RPA]

promoters and genes" (Nov. 12 letter); and "fertile maize plants" (Dec. 2 letter).

(DTX595 at RPA 024235-36; DTX 599 at RPA 020678; DTX 608 at RPA 020684;

DTX 1646 at RPA 023436; DTX 1648 at RPA 023233.)  The declarations sent

with the letters refer to transgenic plants which had some resistance to glyphosate

following transformation with the Comai aroA gene from salmonella (Example One)

but the reference to RPA's mutated maize EPSPS genes was in Example Two and

was in terms of its use as a selectable marker, i.e. exemplifying the transformation

process.  (DTX 599 at RPA 020679-82.)

These terms intimate that the patent DeKalb was discussing in the letters

was for the *process* of transforming corn, not for a fertile plant containing RPA's

genetic constructs that exhibited resistance to glyphosate.  While the declarations

that were attached to the first letters do specifically discuss glyphosate resistance,

it was in the context of use of RPA's gene as a selectable marker or as evidence of

a successful transformation.

The letters must be carefully parsed:  The discussion up until the Flick letter

of November 12, 1993 was DeKalb seeking permission to publish the DMMG and

OTP to exemplify their corn transformation patents.  Dr. Flick, in response to Dr.

Freyssinet's request for reciprocal permission to disclose DeKalb proprietary

information in a prospective RPA patent application, gives permission to RPA to use

that information to exemplify the invention of application so long as the patents

64

RPA wished to apply for were not fertile, transgenic corn plants. This is not the same as asking RPA to waive any rights it might have had to patents DeKalb might apply for in which RPA scientists may have made an inventive contribution. Flick's and Freyssinet's communications were very specific and limited to patents RPA was then contemplating which did not in fact include fertile transgenic plants.

DeKalb stressed that it did not think RPA would mind including such information but that it needed to obtain permission under the Confidentiality Agreement between the parties: "We see no reason why RPA would be concerned about disclosure of this information to the U.S. patent office; however, since this information is covered by our confidentiality agreement we are obligated to obtain your approval." (Aug. 13 letter, DTX 608 at RPA 020684.)  The words used by DeKalb to describe its patent and the subjects of its claims simply do not support an inference that RPA could have reasonably interpreted DeKalb's request to encompass a corn plant resistant to normally toxic levels of glyphosate.

Dr. Freyssinet's August 26, 1993 acquiescence in the use of RPA's information ("Rhone-Poulenc agrees with the use of our constructs to exemplify your patent on corn transformation") was conditioned upon DeKalb's reciprocating with information that could be used to exemplify applications for patents for promoters RPA anticipated filing, not for future claims relating to glyphosate resistant corn, the very object of the collaboration.  (DTX 617 at DKB 017134 (emphasis added).)  The communications were not made in the latter context and

65

could not reasonably have been received by DeKalb as a statement that RPA was waiving any claim of inventorship to corn made glyphosate resistant by the use of its genes.

Moreover, Dr. Flick's deposition testimony flies in the face of DeKalb's claim that RPA said it would not claim inventorship of a patent for glyphosate resistant corn. Dr. Flick, who was either the sender or recipient of the last three letters stated that he was not concerned about inventorship at the time the correspondence was exchanged and that, in any event, he was not the person who would have been involved with determining who inventors on patents should be. (Flick Dep. 864-66, June 21, 2000.) Both Dr. Flick's testimony and the reasons given by DeKalb for seeking RPA's permission support a finding that RPA had no knowledge the fertile, transgenic plants being discussed exhibited any significant level of resistance to glyphosate and did not convey an intent to abandon any claim it may have had in the development of glyphosate resistant plants.

This is further corroborated by the relationship of the parties. RPA and DeKalb had been in a collaboration with the specific goal of creating corn plants that would exhibit agronomic tolerance to glyphosate – meaning that a corn field could be sprayed with a field application of glyphosate, the weeds killed but the corn not harmed. (DeRose, Trial Tr. vol. I, 140-41.) It was toward that end that RPA had sent the various constructs attached to its OTP to DeKalb in February, 1992. There is no evidence that at any time during the exchange of pertinent

66

correspondence (August through November, 1993) that DeKalb had given RPA any information about the success of the RPA genes other than cells transformed with those genes having exhibited resistance to glyphosate in the petri dish. (DTX 613 at RPA 028807-09.) It was not until February 18, 1994 that DeKalb communicated to RPA that laboratory and greenhouse tests of regenerated plants had withstood spraying with at least 16 ounces of glyphosate – the amount recommended by Monsanto for field applications. (PTX 240 at DKB 040277-82.) DeKalb knew what it had told RPA and what it had not told RPA. DeKalb could not reasonably have believed that RPA would abandon any claim to glyphosate resistant plants when the development of glyphosate resistant plants was the goal of their collaboration and the quest of many others at the time and RPA had not been informed that DeKalb had succeeded in that endeavor.

As to the third Aukerman element, DeKalb has shown no detrimental effect which the statements conceivably could have had upon the application process or scope or timing of the claims in either the '497 or the '798 patents. Aukerman, 960 F.2d at 1041. Nor has DeKalb shown that it was detrimentally affected by allowing RPA to use earlier information in seeking patents on genes and promoters.

The defense of equitable estoppel is a matter committed to the sound discretion of the trial judge. Aukerman, 960 F.2d at 1028. It "is not limited to a particular factual situation nor subject to resolution by simple or hard and fast rules. At most, courts have provided general guidelines based on fact patterns which have

67

been litigated, albeit attempting to provide a unifying set of principles." Id. at

1041. In assessing an equitable estoppel defense, a court must also take into

consideration any evidence and facts (in addition to those which relate to the three

elements outlined in Aukerman) which bear on the equities of the parties. Id. at

1043.

 This Court finds that there are no other factors in this case which would

warrant a finding of equitable estoppel. DeKalb simply failed to show that RPA

made misleading statements or that DeKalb could have reasonably interpreted those

statements in a detrimental way or that as a result of those statements it has

suffered actual detriment.

## V. CONCLUSION

 In light of the above discussion, the Court will instruct the Director of the

Patent and Trademark Office to add Rick DeRose, Georges Freyssinet, Michel

Lebrun, Bernard Leroux, and Alain Sailland as joint inventors of U.S. Patent

6,040,497 (dated March 21, 2000). However, for U.S. Patent 5,554,798 (dated

September 10, 1996) it is determined that conception had occurred prior to any of

the applicants making a significant inventive contribution and that their application

to be added as joint inventors on that patent should be denied.

This the day of August 7, 2006

    /s/ N. Carlton Tilley, Jr.
United States District Judge

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SYNGENTA SEEDS, INC., <br> GOLDEN HARVEST SEEDS, INC., and <br> GARST SEED COMPANY, <br><br>            Plaintiffs, <br><br>      v. <br><br> DEKALB GENETICS CORPORATION, <br><br>            Defendant. | ) <br> ) <br> )    Civil Action No.: <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## DECLARATORY JUDGMENT COMPLAINT

Plaintiffs Syngenta Seeds, Inc., Golden Harvest Seeds, Inc., and Garst Seed Company (collectively "Syngenta"), by its undersigned counsel, bring this declaratory judgment action against Defendant DeKalb Genetics Corporation ("DeKalb"). Syngenta alleges as follows:

### JURISDICTION AND VENUE

1.      Syngenta brings this civil action under the Patent Laws of the United States, 35 U.S.C. § 1 et seq., and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, to obtain a declaration that U.S. Patent No. 6,946,587 ("the Lundquist '587 patent") and U.S. Patent No. 5,538,877 ("the Lundquist '877 patent"), both assigned to DeKalb, are not infringed by Syngenta and/or are invalid.  True and correct copies of the Lundquist '587 and '877 patents are attached as Exhibits A and B, respectively.

2.      This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338(a).

3.      This Court has personal jurisdiction over DeKalb, a Delaware corporation.

4.      Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b) and (c).

## THE PARTIES

5.    Syngenta Seeds, Inc. is a corporation duly organized under the laws of the State of Delaware with its principal place of business at 7500 Olson Memorial Highway, Golden Valley, Minnesota 55427.

6.    Golden Harvest Seeds, Inc. is a corporation duly organized under the laws of the State of Delaware with its principal place of business at 100 JC Robinson Boulevard, Waterloo, Nebraska 68069.

7.    Garst Seed Company is a corporation duly organized under the laws of the State of Delaware with its principal place of business at 2369 330th Street, Slater, Iowa 50244.

8.    On information and belief, DeKalb is a corporation duly organized under the laws of the State of Delaware with a principal place of business at 3100 Sycamore Road, DeKalb, Illinois 60115.

9.    DeKalb is a wholly owned subsidiary of Monsanto Company ("Monsanto"). Monsanto is a corporation duly organized under the laws of the State of Delaware with a principal place of business at 800 North Lindbergh Boulevard, St. Louis, Missouri 63167.

## FACTUAL BACKGROUND

### A.    Corn Seeds and Traits

10.    Corn is the leading cash crop in the United States, with an annual value of over $24 billion. In 2005, approximately 81 million acres of corn were grown in the United States.

11.    Like most crops, corn production can be impaired by weeds. To control weeds, growers apply herbicides, which are chemical compounds that destroy or inhibit the growth of undesirable plants.

12.    "Selective herbicides" are tolerated by the crop but kill or suppress one or more weeds that infest the field. "Non-selective herbicides" are active on all vegetation and do not

2

distinguish between the commercial crop (such as corn) and other vegetation (such as weeds). Glyphosate is the leading non-selective herbicide used by growers.

13.     Biotechnology has made it possible to introduce new genetic characteristics into plant seeds. This is accomplished by transforming the genetic make-up (or "genome") of a seed by inserting new genetic information into the seed genome. The result is called a transgenic "event." An event contains, among other things, a specific gene that expresses a desirable characteristic in the seed.

14.     The insertion of a desirable transgenic event into a seed alters the seed's genome, conferring a desirable characteristic, or "trait," on crops grown from the seed.

15.     Since 1996, there have been a number of commercially available biotechnology traits for corn seeds. One of the most common of these traits is for glyphosate tolerance. Glyphosate-tolerant corn is resistant to the effect of glyphosate.  As a result of this biotechnology, growers that plant glyphosate-tolerant corn may apply glyphosate over an entire field, killing the weeds while allowing the corn crop to survive.

16.     Crop protection traits, including herbicide tolerance, are useful to growers because they reduce production costs and increase yield. U.S. farmers are increasingly planting genetically modified varieties of seed. It is estimated that 52% of the corn planted in the U.S. in 2005 was transgenic corn (up from 40% in 2003).

**B.     Syngenta's Commercialization of GA21 Corn**

17.     Syngenta is a world-leading agribusiness committed to sustainable agriculture through innovative research and technology. Syngenta is a leader in the commercial seeds market. Syngenta develops and produces a wide range of agricultural products, including biotechnology traits and seeds. Syngenta markets a broad product portfolio of seeds, corn hybrids, and traits in the United States.

18.    This case concerns a glyphosate-tolerant transgenic corn line known as "GA21" corn. GA21 corn was created by DeKalb in 1993-1994 using a chimeric gene that had been developed by Rhone-Poulenc Agro ("RPA"). In prior litigation in the Middle District of North Carolina, DeKalb was found liable for intentional fraud, patent infringement, and trade secret misappropriation in connection with its unlawful development and marketing of GA21 corn. As a result of that district court decision, which was affirmed on appeal by the United States Court of Appeals for the Federal Circuit, DeKalb and Monsanto lost their right to market GA21 corn and were forced to commercialize a different glyphosate-tolerant corn event known as "NK603."

19.    On February 5, 2004, an affiliate of Syngenta acquired RPA's intellectual property rights to the GA21 glyphosate-tolerant corn trait from RPA's successor, Bayer CropScience. With the acquisition of RPA's rights in GA21 corn, Syngenta has the right to introduce and market its own GA21 corn products and to license others. As part of that acquisition, Syngenta's affiliate also acquired the GA21 license from Bayer CropScience under which Monsanto and its sublicensees operated to produce GA21 corn seeds through 2004.

20.    On May 12, 2004, Syngenta's affiliate announced its intention to acquire Advanta BV, including Advanta's Garst Seed subsidiary and its U.S. corn and soybean seed business. At the same time, Syngenta's affiliate publicly announced its acquisition of the GA21 rights from Bayer CropScience.

21.    On June 25, 2004, Syngenta announced an agreement to acquire the Golden Harvest group of seed companies. Golden Harvest is a producer of hybrid corn seed.

22.    Syngenta's acquisitions of Golden Harvest and Advanta were completed on August 2, 2004, and September 1, 2004, respectively.

4

23.    The combination of the Advanta, Golden Harvest, and GA21 acquisitions has given Syngenta the necessary assets to expand its corn product offerings and to offer seed companies and growers a full range of biotechnology input traits for corn.

24.    Syngenta began selling GA21 corn seed in the United States during the 2005 growing season.

25.    Syngenta plans to continue to commercialize the GA21 corn trait in its NK®, Golden Harvest®, and Garst® brand seeds, and through licenses to other seed companies.

C.    **DeKalb's Activities**

26.    On information and belief, DeKalb is engaged in the business of developing and selling crop seeds in Delaware and elsewhere in the United States.

27.    On information and belief, Monsanto, the parent company of DeKalb, sells the herbicide glyphosate under the trademark Roundup® in Delaware and elsewhere in the United States.

28.    On information and belief, genetically engineered products made by Monsanto that have the glyphosate-tolerance trait, including DeKalb branded corn, are sold under the trademark Roundup Ready® in Delaware and elsewhere in the United States.

D.    **Syngenta Has a Reasonable Apprehension of Being Sued by DeKalb for Infringement of the Lundquist '587 and '877 Patents**

1.    **DeKalb and Its Parent Monsanto Have Already Filed Three Patent Infringement Lawsuits Against Syngenta Since May 2004 Relating to GA21 Corn**

29.    Within the past two-and-a-half years DeKalb and Monsanto have sued Syngenta three separate times for patent infringement, in three separate courts, on four separate patents, all relating to the same allegedly infringing Syngenta product: glyphosate-tolerant GA21 corn.

30.     The first in the series of GA21 lawsuits was brought in this Court by Monsanto on May 12, 2004, the same day that Syngenta publicly announced its acquisition of rights to GA21 corn from Bayer CropScience. Monsanto alleged that Syngenta's proposed making and using of GA21 corn infringed U.S. Patent No. 4,940,835 ("the Shah patent"), entitled "Glyphosate-Resistant Plants." *Monsanto Co. v. Syngenta Seeds, Inc.*, No. 04-305-SLR (D. Del. filed May 12, 2004).

31.     Shortly thereafter, on July 27, 2004, DeKalb sued Syngenta in the Northern District of Illinois, alleging that Syngenta had infringed U.S. Patent Nos. 5,538,880 ("the Lundquist '880 patent"), entitled "Method for Preparing Fertile Transgenic Corn Plants," and 6,013,863 ("the Lundquist '863 patent"), entitled "Fertile Transgenic Corn Plants." *DeKalb Corp. v. Syngenta Seeds, Inc.*, No. 04-CV-50323 (N.D. Ill. filed July 27, 2004) ("the Lundquist action"). DeKalb alleged that Syngenta's proposed making and using of GA21 corn infringed the Lundquist '880 and '863 patents.

32.     The Lundquist '880 and '863 patents purport to claim processes for producing herbicide- or glyphosate-resistant transgenic corn, respectively. DeKalb's Illinois complaint asserted that Syngenta infringed the Lundquist patents "by at least making and using corn containing genes that confer resistance to the herbicide glyphosate." Thus, in both the Shah and Lundquist actions, Monsanto and DeKalb asserted that Syngenta had infringed claims relating to making and using GA21 corn containing a gene that confers resistance to the herbicide glyphosate.

33.     On May 19, 2005, the Illinois district court granted Syngenta's motion to transfer the Lundquist action to this Court in major part because GA21 corn products were accused in both actions and the subject matter of the Lundquist and Shah patents was closely related. On

6

March 24, 2005, this Court consolidated the Shah action with a pending antitrust case brought by Syngenta against Monsanto also relating to Syngenta's efforts to market GA21 corn products. In that antitrust action, Syngenta alleges, *inter alia*, that Monsanto and DeKalb's Shah and Lundquist actions were objectively baseless. *Syngenta Seeds, Inc. v. Monsanto Co.*, C.A. No. 04-CV-908 SLR (D. Del. filed July 28, 2004). Monsanto asserted state law counterclaims (which remain pending) in the antitrust case relating to Syngenta's GA21 corn products and acquisition of Advanta. Subsequently, this Court consolidated the Shah and Lundquist actions on August 23, 2005.

34.    On May 10, 2006, this Court granted summary judgment in favor of Syngenta, finding that Syngenta had not infringed the Lundquist '880 and '863 patents and that the Shah patent was invalid for failure to meet the enablement requirement of 35 U.S.C. § 112.

35.    Immediately after this Court's decision in favor of Syngenta, Monsanto publicly announced its intention to appeal the Shah and Lundquist decisions to the United States Court of Appeals for the Federal Circuit. Subsequently, Monsanto filed its notice of appeal, and the appeal is currently pending. *Monsanto Co. v. Syngenta Seeds, Inc.*, Appeal No. 06-1472 (Fed. Cir.).

36.    Having lost its patent infringement case against Syngenta in this Court, on August 11, 2006, DeKalb sued Syngenta and its affiliates in a different court, the Eastern District of Missouri, alleging infringement of U.S. Patent No. 5,554,798 ("the Lundquist '798 patent"), entitled "Fertile Glyphosate-Resistant Transgenic Corn Plants." *DeKalb Genetics Corp. v. Syngenta Seeds, Inc.*, No. 4 06CV01191MLM (E.D. Mo. filed Aug. 11, 2006).

37.    DeKalb's Missouri complaint mirrors its complaint in the prior case in this Court and alleges that Syngenta has "infringed and continue[s] to infringe one or more claims of the

7

'798 patent by at least making corn containing genes that confer resistance to the herbicide glyphosate." Again, DeKalb is alleging that Syngenta's GA21 corn products infringe one of its Lundquist patents.

38.    The Lundquist '798 patent purports to claim a fertile transgenic corn plant containing heterologous DNA that confers resistance to the herbicide glyphosate.

39.    The Lundquist '798 patent is in the same patent family as the Lundquist '880 and '863 patents that were previously before this Court in the Lundquist action. The specification of the Lundquist '798 patent is similar to the specifications of the Lundquist '880 and '863 patents. The same alleged inventors (Ronald Lundquist and David Walters) are named on the Lundquist '880, '863, and '798 patents. True and correct copies of the Lundquist '880, '863, and '798 patents are attached as Exhibits C, D, and E, respectively.

### 2.    The Lundquist '587 Patent Is Closely Related to the Lundquist '880 and '863 Patents That DeKalb Has Already Asserted Against Syngenta

40.    On information and belief, the Lundquist '587 patent, entitled "Method for Preparing Fertile Transgenic Corn Plants," was granted to DeKalb by the United States Patent and Trademark Office ("PTO") on September 20, 2005. Exh. A.

41.    On information and belief, since the date of issuance of the Lundquist '587 patent, DeKalb has been the owner of the entire right, title, and interest in the patent.

42.    The Lundquist '587 patent purports to claim a method of producing fertile transgenic *Zea mays* (corn) plants via the same microprojectile bombardment process that is the subject of the Lundquist '880 and '863 patents that were adjudicated by this Court in the Lundquist action.

43.    The Lundquist '587 patent is in the same patent family as the Lundquist '880 and '863 patents that were before this Court in the Lundquist action. The specification of the

8

Lundquist '587 patent is similar to the specifications of the Lundquist '880 and '863 patents previously asserted by DeKalb against Syngenta. The same alleged inventors (Ronald Lundquist and David Walters) are named on the Lundquist '587, '880, and '863 patents.

44. The claims of the Lundquist '587 patent are closely related to the claims of the Lundquist '880 and '863 patents, which this Court previously determined had not been infringed by Syngenta. For example, claim 1 of the Lundquist '587 patent purports to claim:

> A method for producing a fertile transgenic *Zea mays* plant, comprising the steps of: (i) bombarding intact regenerable *Zea mays* cells with DNA-coated microprojectiles, wherein said DNA comprises a selectable marker gene; (ii) selecting a population of transformed *Zea mays* cells; and (iii) regenerating a fertile transgenic *Zea mays* plant therefrom, wherein said DNA is heritable, to yield transgenic progeny *Zea mays* plants.

Similarly, claim 1 of the Lundquist '863 patent, previously asserted against Syngenta, purports to claim:

> A process for producing a fertile transgenic *Zea mays* plant comprising the steps of (i) bombarding intact regenerable *Zea mays* cells with DNA-coated microprojectiles, wherein said DNA comprises at least a screenable marker gene; (ii) selecting a population of transformed cells expressing the selectable marker gene; and (iii) regenerating a fertile transgenic plant therefrom, wherein said DNA is expressed so as to impart glyphosate resistance to said transgenic plant and is transmitted through a normal sexual cycle of said transgenic plant to progeny plants.

Likewise, claim 1 of the Lundquist '880 patent, also previously asserted against Syngenta, purports to claim:

> A process for producing a fertile transgenic *Zea mays* plant comprising the steps of (i) bombarding intact regenerable *Zea mays* cells with DNA-coated microprojectiles, (ii) identifying or selecting a population of transformed cells, and (iii) regenerating a fertile transgenic plant therefrom, wherein said DNA is transmitted through a complete sexual cycle of said transgenic plant to its progeny, and imparts herbicide resistance thereto.

3.   **The Lundquist '877 Patent Is Also Closely Related to the Lundquist '880 and '863 Patents That DeKalb Has Already Asserted Against Syngenta**

45.   On information and belief, the Lundquist '877 patent, entitled "Method for Preparing Fertile Transgenic Corn Plants," was granted to DeKalb by the PTO on July 23, 1996. Exh. B.

46.   On information and belief, since the date of issuance of the Lundquist '877 patent, DeKalb has been the owner of the entire right, title, and interest in the patent.

47.   The Lundquist '877 patent purports to claim a process of producing fertile transgenic *Zea mays* (corn) plants via the same microprojectile bombardment process that is the subject of the Lundquist '880 and '863 patents that were previously adjudicated by this Court in the Lundquist action.

48.   The Lundquist '877 patent is in the same patent family as the Lundquist '880 and '863 patents that were previously before this Court in the Lundquist action. The specification of the Lundquist '877 patent is similar to the specifications of the Lundquist '880 and '863 patents previously asserted by DeKalb against Syngenta. The same alleged inventors (Ronald Lundquist and David Walters) are named on the Lundquist '877, '880, and '863 patents.

49.   The claims of the Lundquist '877 patent are closely related to the claims of the Lundquist '880 and '863 patents, which this Court previously determined had not been infringed by Syngenta. For example, claim 1 of the Lundquist '877 patent purports to claim:

> A process for producing a fertile transgenic *Zea mays* plant comprising the steps of (i) establishing a regenerable embryogenic callus culture from a *Zea mays* plant to be transformed, (ii) transforming said culture by bombarding it with DNA-coated microprojectiles, (iii) identifying or selecting a transformed cell line, and (iv) regenerating a fertile transgenic *Zea mays* plant therefrom, wherein said DNA is transmitted through a complete sexual cycle of said transgenic plant to its progeny and imparts herbicide or insect resistance thereto.

10

Similarly, claim 1 of the Lundquist '863 patent, previously asserted against Syngenta, purports to

claim:

> A process for producing a fertile transgenic *Zea mays* plant
> comprising the steps of (i) bombarding intact regenerable *Zea
> mays* cells with DNA-coated microprojectiles, wherein said DNA
> comprises at least a screenable marker gene; (ii) selecting a
> population of transformed cells expressing the selectable marker
> gene; and (iii) regenerating a fertile transgenic plant therefrom,
> wherein said DNA is expressed so as to impart glyphosate
> resistance to said transgenic plant and is transmitted through a
> normal sexual cycle of said transgenic plant to progeny plants.

Likewise, claim 1 of the Lundquist '880 patent, also previously asserted against Syngenta,

purports to claim:

> A process for producing a fertile transgenic *Zea mays* plant
> comprising the steps of (i) bombarding intact regenerable *Zea
> mays* cells with DNA-coated microprojectiles, (ii) identifying or
> selecting a population of transformed cells, and (iii) regenerating a
> fertile transgenic plant therefrom, wherein said DNA is transmitted
> through a complete sexual cycle of said transgenic plant to its
> progeny, and imparts herbicide resistance thereto.

50.     The Lundquist '877 and '587 patents are also related and share similar

specifications and the same named inventors.  The Lundquist '587 patent is a continuation of

U.S. Patent Application Serial No. 07/974,379, which was the patent application that matured

into the Lundquist '877 patent.

> #### 4.    DeKalb Continues to Prosecute Patent Applications in the Lundquist Patent Family in an Effort to Secure Additional Patent Claims to Assert Against Syngenta's GA21 Corn Products

51.     On information and belief, DeKalb is continuing to prosecute patent applications

directed to glyphosate-resistant corn in an effort to secure additional patent claims to assert

against Syngenta's GA21 corn products.

52.     DeKalb has filed approximately 32 related patent applications with the PTO in the

name of Lundquist and Walters, including a new patent application filed as recently as August 9,

11

2006. The Lundquist '880, '863, '587, and '877 patents are among the related patents in this family of related patents and applications ("the Lundquist patent family").

53.    Despite the fact that the alleged inventors, Lundquist and Walters, never worked with glyphosate and never created any glyphosate-resistant corn product, DeKalb continues to pursue patent claims in the Lundquist patent family in an attempt to secure further claims covering glyphosate-resistant corn. Lundquist and Walters did not invent glyphosate-resistant corn or describe that invention in their patent applications in the Lundquist patent family. All patent claims in the Lundquist patent family purporting to cover that subject matter, which Lundquist and Walters did not invent, are invalid.

54.    One pending application in the Lundquist patent family is U.S. Patent Application Serial No. 10/919,228 ("the Lundquist '228 application"). The Lundquist '228 application purports to claim a method of rendering corn plants resistant to the herbicide glyphosate.

55.    On July 18, 2006, the PTO issued a Notice of Allowance in the Lundquist '228 application. On September 18, 2006, DeKalb paid the required issue fee associated with the Lundquist '228 application. The Lundquist '228 application is therefore ready for issuance by the PTO, which could occur any time now and is expected soon.

56.    On information and belief, DeKalb intends to assert the patent issuing from the Lundquist '228 application against Syngenta upon its issuance. The allowed claims of the Lundquist '228 application, when issued as patent claims, will not be infringed by Syngenta and/or will be invalid. Syngenta reserves the right, upon issuance of the Lundquist '228 application as a patent, to amend this Complaint to seek a declaratory judgment that the patent claims issuing on the Lundquist '228 application are not infringed by Syngenta and/or are invalid.

57.    In sum, Syngenta has a reasonable apprehension of being sued by DeKalb for alleged infringement of the Lundquist '587 and '877 patents (and any patent issuing on the Lundquist '228 application) in view of the fact that (1) within the past two-and-a-half years DeKalb and Monsanto have already sued Syngenta three separate times for patent infringement, in three separate courts, on four separate patents, all with respect to Syngenta's GA21 corn products; (2) the Lundquist '587 and '877 patents disclose and claim similar subject matter as the closely related Lundquist '880 and '863 patents that DeKalb previously asserted against Syngenta in this Court; and (3) DeKalb continues to prosecute patent applications in the Lundquist patent family, including the Lundquist '228 application, which will soon issue as a patent, in an effort to secure additional patent claims to assert against Syngenta's GA21 corn products.

## COUNTS

### First Count:  Declaratory Judgment of
### Non-Infringement of U.S. Patent No. 6,946,587

58.    Syngenta hereby restates and realleges the allegations set forth in paragraphs 1 through 57 of this complaint and incorporates them by reference.

59.    Syngenta has not infringed and is not infringing, literally or under the doctrine of equivalents, any valid and enforceable claim of the Lundquist '587 patent, directly, contributorily, or by inducement.

### Second Count:  Declaratory Judgment of
### Invalidity of U.S. Patent No. 6,946,587

60.    Syngenta hereby restates and realleges the allegations set forth in paragraphs 1 through 59 of this complaint and incorporates them by reference.

13

61.    Syngenta cannot be liable for infringement of the Lundquist '587 patent because the claims are invalid for failure to satisfy one or more of the statutory requirements of the Patent Laws of the United States, including 35 U.S.C. §§ 102, 103, and/or 112.

### Third Count: Declaratory Judgment of Non-Infringement of U.S. Patent No. 5,538,877

62.    Syngenta hereby restates and realleges the allegations set forth in paragraphs 1 through 61 of this complaint and incorporates them by reference.

63.    Syngenta has not infringed and is not infringing, literally or under the doctrine of equivalents, any valid and enforceable claim of the Lundquist '877 patent, directly, contributorily, or by inducement.

### Fourth Count: Declaratory Judgment of Invalidity of U.S. Patent No. 5,538,877

64.    Syngenta hereby restates and realleges the allegations set forth in paragraphs 1 through 63 of this complaint and incorporates them by reference.

65.    Syngenta cannot be liable for infringement of the Lundquist '877 patent because the claims are invalid for failure to satisfy one or more of the statutory requirements of the Patent Laws of the United States, including 35 U.S.C. §§ 102, 103, and/or 112.

### PRAYER FOR RELIEF

WHEREFORE, Syngenta respectfully requests that this Court:

1.    Declare that Syngenta has not infringed any claim of the Lundquist '587 or '877 patents;

2.    Declare that each claim of the Lundquist '587 and '877 patents is invalid;

3.    Permanently enjoin DeKalb, its officers, agents, servants, employees, and attorneys, and those other persons or entities in active concert or participation with it, from

14

asserting (either in a lawsuit or in any other manner) that Syngenta has infringed any claim of the

Lundquist '587 or '877 patents;

    4.    Declare that this case is exceptional under 35 U.S.C. § 285 and award Syngenta

its costs, disbursements, and reasonable attorney fees in connection with this action; and

    5.    Award Syngenta such other and further relief as this Court may deem just and

equitable.

Respectfully submitted,

John W. Shaw (#3362)
YOUNG CONAWAY STARGATT &
  TAYLOR, LLP
The Brandywine Building
1000 West Street
P.O. Box 391
Wilmington, DE  19899-0391
(302) 571-6600
jshaw@ycst.com

Of counsel:

Michael J. Flibbert
Howard W. Levine
Sanya Sukduang
Jennifer A. Johnson
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, L.L.P.
901 New York Avenue, N.W.
Washington, DC  20001-4413
(202) 408-4000

Attorneys for Plaintiffs

Dated:  October 5, 2006

# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| SYNGENTA SEEDS, INC.,<br>GOLDEN HARVEST SEEDS, INC., and<br>GARST SEED COMPANY<br><br>Plaintiffs,<br><br>v.<br><br>DEKALB GENETICS CORPORATION<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No. 1:06-cv-00622

### DEKALB'S COVENANT NOT TO SUE SYNGENTA
### FOR INFRINGEMENT OF CERTAIN PATENT CLAIMS

WHEREAS, DEKALB Genetics Corporation ("DEKALB") represents that it owns all

rights, title, and interest in U.S. Patent Nos. 6,946,587 ("the '587 patent") and 5,538,877

("the '877 patent");

WHEREAS, Syngenta Seeds, Inc., Golden Harvest Seeds, Inc., and Garst Seed Company

(collectively "Syngenta") filed a declaratory judgment complaint in the present action in which it

asserted that the claims of '587 and '877 patents are invalid and/or not infringed;

WHEREAS, DEKALB has informed Syngenta that it will not assert any claim of

infringement against Syngenta in this action with respect to '587 and '877 patents, and Syngenta

has agreed that it will voluntarily dismiss its claims for declaratory judgment relating to the '587

and '877 patents;

WHEREAS, DEKALB has further informed Syngenta that it will not assert any claim of

infringement against Syngenta for its GA21 corn activities with respect to any patent that issues

856352v1

from U.S. patent Application Serial No. 10/919,228 identified in paragraph 54 of Syngenta's declaratory judgment complaint in the present action ("the Lundquist '228 application"), which application is assigned to DEKALB;

NOW THEREFORE, DEKALB hereby states as follows:

1.    Definitions.  For the purposes of this Covenant:

    a.    "DEKALB" shall mean DEKALB Genetics Corporation and its successors, assigns, parents, subsidiaries, Affiliates, officers, directors, employees, agents, and all other persons acting on behalf thereof;

    b.    "Syngenta" shall mean Syngenta Seeds, Inc., Syngenta Biotechnology, Inc., Golden Harvest Seeds, Inc., Garwood Seed Co., Golden Seed Company, L.L.C., Sommer Bros. Seed Company, Thorp Seed Co., JC Robinson Seeds. Inc., and Garst Seed Company, and their successors, assigns, parents, subsidiaries, Affiliates, officers, directors, employees, agents, and all other persons acting on behalf thereof;

    c.    "Affiliates" shall mean any business entity which controls, is controlled by or is under common control with a Party; for the purpose of this definition, a business entity shall be deemed to "control" another business entity if it owns, directly or indirectly, in excess of fifty per cent (50%) of the outstanding voting securities or capital stock of such business entity or any other comparable equity or ownership interest with respect to a business entity other than a corporation;

    d.    "GA21" shall mean the glyphosate tolerant corn line described in USDA Petition 97-099-01p for Determination of Non-Regulated Status;

2

e.    "Parties" shall mean DEKALB Genetics Corporation, Syngenta Seeds, Inc., Golden Harvest Seeds, Inc., and Garst Seed Company, and "Party" shall refer to one of the Parties;

f.    "Products" shall include any GA21 corn products, seeds, crops, plants, or organisms containing traits for or exhibiting resistance to glyphosate herbicides that are made, used, sold, offered for sale, or imported by or for Syngenta, or any GA21 corn product licensed by or to Syngenta;

g.    "Protected Person" shall mean any person who is making, using, selling, offering for sale, licensing, or importing Products, including but not limited to:

i.    any farmer or grower in the United States;

ii.    any customer, licensee, sublicensee, partner, collaborator, joint venturer, purchaser of service or goods, or contractual counterpart of Syngenta;

iii.    any person to whom Syngenta owes any warranty or indemnity, regardless of whether such warranty or indemnity arises by contract, by operation of law, or otherwise;

iv.    any seed company in the United States;

v.    any seed cooperative in the United States;

vi.    any farmer cooperative in the United States;

vii.    any dealer or reseller of seed, crops, chemicals, plants, or agricultural Products in the United States;

viii.    any food processors, millers, or grain elevator operators in the United States.

3

2.     DEKALB unconditionally agrees, promises, and covenants not to sue, or otherwise assert any claim against, Syngenta or any other Protected Person for infringement, inducement of infringement, or contributory infringement of any or all of the claims of the '587 patent (or any reissue or supplemental certificate issued with respect to the '587 patent) for the full term of the '587 patent based on any manufacture, use, sale, offer for sale, or importation of any past or present Products.

3.     DEKALB unconditionally agrees, promises, and covenants not to sue, or otherwise assert any claim against, Syngenta or any other Protected Person for infringement, inducement of infringement, or contributory infringement of any or all of the claims of the '877 patent (or any reissue or supplemental certificate issued with respect to the '877 patent) for the full term of the '877 patent based on any manufacture, use, sale, offer for sale, or importation of any past or present Products.

4.     DEKALB unconditionally agrees, promises, and covenants not to sue, or otherwise assert any claim against, Syngenta or any other Protected Person for infringement, inducement of infringement, or contributory infringement of any or all claims of any patent that issues from the Lundquist '228 application (or any reissue or supplemental certificate issued with respect to any such patent) for the full term of any such patent based on any manufacture, use, sale, offer for sale, or importation of any past or present Products.

5.     The foregoing disclaimers are limited solely to actions for infringement of the '587 patent, '877 patent, and/or any patent that issues from the Lundquist '228 application, and no other disclaimer, right, or license is granted either directly or by implication.

6.     This Covenant shall be binding upon, and shall inure to the benefit of, the Parties as well as their respective successors-in-interest, assigns, parents, subsidiaries, and Affiliates.

4

7.     Nothing in this Covenant shall preclude Syngenta from asserting any claim or defense in any subsequent action or proceeding.

Dated: _11/1/06_

By: _____

Title: _ASSOCIATE GENERAL COUNSEL_

On behalf of
DEKALB GENETICS CORPORTION

# EXHIBIT 6

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SYNGENTA SEEDS, INC.,<br>GOLDEN HARVEST SEEDS, INC., AND<br>GARST SEED COMPANY, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 06-622-SLR |
| DEKALB GENETICS CORPORATION, | ) ) | |
| Defendants. | ) ) | |

**NOTICE OF DISMISSAL**

Plaintiffs Syngenta Seeds, Inc., Golden Harvest Seeds, Inc., and Garst Seed Company

hereby dismiss this action in its entirety without prejudice pursuant to Federal Rule of Civil

Procedure 41(a)(1).

YOUNG, CONAWAY, STARGATT &
TAYLOR, LLP

Of counsel:

Michael J. Flibbert
Howard W. Levine
Sanya Sukduang
FINNEGAN, HENDERSON,
   FARABOW, GARRETT &
   DUNNER, L.L.P.
901 New York Avenue, N.W.
Washington, DC 20001-4413
(202) 408-4000

Dated: November 7, 2006

John W. Shaw (No. 3362)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19899-0391
(302) 571-6600
jshaw@ycst.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I, John W. Shaw, hereby certify that on November 7, 2006, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> Richard L. Horwitz, Esquire
> David E. Moore, Esquire
> Potter Anderson & Corroon LLP
> Hercules Plaza
> 1313 North Market Street
> Wilmington, DE 19899-0951

I further certify that on November 7, 2006, I caused a copy of the foregoing document to be served by hand delivery on the above-listed counsel of record.

> YOUNG CONAWAY STARGATT & TAYLOR, LLP
>
> *[signature]*
>
> John W. Shaw (No. 3362)
> The Brandywine Building
> 1000 West Street, 17th Floor
> Wilmington, Delaware  19801
> (302) 571-6600
> jshaw@ycst.com
>
> Attorney for Plaintiffs

# EXHIBIT 7

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| DEKALB GENETICS CORPORATION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case # 4:06CV01191 ERW |
| v. | ) |
| | ) |
| SYNGENTA SEEDS, INC., | ) |
| SYNGENTA BIOTECHNOLOGY, INC., | ) |
| GOLDEN HARVEST SEEDS, INC., | ) **ORAL ARGUMENT** |
| GARWOOD SEED CO., | ) **REQUESTED** |
| GOLDEN SEED COMPANY, L.L.C., | ) |
| SOMMER BROS. SEED COMPANY, | ) |
| THORP SEED CO., | ) |
| JC ROBINSON SEEDS, INC., and | ) |
| GARST SEED COMPANY, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**MEMORANDUM IN SUPPORT OF SYNGENTA'S MOTION**
**TO TRANSFER THIS ACTION TO THE DISTRICT OF DELAWARE**

Defendants (collectively "Syngenta") submit this memorandum in support of their motion

to transfer this patent infringement action filed by plaintiff DeKalb Genetics Corporation

("DeKalb") to the District of Delaware pursuant to 28 U.S.C. § 1404(a).

**I.    INTRODUCTION**

This is now the *third* court in which Monsanto and its wholly owned subsidiary DeKalb

have sued Syngenta for patent infringement based on Syngenta's GA21 corn product.  Initially

Monsanto alleged, in the District of Delaware, that Syngenta's GA21 corn product infringed U.S.

Patent No. 4,940,835 ("the Shah patent").  *Monsanto Co. v. Syngenta Seeds, Inc.*, No. 04-CV-

305 (D. Del. filed May 12, 2004) ("the Shah action"); Exh. 1 (Complaint).  Subsequently, on

July 27, 2004, DeKalb alleged in the Northern District of Illinois that this same GA21 corn

1

product infringed U.S. Patent Nos. 5,538,880 ("the Lundquist '880 patent") and 6,013,863 ("the Lundquist '863 patent"). *DeKalb Corp. v. Syngenta Seeds, Inc.*, No. 04-CV-50323 (N.D. Ill. filed July 27, 2004) ("the Lundquist action"); Exh. 2 (Complaint). Syngenta successfully moved to transfer the Lundquist action, the second-filed action, to Delaware so that the *same* court could manage the litigation and issue consistent rulings. After consolidating the cases, the Delaware district court granted summary judgment of non-infringement in favor of Syngenta with respect to both Lundquist patents, and the court also determined that the Shah patent was invalid. After having its case transferred out of Illinois, and *losing* in Delaware, DeKalb now brings suit here—its third forum—to avoid the effect of that decision.

This Court should not countenance forum shopping of any kind, but when the forum shopping is designed to avoid the effect and background of decisions already made, it represents a blatant misuse of the judicial system. Here, DeKalb raises the very *same allegedly infringing activity* by Syngenta, the sale of GA21 corn, that was at issue in Delaware. Further, the asserted patent, U.S. Patent No. 5,554,798 ("the Lundquist '798 patent"), names the *same alleged inventors* (Ronald Lundquist and David Walters) and discloses essentially the *same subject matter* as the Lundquist '880 and '863 patents that were held not infringed in Delaware. This case also involves the *same parties*, substantially similar questions of fact and law, and largely the *same witnesses and discovery* as the Delaware action. DeKalb, however, rushed to this Court in a transparent effort to locate a more favorable forum in which to continue to pursue its infringement claims and avoid the court that is familiar with this dispute, the patents, and the accused GA21 corn product. The interests of justice, including the need to avoid piecemeal litigation and inconsistent rulings on both liability and damages, and to promote judicial

2

economy, strongly support continuing to have one court preside over the GA21 corn patent litigation: the District of Delaware.

Moreover, an important non-party witness, Dr. Theodore Klein, resides in Wilmington, Delaware and is only within the Delaware court's subpoena power. The inventors of the patent-in-suit and other principal fact witnesses in this case (including all Syngenta witnesses) are located outside of Missouri. This litigation has no unique connection to Missouri.

Accordingly, as further detailed below, Syngenta respectfully requests that this Court transfer this action to the District of Delaware under 28 U.S.C. § 1404(a).[1]

## II.    FACTUAL BACKGROUND

### A.    The Unsuccessful Patent Actions Previously Filed by DeKalb and Monsanto Against Syngenta Relating to GA21 Corn

This patent infringement litigation against Syngenta is based on Syngenta's genetically engineered corn product, known as GA21 corn. GA21 corn contains a gene, developed by Rhone-Poulenc Agro ("RPA"),[2] which makes the corn tolerant to the herbicide glyphosate. Farmers that plant GA21 corn may apply glyphosate over an entire field, killing the weeds while allowing the corn crop to survive. Syngenta acquired RPA's intellectual property rights to the GA21 glyphosate-tolerance corn trait from RPA's successor, Bayer CropScience, on February 5, 2004. Syngenta began selling GA21 corn seed in the U.S. during the 2005 growing season.

---

[1] Syngenta also requests that the Court stay discovery in this case pending resolution of this transfer motion to avoid undue burden and expense on the parties.

[2] DeKalb was found liable for "egregious" intentional fraud, patent infringement, and trade secret misappropriation in connection with its dealings with RPA and its unlawful development and marketing of GA21 corn. *See Rhone-Poulenc Agro, S.A. v. DeKalb Genetics Corp.*, 345 F.3d 1366, 1372 (Fed. Cir. 2003); *Rhone-Poulenc Agro, S.A. v. DeKalb Genetics Corp.*, 272 F.3d 1335 (Fed. Cir. 2001). As a result of that decision, DeKalb and Monsanto lost their right to market GA21 corn.

Within the past two-and-a-half years, DeKalb and Monsanto have sued Syngenta for patent infringement in *three different courts* on the basis of Syngenta's GA21 corn product. So far, DeKalb's and Monsanto's infringement assertions have all failed. Monsanto brought the first of these GA21 lawsuits in the District of Delaware on May 12, 2004, the same day that Syngenta announced its acquisition of GA21 rights from Bayer. Monsanto alleged that Syngenta's proposed GA21 corn product infringed the Shah patent. *See* Exh. 1 (Complaint).

Ignoring the pending suit in Delaware, DeKalb (Monsanto's wholly owned subsidiary) sued Syngenta (using the same outside counsel) in the Northern District of Illinois, alleging that the same GA21 corn product infringed the Lundquist '880 and '863 patents on July 27, 2004. *See* Exh. 2 (Complaint). This led to an intolerable situation—two pending actions involving the same allegedly infringing activity. There was a strong possibility of inconsistent decisions both on substantive issues and on the management of discovery. For this reason, Syngenta moved to transfer the later-filed Illinois case to Delaware.

The Illinois district court granted Syngenta's motion on May 19, 2005, and transferred the Lundquist action to Delaware. The court held that it made sense for *one court* to manage the GA21 litigation, explaining that the Lundquist and Shah patents raised similar issues and the alleged infringing activity (sales of GA21 corn) was the same in both actions. Exh. 3 (Transfer Order). The Delaware court consolidated the Shah action and the transferred Lundquist action with an antitrust action brought by Syngenta against Monsanto also relating to Syngenta's efforts to market GA21 corn products. *Syngenta Seeds, Inc. v. Monsanto Co.*, C.A. No. 04-CV-305 SLR (D. Del. filed July 28, 2004) ("the antitrust action"). In that pending antitrust action, Syngenta contends, *inter alia*, that the Shah and Lundquist actions were objectively baseless. Monsanto has asserted state law counterclaims relating to Syngenta's GA21 corn products.

4

After consolidation, the Delaware court granted summary judgment in favor of Syngenta on May 10, 2006. The court held that Syngenta had not infringed the Lundquist '880 and '863 patents and that the Shah patent was invalid. Exh. 4 (Mem. Opin.). In its decision, the court adopted Syngenta's proposed claim constructions with respect to the Lundquist '880 and '863 patents and rejected DeKalb's claim construction positions. Exh. 4 at 16-17 n.8 (adopting Syngenta's proposed claim constructions set forth in D.I. 309); Exh. 5 (D.I. 309).

Following Rule 54(b) certification, DeKalb and Monsanto appealed the adverse summary judgment decision. *Monsanto Co. v. Syngenta Seeds, Inc.*, Appeal No. 06-1472 (Fed. Cir.). In their Federal Circuit appeal (which remains pending), DeKalb and Monsanto maintain that the Delaware district court's summary judgment rulings should be reversed and its claim constructions vacated and that "the case should be remanded [to Delaware] for further proceedings." Exh. 6 (Monsanto/DeKalb appeal brief excerpt) at 62.

Syngenta recently filed an action against DeKalb in Delaware seeking a declaration that two other Lundquist patents (U.S. Patent Nos. 6,946,587 and 5,538,877) in the same patent family are invalid and/or not infringed by Syngenta's activities with GA21 corn. *Syngenta Seeds, Inc. v. DeKalb Genetics Corp.*, No. 1:06-CV-00622 (D. Del. filed Oct. 5, 2006). DeKalb has now agreed to a covenant not to sue Syngenta on those particular Lundquist patents; therefore, Syngenta likely will dismiss voluntarily that action in due course.

Syngenta's antitrust action against Monsanto concerning GA21 corn remains pending in the Delaware district court and is set for trial beginning on January 8, 2007. In addition, two seed growers have separately filed proposed class-action antitrust complaints against Monsanto relating to GA21 corn in the Delaware district court. *Am. Seed Co. v. Monsanto Co.*, No. 1:05cv535 (SLR) (D. Del. filed July 6, 2005); *Pullen Seeds & Soil v. Monsanto Co.*, No.

1:06cv599 (SLR) (D. Del. filed Sept. 26, 2006). All of these related GA21 corn cases have been handled by Chief Judge Robinson in Delaware.

**B.    The Lundquist '798 Patent at Issue Is Similar to the Lundquist '880 and '863 Patents Previously Asserted Against Syngenta**

Having lost in Delaware, DeKalb sued Syngenta in this Court for infringement of the Lundquist '798 patent, entitled "Fertile Glyphosate-Resistant Transgenic Corn Plants."

The Lundquist '798 patent is in the same patent family as the Lundquist '880 and '863 patents that were previously before the Delaware court in the Lundquist action. In particular, the Lundquist '880, '863, and '798 patents all derive from the same parent patent application, Ser. No. 07/467,983, filed on January 22, 1990. *See* "Related U.S. Application Data" listed on the cover pages of the Lundquist '880, '863, and '798 patents (attached as Exhs. 7-9, respectively).

The same alleged inventors (Ronald Lundquist and David Walters) are named on the Lundquist '880, '863, and '798 patents. *See* cover pages of Exhs. 7-9. Further, because the Lundquist patents share the same parent patent application, the specifications of the Lundquist '880, '863, and '798 patents are largely the same. *See* Exhs. 7-9. For instance, all three Lundquist patents describe the same limited working examples concerning the production of corn resistant to *hygromycin* (an antibiotic) and they provide no example of corn resistant to *glyphosate* (a herbicide). *See id.*

Syngenta's invalidity defenses with respect to the Lundquist '798 patent will include similar issues to those developed in the previous Delaware suit. For example, the claims of the Lundquist '863 and '798 patents raise similar enablement issues, particularly the patents' failure to describe how to carry out the full scope of the claims without undue experimentation. The Lundquist '863 patent claims a process for producing a fertile transgenic glyphosate-resistant *Zea mays* (corn) plant, and the Lundquist '798 patent claims a fertile transgenic glyphosate-

resistant *Zea mays* plant. *See* Exh. 8 at cols. 29-30; Exh. 9 at col. 26. Syngenta alleges that it

was not possible to create such a glyphosate-resistant plant as of the effective filing date of the

'863 and '798 patents. This would mean that the patents are invalid for lack of enablement.

In Delaware, Syngenta also raised invalidity defenses with respect to the Lundquist

patents based on prior art publications describing Dr. Theodore Klein's pioneering work in corn

transformation. If DeKalb asserts here (as it has in prior litigation) that genes were available in

1990 that would impart glyphosate resistance to fertile transgenic corn plants, Syngenta expects

to raise similar prior art challenges to the Lundquist '798 patent. Dr. Klein is employed by

DuPont (a competitor of Syngenta), and he resides in Wilmington, Delaware. Exh. 10 (Klein

Tr.) at 3-5. Both parties subpoenaed Dr. Klein for a deposition and examined him at that

deposition in the Delaware case, and Syngenta identified him as a likely trial witness. Exh. 11

(Syngenta subpoena); Exh. 12 (DeKalb subpoena); Exh. 13 (Syngenta's witness list). The issue

of Dr. Klein's prior work was before the Delaware court on DeKalb's motion for summary

judgment of validity over the Klein work. The Delaware court dismissed the motion as moot in

light of its summary judgment decision, but the issue was fully developed, briefed and argued

before that court.

## III.  ARGUMENT

### A.  Legal Standards for Transfer

District courts have broad discretion under 28 U.S.C. § 1404(a) to transfer actions. In

determining whether to transfer a case, the Court will consider "the convenience of the parties,

the convenience of the witnesses, and the interests of justice." *Terra Int'l, Inc. v. Miss. Chem.

Corp.*, 119 F.3d 688, 696 (8th Cir. 1997). "The purpose of Section 1404(a) is to avoid the waste

of time, energy, and money to safeguard litigants, witnesses and the public against inconvenience

and expense." *Paterson v. Wal-Mart Stores, Inc.*, No. 05-1049-CV-W-SOW, 2005 WL

3302367, at *1 (W.D. Mo. Dec. 5, 2005). The Eighth Circuit has "recognized that such determinations require a case-by-case evaluation of the particular circumstances at hand and a consideration of all relevant factors." *Terra Int'l*, 119 F.3d at 691.

B.    **The Interests of Justice Support Transfer to Delaware**

In assessing the interests of justice, courts examine judicial economy, the need to avoid piecemeal litigation and eliminate the risk of inconsistent decisions on liability and damages, the judicial policy disfavoring forum shopping, and the residence of important witnesses. Here, those factors strongly support transfer of this case to Delaware.

1.    **This Court Should Reject DeKalb's Attempt to Avoid the Delaware Court's Rulings by Bringing This Action in Missouri**

Judicial economy would be best served by continuing to have one court, the Delaware court, preside over the GA21 corn patent dispute between DeKalb and Syngenta. DeKalb is asserting the same allegedly infringing activity—Syngenta's sales of GA21 corn—in this case as it did in the previous Lundquist action in Delaware. *Compare* Exh. 2 (Complaint in the Lundquist action) at ¶ 12 (accusing Syngenta of "making and using corn containing genes that confer resistance to the herbicide glyphosate") *with* Exh. 15 (First Amended Complaint in the present case) at ¶ 19 (accusing Syngenta of "making corn containing genes that confer resistance to the herbicide glyphosate").

Further, the Lundquist '798 patent asserted against Syngenta here is in the same patent family as the Lundquist '880 and '863 patents that were previously at issue in Delaware. As such, the Lundquist '880, '863, and '798 patents all derive from the same parent patent application filed in January 1990, name the same alleged inventors (Lundquist and Walters), and disclose largely the same subject matter. *See* Exhs. 7-9. Accordingly, the Delaware court is fully familiar with the Lundquist patents, Syngenta's GA21 corn products, and the relevant

8

biotechnology and legal issues. Additionally, the Delaware court, having construed the claims of the Lundquist '880 and '863 patents, presumably would apply that same construction to claim terms that are common to the claims of the three Lundquist patents.

For example, the Delaware court construed the term "glyphosate resistance" in the Lundquist '863 patent claims to mean that the corn "will not be significantly injured when glyphosate is applied to it." Exh. 5 at 6-7. The Lundquist '798 patent claims similarly refer to glyphosate-resistant corn and, therefore, this same definition of glyphosate resistance should apply. *See* Exh. 9 at claim 1 ("resistance to normally toxic levels of glyphosate").[3]

The Delaware court also resolved numerous discovery disputes between the parties during two years of litigation. Effectively, the Delaware action is the first-filed case in the GA21 corn dispute and is where all claims related to DeKalb's Lundquist patents should be adjudicated. *See Deutsch v. Purdue Pharma Co.*, No. 4:04 CV 354 JCH, 2004 WL 1179337, at *2 (E.D. Mo. May 27, 2004) (granting defendants' motion to transfer to jurisdiction where related patent case had been previously adjudicated).[4]

DeKalb's decision to sue Syngenta on the Lundquist '798 patent here, *after losing* on summary judgment in Delaware, and *after losing* all of its claim construction arguments regarding the Lundquist patents (Exh. 4 at 16-17 n.8; Exh. 5), is a unique example of forum shopping. DeKalb presumably will attack the Delaware court's claim construction in this Court on the ground that the prior claim construction is not controlling and can be disregarded. This is

---

[3] Importantly, all three Lundquist patents (including the '798 patent) fail to disclose how to make *any* glyphosate-resistant corn product that would "not be significantly injured" by glyphosate. DeKalb's patent claims purporting to claim this subject matter are therefore invalid.

[4] Syngenta notes that Monsanto brought a prior action against Bayer CropScience in this Court alleging infringement of the Shah patent, but that case did not involve Syngenta or (continued...)

an argument DeKalb could not make in Delaware. The Delaware court, however, correctly rejected DeKalb's unsupported claim construction positions, and DeKalb should not be permitted to attempt to obtain a more favorable claim construction in a different court. The parties litigated before the Delaware court for two years and submitted extensive briefing and supporting materials (totaling some 1000 pages) concerning claim construction issues and participated in a *Markman* hearing before that court. As such, the Delaware court can efficiently determine whether (and, if so, to what extent) its prior constructions of the Lundquist '880 and '863 patent claims should apply to the Lundquist '798 patent claims.[5]

Accordingly, because DeKalb's suit here is transparently motivated by forum shopping—including DeKalb's desire to avoid the Delaware court's claim construction rulings and extensive knowledge of the patented subject matter and the accused product—the interests of justice support transfer of this case to Delaware. *See, e.g., Wireless Consumers Alliance, Inc. v. T-Mobile USA, Inc.*, No. C 03-3711 MHP, 2003 WL 22387598, at *5 (N.D. Cal. Oct. 14, 2003) ("[E]vidence of plaintiff's attempt to avoid a particular precedent from a particular judge weighs heavily in the context of this [interest of justice] prong and would often make the transfer of venue proper."); *At Home Corp. v. Cox Commc'n, Inc.*, No. 02-1486-JJF, 2003 WL 22350925, at *2 (D. Del. Oct. 8, 2003) ("Obviously, when a court finds or it appears based on the circumstances that a party is making an effort at forum shopping, transfer is warranted.").

---

(...continued)
DeKalb's Lundquist patents. *Monsanto Co. v. Bayer CropScience*, No. 4:01cv1825 (E.D. Mo. filed Nov. 20, 2001).

[5] The Delaware court can also resolve any conflict between its claim construction rulings and a recent decision by the Middle District of North Carolina in the *RPA* litigation, in which the North Carolina court construed the Lundquist '798 patent claims in connection with a limited dispute concerning the *inventorship* of the '798 patent. *See Rhone-Poulenc Agro, S.A. v.*
(continued...)

10

At a minimum, this Court need not defer to DeKalb's choice of forum in view of DeKalb's forum shopping. *See, e.g., Clarus Transphase Scientific, Inc. v. Q-Ray, Inc.*, No. C 06-3450 JF (RS), 2006 WL 2374738, at *5 (N.D. Cal. Aug. 16, 2006) ("[T]he Court may disregard the plaintiff's choice of forum where the plaintiff's suit is the result of forum-shopping.").

2.    **Transfer Would Avoid Piecemeal Litigation and Eliminate the Risk of Inconsistent Decisions on Liability and Damages**

Absent transfer there is a substantial risk of piecemeal litigation of the parties' continuing dispute over GA21 corn and, consequently, of inconsistent decisions on liability and/or damages. In addition to the possibility of reaching inconsistent claim constructions, as discussed above, the Delaware Lundquist action is currently on appeal. In that appeal, DeKalb is asking the Federal Circuit to reverse the Delaware court's summary judgment decision and vacate claim constructions on the Lundquist '880 and '863 patents and to remand the case to Delaware for further proceedings. Exh. 6 at 62. If DeKalb succeeds in its appeal, and without transfer of this action, there would be co-pending litigations in two different jurisdictions concerning the same allegedly infringing GA21 corn product and the three related Lundquist patents. Such piecemeal litigation would be highly inefficient and could lead to conflicting decisions. This is very reason why the Illinois court initially transferred the Lundquist case to Delaware.

For example, as noted above, the specifications of the Lundquist '863 and '798 patents disclose the same limited examples concerning corn resistant to *hygromycin* (an antibiotic) while improperly claiming alleged "inventions" relating to corn resistant to *glyphosate* (a herbicide). Syngenta contends that the patents are therefore invalid under 35 U.S.C. § 112. Syngenta's

---

(...continued)
*Monsanto Co.*, No. 1:97CV1138, 2006 WL 2302065 (M.D.N.C. Aug. 7, 2006). The decision in that case, which did not involve any issue of patent validity or infringement, is still not final.

invalidity defenses for the three Lundquist patents are closely related and involve similar issues and evidence. Accordingly, if DeKalb's appeal succeeds, the interests of justice would be furthered by having a single court preside over all common questions of patent invalidity and non-infringement. *See, e.g., May Dep't Stores Co. v. Wilansky*, 900 F. Supp. 1154, 1166 (E.D. Mo. 1995) (granting transfer to allow adjudication of related claims in one court); *Silverberg v. H & R Block, Inc.*, No. 4:06CV00519, 2006 WL 1314005, at *3 (E.D. Mo. May 12, 2006) (granting motion to transfer to jurisdiction where related claims were pending) (citing *May Dep't Stores*, 900 F. Supp. at 1166).

The potential for inconsistent or double recovery of damages also supports transfer. In the currently pending antitrust action (set for trial in January), Monsanto has asserted state law counterclaims seeking damages on Syngenta's sales of GA21 corn. Those alleged damages are the same as (or substantially overlap with) the damages DeKalb is seeking on the same GA21 corn sales in this case. Having a single court consider damages based on the same GA21 corn sales would best serve judicial economy and would avoid double recovery.

### 3. A Critical Non-Party Witness, Dr. Klein, Resides in Wilmington, Delaware and Is Only Within the Delaware Court's Subpoena Power

A key non-party witness that Syngenta may call to testify at trial is Dr. Theodore Klein. *See* §II.B, *supra*. Dr. Klein and his colleagues developed the microprojectile bombardment process used to transform corn cells with DNA. DeKalb admits in the Lundquist '798 patent itself that Lundquist and Walter's "preferred procedure entails exactly the procedure of Klein et al." except for minor alleged refinements (such as doubling the DNA concentration) that are not even referred to in the claims. Exh. 9 at col. 11, lines 3-7. Dr. Klein is a non-party witness who works for DuPont (a competitor of Syngenta). Exh. 10 (Klein Tr.) at 4-5. He resides *in Wilmington, Delaware* and is within the subpoena power of the Delaware court. *Id.* at 3.

During the previous Lundquist action in Delaware, both Syngenta and DeKalb subpoenaed Dr. Klein for a deposition, both parties examined him at the deposition, and Syngenta subsequently identified Dr. Klein as a likely trial witness. Exh. 11 (Syngenta subpoena); Exh. 12 (DeKalb subpoena); Exh. 13 (Syngenta's witness list). Syngenta's trial presentation in this case could be compromised if it is deprived of the opportunity to subpoena Dr. Klein for trial. *See, e.g., Popular Leasing USA, Inc. v. Highland Park*, No. 4:04CV01812 ERW, 2005 WL 3527300, at *4 (E.D. Mo. Dec. 22, 2005) (finding that transferee court's subpoena power over non-party witness was an "especially important" consideration supporting transfer in the interests of justice).

C.    **The Convenience of the Witnesses Supports Transfer to Delaware**

In addition to Dr. Klein, discussed above, other relevant fact witnesses in this case reside outside of Missouri. Ronald Lundquist and David Walters, the alleged inventors, reside in Minnesota and Connecticut, respectively. Exh. 14 (Monsanto/DeKalb's witness list in the Lundquist action). The law firm that prosecuted the application that led to the Lundquist '798 patent is located in Minnesota.[6] Michael Spencer, a DeKalb employee who submitted a declaration during prosecution of the Lundquist '798 patent, resides in Connecticut. Exh. 14. Dr. Rick DeRose, a scientist who was involved in the creation of the RPA glyphosate-tolerance gene used in GA21 corn, resides in North Carolina. Exh. 13.

Further, based on prior discovery, Syngenta's likely trial witnesses are located in Minnesota (where Syngenta Seeds, Inc. is headquartered) and elsewhere outside of Missouri. Accordingly, the convenience of the witnesses, including convenience to Dr. Klein, favors transfer of this case to Delaware.

---

[6] That law firm is Schwegman, Lundberg, Woessner & Kluth (*see* cover pages of Exhs. 7-9), which is located in Minneapolis, Minnesota. *See* http://www.slwk.com.

13

D.    **The Convenience of the Parties Supports Transfer to Delaware**

Missouri has minimal connection to the present litigation. DeKalb's parent, Monsanto, *chose Delaware* as the forum for the first GA21 patent case (the Shah action). *See* Exh. 1. For the second case (the Lundquist action), DeKalb opted against filing in this Court and instead brought suit in Illinois, and that case was transferred for convenience to Delaware. *See* Exh. 3. Further, although DeKalb now alleges that it has a principal place of business in St. Louis, Missouri (*see* Exh. 15 at ¶ 1), in July 2004 DeKalb alleged in the prior Lundquist action that its principal place of business is DeKalb, Illinois (*see* Exh. 2 at ¶ 1).[7] DeKalb presumably did not file this latest case in Illinois to avoid having the Illinois court again transfer the case to Delaware. *See* Exh. 3.

Monsanto/DeKalb's deliberate choices, combined with the fact that related GA21 litigation between the parties is currently pending in Delaware, show that Delaware is a highly convenient forum for the parties to litigate this additional patent dispute concerning GA21 corn. On the other hand, it would be far less convenient for the parties to litigate related GA21 cases in multiple forums.

E.    **Venue Is Proper in Delaware**

Finally, there is no dispute that the requirement for venue in the proposed transferee forum, Delaware, is proper. In its Order transferring the prior Lundquist action to Delaware, the Illinois district court stated that "it is undisputed that venue is proper . . . in Delaware." Exh. 3. Further, in the Pretrial Order jointly filed by the parties in the Delaware Lundquist action, DeKalb and Syngenta both acknowledged that venue was proper in the Delaware district court.

---

[7] Syngenta has located no published decision indicating that DeKalb has ever previously filed a patent infringement action in Missouri.

Exh. 16 (Pretrial Order excerpt) at 5. The same parties and same alleged infringement with respect to sales of GA21 corn are involved here, and venue remains proper in Delaware.

**IV.     CONCLUSION**

For all the above reasons, Syngenta respectfully requests that this Court transfer this action to the District of Delaware.

Respectfully submitted,

/s/ Glenn E. Davis
Glenn E. Davis #2940
John H. Quinn III #4110
*Attorneys for Defendants*
ARMSTRONG TEASDALE LLP
One Metropolitan Square, Suite 2600
St. Louis, Missouri 63102-2740
(314) 621-5070
(314) 612-2241 (facsimile)
gdavis@armstrongteasdale.com
jquinn@armstrongteasdale.com

Of counsel:

Michael J. Flibbert
Howard W. Levine
Sanya Sukduang
Jennifer A. Johnson
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, L.L.P.
901 New York Ave., N.W.
Washington, DC  20001-4413
(202) 408-4000
(202) 408-4400 (facsimile)
michael.flibbert@finnegan.com
howard.levine@finnegan.com
sanya.sukduang@finnegan.com
jennifer.johnson@finnegan.com

### CERTIFICATE OF SERVICE

I hereby certify that on October 20, 2006, the foregoing was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system upon the following and/or was mailed by United States Postal Service to the following non-participants in Electronic Case Filing:

Joseph P. Conran
Dutro E. Campbell, II
Thomas M. Dee
HUSCH & EPPENBERGER, LLC
190 Carondelet Plaza, #600
St. Louis, MO 63105
Tel: (314) 480-1500
Fax: (314) 480-1530
joe.conran@husch.com
bruce.campbell@husch.com
tom.dee@husch.com
*Attorneys for Plaintiff*
*DEKALB Genetics Corporation*

Scott W. Clark
Susan K. Knoll
Thomas A. Miller
Steven G. Spears
HOWREY LLP
1111 Louisiana, 25th Floor
Houston, TX 77002-5242
Tel: (713) 787-1400
Fax: (713) 787-1440
clarks@howrey.com
knoll@howrey.com
millert@howrey.com
spears@howrey.com
*Attorneys for Plaintiff*
*DEKALB Genetics Corporation*


_____ /s/Glenn E. Davis _____

16

**Zumbach, Carol**

| | |
|---|---|
| **From:** | Moed_AutoSend@moed.uscourts.gov |
| **Sent:** | Friday, October 20, 2006 2:41 PM |
| **To:** | MOED_ECF_Notification@moed.uscourts.gov |
| **Subject:** | Activity in Case 4:06-cv-01191-ERW Dekalb Genetics Corporation v. Syngenta Seeds, Inc. et al "Memorandum in Support of Motion" |

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* You may view the filed documents once without charge. To avoid later charges, download a copy of each document during this first viewing.**

**U.S. District Court**

**Eastern District of Missouri (LIVE)**

Notice of Electronic Filing

The following transaction was received from Davis, Glenn entered on 10/20/2006 at 2:39 PM CDT and filed on 10/20/2006

| | |
|---|---|
| **Case Name:** | Dekalb Genetics Corporation v. Syngenta Seeds, Inc. et al |
| **Case Number:** | 4:06-cv-1191 |
| **Filer:** | Syngenta Seeds, Inc. |
| | Syngenta Biotechnology, Inc |
| | Golden Harvest Seeds, Inc. |
| | Garwood Seed Co. |
| | Golden Seed Company, L.L.C. |
| | Sommer Bros. Seed Company |
| | Thorp Seed Co. |
| | JC Robinson Seeds, Inc. |
| | Garst Seed Company |

**Document Number:** 24

**Docket Text:**
MEMORANDUM in Support of Motion re [23] MOTION to Transfer Case to the District of Delaware filed by Defendants Thorp Seed Co., JC Robinson Seeds, Inc., Garst Seed Company, Syngenta Seeds, Inc., Syngenta Biotechnology, Inc, Golden Harvest Seeds, Inc., Garwood Seed Co., Golden Seed Company, L.L.C., Sommer Bros. Seed Company. (Attachments: # (1) Exhibit 1 - Complaint (Delaware) # (2) Exhibit 2 - Complaint (Western District, Illinois)# (3) Exhibit 3 - Docket Statement (Northern District, Illinois)# (4) Exhibit 4 - Memorandum Opinion (Delaware)# (5) Exhibit 5 - Joint Claim Construction Submission (Delaware)# (6) Exhibit 6 - U.S. Court Appeals 06-1472# (7) Exhibit 7A (Part 1) U.S. Patent 5,538,880# (8) Exhibit 7B (Part 2) U.S. Patent 5,538,880# (9) Exhibit 8A (Part 1) U.S. Patent 6,013,863# (10) Exhibit 8B (Part 2) U.S. Patent 6,013,863# (11) Exhibit 9A (Part 1) U.S. Patent 5,554,798# (12) Exhibit 9B (Part 2) U.S. Patent 5,554,798# (13) Exhibit 10 - Deposition of T. Klein, Ph.D.#! (14) Exhibit 11 - Notice of Subpoena (Delaware)# (15) Exhibit 12 - Subpoena to T. Klein# (16) Exhibit 13 - Syngenta's Witness List# (17) Exhibit 14 - Plaintiffs' List of Live Witnesses and Expert Statements# (18) Exhibit 15 - First Amended Complaint (E.D. of MO)# (19) Exhibit 16 - Pretrial Order (Delaware))(Davis, Glenn)

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1037221849 [Date=10/20/2006] [FileNumber=1709832-0] [3ee414355d42420efb53bde41d2defc11656b5cb2ac66cb587025a8a0b050b1520 8b65923fe0acf95ca810c58806763ca1527b1ac128ce32ac86c8715ab691a6]]
**Document description:**Exhibit 1 - Complaint (Delaware)
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1037221849 [Date=10/20/2006] [FileNumber=1709832-1] [38e015c80e56913a1760178ab04b3f74cc150a75e743df2e4e87c22bca5753ddc1 2482a71891cc9dd45a84a8c0014bb4d6a2c046990aa0c5fb027363e4fe63be]]
**Document description:**Exhibit 2 - Complaint (Western District, Illinois)
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1037221849 [Date=10/20/2006] [FileNumber=1709832-2] [0fb1d5e3027c4a7a1be12f899ef40a6603497bff2f0ad2cc70689198ccfd2e0b9c 5ea9ed1b8363f20d450959abd0c59149e37dc40e19eb37899ad73176c081ba]]
**Document description:**Exhibit 3 - Docket Statement (Northern District, Illinois)
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1037221849 [Date=10/20/2006] [FileNumber=1709832-3] [702a05e2abe2371f65ef21589c0014e93fb9190fcc8f184c505ab035b9535a479f a073b63c2c8b1a069bd2a74880f51871b2228e15838cb7c526de6d284f17d0]]
**Document description:**Exhibit 4 - Memorandum Opinion (Delaware)
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1037221849 [Date=10/20/2006] [FileNumber=1709832-4] [6bb46a74e3ff9ffe5471ed96b7658364dab3dce51c0e7a0234a2db0a9134842d91 1609a611c0c5cc098e9965f38454ab1fc3a4baa3faf8baceb12d2e5fb7f04d]]
**Document description:**Exhibit 5 - Joint Claim Construction Submission (Delaware)
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1037221849 [Date=10/20/2006] [FileNumber=1709832-5] [3ba8c36b0bd1b7164f092e6b0e89c03d334b4985536aa8de68f99f92cc262e33cb 88c507058fb2f29cf2e9e5896f6c10cb15143649e9f7ab46203528ccfe8387]]
**Document description:**Exhibit 6 - U.S. Court Appeals 06-1472
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1037221849 [Date=10/20/2006] [FileNumber=1709832-6] [992bbce3f1f5edfb3a3e9365489fa86aafe4d3cecf99a7fe6f35bf271d554d75ba 4a874f812a595a38c60af276cdce78622d56c63a15d81266f66d46ed67a8c0]]
**Document description:**Exhibit 7A (Part 1) U.S. Patent 5,538,880
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1037221849 [Date=10/20/2006] [FileNumber=1709832-7] [7f25fb6524534feb63a4f26b966c62de4142f976ba235a79d566315ce29c13fc3c 1b34b95dd5533502ab73bc71f16cee5c756426b41b33b1d42e152147203aa0]]
**Document description:**Exhibit 7B (Part 2) U.S. Patent 5,538,880

**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1037221849 [Date=10/20/2006] [FileNumber=1709832-8] [8a2b89028a68bc5d323decd9d1bbfe5a917448f6a016acf82c332eb82eaaa502b3 7f1e3543d2504fa7c584cded7f130aa67daa42238e7a072ecaf47b53a2d0fc]]
**Document description:**Exhibit 8A (Part 1) U.S. Patent 6,013,863
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1037221849 [Date=10/20/2006] [FileNumber=1709832-9] [545f6c17800e3c3286e864ed9c8560e8a70ff9ae5c32d1fee14b536de2ec447161 6da6bb7319b5df08fa17f84d3bb90d2baa43ef6b702b0cd7b139ddafd9fd42]]
**Document description:**Exhibit 8B (Part 2) U.S. Patent 6,013,863
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1037221849 [Date=10/20/2006] [FileNumber=1709832-10] [ab4ce055fef197d1c49a5d6bb154168306881b9cb59e50ca9b57afd3c4479fd7c ebe4d745fd9b52e23aa2afe6b811920230a284a5c715598546131cd472546f6]]
**Document description:**Exhibit 9A (Part 1) U.S. Patent 5,554,798
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1037221849 [Date=10/20/2006] [FileNumber=1709832-11] [8863e08c1087600b7e41113e25921cdbbebb6a3c603dab451c3428773e26ca8a6 1ef96216acbcdb154c6220892b91b085feff2e2efec0d92cce670b572f7881d]]
**Document description:**Exhibit 9B (Part 2) U.S. Patent 5,554,798
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1037221849 [Date=10/20/2006] [FileNumber=1709832-12] [11cd8248421866e03467e6dd0e676d041268a062a98af143fa766a485e79e2add 89e95c67a26af08b94dfd0ad2af47aff9a6b2e51ed892bed3a5b69735e553ab]]
**Document description:**Exhibit 10 - Deposition of T. Klein, Ph.D.
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1037221849 [Date=10/20/2006] [FileNumber=1709832-13] [06ad83648d9cfa4ebbc1cde69461a629f480a547e644645903dcafd4c593e961d 81d344ec849dde212ac486b8aee6a972f1000db92c67071aee8746405da6da8]]
**Document description:**Exhibit 11 - Notice of Subpoena (Delaware)
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1037221849 [Date=10/20/2006] [FileNumber=1709832-14] [11585f90743f8cd5ae4a25f9c1f5d7483da784bc8465a76694df5dec6a4b8ba9d dadb3bf7aed85a3f58d968de399a12c43bbc5d872fdf6d43afa348f6ea961a6]]
**Document description:**Exhibit 12 - Subpoena to T. Klein
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1037221849 [Date=10/20/2006] [FileNumber=1709832-15] [389e23692558aee1f071aaae9557b07c0369de234fa1838a6c5a0fd31abc7cf35 e673cd3125d152398598291adcfddbe6a83fb2ea331119b53d8923b755c6597]]
**Document description:**Exhibit 13 - Syngenta's Witness List
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1037221849 [Date=10/20/2006] [FileNumber=1709832-

16] [15e260192a09bd658599ff84f73f34059ff47133ddf6863840dc07d89cf0258f4
6781fafbf5a7721cd02ce82b21aa12e2f764bf0340d86de99afa0d881ce83bb]]
**Document description:**Exhibit 14 - Plaintiffs' List of Live Witnesses and Expert Statements
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1037221849 [Date=10/20/2006] [FileNumber=1709832-
17] [6b3a44320d59335e82094a144f98f5ba2ae8cdadf8bbdd44243077ca6a3c4f60f
e8c7f0901dd98668ce19d05e3165adbc2a8f2637883a13db91eb92b1206fce3]]
**Document description:**Exhibit 15 - First Amended Complaint (E.D. of MO)
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1037221849 [Date=10/20/2006] [FileNumber=1709832-
18] [38ec2717c7f260a073171a875f0629d389afa46300fd35f7826b1064367dcd6f0
0b6d9a79c209cc820d322ad076e767da2fe548ddd633f4548279a91b01adc96]]
**Document description:**Exhibit 16 - Pretrial Order (Delaware)
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1037221849 [Date=10/20/2006] [FileNumber=1709832-
19] [1c4e9252f564aaa635f3000bc211a6aa7b02541ba483dcc87528badea0f3c1e8d
4a90f103b83e9c76abd2a678962240df5ad0f5259086f13989877288100cb29]]

**4:06-cv-1191 Notice will be electronically mailed to:**

Dutro E. Campbell , II     bruce.campbell@husch.com, lisa.carter@husch.com

Scott W. Clark     clarks@howrey.com, zumbachc@howrey.com

Joseph P. Conran     joe.conran@husch.com,

Glenn E. Davis     gdavis@armstrongteasdale.com, kdoyle@armstrongteasdale.com

Thomas M. Dee     tom.dee@husch.com,

Michael J. Flibbert     michael.flibbert@finnegan.com, jeremy.miller@finnegan.com

Susan K. Knoll     knolls@howrey.com

Thomas A. Miller     millert@howrey.com, ricardof@howrey.com

John H. Quinn ! , III     jquinn@armstrongteasdale.com, eridyard@armstrongteasdale.com

Steven G. Spears     spearss@howrey.com,

**4:06-cv-1191 Notice will be delivered by other means to:**

10/20/2006

# EXHIBIT 8

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY

# EXHIBIT 9

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| DEKALB GENETICS CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case # 4:06CV01191ERW |
| v. | ) | |
| | ) | |
| SYNGENTA SEEDS, INC., et al., | ) | |
| | ) | **ORAL ARGUMENT** |
| Defendants. | ) | **REQUESTED** |
| | ) | |

## REPLY MEMORANDUM SUPPORTING SYNGENTA'S MOTION TO TRANSFER THIS ACTION TO THE DISTRICT OF DELAWARE

**I.    INTRODUCTION**

Defendants (collectively "Syngenta") demonstrated in its moving papers that the interests of justice and considerations of judicial economy strongly support transfer to Delaware. In its opposition, DeKalb provides no compelling arguments refuting transfer. In particular, DeKalb fails to address the following facts: (1) Monsanto (DeKalb's owner) purposely chose Delaware as the forum for the GA21 litigation by suing Syngenta there in 2004; (2) the Northern District of Illinois has already *rejected* DeKalb's "home forum" argument and transferred litigation involving the Lundquist patents out of Illinois (DeKalb's previous "home forum") to Delaware so that one court could preside over the GA21 litigation; (3) the Lundquist '880 and '863 patents at issue in Delaware and the Lundquist '798 patent at issue here have essentially identical specifications and raise similar claim construction and validity arguments, some of which have already been considered by the Delaware court; (4) Monsanto and DeKalb have appealed the Delaware court's decision of non-infringement of the Lundquist '880 and '863 patents, *specifically requesting remand to Delaware*; and (5) the GA21 corn antitrust litigation between

the parties remains pending in Delaware, is set for trial in January, and involves issues concerning DeKalb's assertion of the Lundquist patents as well as overlapping alleged damages.

Instead of addressing these dispositive points, DeKalb argues that the relevant documents and witnesses are located in Missouri and that it could not sue JC Robinson in Delaware. But to the contrary, the Lundquist '798 patent litigation will concern the period of time *before* Monsanto acquired DeKalb in 1998, and focus on DeKalb's development activities with glyphosate-resistant corn in the early to mid-1990's—none of which took place in Missouri. Indeed, in the previous Delaware GA21 lawsuit, Monsanto and DeKalb argued that very few documents were located in Missouri. Moreover, contrary to DeKalb's current allegations, Monsanto has specifically sued JC Robinson in Delaware *twice* in GA21 corn-related litigation. Thus, as fully explained below, DeKalb's opposition to transfer is without merit.

## II.    REPLY

### A.    DeKalb's Choice of Missouri Should Be Given Little Weight

#### 1.    Monsanto Purposely Chose to Sue in Delaware

DeKalb argues it should be entitled to litigate in its "home forum." (Opp. at 9-10.) But Monsanto started this GA21 litigation in May 2004 by intentionally suing Syngenta in *Delaware*. And for the last two and a half years, Syngenta has defended against this litigation in Delaware. Chief Judge Robinson has issued discovery orders, heard oral argument on claim construction and summary judgment issues, construed the claims of the Lundquist '880 and '863 patents, including claim terms specifically implicated by the Lundquist '798 patent here in suit, and decided summary judgment motions on substantive issues in the case. (*See, e.g.*, Exh. 4.)[1]

---

[1] Citations to Exhs. 1-16 refer to the exhibits attached to Syngenta's opening brief in support of its motion to transfer (D.I. 23). Exhibits 17-31 are attached to this reply.

DeKalb's argument that Delaware is "a distant location unconnected to any relevant activity" (Opp. at 1) is absurd.

###    2.    The Illinois Court Rejected DeKalb's "Home Forum" Argument

DeKalb's opposition largely ignores the prior Illinois transfer decision. After Monsanto sued Syngenta in Delaware on the Shah '835 patent, DeKalb sued Syngenta in Illinois (allegedly its "home forum") on the Lundquist '880 and '863 patents. DeKalb acknowledges that it also would have asserted the '798 patent against Syngenta in the Illinois action, except that "the patent was tied up in litigation in North Carolina . . . based upon a claim of co-inventorship." (Opp. at 5.)

Because of the pending action in Delaware involving exactly the same product (Syngenta's GA21 corn), Syngenta moved to transfer the Illinois case to Delaware to avoid inconsistent rulings both on substantive and discovery issues. DeKalb responded that its "choice of its home forum should be entitled to substantial weight." (Exh. 17 at 11.) The Illinois court, however, specifically *rejected* this argument, holding that "[w]hile deference must be given to the plaintiff's choice of forum, the issue of whether a transfer is in the interests of justice may still be determinative in a particular case." (Exh. 3 at 1.) The court explained that "the interests of justice weigh[] heavily in favor of transfer" because "there will be similar issues . . . [and] the alleged infringing activity is the same." (*Id.*) The court further noted "that having one judge oversee related cases can, in this context, facilitate efficient case management and promote expeditious resolution of all cases. Also the risk of inconsistent rulings will be minimized greatly by litigating in one forum." (*Id.* at 2.)

That decision was between the same parties and involved the same alleged infringement and legal issues. If not for the North Carolina inventorship litigation, DeKalb would have sued Syngenta on the '798 patent in Illinois, and that patent would have been already transferred to

Delaware with the other Lundquist patents. The facts are even more compelling for transfer now because the '798, '880, and '863 patents share almost the identical specification, and because the parties have already conducted extensive litigation on similar claim construction and validity issues in Delaware on the '880 and '863 patents. The sound reasoning of the Illinois court should not be ignored.

Further, DeKalb's prior selection of Illinois was not motivated by the location of its "home forum." DeKalb brought the Illinois suit against Syngenta in July 2004. But, according to an affidavit submitted by DeKalb in this case, "[s]tarting in *2002* and continuing through June 2005, all business records from the Illinois facility were transferred to Monsanto's St. Louis facilities" and "[i]n June 2005, the Illinois facility was closed." (Opp. Exh. 6 at ¶ 4 (emphasis added).) Given the duration of a patent litigation, why would DeKalb sue Syngenta in Illinois in 2004, when beginning in 2002, all the documents were being moved, the witnesses relocated, and the facility closed in less than a year? As DeKalb itself acknowledged, its true reason for suing in Illinois had little to do with litigating in its home forum: "DeKalb filed this case in the Northern District of Illinois because this Court was the first to acquire jurisdiction over the '880 patent and has years of experience dealing with the complex technology involved . . . ." (Exh. 17 at 8 (footnote omitted).) DeKalb argued that "[i]t would be an enormous waste of the parties' and judicial resources to start over in a new district where the court has no knowledge of the Lundquist patents." (*Id.*) DeKalb urged that the Illinois court should keep the litigation because the '880 patent (which was at issue previously in Illinois) and the '863 patent (which was newly asserted) share the same specification and part of the same file history. (*Id.* at 5.)

Here, each of those reasons previously argued by DeKalb strongly supports transfer to Delaware where that court managed the prior litigation for two years, reviewed the prosecution

history of the Lundquist patents in connection with its non-infringement decision, construed many of the key claim terms, reviewed summary judgment briefs, and heard oral argument concerning the invalidity of the Lundquist '880 and '863 patents. The Delaware court was the first court to obtain jurisdiction over the parties' dispute involving the Lundquist patents and Syngenta's GA21 corn product. DeKalb's belated choice of its so-called "home forum," after having lost in Delaware, does not provide a compelling reason to retain this case in Missouri.

### 3. DeKalb Seeks to Avoid the Rulings of the Delaware Court

DeKalb's alleged preference for litigating in its home forum should not allow it to avoid unfavorable Delaware rulings in connection with the Lundquist patents. DeKalb's opposition brief makes clear that DeKalb seeks to collaterally attack the orders issued in Delaware. For example, the Delaware court construed the term "glyphosate resistance" in the Lundquist '863 patent claims to mean that the corn "will not be significantly injured when glyphosate is applied to it." (Exh. 4 at 16 n.8; Exh. 5 at 7.) The Lundquist '798 patent claims similarly refer to glyphosate-resistant corn and, therefore, this same definition of glyphosate resistance should apply. (*See* Exh. 9 at claim 1.) DeKalb belittles the Delaware rulings, arguing that the court "never did a claim construction analysis of the term glyphosate resistance," and that its claim constructions lacked "sufficient findings and reasoning to permit meaningful scrutiny" and were inconsistent with prior courts' orders. (Opp. at 6, 14 & n.6.) But those arguments, which are wrong, should be raised in Delaware—not to this Court in a blatant example of forum shopping.

### B. The Delaware Action Is Closely Related to This Action

#### 1. The '798, '880, and '863 Patents Raise Overlapping Issues

As explained by the Illinois court, the "issue of whether a transfer is in the interests of justice may still be determinative in a particular case." (Exh. 3 at 1.) Here, the interests of justice strongly favor transferring this case to Delaware where that court has already considered

5

the Lundquist '880 and '863 patents. The Lundquist '880, '863, and '798 patents share almost identical specifications, parts of the same prosecution history, and discuss the same experimental work. (Exhs. 7-9.) In response, DeKalb argues that because the '880 and '863 patents are method patents, and "the '798 patent claims recite no method steps," there is no basis for transfer. (Opp. at 14.) But this attempt to parse the patents fails on numerous grounds. All the Lundquist patents, including the '798 patent, are based on the alleged discovery of a three-step method of transforming plants by (1) DNA bombardment, (2) selecting (or identifying) transformed cells, and (3) regenerating a transgenic plant ("R0") from the transformed cells. For example, DeKalb sued Syngenta on claim 6 of the '798 patent, which recites those very method steps as shown by the following comparison to the '863 patent at issue in the Delaware litigation:

| Claim 1 of the '863 Patent | Claim 6 of the '798 Patent |
|---|---|
| A process for producing a fertile transgenic *Zea mays* [corn] plant comprising the steps of | The transgenic plant of claim 1 wherein the plant is obtainable by a process comprising the steps of: |
| (i) *bombarding* intact regenerable Zea mays cells with DNA-coated microprojectiles, wherein said DNA comprises at least a selectable marker gene; | (i) *bombarding* intact regenerable Zea mays cells with microprojectiles coated with said heterologous DNA construct; |
| (ii) *selecting* a population of transformed cells expressing the selectable marker gene; and | (ii) *identifying or selecting* a population of transformed cells; and |
| (iii) *regenerating* a fertile transgenic plant therefrom, wherein said DNA is expressed so as to impart glyphosate resistance to said transgenic plant and is transmitted through a normal sexual cycle of said transgenic plant to progeny plants. | (iii) *regenerating* a fertile transgenic plant therefrom. |

Regardless of the form of the claim (method or plant), the issues plainly overlap. For example, both claims require "glyphosate resistance" and that the resulting plant (called the R0 plant) be made from the bombardment process. (*Compare* Exh. 8 at claim 1 *with* Exh. 9 at claims 1, 6.) Further, the claims also use the term "progeny," which under the claim construction by the Delaware court refers to the next generation ("R1") plant and contains the glyphosate resistance-imparting DNA inherited from the R0 plant. (Exh. 4 at 16 n.8; Exh. 5 at 6-7.)

6

In addition, Syngenta contends both in Delaware and here that the Lundquist '863 and '798 patents do not enable those skilled in art to obtain "glyphosate resistance" in a corn plant as of January 1990 (their parent application's filing date). (*See* Exh. 30 at Exh. 5 ¶ 22.) Thus, the construction of the claim term "glyphosate resistance" is critical to the invalidity of the '798 patent. After the parties submitted roughly 1000 pages of claim construction briefing, including exhibits and detailed claim charts (*see* Exh. 5), and after a 1.5 hour oral argument, the Delaware court adopted Syngenta's position on the term glyphosate resistance—that the corn "will not be significantly injured when glyphosate is applied to it." (Exh. 4 at 16 n.8; Exh. 5 at 7.) The court did not need to write a detailed opinion on the claim construction issues because it granted Syngenta's motions for summary judgment, but those issues were fully vetted before that court.

Further, contrary to DeKalb's suggestion that Syngenta will not contest infringement (Opp. at 3), Syngenta's position is that it does not infringe any claim of the '798 patent, and it relies in part on interpretations of the claim terms *adopted* by the Delaware court. There, Syngenta argued that the plants made by the processes of claims 1 of the '880 and '863 patents are the R0 plant, and that the asserted claims covering the making of "progeny," should be interpreted as the R1, R2, or R3 generation. (Exh. 5 at 3-4 and 6-7; Exh. 18 at 22-24.) Syngenta's accused plants and plant seeds, however, are not the R0-R3 generation. Similarly, claim 1 of the '798 patent is directed to the R0 plant, the asserted claims to progeny plants are directed to the R1 or R2 generation, and Syngenta indisputably has not made, used, sold, offered to sell, or imported such plants. Clearly, DeKalb wants to avoid the Delaware court's sensible claim construction by rearguing before this Court the claim construction positions it lost in Delaware. But any argument that the Delaware court did not perform a proper claim construction (Opp. at 14 & n.6) should be made in Delaware—not this Court. In any event,

7

DeKalb cannot fairly contend that the Delaware litigation on the Lundquist '863 and '880 patents is unrelated to the present litigation.

### 2.    The Risk of Inconsistent Decisions

As noted above, one important reason for the Illinois court's transfer of the earlier Lundquist patent litigation to Delaware was to avoid inconsistent decisions. That same factor applies strongly here. The Delaware court has already issued claim construction rulings as well as considered the technology and facts (and whether material facts were truly in dispute) in reaching certain summary judgment decisions of non-enablement and non-infringement. This Court would be called upon to interpret some of the same claim terms (as explained above), delve into the same technology, and decide similar legal issues.

Moreover, the potential for future inconsistent determinations between this Court and the Delaware court is significant because the Delaware action has not ended. (*See* Opp. at 5.) DeKalb's opposition obscures the fact that DeKalb and Monsanto *appealed* the Delaware court's decision to the Federal Circuit. While DeKalb is arguing here that there is no pending related case in Delaware, DeKalb and Monsanto are arguing to the Federal Circuit that the Delaware court's decision was contrary to law and fact and that the case should be *remanded* for further proceedings in *Delaware*. (Exh. 6.) The Court should not permit DeKalb to advance such inconsistent positions simply to suit its litigation strategy.

DeKalb, therefore, cannot deny in good faith before this Court the possibility of further proceedings in Delaware on the Lundquist patents. If that were to happen, Syngenta would have to litigate the three Lundquist patents in two different forums. This would raise the possibility of inconsistent claim constructions, inconsistent non-infringement and validity decisions, and potentially different damage calculations by two different juries for exactly the same sales of GA21 corn. Overriding principles of judicial economy clearly favor transfer to Delaware.

8

The related antitrust case pending in Delaware is another source of potential inconsistent decision-making if the case is not transferred. DeKalb argues here that it "will show at trial" that Syngenta wrongfully obtained GA21 corn in violation of license agreements between Monsanto and certain seed companies. (Opp. at 2-3.) To the extent this wrongful acquisition argument is relevant, Monsanto has raised the same contention in its tortious interference counterclaim *against Syngenta currently pending in Delaware.* (Exh. 19 at 38, ¶¶ 76-80.) Thus, this issue is currently being litigated in Delaware and trial will take place in about two months. Furthermore, Monsanto and DeKalb also made the argument concerning Syngenta's wrongful acquisition of GA21 in its opposition to Syngenta's summary judgment motion for non-infringement of the Lundquist patents (Exh. 20 at 7, 24) and on appeal to the Federal Circuit (Exh. 21 at 40-42). The Delaware court noted this "business tort" argument in its opinion. (Exh. 4 at 8-9.) Thus, to the extent this argument is at all relevant to any issue in this case, it has been and will continue to be litigated in Delaware. DeKalb should not be allowed to argue the same issue, against the same party, in two different forums at the same time.

### C.     The Location of Witnesses and Documents Does Not Favor Missouri

#### 1.     The Relevant Witnesses Are Not in Missouri

DeKalb claims that the relevant "witnesses either reside and work in the St. Louis area, or are regularly in St. Louis on business." (Opp. at 10.) This is simply wrong. Dr. Lundquist, an inventor on the '798 patent, resides in Minnesota. Mr. Walters, the other inventor on the '798 patent, resides in Connecticut. Mr. Spencer, a DeKalb scientist who submitted a declaration during the prosecution of the '798 patent, also resides in Connecticut. DeKalb does not allege that it could make Dr. Lundquist available in Missouri, and its assertion that Mr. Walters and Mr. Spencer can be made available in Missouri rings hollow (*see* Opp. at 7 n.4), as both were made available for deposition not in Missouri, but in *Connecticut* in the prior Delaware case. (Exh.

22.) In any case, if DeKalb can make these individuals available outside their home state, they can easily bring them to Delaware.

In an attempt to boost Missouri's connection to the instant lawsuit, DeKalb lists *Monsanto* witnesses who reside in Missouri who are knowledgeable about *Monsanto's* "current" glyphosate resistance business, i.e. Bothe, Rinkenberger, Casale, Harper, Nothmann, and Liesure. (Opp. at 7.) But DeKalb claims an effective filing date of the '798 patent in *1990*, years before the *1998* acquisition of DeKalb by Monsanto. Syngenta's invalidity defenses in this case will focus on the period before 1998, primarily the early to mid-1990's, and the numerous failures by DeKalb to develop glyphosate-resistant corn before RPA's contribution of the GA21 gene. Indeed, DeKalb admits that "DeKalb's development work was done in Illinois and Connecticut." (*Id.*) Monsanto's work with its later corn product NK603 has limited or no relevance to the invalidity or non-infringement of the '798 patent. At most, the "roster" of current Monsanto witnesses may have some relevance to damages. But, DeKalb has made no showing that it could not bring those witnesses to trial in Delaware. Indeed, Bothe, Rinkenberger, Harper, and Liesure were on Monsanto and DeKalb's Delaware trial witness list. (Exh. 14.)

DeKalb also identifies several people from Syngenta's witness list from the previous GA21 litigation in Delaware who can be made available in St. Louis. (Opp. at 7, 10.) What DeKalb fails to mention is that this witness list included witnesses relevant to Syngenta's invalidity defenses for both the Shah '835 patent and the Lundquist patents. Dr. Horsch, Ms. Hoffman, and Dr. Shah were most relevant to Syngenta's defenses concerning the '835 patent— not the Lundquist patents. Dr. Shah and Dr. Horsch were inventors of the Shah '835 patent, and Ms. Hoffman was relevant to a best mode defense for that patent. The Monsanto witness

10

relevant to this case is Dr. Armstrong, because he tried to obtain glyphosate resistance in corn during the relevant time period. But Dr. Armstrong (also on Monsanto's prior witness list) continues to be a Monsanto employee and can travel to Delaware for trial. (Exh. 14.)

In contrast, Dr. Klein, an important non-party witness living in Delaware, is not under the control of Syngenta, and his potential unavailability at trial would greatly prejudice Syngenta. Syngenta cannot compel Dr. Klein's attendance at trial. Just because Syngenta and DuPont—Dr. Klein's employer—have a joint venture for the purposes of development and licensing of corn and soybean does not mean that Syngenta has control over DuPont's employees. While DeKalb notes that Dr. Klein (and his counsel) spoke to Syngenta prior to his deposition, DeKalb fails to mention that Dr. Klein met with Syngenta (in Delaware) only after being subpoenaed. (Exhs. 11-12.) Indeed, DeKalb further fails to mention that Syngenta was recently adverse to DuPont in a previous case in Delaware. Importantly, DeKalb has identified no witness who would be unavailable to testify at trial if this action is transferred to Delaware.

DeKalb also misstates the importance of Dr. Klein to Syngenta's case. Dr. Klein conceived of a method for transforming corn years before Lundquist and Walters and diligently worked to obtain fertile transgenic corn. This fact is confirmed by the '798 patent itself, which specifically cites Klein's papers for the transformation method. (Exh. 9 at col. 11, 2-5.) These facts can lead to invalidation of the '798 patent for anticipation under 35 U.S.C. § 102 and/or obviousness under § 103, as DeKalb itself admits. (Opp. Br. 12.) The jury should be permitted to judge Dr. Klein's credibility and the value of his contribution as opposed to that of the named inventors on the '798 patent. Although DeKalb self-servingly declares the Klein defense weak, Syngenta's right to present it will be seriously compromised without calling Dr. Klein to testify. (Opp. at 11-12.)

### 2.     The Relevant Documents Are Not Located in Missouri

DeKalb's contention that all of the relevant documents are located in St. Louis ignores the history of this litigation. (Opp. at 10-11.) In the prior Delaware action involving the Lundquist patents, DeKalb and Monsanto produced over 1.5 million pages of documents. Syngenta, however, had to obtain nearly 1.4 million of those pages from locations *outside* St. Louis. (Exh. 23 at 1.) Indeed, DeKalb instructed Syngenta to obtain relevant documents from prior counsel, none of whom were located in St. Louis. (*See* Exh. 24; *See* Exh. 25 at 7, 41-43, and General Objections G, O, P, and Q.) With respect to most of the documents not in the possession of prior counsel that DeKalb produced, it identified "Howrey," located in Houston, Texas, as the source location. (*See* Exhs. 26-27.) Thus, to the extent that DeKalb is referring to the approximately 1.5 million documents already produced in the Delaware litigation, those documents are *already in Syngenta's possession*, not in St. Louis.

DeKalb also briefly mentions the prior North Carolina litigation concerning inventorship of the '798 patent. (Opp. at 5-6.) In the Delaware action, Syngenta specifically requested documents from the North Carolina case and the related fraud trial, which are in the possession of the Howrey law firm in Texas, not St. Louis. DeKalb, however, refused to produce many of those documents, including those from the fraud trial. (*See* Exh. 25 at 114-15.) Now that DeKalb has asserted the '798 patent, those documents are even more relevant and should be produced by Howrey. But again, those documents remain in the possession of the Howrey firm in Texas, not in Missouri.

Finally, DeKalb asserts that documents relating to NK603, which are allegedly located in St. Louis, are somehow relevant to the present case. (Opp. at 7, 10.) This is a far cry from DeKalb's previous position in the Delaware case, where it refused to produce any documents relating to NK603. (Exh. 28, "Indeed, Monsanto/DeKalb have indicated that they will not

produce any documents concerning NK603.")  DeKalb's assertion that these documents are now relevant, despite being withheld as irrelevant in the prior GA21 case, is nothing more than a litigation-derived assertion made to avoid transfer and should be given no weight.

### D.    Monsanto and DeKalb Previously Represented to the Delaware Court that It had Jurisdiction Over JC Robinson

DeKalb argues that the case should not be transferred because DeKalb and Monsanto "[c]ould not have brought [suit] against JC Robinson [one of the defendants] in Delaware." (Opp. at 8.) This argument is contrary to the fact that *Monsanto sued JC Robinson in Delaware twice in connection with the GA21 litigation.* Monsanto and DeKalb cannot now assert there is no jurisdiction over JC Robinson in Delaware "simply because its interests have changed." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001).

Before the Illinois case was transferred to Delaware, Monsanto *sued* JC Robinson on the Shah '835 patent in Delaware, specifically alleging that venue was proper in Delaware. (Exh. 29 at 3, ¶¶ 10, 13.) Moreover, in the pre-trial order in the Delaware case, Monsanto and DeKalb *stipulated* that venue over the defendants *(including JC Robinson)* was proper in Delaware. (Opp. Exh. 19 at 5 ¶ 2.) Likewise, in the antitrust case in Delaware, Monsanto also sued JC Robinson (identifying it as a counterdefendant) for tortious interference, again representing to the court that venue was proper. (Exh. 19 at 20 ¶ 4, 22 ¶ 14-15.) Monsanto and DeKalb cannot possibly argue that it could *not* have brought suit against JC Robinson in Delaware when Monsanto previously sued the company there *twice* and DeKalb has represented to the court that venue was proper.

Further, Monsanto and DeKalb are barred by the doctrine of judicial estoppel from taking a different litigation position for the convenience of its transfer opposition. To apply judicial estoppel, "a party's later position must be clearly inconsistent with its earlier position." *Stallings*

13

*v. Hussmann Corp.*, 447 F.3d 1041, 1047 (8th Cir. 2006). Here, DeKalb's earlier position that jurisdiction over JC Robinson in Delaware was proper is inconsistent with its current position that there is no jurisdiction over JC Robinson in Delaware. "Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled." *Id.* at 1047. Here, DeKalb represented that jurisdiction over JC Robinson was proper and the Delaware court implicitly accepted that representation by retaining jurisdiction over the case. "A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id.* After suing JC Robinson twice in Delaware, and litigating there for two years, it would be unfair for DeKalb to allege that jurisdiction in Delaware over JC Robinson is now improper.

Irrespective of whether there was personal jurisdiction over JC Robinson in Delaware when Monsanto first sued JC Robinson there in 2004, there clearly is personal jurisdiction now. "Minimal contacts are present when, due to the activities of the forum state, the defendant may reasonably anticipate being haled into court there." *Cognex Corp. v. VCode Holdings, Inc.*, Civ. No. 06-1040 (JNE/JSG) 2006 WL 3043129, at **11-12 (D. Minn. Oct. 24, 2006) (finding personal jurisdiction based on litigation activities within the forum state) (citing *Hildebrand v. Steck Mfg.Co.*, 279 F.3d 1351, 1354 (Fed. Cir. 2002)). Since 2004, JC Robinson has never objected to personal jurisdiction in Delaware in response to Monsanto and DeKalb's lawsuits, and has taken full advantage of the Delaware court in litigating the GA21 corn issues, including taking discovery, raising affirmative defenses, and filing motions for summary judgment on the merits. Given JC Robinson's extensive litigation activity in Delaware, "it is fair and reasonable

for [JC Robinson] to expect to be haled into court" there on another related GA21 patent litigation. *See id.* at *12. Thus, contrary to DeKalb's argument that "a more complete set of defendants" are subject to jurisdiction in this Court (Opp. at 9), *all* of the defendants are subject to jurisdiction in Delaware in this case, whereas at least five of them are not amenable to jurisdiction here.  (*See* Exh. 31 at 2, ¶ 13 (disputing venue with respect to Syngenta Biotechnology, Inc., Garwood Seed Co., Golden Seed Company, L.L.C., Sommer Bros. Seed Company and Thorpe Seed Co.).)

## III.    CONCLUSION

For all the above reasons, Syngenta respectfully requests that this Court transfer this action to the District of Delaware.

Respectfully submitted,

Of counsel:
Michael J. Flibbert
Howard W. Levine
Sanya Sukduang
Jennifer A. Johnson
FINNEGAN, HENDERSON, FARABOW,
    GARRETT & DUNNER, L.L.P.
901 New York Ave., N.W.
Washington, DC  20001-4413
(202) 408-4000
(202) 408-4400 (facsimile)
michael.flibbert@finnegan.com
howard.levine@finnegan.com
sanya.sukduang@finnegan.com
jennifer.johnson@finnegan.com

       /s/ Glenn E. Davis
Glenn E. Davis  #2940
John H. Quinn III  #4110
*Attorneys for Defendants*
ARMSTRONG TEASDALE LLP
One Metropolitan Square
Suite 2600
St. Louis, Missouri 63102-2740
(314) 621-5070
(314) 612-2241 (facsimile)
gdavis@armstrongteasdale.com
jquinn@armstrongteasdale.com

15

## CERTIFICATE OF SERVICE

I hereby certify that on November 6, 2006, the foregoing was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system upon the following and/or was mailed by United States Postal Service to the following non-participants in Electronic Case Filing:

Joseph P. Conran
Dutro E. Campbell, II
Thomas M. Dee
HUSCH & EPPENBERGER, LLC
190 Carondelet Plaza, #600
St. Louis, MO 63105
Tel: (314) 480-1500
Fax: (314) 480-1530
joe.conran@husch.com
bruce.campbell@husch.com
tom.dee@husch.com
*Attorneys for Plaintiff*
*DEKALB Genetics Corporation*

Scott W. Clark
Susan K. Knoll
Thomas A. Miller
Steven G. Spears
HOWREY LLP
1111 Louisiana, 25th Floor
Houston, TX 77002-5242
Tel: (713) 787-1400
Fax: (713) 787-1440
clarks@howrey.com
knoll@howrey.com
millert@howrey.com
spears@howrey.com
*Attorneys for Plaintiff*
*DEKALB Genetics Corporation*


                    /s/Glenn E. Davis

16

**Freyre, Ricardo**

| | |
|---|---|
| **From:** | Moed_AutoSend@moed.uscourts.gov |
| **Sent:** | Monday, November 06, 2006 2:57 PM |
| **To:** | MOED_ECF_Notification@moed.uscourts.gov |
| **Subject:** | Activity in Case 4:06-cv-01191-ERW Dekalb Genetics Corporation v. Syngenta Seeds, Inc. et al "Reply to Response to Motion" |

\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* You may view the filed documents once without charge. To avoid later charges, download a copy of each document during this first viewing.

<div align="center">

**U.S. District Court**

**Eastern District of Missouri (LIVE)**

</div>

Notice of Electronic Filing

The following transaction was received from Davis, Glenn entered on 11/6/2006 at 2:56 PM CST and filed on 11/6/2006

| | |
|---|---|
| **Case Name:** | Dekalb Genetics Corporation v. Syngenta Seeds, Inc. et al |
| **Case Number:** | 4:06-cv-1191 |
| **Filer:** | Syngenta Seeds, Inc. |
| | Syngenta Biotechnology, Inc |
| | Golden Harvest Seeds, Inc. |
| | Garwood Seed Co. |
| | Golden Seed Company, L.L.C. |
| | Sommer Bros. Seed Company |
| | Thorp Seed Co. |
| | JC Robinson Seeds, Inc. |
| | Garst Seed Company |

**Document Number:** 27

**Docket Text:**
REPLY to Response to Motion re [23] MOTION to Transfer Case to the District of Delaware *Reply Memorandum Supporting Syngenta's Motion to Transfer this Action To The District of Delaware* filed by Defendants Thorp Seed Co., JC Robinson Seeds, Inc., Garst Seed Company, Syngenta Seeds, Inc., Syngenta Biotechnology, Inc, Golden Harvest Seeds, Inc., Garwood Seed Co., Golden Seed Company, L.L.C., Sommer Bros. Seed Company. (Attachments: # (1) Exhibit 17# (2) Exhibit 18# (3) Exhibit 19# (4) Exhibit 20# (5) Exhibit 21# (6) Exhibit 22# (7) Exhibit 23# (8) Exhibit 24# (9) Exhibit 25# (10) Exhibit 26# (11) Exhibit 27# (12) Exhibit 28# (13) Exhibit 29# (14) Exhibit 30# (15) Exhibit 31)(Davis, Glenn)

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1037221849 [Date=11/6/2006] [FileNumber=1730768-0
] [8b88105be7a3cdba4f1877675dd0790a6fb18977e2e5b5acfb483d4c8a8f06128e1

11/6/2006

95096cf1270dfdcb546f180244a70f62336252bd69ef33e80a3d87ec60198]]
**Document description:**Exhibit 17
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1037221849 [Date=11/6/2006] [FileNumber=1730768-1
] [03766c2c3fcba8e2c00c91e7ca90a0c31762963e68ffefaa7fdf7bf9572596445a9
2487f039d6ffc63dc2f9d66ba2e6a9c068ba839b4650d2a167d173c436cb3]]
**Document description:**Exhibit 18
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1037221849 [Date=11/6/2006] [FileNumber=1730768-2
] [6923f186fcdcf7d83e5d7da66319921fd87178b43c7535d46b8339f65e0aea827e5
cea76f89e1fd12a602c3a12a355cf0a2b4c0434d8dc92ecfb8eaf0c261d02]]
**Document description:**Exhibit 19
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1037221849 [Date=11/6/2006] [FileNumber=1730768-3
] [1b7e8e6de9524f1439abeb5c4b27ea68fcb1ba5c17b0de71101aaac51ff51f978ec
3cedcc61993700582e60435225f4d643f891821096266ac2d13b73086b991]]
**Document description:**Exhibit 20
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1037221849 [Date=11/6/2006] [FileNumber=1730768-4
] [3fb49efc7b5d8527f4f7fe1920d2261ef51619bda22211042bc9d2265b98b32d722
b78dc7b9e81ed586f108214d9ee1585eeafb161262b8476bf665421822eb6]]
**Document description:**Exhibit 21
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1037221849 [Date=11/6/2006] [FileNumber=1730768-5
] [4f3b184dae376e6fb4f344ae3b0d686ae8582805be8ccf3fddf65b6fcaec1c5d419
f56be4ab0379e39ceaa669bf59c41a4348627a32df32d4fd20085603cb9a2]]
**Document description:**Exhibit 22
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1037221849 [Date=11/6/2006] [FileNumber=1730768-6
] [0164b0a3018f1c9511e38721f26f897ee76c3a9af504fbd3e19ac01e6b394177c6e
8f29a064b9223f77e03650761bafab135b139e2eba2bbdaf7487e096a8cb5]]
**Document description:**Exhibit 23
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1037221849 [Date=11/6/2006] [FileNumber=1730768-7
] [6dca0f3bfb60581fa2b81843b317c8c986e5428d4d7f738d63f1991ee581c237fcf
4a05d3b14e65fc4169b72dbc28b5005efbc679c191909f915a04ea8d42f6d]]
**Document description:**Exhibit 24
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1037221849 [Date=11/6/2006] [FileNumber=1730768-8
] [94e0489e986fbf1ce93a8271b55dfcc263895442cc54084d5f473fb32ac0d94a069
75301af49f1c9b8f9bc1300c6c47951e4c5451f7ef2d2b5f576df1ad6596a]]
**Document description:**Exhibit 25
**Original filename:**n/a

11/6/2006

**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1037221849 [Date=11/6/2006] [FileNumber=1730768-9
] [51d89f58934d8ca297d4a3d96e201bde48f71b8ad1f20dda9822cb2ea5590b962ba
0a6a27d0ef42881c77c057bd01d906920816b81aec01b32a9261f3ea461fa]]
**Document description:**Exhibit 26
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1037221849 [Date=11/6/2006] [FileNumber=1730768-1
0] [55c4d6725a0bbf5bb8f5d728b3b0f6c6b94ecb1a97bed0d2c5c6761545679a5c9b
991f6cf92737b5b3a4cd671769a8aff33b3467b68fb55b7630dd424555a56f]]
**Document description:**Exhibit 27
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1037221849 [Date=11/6/2006] [FileNumber=1730768-1
1] [1093c24e3e8dc345a07fabd50eeb17317b5faa924982512070bc4db6f1a6a17afb
b86192614dafcfa222adc35be07362ef90abf3da034c869cabd567a983aeb4]]
**Document description:**Exhibit 28
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1037221849 [Date=11/6/2006] [FileNumber=1730768-1
2] [5262be428dda780e46da798416fa2849cf5e543245388119e747654147bde88299
a21796a4642daf53e6034f9ea698b176f9ff800fa0e8d5e2d2e5cb15eff8cb]]
**Document description:**Exhibit 29
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1037221849 [Date=11/6/2006] [FileNumber=1730768-1
3] [3e0d0cd45826f5af85f9d8915f6fe6f2e141e98cc5ea17fa8a61510433a90cf32a
051c56b3b073f33b5d4b6ee1581a328ce4b0c1816b2e269b971fbb5a79985a]]
**Document description:**Exhibit 30
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1037221849 [Date=11/6/2006] [FileNumber=1730768-1
4] [60489259c8f50afb6d28ea5c741321e18e5c510c81620d426d7b63580f88f0c968
5fbcee5069e1da01c6f7c8db65cb191d3d3b564cf187b25c9fecd7b97f6763]]
**Document description:**Exhibit 31
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1037221849 [Date=11/6/2006] [FileNumber=1730768-1
5] [0553bbf5effe0468e8c86c3b544892f0c82c477e0ed101ad1a754a76b5ea3257b9
3354731ebc40d3753311418ba6e511ca4f6974f8b86a249389d21f73510139]]

**4:06-cv-1191 Notice will be electronically mailed to:**

Dutro E. Campbell , II    bruce.campbell@husch.com, lisa.carter@husch.com

Scott W. Clark    clarks@howrey.com, zumbachc@howrey.com

Joseph P. Conran    joe.conran@husch.com

Glenn E. Davis    gdavis@armstrongteasdale.com, kdoyle@armstrongteasdale.com

11/6/2006

Thomas M. Dee     tom.dee@husch.com,

Michael J. Flibbert     michael.flibbert@finnegan.com, jeremy.miller@finnegan.com

Susan K. Knoll     knolls@howrey.com

Thomas A. Miller     millert@howrey.com, ricardof@howrey.com

John H. Quinn ! , III     jquinn@armstrongteasdale.com, eridyard@armstrongteasdale.com

Steven G. Spears     spearss@howrey.com,

**4:06-cv-1191 Notice will be delivered by other means to:**

11/6/2006

# EXHIBIT 10

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| DEKALB GENETICS CORP., | ) | |
| | ) | |
| Plaintiff(s), | ) | |
| | ) | |
| vs. | ) | Case No. 4:06CV01191 ERW |
| | ) | |
| SYNGENTA SEEDS, INC., et al., | ) | |
| | ) | |
| Defendant(s). | ) | |

## MEMORANDUM AND ORDER

This matter comes before the Court on Defendants' Motion to Transfer this action to the

District of Delaware [doc. #23].

### I. BACKGROUND FACTS[1]

This case involves a suit for patent infringement by Plaintiff Dekalb Genetics Corporation

("Plaintiff") against numerous Defendants, for infringement of U.S. patent No. 5,554,798

("Lundquist '798 patent"). Plaintiff is suing for infringement of the Lundquist '798 patent by

Defendant through the manufacture and marketing of GA21 corn. GA21 corn is genetically

modified corn which is resistant to the herbicide glyphosate, the main ingredient in Monsanto's

RoundUp products. The patents surrounding GA21 corn have been the subject of numerous

lawsuits between Dekalb, or their parent company Monsanto, and Syngenta. There have been

two previous lawsuits initiated by Monsanto, as well as an antitrust action initiated by Syngenta.

Monsanto originally sued Syngenta in Delaware district court alleging patent infringement of the

---

[1]The Court's recitation of the facts comes from both Plaintiff and Defendants
memorandums in support and opposition of Defendants Motion to Transfer.

1

"Shah" patent. Subsequently, Monsanto sued Syngenta in the Northern District of Illinois for alleged infringement of two Lundquist patents. This case was transferred, upon Defendants motion, to the District of Delaware and consolidated with the Shah action pending before that court, as well as with an antitrust action brought by Syngenta. Given the long history of litigation between these two parties, Defendant Syngenta sought to transfer the current action, which also involves a Lundquist patent, to the District of Delaware.

## II. LEGAL STANDARD

28 U.S.C. § 1404(a) provides that: "for the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." The first inquiry in ruling on a motion to transfer under § 1404(a), is to determine whether the case could have originally been brought in the transferee forum. *Biometics, LLC. v. New Womyn, Inc.*, 112 F.Supp.2d 869, 875 (E.D.Mo. 2000). This distinguishes a transfer pursuant to § 1404(a) from a transfer pursuant to § 1406(a), "under § 1404(a) both the transferor and the transferee court have venue over the action, but it is more efficient to prosecute the action in the later court." *Chrysler Credit Corp. v. Country Chrysler, Inc.*, 928 F.2d 1509, 1515 n. 3 (10th Cir. 1901).

The Eighth Circuit has held that "the statutory language reveals three general categories of factors that courts must consider when deciding a motion to transfer: (1) the convenience of the parties, (2) the convenience of the witnesses, and (3) the interests of justice." *Terra International, Inc. v. Mississippi Chemical corporation*, 119 F.3d 688, 691 (8th Cir. 1997). This standard is "intended to place discretion in the district court to adjudicate motions for transfer according to an individualized case-by-case consideration of convenience and fairness. A motion to transfer under § 1404(a) thus calls on the district court to weigh in the balance a number of

2

case-specific factors." *Stewart Organization, Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988) (internal citations omitted). Courts have not limited the analysis to those specific factors listed in the statute, but rather have looked at numerous factors which play a role in the district court's decision. *Tera International Inc.*, 119 F.3d at 696; *see also Collins v. Missouri Electric Cooperative Employee Credit Union*, 2005 WL 1702687 (E.D.Mo. July 20, 2005). The burden is placed on the defendant to show that the transferee forum is more appropriate, as the plaintiff's choice of forum is given great respect. *Biometics, LLC.*, 112 F.Supp.2d at 875; *see also Terra International Inc.*, 119 F.3d at 695.

## III. DISCUSSION

The Defendant in this action seeks to transfer the case to the District of Delaware, claiming that the action is more appropriately heard in that forum. They argue that it is more convenient for the parties to be in Delaware, that one of the key witnesses in the case is within the subpoena power of the Delaware court, and that the interests of justice heavily favor transfer because two other similar actions have been heard before the Delaware court or are currently pending before that court. *Def. Memo. in Support of Def. Mot. to Transfer*, 8-13. Additionally Defendants argue that venue is proper in Delaware. *Id.* at 14. Plaintiffs respond that great deference should be given to the Plaintiff's choice of forum, and further, that a weighing of the additional factors favor keeping the case in this Court. *Pl. Mot. in Opp. to Def. Mot. to Transfer*, 9-14. Most notably, Plaintiff argues that this action could not have been brought in Delaware, because the Delaware court does not have personal jurisdiction over Defendant JC Robinson, and therefore venue is not proper in the Delaware court. *Id.* at 8.

## A. Is Venue Proper in Delaware[2]

The first question for the Court to address is whether venue would be proper in the district of Delaware. *Biometics*, 112 F.Supp.2d at 875 ("the initial inquiry. . . is whether this case might have been brought in the Central District of Illinois."). Plaintiff argues that venue is not proper in the District of Delaware because Defendant JC Robinson Seeds, Inc. ("JC Robinson"), is not subject to personal jurisdiction in the District of Delaware. *Pl. Mot. in Opp. to Def. Mot. to Transfer*, 8. The Defendant responds that Plaintiff Dekalb, and their parent company, Monsanto, have twice sued JC Robinson in Delaware. *Def. Reply Memo. in Support of Def. Mot. to Transfer*, 2, 13. One of these cases is a counterclaim, to an antitrust suit, that was asserted against the Defendants in this action, the second was a suit initiated by Monsanto against numerous defendants including JC Robinson.[3] *Id.* Defendants make two arguments in support of the Delaware court having personal jurisdiction over JC Robinson. First, Defendant argues that there are minimum contacts in Delaware, sufficient to satisfy personal jurisdiction, because of the prior litigation in which JC Robinson was involved in that forum. Second, Defendants argue that Monsanto, the parent company of Dekalb, represented to the Delaware court that jurisdiction was proper over all Defendants, and therefore the Plaintiff is now estopped from arguing a lack of personal jurisdiction over JC Robinson in that forum. *Id.* at 13.

---

[2]The Court recognizes that the Illinois district court found that venue was proper in Delaware. However, personal jurisdiction was not raised by the plaintiff in that action, and therefore it was not addressed by the court. The holding of the Illinois court is not binding on this Court.

[3]Plaintiff disputes that they have twice sued JC Robinson in Delaware. They disagree that JC Robinson was named as a defendant in the counterclaim in the antitrust action. As to the patent suit, they point out that JC Robinson was not initially named as a Defendant, and after they learned of JC Robinson, it consented to jurisdiction in Delaware.

Although the Defendants clearly argue that JC Robinson would subject itself, and has in prior suits subjected itself, to the jurisdiction of the District of Delaware, the Supreme Court has squarely held that a jurisdiction where venue "would have been proper," does not mean a jurisdiction where the suit "may now be rebrought with the defendants' consent." *Hoffman v. Blaski*, 363 U.S. 335, 342-343 (1960); *see also Chrysler Credit Corp.*, 928 F.2d at 1515 ("But § 1404(a) does not allow a court to transfer a suit to a district which lacks personal jurisdiction over the defendants, even if they consent to suit there."). Clearly, JC Robinson's consent to the Delaware District Court's jurisdiction will not be sufficient to allow transfer of the current action, assuming that transfer would otherwise be proper under § 1404(a). However, Defendants urge that by JC Robinson subjecting itself to prior lawsuits in the District of Delaware, involving the same subject matter, namely patents relating to GA21 corn products, they now have minimum contacts with that district. *Hearing Transcript*, pg. 26, line 13-14 (Mr. Filibbert, Counsel for Defendant: "Minimum contacts are met in August of 2006 based on the extensive litigation activity that JC Robinson undertook."). This is a distinct argument from that discussed in the *Hoffman* case. Defendants are not arguing consent, but rather they are arguing that Plaintiff could have sued JC Robinson, in the District of Delaware, in any suit involving GA21 corn. This Court will address whether the prior litigation in Delaware is sufficient to satisfy personal jurisdiction over JC Robinson, in that forum.

In deciding whether personal jurisdiction exists over JC Robinson in the District of Delaware, the Court will look to Federal Circuit case law, as this is a patent case, as well as to the Delaware long arm statute. *3D Systems, Inc. v. Aarotech Laboratories, Inc.*, 160 F.3d 1373, 1377 (Fed. Cir. 1998) ("The Federal Circuit has exclusive jurisdiction over an appeal from a district court when that court's jurisdiction is based at least in part on a claim arising under the

patent laws of the United States."); *see also Cognex Corp. v. VCode Holdings, Inc.*, 2006 WL 3043129, at *11 (D.Minn. Oct. 24, 2006) ("When examining personal jurisdiction in the context of patent litigation, the law of the Federal Circuit applies."). Under the Federal Rules of Civil Procedure, a federal district court (here the Delaware District Court) applies the long-arm statute of the jurisdiction in which it sits, unless the Defendant is found to be a citizen of no state, and then the federal long arm provision applies.[4] *Deprenyl Animal Health, Inc. v. University of Toronto Innovations Foundation*, 297 F.3d 1343, 1350 (Fed. Cir. 2002) ("Rule 4 of the Federal Rules of Civil Procedure allows a plaintiff to rely on the state long arm statute of the state in which the federal district court sits."). The district court will apply the state's long arm statute, as long as it comports with the Constitutional requirements of due process. *Breckenridge Pharm., Inc. v. Metabolite Labs., Inc.*, 444 F.3d 1356, 1376 (Fed. Cir. 2006) ("A court must examine whether service may be accomplished under the long-arm statute and whether that statutory authority comports with due process."); *See also Walker v. West Michigan Nat'l Bank & Trust*, 14 Fed.Appx. 718, 721 (3rd Cir. 2005) ("[P]laintiff was obligated to establish that the defendants were subject to the Delaware Long Arm statute and that there was no Due Process violation."); *AeroGlobal Management, LLC. v. Cirrus Industries, Inc.*, 871 A.2d 428, 438 (Del. 2005) (same). As this Court must determine whether venue would have been proper in Delaware, before

---

[4]Fed. R. Civ. P. 4(k)(1)(A) states: "Service of summons or filing a waiver of service is effective to establish jurisdiction over the person of a defendant (A) who could be subjected to the jurisdiction of a court of general jurisdiction in the state in which the district court is located." . .."; Fed. R. Civ. P. 4(k)(2) provides for jurisdiction of the federal court over a defendant who is not a resident of any state: "If the exercise of jurisdiction is consistent with the Constitution and the laws of the United States, serving a summons or filing a waiver of service is also effective, with respect to claims arising under federal law, to establish personal jurisdiction over the person of any defendant who is not subject to the jurisdiction of the courts of general jurisdiction of any state."

deciding whether transfer is appropriate, the Court analyzes the Delaware long arm statute, as well as the due process requirements.[5]

     The Court initially notes that JC Robinson is a Nebraska Corporation, with its principal place of business in Nebraska. In order for a Delaware court to exercise jurisdiction over JC Robinson, a nonresident, it must have authority under the Delaware long arm statute.[6] *See* Fed. R. Civ. P. 4(k)(1); *see also Hercules Inc. v. Leu Trust and Banking Ltd.*, 611 A.2d 476, 480 ("First we must consider whether Delaware's long arm statute is applicable. . ."). In applying the Delaware long arm statute this Court accepts the interpretation provided by the Delaware Supreme Court. *3D Systems, Inc.*, 160 F.3d at 1377 ("We defer to the interpretation of a state's long-arm statute given by that state's highest court, particularly whether or not the statute is intended to reach the limit of federal due process."). The Delaware long arm statute has been

---

[5]The Court notes that neither party raised the question of whether personal jurisdiction would have been proper under the Delaware long arm statute; focusing their arguments on whether the minimum requirements of due process were met, sufficient for a Delaware Court to exercise personal jurisdiction. However, this Court cannot transfer a case to a court where venue would not have been proper in the transferee court, and therefore must determine whether the Delaware Court could have exercised personal jurisdiction over the Defendant JC Robinson, necessitating a discussion of the Delaware long arm statute.

[6]The Delaware Long Arm Statute provides in part:

a court may exercise personal jurisdiction over any nonresident, or a personal representative, who in person or through an agent: (1) Transacts any business or performs any character of work or service in the State; (2) contracts to supply services or things in this State; (3) Causes tortious injury in the State or outside of the State by an act or omission outside the State if the person regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State; (5) Has an interest in, uses or possesses real property in the State; or (6) Contracts to insure or act as surety for, or on, any person, property, risk, contract, obligation or agreement located, executed or to be performed within the State at the time the contract is made, unless the parties otherwise provide in writing.

10 Del. C. § 3104(c)(1)-(5).

interpreted as conferring "jurisdiction to the maximum extent possible under the Due Process Clause. *Id.* The Defendants have not provided any evidence that Defendant JC Robinson conducts business in Delaware in any capacity, rather they rely solely on JC Robinson's prior activity in the Delaware District Court as the basis for that court's jurisdiction. This Court looks to whether jurisdiction would be proper under the Due Process Clause, as the Delaware long arm statute is construed as extending personal jurisdiction to the full extent of that clause.

In order for JC Robinson to be subject to the jurisdiction of the Delaware District Court, it must have had sufficient minimal contacts with that state for the Delaware court to exercise power over it. *International Shoe Co. v. State of Washington*, 326 U.S. 310. The Supreme Court, in interpreting the minimal contacts requirement, stated "it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State. . .." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958). Under the facts of the case in *Hanson*, the Court held that "the cause of action in this case is not one that arises out of an act done or transaction consummated in the forum State." *Id.* at 251. Due Process is satisfied "if the defendant has purposefully directed his activities at residents of the forum and the litigation results from alleged injuries that arise out of or relate to those activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (internal citations omitted). The Federal Circuit has articulated a three part standard, based on Supreme Court precedent, for determining whether personal jurisdiction exists: "1) the purposefully directed activities. . ., 2) their relationship to the cause of action. . .[and], 3) the constitutional reasonableness of jurisdiction." *Akro Corp. v. Luker*, 45 F.3d 1541, 1546-1549. In order for JC Robinson to be subject to the district of Delaware's jurisdiction, it must have availed itself of the privileges of that

state and the cause of action must be one which arises out of that purposeful availment. *Hanson*, 357 U.S. at 253.

In this case Defendants argue that the purposeful availment sufficient for minimum contacts is the prior litigation in which JC Robinson was involved. In support of this argument Defendants cite *Cognex Corp.*, in which the court held that "[g]iven the frequent litigation of VData in Minnesota, it is fair and reasonable for [defendant] to expect to be haled into court here." 2006 WL 3043129 at *12. However, this Court is not persuaded by the court's analysis in *Cognex Corp.* The first requirement, as articulated by the Federal Circuit, is that the defendant purposefully availed itself of the forum state. *Akro Corp.*, 45 F.3d at 1546. JC Robinson has not purposefully availed itself of the State of Delaware. The first action in which it was involved was as a defendant, and the second was a counterclaim. As the Southern District of Florida held, "a party's initiation or defense of a legal action in Florida does not provide personal jurisdiction over that party in a separate suit. . . even where. . . the later suit arises from subject matter that is similar to the earlier suit." *United States of America v. Subklew*, 2001 WL 896473, at *3 (S.D. Fla. June 5, 2001); *see also Gibbons v. Brown*, 716 So.2d 868, 870 (Fla. Dist. Ct. App. 1998) ("A current defendant's prior decision to bring a suit in Florida should not act indefinitely as a sword of Damocles hanging perilously over the head of that defendant if she later challenges jurisdiction in a separate suit (albeit a suit arising from the same subject matter)."). Secondly, even if a prior lawsuit was considered purposefully availing oneself of the laws of that forum, JC Robinson's prior litigation activity is not the subject of the present suit. *See e.g. Hanson*, 357 U.S. at 251. The activities in the forum state must give rise to the litigation. *Id.* The activity that is the subject of the present suit, is the sale of GA21 corn; this activity took place in the Midwest. JC Robinson had no contacts with the state of Delaware prior to the lawsuit by Monsanto. The

action at bar is for patent infringement, not for some activity that resulted from the litigation that took place in Delaware.[7] The third consideration articulated by the Federal Circuit is the reasonableness of the forum's state exercise of jurisdiction. *Akro Corp.*, 45 F.3d at 1549. As this court finds that the first two requirements are not met, it is not necessary to address whether the exercise of jurisdiction would be reasonable.

### B.  Plaintiffs are Estopped from Asserting a lack of Jurisdiction

Defendants additionally argue that Plaintiff Dekalb's parent company, Monsanto, previously represented to the court in the District of Delaware that there was personal jurisdiction of JC Robinson, and therefore should be estopped from now asserting a lack of jurisdiction. *Def. Reply Memo. in Support of their Mot. to Transfer*, 13 ("This argument is contrary to the fact that Monsanto sued JC Robinson in Delaware twice in connection with the GA21 litigation"). Additionally, Defendants point to the fact that Monsanto "stipulated that venue over the defendants was proper in Delaware." *Id.* This Court does not see the relevance of the Plaintiff stipulating to jurisdiction over the Defendants. The fact that Monsanto previously asserted that jurisdiction was proper over the Defendants in a previous Delaware action, does not affect the question of whether venue would be proper in Delaware in this action, and as the Court has determined above, it would not. Defendants argument can be boiled down to a second attempt at arguing consent, which the Supreme Court rejected in *Hoffman*. 363 U.S. at 342-343.

---

[7]There is an eleventh circuit decision which initially seems to reach a different result. *See Huff v. Pharr*, 748 F.2d 1553 (11th Cir. 1984) ("The narrow issue of this appeal is whether the defendant's participation in the original litigation and his connection with the State of California prior to that litigation satisfy the minimum contacts requirement. . . We hold the defendant had the requisite minimum contacts."). However, this case is easily distinguishable, as the California court had jurisdiction over the defendant for purposes of the first action, based on the defendant's consent, and the second action was a suit to enforce the judgment obtained in the first action. *Id.* at 1554. Therefore, the second action was a direct result of the defendant's conduct in the first suit.

Furthermore, the cases raised by Defendants in support of this argument are factually distinguishable from the question of jurisdiction. *See e.g. New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) ("This rule, known as judicial estoppel, generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." (internal citations omitted)). The policy justifications for the doctrine of judicial estoppel further emphasize its inapplicability to the case at bar. "A court invokes judicial estoppel when a party abuses the judicial forum or process by making a knowing misrepresentation to the court or perpetrating a fraud on the court." *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1047 (8th Cir. 2006). There is no argument, from either party, that the Plaintiff could not have chosen to bring this action in Delaware, with the expectation that Defendant JC Robinson would have consented to jurisdiction. However, the fact that Plaintiff decided to bring this action in this Court is not sufficient to show that they are "perpetrating a fraud on the court." *Id.* If Plaintiff believed it would be preferable to bring this action in this Court, where venue is proper, that is the Plaintiff's prerogative. There is no evidence that either of the parties argued the question of venue or jurisdiction in the prior Delaware action. Additionally, the consent to jurisdiction in a prior suit, is not sufficient to allow this Court to transfer the case to Delaware.

## IV. CONCLUSION

The Court holds that venue would not be proper in the district of Delaware, and therefore transfer is not appropriate under 28 U.S.C. § 1404(a). In order for venue to be proper, the transferee court must have personal jurisdiction over each of the defendants. Personal jurisdiction requires minimum contacts sufficient to show the defendant purposely availed itself of that court's jurisdiction. The prior litigation in Delaware is not sufficient to satisfy this requirement. Furthermore, the fact that the Plaintiff, through its parent company Monsanto, previously asserted

11

that personal jurisdiction existed over the Defendants, is not a contrary legal position such that

Plaintiff is now estopped from asserting a lack of jurisdiction in the present action. The question

of the Delaware court's jurisdiction is a question of fact, which must be satisfied in order for this

Court to have the authority to transfer under 28 U.S.C. §1404(a).

Accordingly,

      **IT IS HEREBY ORDERED** that Defendants' Motion to Transfer [doc. #23] is

**DENIED.**

Dated this <u>29th</u> Day of <u>December,</u> 2006.


                                         _E. Richard Webber_

                                   E. RICHARD WEBBER

                                   UNITED STATES DISTRICT JUDGE

Page 1 of 2

## Ehrhard, Kathy

**From:** Conran, Joe
**Sent:** Friday, December 29, 2006 9:39 AM
**To:** Ehrhard, Kathy
**Subject:** FW: Activity in Case 4:06-cv-01191-ERW Dekalb Genetics Corporation v. Syngenta Seeds, Inc. et al "Memorandum & Order"

**From:** Moed_AutoSend@moed.uscourts.gov[SMTP:MOED_AUTOSEND@MOED.USCOURTS.GOV]
**Sent:** Friday, December 29, 2006 9:39:02 AM
**To:** MOED_ECF_Notification@moed.uscourts.gov
**Subject:** Activity in Case 4:06-cv-01191-ERW Dekalb Genetics Corporation v. Syngenta Seeds, Inc. et al "Memorandum & Order"

**Auto forwarded by a Rule**

***NOTE TO PUBLIC ACCESS USERS*** There is no charge for viewing opinions.

### U.S. District Court

### Eastern District of Missouri (LIVE)

Notice of Electronic Filing

The following transaction was received from BAK, entered on 12/29/2006 at 9:39 AM CST and filed on 12/29/2006
**Case Name:**       Dekalb Genetics Corporation v. Syngenta Seeds, Inc. et al
**Case Number:**    4:06-cv-1191
**Filer:**
**Document Number:** 32

**Docket Text:**
MEMORANDUM AND ORDER - IT IS HEREBY ORDERED that Defendants' Motion to Transfer [23] is DENIED. Signed by Judge E. Richard Webber on 12/29/06. (BAK, )

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1037221849 [Date=12/29/2006] [FileNumber=1786955-0] [8927cb1d179374e97210b7d139d22f8da675ae20b709c40010ef4f5eb56d8422be
c8964ad46dfdef362892fc551f4ccd627156863d7a98acdebe3c26997cddea]]

**4:06-cv-1191 Notice will be electronically mailed to:**

Dutro E. Campbell , II    bruce.campbell@husch.com, lisa.carter@husch.com

Scott W. Clark    clarks@howrey.com, knappj@howrey.com

Joseph P. Conran    joe.conran@husch.com

12/29/2006

Glenn E. Davis    gdavis@armstrongteasdale.com, kdoyle@armstrongteasdale.com

Thomas M. Dee    tom.dee@husch.com,

Michael J. Flibbert    michael.flibbert@finnegan.com, jeremy.miller@finnegan.com

Susan K. Knoll    knolls@howrey.com

Howard W. Levine    howard.levine@finnegan.com

Thomas A. Miller !    millert@howrey.com, ricardof@howrey.com

John H. Quinn , III    jquinn@armstrongteasdale.com, eridyard@armstrongteasdale.com

Steven G. Spears    spearss@howrey.com,

**4:06-cv-1191 Notice will be delivered by other means to:**

12/29/2006

# EXHIBIT 11

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | |
|---|---|
| DEKALB GENETICS CORPORATION, )<br><br>Plaintiff, )<br><br>v. )<br><br>SYNGENTA SEEDS, INC., et al., )<br><br>Defendants. ) | Case # 4:06CV01191 ERW<br><br>**Judge E Richard Webber** |

## DEFENDANTS' MOTION TO DISMISS DEKALB'S
## INFRINGEMENT CLAIMS FOR LACK OF PERSONAL JURISDICTION

Defendants Syngenta Biotechnology, Inc., Garwood Seed Co., Golden Seed Company,

L.L.C., and Thorp Seed Co. respectfully move this Court for an Order pursuant to Fed. R. Civ. P.

12(b)(2) dismissing the patent infringement claims asserted against them by plaintiff DeKalb

Genetics Corporation for lack of personal jurisdiction.

Dated: January 19, 2007

Respectfully submitted,

_/s/ Glenn E. Davis_
Glenn E. Davis #2940
John H. Quinn III #4110
*Attorneys for Defendants*
ARMSTRONG TEASDALE LLP
One Metropolitan Square, Suite 2600
St. Louis, Missouri 63102-2740
(314) 621-5070
(314) 612-2241 (facsimile)
gdavis@armstrongteasdale.com
jquinn@armstrongteasdale.com

Of counsel:

Michael J. Flibbert
Howard W. Levine
Sanya Sukduang
Jennifer A. Johnson
FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, L.L.P.
901 New York Ave., N.W.
Washington, DC  20001-4413
(202) 408-4000
(202) 408-4400 (facsimile)
michael.flibbert@finnegan.com
howard.levine@finnegan.com
sanya.sukduang@finnegan.com
jennifer.johnson@finnegan.com

## CERTIFICATE OF SERVICE

I hereby certify that on January 19, 2007, the foregoing was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system upon the following and/or was mailed by United States Postal Service to the following non-participants in Electronic Case Filing:

Joseph P. Conran
Dutro E. Campbell, II
Thomas M. Dee
HUSCH & EPPENBERGER, LLC
190 Carondelet Plaza, #600
St. Louis, MO 63105
Tel: (314) 480-1500
Fax: (314) 480-1530
joe.conran@husch.com
bruce.campbell@husch.com
tom.dee@husch.com
*Attorneys for Plaintiff*
*DeKalb Genetics Corporation*

Susan K. Knoll
Thomas A. Miller
Steven G. Spears
Scott W. Clark
HOWREY LLP
1111 Louisiana, 25th Floor
Houston, TX 77002-5242
Tel: (713) 787-1400
Fax: (713) 787-1440
knoll@howrey.com
millert@howrey.com
spears@howrey.com
clarks@howrey.com
*Attorneys for Plaintiff*
*DeKalb Genetics Corporation*

/s/Glenn E. Davis

# EXHIBIT 12

## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| DEKALB GENETICS CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case # 4:06CV01191 ERW |
| v. | ) | |
| | ) | **Judge E Richard Webber** |
| SYNGENTA SEEDS, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

### SYNGENTA'S MOTION TO SEVER THE CLAIM AGAINST JC ROBINSON AND TRANSFER THE REMAINING CLAIMS TO THE DISTRICT OF DELAWARE

Defendants (collectively "Syngenta") respectfully move for an Order severing DeKalb Genetics Corporation's ("DeKalb") patent infringement claim against JC Robinson from the main cause of action against Syngenta pursuant to Fed. R. Civ. P. 21. Further, because severance of JC Robinson would eliminate the jurisdictional impediment to transfer set forth in the Court's Memorandum and Order dated December 29, 2006, Syngenta also respectfully requests that the Court reconsider transferring DeKalb's claims against the remaining defendants to the District of Delaware pursuant to 28 U.S.C. § 1404(a).

Dated: January 19, 2007

Respectfully submitted,

_/s/ Glenn E. Davis_
Glenn E. Davis #2940
John H. Quinn III #4110
*Attorneys for Defendants*
ARMSTRONG TEASDALE LLP
One Metropolitan Square, Suite 2600
St. Louis, Missouri 63102-2740
(314) 621-5070
(314) 612-2241 (facsimile)
gdavis@armstrongteasdale.com
jquinn@armstrongteasdale.com

Of counsel:

Michael J. Flibbert
Howard W. Levine
Sanya Sukduang
Jennifer A. Johnson
FINNEGAN, HENDERSON, FARABOW,
   GARRETT & DUNNER, L.L.P.
901 New York Ave., N.W.
Washington, DC  20001-4413
(202) 408-4000
(202) 408-4400 (facsimile)
michael.flibbert@finnegan.com
howard.levine@finnegan.com
sanya.sukduang@finnegan.com
jennifer.johnson@finnegan.com

## CERTIFICATE OF SERVICE

I hereby certify that on January 19, 2007, the foregoing was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system upon the following and/or was mailed by United States Postal Service to the following non-participants in Electronic Case Filing:

Joseph P. Conran
Dutro E. Campbell, II
Thomas M. Dee
HUSCH & EPPENBERGER, LLC
190 Carondelet Plaza, #600
St. Louis, MO 63105
Tel: (314) 480-1500
Fax: (314) 480-1530
joe.conran@husch.com
bruce.campbell@husch.com
tom.dee@husch.com
*Attorneys for Plaintiff*
*DeKalb Genetics Corporation*

Susan K. Knoll
Thomas A. Miller
Steven G. Spears
Scott W. Clark
HOWREY LLP
1111 Louisiana, 25th Floor
Houston, TX 77002-5242
Tel: (713) 787-1400
Fax: (713) 787-1440
knoll@howrey.com
millert@howrey.com
spears@howrey.com
clarks@howrey.com
*Attorneys for Plaintiff*
*DeKalb Genetics Corporation*


/s/Glenn E. Davis

# EXHIBIT 13

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

SYNGENTA BIOTECHNOLOGY, INC.,
GARWOOD SEED CO.,
GOLDEN SEED COMPANY, L.L.C., and
THORP SEED CO.,

Plaintiffs,

v.

DEKALB GENETICS CORPORATION, and
MONSANTO COMPANY,

Defendants.

Civil Action No. 07-38

## DECLARATION OF JOAN E. PURK

1.     My name is Joan E. Purk.  I am a paralegal in the Legal Department of Monsanto Company ("Monsanto") in St. Louis Missouri.  In the course of my job responsibilities, I have a familiarity with the location of Monsanto's offices, the location of Monsanto's scientific and business records, and the location of Monsanto's employees.  I am also familiar with the locations of offices, records, and employees for Monsanto's subsidiary, DEKALB Genetics Corp.

2.     Monsanto's principal place of business is in St. Louis, Missouri, and the surrounding area.  Its corporate headquarters is in St. Louis.  Monsanto's primary facilities are located at 800 North Lindbergh Boulevard (which is approximately a 20 minute drive from the federal courthouse in St. Louis), and 700 N. Chesterfield Parkway (which is approximately a 40 minute drive from the federal courthouse in St. Louis).

3.     DEKALB's principal place of business is in St. Louis, Missouri.  Its corporate headquarters is in St. Louis.

DM_US\8430494.v1

4.     Most of Monsanto and DEKALB's business and scientific documents relevant to this case involving glyphosate resistant corn are located at their St. Louis facilities. Moreover, most of Monsanto's employees, including those involved in agricultural biotechnology research, product development, product marketing, and regulatory matters are located at these locations.

5.     I have reviewed Syngenta's Witness List submitted in connection with *Monsanto Co. v. Syngenta Seeds, Inc.*, 04-305-SLR (lead case). The following individuals identified in that list are located in St. Louis:

> Chuck Armstrong
> Anthony Leisure
> David Nothmann
> Ken Rinkenberger

Joseph Bothe travels to St. Louis two days a week as part of his job responsibilities with Monsanto and maintains a permanent office at the North Lindbergh Boulevard, St. Louis facility. Delbert Harper has retired from Monsanto but works as a consultant three days a week at the North Lindbergh Boulevard, St. Louis facility, where he maintains a permanent office, and he stills resides in St. Louis. Michael Spencer is located in Mystic, Conneticut and regularly travels to St. Louis as part of his job responsibilities with Monsanto.

I declare under penalty of perjury that the forgoing is true and correct.

Dated: _1/23/07_                                   Joan E. Purk

DM_US\8430494.v1                                   2

# EXHIBIT 14

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 15

**EXHIBIT 9**

Civil Action No. 04-305-SLR (Lead Case)

## SYNGENTA'S WITNESS LIST

Syngenta may call some or all of the following witnesses either live or by deposition. Syngenta reserves the right to modify or supplement this list and reserves the right to call witnesses not included on this list as rebuttal witnesses. Syngenta reserves the right to modify or supplement this list based on the Court's rulings on claim construction and pending motions. Syngenta makes no representation that each or any of these witnesses will testify at trial.

Syngenta reserves the right to call additional witnesses to provide foundational testimony should Monsanto/DeKalb contest the authenticity or admissibility of any materials to be proffered at trial. Syngenta reserves the right to call substitute witnesses to the extent that the employment of any witness changes or a witness otherwise becomes unavailable for trial. Syngenta also reserves the right to call any witness for impeachment purposes.

Syngenta reserves the right to call at trial any witness who appears on Monsanto/DeKalb's witness list. If any of Monsanto/DeKalb's witnesses fail to appear at trial, Syngenta reserves the right to use their deposition testimony. Syngenta also reserves the right to supplement this list after it receives Monsanto/DeKalb's witness list.

The addresses of the witnesses affiliated with Syngenta are listed as "Syngenta," and can be reached through litigation counsel. The witnesses whose addresses are listed as "Monsanto/DeKalb," are Monsanto/DeKalb current or former employees, officers, or directors and can be reached through Monsanto/DeKalb's litigation counsel.

## I.     Fact Witnesses

1.   Thomas Adams - Monsanto/DeKalb

2.   Chuck Armstrong - Monsanto/DeKalb

3.   Joseph Michael Bothe - Monsanto/DeKalb

4.   Jack Bernens - Syngenta

5.   Guy Della-Cioppa - Monsanto/DeKalb

6.   Rick DeRose - 909 Camden Ct.
              Winston Salem, NC

7.   Chris Flick - Monsanto/DeKalb

8.   Michael Fromm - Monsanto/DeKalb

9.   Charles Gasser - Monsanto/DeKalb

10. Delbert Harper - Monsanto/DeKalb

11. Nancy Hoffman - Monsanto/DeKalb

12. Robert Horsch - Monsanto/DeKalb

13. Jeff Jorgenson - Syngenta

14. Ganesh Kishore - Monsanto/DeKalb

15. Harry Klee - Monsanto/DeKalb

16. Ted Klein - 2229 Rosewood Dr.,
              Wilmington, DE

17.  Marshall Kostiuk - Syngenta

18. Michel Lebrun - Address Unknown

19. Anthony Leisure - Monsanto/DeKalb

20. Peggy Lemaux - Monsanto/DeKalb

21. Ronald Lundquist - Monsanto/DeKalb

22. Catherine Mackey - Monsanto/DeKalb

23. David Nothman - Monsanto/DeKalb

24. Greg Parker- Syngenta

25. Ed Resler - Syngenta

26. Ray Riley- Syngenta

27. Ken Rinkenberger - Monsanto/DeKalb

28. Robert Robinson - Syngenta

29. Sally Rockey - Address unknown

30. Stephen Rogers - Monsanto/DeKalb

31. John Sanford - Address unknown

32. Dilip Shah - Monsanto/DeKalb

33. Michael Spencer - Monsanto/DeKalb

34. David Walters - Monsanto/DeKalb

35. Robert Wilde - Syngenta

36. David Witherspoon - Syngenta

37. Ron Wulfkhule - Syngenta

## II.     Expert Witnesses

1.  Barry Bruce

Biochemistry, Cellular & Molecular Biology Department
Walters Life Science Building
University of Tennessee at Knoxville
Knoxville, TN 37996

Dr. Bruce is a Professor in the department of Biochemistry, Cellular & Molecular

biology at the University of Tennessee at Knoxville.  His qualifications are fully set forth

in his curriculum vitae, which is attached to his expert report.  Dr. Bruce is expected to

# EXHIBIT 16

  

**Media Release**

# DuPont and Syngenta form joint venture to facilitate the out-licensing of seed genetics and biotech traits

**Wilmington, Delaware, USA, and Basel, Switzerland 10 April 2006**

DuPont and Syngenta today announced in Chicago, Ill., the formation of a joint venture and licensing agreements that will bring expanded choice to North American farmers through broader access to the companies' proprietary corn and soybean genetics and biotechnology traits.

Syngenta Seeds, Inc. and DuPont subsidiary Pioneer Hi-Bred International, Inc. will form the seed industry's first 50/50 joint venture to out-license genetics to U.S. and Canadian seed companies, with potential to expand worldwide.

The two companies also agree to cross-license certain corn and soybean traits that each company will market independently under their own seed brands. The agreement includes rights for Syngenta to market the new Optimum™ GAT™ herbicide tolerant trait developed by DuPont.

"This is outstanding news for growers and the seed industry because it will make available a new and unique pool of corn and soybean traits and genetics from both companies' research efforts. As a result, North American growers will have access to broader product choices and technologies," said Mike Mack, chief operating officer of Syngenta Seeds.

The joint venture, GreenLeaf Genetics LLC, will offer corn and soybean breeding material from both DuPont and Syngenta. It will also facilitate the licensing of biotech traits by both companies. While Syngenta originally launched GreenLeaf Genetics as a traits and genetics licensing business in 2004, DuPont will, for the first time, provide other seed companies targeted access to the world's largest plant genetics library at Pioneer.

"The joint venture and the licensing agreements bring together the strength of two industry leaders to deliver new technologies to the market more quickly," said Dean Oestreich, DuPont vice president, general manager and Pioneer president. "We are excited about making the results of our research investments in both genetics and traits available to more farmers, sooner."

GreenLeaf Genetics will be based in Omaha, Neb., and led by Ron Wulfkuhle, the current head of Syngenta's GreenLeaf Genetics business. "We are ready to coordinate access to all the inbred lines, hybrids and traits needed for customers to feed their own breeding programs", Wulfkuhle said.

Through the cross-license agreements:

- Syngenta receives a global license to the Optimum™ GAT™ trait, a DuPont proprietary glyphosate and ALS chemistry tolerant trait for both soybeans and corn to be marketed in conjunction with its Agrisure™ brand of traits. The new trait will give farmers expanded weed control options and help optimize yield. U.S. registration for the Optimum™ GAT™ trait is expected as early as 2009.

- DuPont receives a global license to Syngenta's insect resistance technology for European corn borer, corn rootworm and broad lepidopteran control as it develops the next generation of insect traits.

This is the second business agreement announced this year between Syngenta and DuPont agriculture businesses. In February, the two companies announced an agreement to broaden each company's crop protection product offer. Syngenta acquired an exclusive worldwide license to develop DuPont's new insecticide Rynaxypyr™ in mixtures with its own leading insect control products. DuPont Crop Protection acquired worldwide rights to Syngenta's strobilurin fungicide picoxystrobin, sold as Acanto®, including access to companion products used in mixtures.

Syngenta is a world-leading agribusiness committed to sustainable agriculture through innovative research and technology. The company is a leader in crop protection, and ranks third in the high-value commercial seeds market. Sales in 2005 were approximately $8.1 billion. Syngenta employs more than 19,000 people in over 90 countries. Syngenta is listed on the Swiss stock exchange (SYNN) and in New York (SYT). Further information is available at www.syngenta.com.

DuPont is a science company. Founded in 1802, DuPont puts science to work by creating sustainable solutions essential to a better, safer, healthier life for people everywhere. Operating in more than 70 countries, DuPont offers a wide range of innovative products and services for markets including agriculture, nutrition, electronics, communications, safety and protection, home and construction, transportation and apparel. Pioneer Hi-Bred International, Inc., a subsidiary of DuPont, which has the world's leading market share in corn and soybean seed. Further information is available at www.dupont.com.

| Syngenta Media: | Switzerland: | Guy Wolff | Tel: +41 (61) 323 2323 |
| | USA: | Sarah Hull | Tel: +1 (202) 628 2372 |
| | UK: | Andrew Coker | Tel: +44 (1483) 26 0014 |
| DuPont Media: | USA: | Doyle Karr | Tel: +1 (515)270 3428 |
| Syngenta Analysts: | Switzerland: | Jonathan Seabrook | Tel: +41 (61) 323 7502 |
| | | Jennifer Gough | Tel: +41 (61) 323 5059 |
| | USA: | Rhonda Chiger | Tel: +1 (917) 322 2569 |
| DuPont Analysts: | USA: | David Peet | Tel: +1 (302) 774 1125 |

*Cautionary Statement Regarding Forward-Looking Statements*

This document contains forward-looking statements, which can be identified by terminology such as 'expect', 'would', 'will', 'potential', 'plans', 'prospects', 'estimated', 'aiming', 'on track' and similar expressions. Such statements may be subject to risks and uncertainties that could cause the actual results to differ materially from these statements. We refer you to DuPont and Syngenta publicly available filings with the U.S. Securities and Exchange Commission for information about these and other risks and uncertainties. DuPont and Syngenta assume no obligation to update forward-looking statements to reflect changed assumptions or other factors. This document does not constitute, or form part of, any offer or invitation to sell or issue, or any solicitation of any offer, to purchase or subscribe for any ordinary shares in DuPont, Syngenta AG, or Syngenta ADSs, nor shall it form the basis of, or be relied on in connection with, any contract therefor.

Agrisure™, and Acanto® are trademarks of a Syngenta Group Company.
Optimum™ GAT™ are trademarks of Pioneer Hi-Bred International, Inc.
Rynaxypyr™ is a trademark of DuPont Crop Protection.

# EXHIBIT 17



**Media Room**

Search Pioneer: [        ] Go

PRODUCTS, PERFORMANCE & INFO | AGRONOMY, NUTRITION, RESEARCH & TECHNOLOGY | WORLDWIDE LOCATIONS | CONTACT US | GROWINGPOINTS WEBSITE | ABOUT PIONEER | CAREER OPPORTUNITIES | MEDIAROOM

What's New | Pioneer Home

Welcome

Multimedia Gallery

Business Overview

Research Technology Pipeline & Spec Sheets

Fueling the World with Biofuels

News Releases

Backgrounders

Media Kits/Glossary

Advancing Global Agriculture

Publications

Get the News & The Pioneer Page

Links

<< [Back to News Releases]

**DuPont and Syngenta Form Joint Venture to Facilitate the Out-Licensing of Seed Genetics and Biotech Traits**

WILMINGTON, Del. and BASEL, Switzerland, April 10 /PRNewswire-FirstCall/ -- DuPont and Syngenta today announced in Chicago, Illinois, the formation of a joint venture and licensing agreements that will bring expanded choice to North American farmers through broader access to the companies' proprietary corn and soybean genetics and biotechnology traits.

Syngenta Seeds, Inc., and DuPont subsidiary Pioneer Hi-Bred International, Inc., will form the seed industry's first 50/50 joint venture to out-license genetics to U.S. and Canadian seed companies, with potential to expand worldwide.

The two companies also agree to cross-license certain corn and soybean traits that each company will market independently under their own seed brands. The agreement includes rights for Syngenta to market the new Optimum™ GAT™ herbicide tolerant trait developed by DuPont.

"This is outstanding news for growers and the seed industry because it will make available a new and unique pool of corn and soybean traits and genetics from both companies' research efforts. As a result, North American growers will have access to broader product choices and technologies," said Mike Mack, Chief Operating Officer of Syngenta Seeds.

The joint venture, GreenLeaf Genetics LLC, will offer corn and soybean breeding material from both DuPont and Syngenta. It will also facilitate the licensing of biotech traits by both companies. While Syngenta originally launched GreenLeaf Genetics as a traits and genetics licensing business in 2004, DuPont will, for the first time, provide other seed companies targeted access to the world's largest plant genetics library at Pioneer.

"The joint venture and the licensing agreements bring together the strength of two industry leaders to deliver new technologies to the market more quickly," said Dean Oestreich, DuPont Vice President, General Manager and Pioneer President. "We are excited about

making the results of our research investments in both genetics and traits available to more farmers, sooner."

GreenLeaf Genetics will be based in Omaha, Nebraska, and led by Ron Wulfkuhle, the current head of Syngenta's GreenLeaf Genetics business. "We are ready to coordinate access to all the inbred lines, hybrids and traits needed for customers to feed their own breeding programs," Wulfkuhle said.

Through the cross-license agreements:

* Syngenta receives a global license to the Optimum™ GAT™ trait, a DuPont proprietary glyphosate and ALS chemistry tolerant trait for both soybeans and corn to be marketed in conjunction with its Agrisure™ brand of traits. The new trait will give farmers expanded weed control options and help optimize yield. U.S. registration for the Optimum™ GAT™ trait is expected as early as 2009.

* DuPont receives a global license to Syngenta's insect resistance technology for European corn borer, corn rootworm and broad lepidopteran control as it develops the next generation of insect traits.

This is the second business agreement announced this year between Syngenta and DuPont agriculture businesses. In February, the two companies announced an agreement to broaden each company's crop protection product offer. Syngenta acquired an exclusive worldwide license to develop DuPont's new insecticide Rynaxypyr™ in mixtures with its own leading insect control products. DuPont Crop Protection acquired worldwide rights to Syngenta's strobilurin fungicide picoxystrobin, sold as Acanto®, including access to companion products used in mixtures.

Syngenta is a world-leading agribusiness committed to sustainable agriculture through innovative research and technology. The company is a leader in crop protection, and ranks third in the high-value commercial seeds market. Sales in 2005 were approximately $8.1 billion. Syngenta employs more than 19,000 people in over 90 countries. Syngenta is listed on the Swiss stock exchange (SYNN) and in New York (SYT). Further information is available at http://www.syngenta.com/ .

DuPont is a science company. Founded in 1802, DuPont puts science to work by creating sustainable solutions essential to a better, safer, healthier life for people everywhere. Operating in more than 70 countries, DuPont offers a wide range of innovative products and services for markets including agriculture, nutrition, electronics, communications, safety and protection, home and construction, transportation and apparel. Pioneer Hi-Bred International, Inc., a subsidiary of DuPont, which has the world's leading market share in corn and soybean seed. Further information is available at http://www.dupont.com/ .

| Syngenta Media: | Switzerland: | Guy Wolff | Tel: +41 (61) 323 2323 |
| | USA: | Sarah Hull | Tel: +1 (202) 628 2372 |
| | UK: | Andrew Coker | Tel: +44 (1483) 26 0014 |
| DuPont Media: | Global: | Doyle Karr | Tel: +1 (515) 270 3428 |

MediaRoom | Pioneer Hi-Bred International, Inc. - News Releases                    Page 3 of 3

```
Syngenta Analysts:    Switzerland: Jonathan Seabrook Tel: +41 (61) 323 7502
                                   Jennifer Gough    Tel: +41 (61) 323 5059
                      USA:         Rhonda Chiger     Tel: +1 (917) 322 2569

DuPont Analysts:      USA:         David Peet        Tel: +1 (302) 774 1125

Cautionary Statement Regarding Forward-Looking Statements
```

This document contains forward-looking statements, which can be identified by terminology such as 'expect,' 'would,' 'will,' 'potential,' 'plans,' 'prospects,' 'estimated,' 'aiming,' 'on track' and similar expressions. Such statements may be subject to risks and uncertainties that could cause the actual results to differ materially from these statements. We refer you to DuPont and Syngenta publicly available filings with the U.S. Securities and Exchange Commission for information about these and other risks and uncertainties. DuPont and Syngenta assume no obligation to update forward-looking statements to reflect actual results, changed assumptions or other factors. This document does not constitute, or form part of, any offer or invitation to sell or issue, or any solicitation of any offer, to purchase or subscribe for any ordinary shares in DuPont, Syngenta AG, or Syngenta ADSs, nor shall it form the basis of, or be relied on in connection with, any contract therefore.

Agrisure™, and Acanto® are trademarks of a Syngenta Group Company.
Optimum™ GAT™ are trademarks of Pioneer Hi-Bred International, Inc.
Rynaxypyr™ is a trademark of DuPont Crop Protection.

SOURCE: DuPont; Syngenta

CONTACT: Syngenta Media, Switzerland, Guy Wolff, +41-61-323-2323, or
USA, Sarah Hull, +1-202-628 2372, or UK, Andrew Coker, +44-1483-26 0014;
DuPont Media, Global, Doyle Karr, +1-515-270-3428; Syngenta Analysts,
Switzerland, Jonathan Seabrook, +41-61-323-7502, or Jennifer Gough,
+41-61-323-5059, or USA, Rhonda Chiger, +1-917-322-2569;
DuPont Analysts, USA,
David Peet, +1-302-774-1125

Web site: http://www.syngenta.com/
http://www.dupont.com/

Page last updated: 10/24/2006
Site Map | Terms of Use | PRIVACY | Search | Home            [Explore Pi]

®, ™, ℠ trademarks and service marks of Pioneer Hi-Bred International, Inc.
© 1996-2006 Pioneer Hi-Bred International, Inc.

# EXHIBIT 18



# EXHIBIT 19

ORAL DEPOSITION OF THEODORE M. KLEIN, Ph.D.

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MONSANTO COMPANY and            )
MONSANTO TECHNOLOGY LLC,         )
          Plaintiffs,            )
                                 ) Civil Action
     v.                          ) No. 04-305 SLR
                                 )
SYNGENTA SEEDS, INC.             )
SYNGENTA BIOTECHNOLOGY, INC., et al.,  )
          Defendants             )
_____

DEKALB GENETICS CORPORATION,     )
          Plaintiff,             )
     v.                          )
SYNGENTA SEEDS, INC.             )
SYNGENTA BIOTECHNOLOGY, INC., ET AL.  )
          Defendants             )

          Deposition of THEODORE M. KLEIN, Ph.D.,
taken pursuant to notice at the law offices of Potter
Anderson & Corroon LLP, 1313 North Market Street, Sixth
Floor, Wilmington, Delaware, beginning at 8:37 a.m., on
Friday, March 31, 2006, before Terry Barbano Burke,
RMR-CRR and Notary Public.

                              Job No. 56702

APPEARANCES:

          THOMAS A. MILLER, ESQUIRE
          HOWREY, LLP
            1111 Louisiana, 25th Floor
            Houston, Texas  77002-5242
            For the Plaintiffs

          JENNIFER A. JOHNSON, ESQUIRE
          HOWARD W. LEVINE, ESQUIRE
          Finnegan Henderson Farabow Garrett
          & Dunner, LLP
            901 New York Avenue, NW
            Washington, DC  20001-4413
            For the Defendants

ORAL DEPOSITION OF THEODORE M. KLEIN, Ph.D.

| Page 2 |
|---|

1  ALSO PRESENT:
2      ALFRED H. HECKEL, ESQUIRE
       Kaye Scholer LLP
3      425 Park Avenue
       New York, NY 10022-3598
4      Counsel for the witness
5  LINDSAY duPHILY, Videotape Specialist
       Discovery Video Services - (302) 655-4005
6
7          - - -
8      VIDEO SPECIALIST: This is the videotape
9  deposition of Mr. Theodore M. Klein, Ph.D., taken in
10 the matter of Monsanto Company and Monsanto Technology
11 LLC, plaintiffs, versus Syngenta Seeds, Inc., and
12 Syngenta Biotechnology, Inc., et al, defendants, DeKalb
13 Genetics Corporation, plaintiffs, versus Syngenta
14 Seeds, Inc., Syngenta Biotechnology, Inc., et al,
15 defendants, Civil Action No. 04-305.
16     This deposition is being held in the
17 offices of Potter Anderson and Corroon, Wilmington,
18 Delaware. We are going on the record on March 31st,
19 2006, at approximately 8:37 a.m.
20     The court reporter is Terry Burke from
21 the firm of Wilcox and Fetzer, Wilmington, Delaware.
22 My name is Lindsay duPhily and I'm the videotape
23 specialist of Discovery Video Services, in association
24 with Wilcox and Fetzer.

| Page 3 |
|---|

1      Counsel will now introduce themselves and
2  the court reporter will swear in the witness.
3      MR. MILLER: Tom Miller representing
4  Monsanto and DeKalb.
5      MS. JOHNSON: Jennifer Johnson of
6  Finnegan Henderson representing the defendants.
7      MR. LEVINE: Howard Levine from Finnegan
8  Henderson representing the Syngenta defendants as well.
9      MR. HECKEL: Hank Heckel from Kaye
10 Scholer representing the witness.
11     THEODORE M. KLEIN, Ph.D.,
12     the deponent herein, having first been
13     duly sworn on oath, was examined and
14     testified as follows:
15 BY MR. MILLER:
16 Q.  Could you state your full name for the record,
17 please, and also your current residence address?
18 A.  Theodore Mitchell Klein. 2229 Rosewood Drive
19 in Wilmington, Delaware.
20 Q.  Dr. Klein, is it Dr. Klein?
21 A.  Uh-huh.
22 Q.  I would ask you as we proceed today, instead
23 of saying uh-huh, you need to answer yes or no so the
24 court reporter can take down with clarity your answers

| Page 4 |
|---|

1  to the questions, is that okay?
2  A.  That's fine.
3  Q.  You have been deposed before?
4  A.  If I don't do it, just remind me.
5  Q.  Okay.
6      You have been deposed before?
7  A.  Yes.
8  Q.  You understand you're under oath today?
9  A.  Sure.
10     MR. MILLER: I'll ask your counsel, is
11 because I believe we served a subpoena on counsel, is
12 the witness appearing here today pursuant to subpoena?
13     MR. HECKEL: That's correct.
14 BY MR. MILLER:
15 Q.  Dr. Klein, do you have any physical problems
16 today that would preclude you from answering fully the
17 questions I'm --
18 A.  No.
19 Q.  -- going to ask you?
20     Are you on any medications that would
21 preclude you from fully answering the questions?
22 A.  No.
23 Q.  Who are you currently employed by?
24 A.  DuPont.

| Page 5 |
|---|

1  Q.  How long have you been employed by DuPont?
2  A.  Since November 1989.
3  Q.  I am going to hand you what I have marked as
4  Exhibit 1. I only have three copies.
5      Dr. Klein, this is a copy of a resume of
6  yours that was prepared some time in the past; is that
7  right?
8  A.  Yeah.
9  Q.  Under the professional experience section, is
10 that still an accurate description of your professional
11 experience as of today?
12 A.  Professional -- well, I notice here that I did
13 leave off my master's degree from University of
14 Connecticut.
15 Q.  That's at the top under education; right?
16 A.  Oh, yeah, it is. Is it? Okay. Yes, so this
17 is accurate, to the best of my knowledge.
18 Q.  This indicates that at DuPont, at the time
19 that you prepared this document, you were a senior
20 research biologist at DuPont.
21     Are you still a senior research
22 biologist at DuPont?
23 A.  Yes.
24 Q.  It indicates under that that for DuPont you

2 (Pages 2 to 5)

e9ae1ac0-cf63-4439-b6d4-ae815e0f7e25

ORAL DEPOSITION OF THEODORE M. KLEIN, Ph.D.

---

**Page 6**

1  have been involved in the development of gene transfer
2  systems for maize and soybean.
3      A.   Uh-huh.
4      Q.   Is that still true as of today?
5      A.   Do I have to answer?
6          MR. HECKEL:  Yes.
7          THE WITNESS:  Yes, it says it is, yes.
8  BY MR. MILLER:
9      Q.   Let me ask you this.
10     A.   Yes.
11     Q.   I am just asking in general terms now.  Are
12  you still involved in corn transformation at DuPont?
13     A.   Not at the moment.
14     Q.   When was the last time you were involved in
15  corn transformation at DuPont?
16     A.   Maybe four or five years ago directly.
17  Indirectly.
18     Q.   Are you still involved in plant transformation
19  at DuPont?
20     A.   Yes.
21     Q.   But it's not corn?
22     A.   Right.
23     Q.   Did you have any meetings with DuPont counsel
24  to prepare for your deposition today?

---

**Page 7**

1      A.   Yes.
2          MR. HECKEL:  I'll just caution the
3  witness not to reveal any attorney-client protected
4  information.
5  BY MR. MILLER:
6      Q.   Did you review any documents in preparation
7  for your deposition today?
8      A.   At that meeting?
9      Q.   Yes.
10     A.   No.
11     Q.   Did you review any documents in preparation
12  for your deposition outside of that meeting?
13     A.   I did receive my previous deposition from
14  whenever that was, '98, and I looked at some lines, but
15  I couldn't read it all.  I didn't really read it, no.
16     Q.   Did you review any other documents besides
17  your deposition?
18     A.   No.
19     Q.   Have you had any discussions with any lawyers
20  for Syngenta?
21     A.   Yes.
22     Q.   Who did you have discussions with?
23     A.   These folks here, whatever their names are.
24     Q.   And when did you have those discussions?

---

**Page 8**

1      A.   Maybe two weeks ago or so.  I don't remember
2  the exact day.
3      Q.   Was a lawyer for DuPont present during those
4  discussions?
5      A.   Yes.
6      Q.   Who?
7      A.   Tom Fleming.  Just Tom.
8      Q.   Where did those discussions take place?
9      A.   At the DuPont office.
10     Q.   How long did it last?
11     A.   Oh, maybe an hour or so.
12     Q.   Did you look at any documents during that
13  meeting?
14     A.   We did look at some lines in the deposition.
15     Q.   The deposition from 1998?
16     A.   Yes.
17     Q.   What did you discuss, did you discuss your
18  work in corn transformation from the 1980's?
19     A.   Just briefly.  Went over a little bit of what
20  I did at Cornell and at the USDA and that was about it.
21  Just in general terms, just basically because it was
22  all pretty spelled out in the deposition I think, so.
23     Q.   Did you discuss your grant application?
24     A.   Yes.

---

**Page 9**

1      Q.   What did you discuss about your grant
2  application?
3      A.   Just took a look at it, and they asked me if
4  this was me and did I write it and yep.
5      Q.   Did they ask you about the substance of what's
6  stated in the grant application?
7      A.   Just a little bit about what kind of work was
8  described in that, in that grant application, yes.
9      Q.   Did they discuss with you the possibility of
10  testifying at trial in this case?
11     A.   That's been mentioned, yes.
12     Q.   And are you available to testify at trial in
13  this case?
14         MR. HECKEL:  Objection to the extent it
15  calls for a legal conclusion.
16         THE WITNESS:  I don't know.  It all
17  depends.
18  BY MR. MILLER:
19     Q.   Are you planning any trips outside of Delaware
20  during the period of May 30th to June 16th of this
21  year?
22     A.   I hate to say this without my wife present
23  because she has the calendar, so I don't really know.
24  I'd have to get back to you on that.

3  (Pages 6 to 9)