**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| SYNGENTA BIOTECHNOLOGY, INC., GARWOOD SEED CO., GOLDEN SEED COMPANY, L.L.C., and THORP SEED CO., | ) | C.A. No. 07-38-SLR |
| Plaintiffs, | ) | |
| v. | ) | **PUBLIC VERSION** |
| DEKALB GENETICS CORPORATION, and MONSANTO COMPANY, | ) | |
| Defendants. | ) | |

# REPLY IN SUPPORT OF DEFENDANTS DEKALB GENETICS CORPORATION AND MONSANTO COMPANY'S MOTION TO TRANSFER

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19801
Tel: (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Defendants*

OF COUNSEL:

Susan K. Knoll
Thomas A. Miller
Steven G. Spears
HOWREY LLP
1111 Louisiana, 25th Floor
Houston, Texas 77002
Telephone (713) 787-1400

Dated: March 23, 2007
Public Version Dated: April 2, 2007
786883 / 31144

# TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................ 1

II. ARGUMENT IN REPLY .............................................................................. 3

A. The Prior Delaware Action Concerning The '835, '880, And '863 Patents Is Not The First-Filed Case Concerning The '798 Patent ..............3

1. The Missouri Case Is The First-Filed Case Concerning The '798 Patent ..........................................................................................3

2. There Is No Concurrent Case Filed Earlier Than The Missouri Action Because The Prior Delaware Action Is Not Currently Active..........................................................................4

3. That The Prior Delaware Action Involved Patents With Similar Specifications And Common Inventors Does Not Make It The First-Filed Action ......................................................5

B. There Is No Exception That Prevents The First-Filed Rule From Applying To The Missouri Case..........................................................8

C. DEKALB Is Not Seeking To Avoid This Court's Prior Summary Judgment Order Because It Does Not Adversely Affect Claim Construction For The '798 Patent..........................................................10

1. The DJ Delaware Plaintiffs' Construction Of The Term "Progeny" Is Contrary To The Plain Meaning Of The Term And Inconsitent With The Prior Record .......................................12

2. The DJ Delaware Plaintiffs' Construction Of The Term "Resistance" Is Inconsitent With Syngenta's Prior Position And With The Prior Construction Reached By The North Carolina Court..........................................................................13

D. The Interests Of Justice Favor Transfer To Missouri ...............................14

1. Delaware DJ Plaintiffs' Motion To Dismiss The Missouri Action For Lack of Personal Jurisdiction Is Procedurally Defective And Without Merit ......................................................15

2. Delaware DJ Plaintiffs Do Not Dispute That Suit Could Not Have Been Brought Against JC Robinson In Delaware .........17

E. The Convenience Of The Witnesses And Parties Favors Transfer To Missouri ....17

III. CONCLUSION .... 19

# TABLE OF AUTHORITIES

**Cases**

*33D Sys. Inc. v. Aarotech Lab., Inc.*,
160 F.3d 1372 (Fed. Cir. 1998) ..... 16

*Air Prods. & Chems., Inc. v. MG Nitrogen Servs.*,
133 F. Supp. 2d 354 (D. Del. 2001) ..... 10

*Anderson v. Dassault Aviation*,
361 F.3d 449 (8th Cir. 2004) ..... 16

*Applied BioSystems, Inc. v. Cruachem, Ltd.*,
772 F. Supp. 1458 (D. Del. 1991) ..... 17

*APV North America v. Sig Simonazzi North America*,
295 F. Supp. 2d 393 (D. Del. 2002) ..... 3

*Chrysler Credit Corp. v. Country Chrysler, Inc.*,
928 F.2d 1505 (10th Cir. 1991) ..... 17

*Corixa Corp. v. IDEC Pharms. Corp.*,
C. A 01-615-GMS, 2002 WL 265094 (D. Del. Feb. 25, 2002) ..... 3

*Crosley Corp. v. Hazeltine Corp.*,
122 F.2d 925 (3d Cir.1941) ..... 4

*Cummins-Allison Corp. v. Glory LTD*,
Civ. A. 2-03-CV-358TJ, 2004 WL1635534 (E.D. Tex. May 26, 2004) ..... 6, 7

*Datex-Ohmeda, Inc. v. Hill-Rom Services, Inc.*,
185 F. Supp. 2d 407 (D. Del. 2002) ..... 8

*EEOC v. Univ. of Penn.*,
850 F.2d 969 (3d Cir. 1988) ..... 9

*Everst Capital Limited v. Everest Funds Management, L.L.C.*,
178 F. Supp. 2d 459 (S.D.N.Y. 2002) ..... 8

*Genfoot, Inc. v. Payless Shoesource, Inc.*,
No. Civ. 03-398-SLR, 2003 WL 22953183 (D. Del. Dec. 3, 2003) ..... 3

*Hoffman v. Blaski*,
363 U.S. 335 (1960) ..... 17

*Lab. Corp. of America Holdings v. Chiron Corp.*,
384 F.3d 1326 (Fed. Cir. 2004) ........................................ 3, 7

*Minnesota Min. & Mfg. Co. v. Eco Chem., Inc.*
757 F.2d 1256 (Fed. Cir. 1985) ........................................ 16

*Optical Recording Corp. v. Capitol-EMI Music, Inc.*,
803 F. Supp. 971 (D. Del. 1992)........................................ 9, 10

*Orion IP, LLC v. Sony Electronics, Inc.*,
C.A. No. 05-255-GMS, 2006 WL 680657 (D. Del. Mar. 14, 2006) .................. 3

*Pharmaceutical Resources, Inc. v. Alpharma USPD Inc.*,
2002 WL 987299 (S.D.N.Y. May 13, 2002) ........................................ 8

*Pinker v. Roche Holdings Ltd.*,
292 F.3d 361 (3d Cir. 2002) ........................................ 17

*Reach & Associates, P.C. v. Dencer*,
269 F. Supp. 2d 497 (D. Del. 2003)........................................ 17

*Thales Airborne Sys. S.A. v. Univeral Avionics Sys. Corp.*,
C. A. No. 05-853-SLR, 2006 WL 1749399 (D. Del. June 21, 2006) .................. 3, 7

*Tuff Torq Corp. v. Hydro-Gear Ltd.*,
882 F. Supp. 359 (D. Del. 1994)........................................ 8

*Venen v. Sweet*,
758 F.2d 117 (3d Cir. 1985) ........................................ 4

*Virgin Wireless, Inc. v. Virgin Enterprises Limited*,
201 F. Supp. 2d 294 (D. Del. 2002)........................................ 8

Defendants DEKALB Genetics Corporation and Monsanto Company (collectively, "Defendants") submit this reply in support of their motion to transfer to the Eastern District of Missouri or dismiss this declaratory judgment patent case brought by Syngenta Biotechnology, Inc., Garwood Seed, Co., Golden Seed Co., LLC, and Thorp Seed Co., the declaratory judgment plaintiffs here (collectively, "Delaware DJ Plaintiffs").

## I.    INTRODUCTION

The Missouri court has already denied a motion by the Syngenta-related companies (including the Delaware DJ Plaintiffs) to transfer the Missouri action to this district. It was only after Syngenta lost that motion that the Delaware DJ Plaintiffs brought this declaratory judgment action (together with a series of other motions in Missouri, including Delaware DJ Plaintiffs' motion to dismiss for lack of personal jurisdiction). Thus, the Delaware DJ Plaintiffs' complaint that it would be "manifestly unfair" to transfer this action to Missouri is an attempt to distract this Court from their true motivations. Indeed, the Delaware DJ Plaintiffs do not dispute that this declaratory judgment action could have brought against Defendants in Missouri, where DEKALB and Monsanto's principal places of business are located.

Instead, the Delaware DJ Plaintiffs' opposition (hereinafter, "Opp. Br.") is premised upon the assumption that the prior 2004 case in this Court is the first-filed action for purposes of Defendants' motion to transfer. That premise is wrong because there is no active case between the parties in this Court. The patent dispute concerning U.S. Patent Nos. 5,538,880 and 6,013,863 ("the '880 patent" and "the '863 patent," respectively) is currently on appeal to the Court of Appeals for the Federal Circuit, and the related antitrust case has been stayed pending the outcome of that appeal.

Moreover, even if there were an active dispute between the parties in this Court, the Missouri action concerns a materially different patent, U.S. Patent No. 5,554,798 ("the '798 patent"). Although the Delaware DJ Plaintiffs describe the inventors and specification as being the same, they fail to acknowledge that the claims are materially different. While the '880 and '863 patents contain "method" claims directed to methods for making herbicide ('880) and glyphosate ('863) resistant plants, the '798 patent contains product claims, reciting the resistant plants themselves.

This difference in claims between the patents is significant, because this Court's summary judgment order only decided the issues before it—(1) invalidity of U.S. Patent No. 4,490,835 ("the '835 patent), which even the Delaware DJ Plaintiffs do not contend is related to the '798 patent, and (2) noninfringement of the '880 and '863 patents on grounds that some of the claimed process steps were performed by DEKALB (not Syngenta) before the patents issued. Accordingly, this Court's summary judgment decision has no relevance to whether the '798 product claims are infringed or any other issue in first-filed Missouri action.

Therefore, the Delaware DJ Plaintiffs' claim that DEKALB's suit in Missouri is "forum shopping" designed to avoid unfavorable decisions previously made by this Court is baseless. And under settled law, DEKALB cannot be accused of forum shopping when it has chosen to sue in Missouri, the location of its principal place of business.

## II. ARGUMENT IN REPLY

### A. The Prior Delaware Action Concerning The '835, '880, And '863 Patents Is Not The First-Filed Case Concerning The '798 Patent

#### 1. The Missouri Case Is The First-Filed Case Concerning The '798 Patent

Under the law of the Federal Circuit and this Court, the first-filed rule applies to "'parallel actions,' [i.e.] co-pending patent infringement and declaratory judgment actions involving the ***same patents*** and the same parties." *Lab. Corp. of America Holdings v. Chiron Corp.*, 384 F.3d 1326, 1328 (Fed. Cir. 2004) (emphasis added); *APV North America v. Sig Simonazzi North America*, 295 F. Supp. 2d 393, 397-98 (D. Del. 2002); *Thales Airborne Sys. S.A. v. Univeral Avionics Sys. Corp.*, C. A. No. 05-853-SLR, 2006 WL 1749399, at * 4 (D. Del. June 21, 2006) (noting that the Federal Circuit's strong preference for the first filed rule applies to actions "involving the same patents").

The Missouri '798 patent case is the first case between DEKALB and the Syngenta companies (including the Delaware DJ Plaintiffs) involving the '798 patent. It is undisputed that the instant declaratory judgment is effectively a mirror image of the earlier Missouri case. Thus, it should be transferred to the Missouri court. *See Orion IP, LLC v. Sony Elecs., Inc.*, C.A. No. 05-255-GMS, 2006 WL 680657 (D. Del. Mar. 14, 2006) ("where two patent lawsuits involving the same claims are filed in different jurisdictions, the Federal Circuit requires that the first-filed action be given preference absent special circumstances"), *quoting Corixa Corp. v. IDEC Pharms. Corp.*, C. A. No. 01-615-GMS, 2002 WL 265094 (D. Del. Feb. 25, 2002); *Genfoot, Inc. v. Payless Shoesource, Inc.*, C. A. No. 03-398-SLR, 2003 WL 22953183 (D. Del. Dec. 3, 2003). Moreover, the Missouri court has ***already*** denied the Syngenta Companies' motion to

transfer DEKALB's infringement action to Delaware. Hence, transfer to Missouri is in the interest of justice because it will prevent the Syngenta Companies from circumventing the Missouri court's order denying transfer.

### 2. There Is No Concurrent Case Filed Earlier Than The Missouri Action Because The Prior Delaware Action Is Not Currently Active

The prior action in this Court cannot be the first-filed case because there is no active case between the parties in this Court. Nevertheless, the Delaware DJ Plaintiffs' argue that the prior dispute between the parties in this Court concerning the '880 and '863 patents should "be considered" the first-filed action for purposes of Defendants' motion to transfer. [Opp. Br. at 1] However, that dispute is currently on appeal before the Court of Appeals for the Federal Circuit, and the related antitrust case has been stayed pending the outcome of that appeal. Thus, there is no concurrent case filed earlier than the Missouri case. *See Crosley Corp. v. Hazeltine Corp.*, 122 F.2d 925, 929 (3d Cir. 1941) ("in all cases of federal concurrent jurisdiction the court which first had possession of the subject must decide it").

The Delaware DJ Plaintiffs cite no authority for its assertion that "the GA21 litigation proceedings in this Court have not ended." [Opp. Br. at 16] On the contrary, when this Court entered judgment on Monsanto and DEKALB's patent infringement claims, the case did in fact end. *Venen v. Sweet*, 758 F.2d 117, 120 (3d Cir. 1985) ("As a general rule, the timely filing of a notice of appeal is an event of jurisdictional significance, immediately conferring jurisdiction on a Court of Appeals and divesting a district court of its control over those aspects of the case involved in the appeal").

Moreover, the antitrust case, which is stayed pending the appeal, has nothing to do with DEKALB's patent infringement case based on the '798 patent.

### 3. That The Prior Delaware Action Involved Patents With Similar Specifications And Common Inventors Does Not Make It The First-Filed Action

At the heart of the DJ Delaware Plaintiffs' opposition is the incorrect notion that the prior Delaware action (involving the '835, '880, and '863 patents) should be considered the first-filed action because the '880, '863 and '798 patents share common inventors and similar specifications. However, the DJ Delaware Plaintiffs fail to acknowledge that the ***claims*** are materially different. While the '880 and '863 patents contain "method" claims directed to methods for making herbicide ('880) and glyphosate ('863) resistant plants, all of the '798 patent claim are directed to a product, reciting the resistant plants themselves. [Ex. 1, '880 patent, at col. 22, ll. 48-55; Ex. 2, '863 patent, at col. 29, l. 25-col. 30, l. 5; Ex. 3, '798 patent, at col. 26, ll. 15-24] For example, claim 1 is directed to "[a] fertile transgenic Zea may plant":

> 1. ***A fertile transgenic Zea mays plant*** containing an isolated heterologous DNA construct encoding EPSP synthase wherein said DNA construct is expressed so that the plant exhibits resistance to normally toxic levels of glyphosate, wherein said resistance is not present in a *Zea mays* plant not containing said DNA construct, and wherein said DNA construct is transmitted through a complete normal sexual cycle of the transgenic plant to the progeny generation.

[*Id.* at col. 26, ll. 15-23] Claims 2, 3, 4 and 5, which all ultimately depend from claim 1, are directed to (i) a "transgenic plant," (ii) a "seed produced by the transgenic plant," (iii) "progeny … derived from the transgenic plant," or (iv) "seed derived from the progeny plant." [*Id.* at col. 26, ll. 24-34] Even claim 6, upon which the Delaware DJ

Plaintiffs rely in their opposition [Opp. Br. at 7], is a product claim (in a product-by-process claim format):

> 6.     The ***transgenic plant of claim 1*** wherein the plant is obtainable by a process comprising the steps of:
>
> (i)     bombarding intact regenerable *Zea mays* cells with microprojectiles coated with said heterologous DNA construct;
>
> (ii)    identifying or selecting a population of transformed cells; and
>
> (iii)   regenerating a fertile transgenic plant therefrom.

[Ex. 3 at col. 26, ll. 35-42]  Thus, unlike the asserted claims of the '880 and '863 patents previously at issue in this Court, all of the claims of the '798 patent are product claims.

Cases squarely addressing this issue have plainly held that the prior cases involving related patents should not be considered the "first-filed" case under the first-filed rule.  For example, in *Cummins-Allison Corp. v. Glory LTD*, Civ. A. 2-03-CV-358TJ, 2004 WL1635534 (E.D. Tex. May 26, 2004), the plaintiff, Cummins brought a patent infringement action against Glory in the North District of Illinois on two patents. Subsequently, Cummins attempted to amend its complaint to add infringement claims for three other patents that were related to the first two through the same chain of applications.  The Illinois court denied Cummins' motion to amend, and Cummins then brought a patent infringement action on the three patents in the Eastern District of Texas. Glory then brought a declaratory judgment on the three patents in the Northern District of Illinois and filed a motion to transfer the Texas case to Illinois.

In support of its motion to transfer, Glory argued that the earliest Illinois case was the first-filed.  The court disagreed:

> The Court finds that this case is the first-filed case and should proceed in this Court.  ***Although the patents are related and might involve the***

> ***interpretation of identical claim terms, the patents are different patents than those in suit in the initial Illinois case.***

*Cummins*, 2004 WL 1635534 at * 3. The Texas court denied the motion to transfer. Applying the rule from *Cummins* (and *Thales, supra*, § II.A.2) in the instant case, the first-filed rule does not apply to the prior Delaware case, regardless of the similarity or relatedness of the '880 and '863 patents-in-suit there to the '798 patent-in-suit here.

The DJ Delaware Plaintiffs' reliance upon this Court's decision in *Thales* is also misplaced. [Opp. Br. at 12-13] In *Thales*, this Court determined that the "first-to-file" rule applied where the ***same*** two patents were asserted in two separate actions—a first action in Delaware and a second action in New Jersey. *Thales*, 2006 WL 1749399, at * 12. However, this Court held that the "first-to-file" rule ***did not apply*** to two additional patents that were asserted in the New Jersey action, but not in the Delaware action. *Id.* at 11-12. In so holding, this Court noted that:

> [p]laintiffs cite several cases for the proposition that only the same general subject matter between the two actions is needed if additional claims are raised in a subsequently-filed action. None of the cases cited are Federal Circuit patent cases, however, and ***while the Federal Circuit has a strong preference for adhering to the first-filed rule, its application seems limited to actions "involving the same patents***."

*Id.* (quoting *Lab. Corp. of Am. Holdings v. Chiron Corp.*, 384 F.3d 1326, 1328 (Fed. Cir. 2004) (emphasis added)). Hence, Defendants submit that *Thales* stands for the proposition that the first-filed rule applies to cases involving the same patent, not cases involving allegedly similar patents. Under *Thales*, the first-filed action is the action filed by DEKALB in Missouri involving the '798 patent, not the previous Delaware action involving the '835, '880, and '863 patents.

**B. There Is No Exception That Prevents The First-Filed Rule From Applying To The Missouri Case**

This Court recognizes exceptions to the first-filed when (1) the second-filed case has developed more rapidly than the first; (2) the first-filing party instituted suit in one forum in anticipation of the opposing party's imminent suit in another, less favorable, forum; or (3) in cases involving bad faith or forum shopping. However, none of those exceptions exist here. *Tuff Torq Corp. v. Hydro-Gear Ltd.*, 882 F. Supp. 359, 364-65 (D. Del. 1994); *Virgin Wireless, Inc. v. Virgin Enters. Ltd.*, 201 F. Supp. 2d 294, 301 (D. Del. 2002).

The DJ Delaware Plaintiffs seek to avoid the considerable deference afforded to DEKALB's choice of Missouri by accusing DEKALB (and Monsanto) of forum shopping. [Opp. Br. at 15] However, DEKALB's principal place of business is St. Louis, Missouri, and a plaintiff that has chosen to sue in its principal place of business cannot be accused of forum shopping. *See Tuff Torq*, 882 F. Supp. at 362; *Datex-Ohmeda, Inc. v. Hill-Rom Servs., Inc.*, 185 F. Supp. 2d 407, 411 (D. Del. 2002); *Everst Capital Ltd. v. Everest Funds Mgmt, L.L.C.*, 178 F. Supp. 2d 459, 470 (S.D.N.Y. 2002)("Given that the locus of Defendants' business is in Nebraska, as are anticipated witnesses and documents relevant to the issues raised by the litigation, their choice of a court in Nebraska is not indicative of improper forum shopping."); *Pharm. Res., Inc. v. Alpharma USPD Inc.*, 2002 WL 987299 at *3 (S.D.N.Y. May 13, 2002).

Moreover, despite the DJ Delaware Plaintiffs' assertions to the contrary [Opp. Br. at 15], DEKALB has consistently brought suit in its home forum, first in Illinois with respect to the '880 and '863 patents (before DEKALB's relocation to Missouri), and now in Missouri with respect to the '798 patent. The DJ Delaware Plaintiffs intentionally

confuse this point, failing to acknowledge that Monsanto, DEKALB's corporate parent, is ***not*** a party to the Missouri action. Indeed, Monsanto is not a proper party to the Missouri action because DEKALB—not Monsanto—is the owner of the '798 patent and Monsanto in not an exclusive licensee under that patent. Moreover, DEKALB has ***never*** brought a patent suit against the Syngenta companies in Delaware. The DJ Delaware Plaintiffs simply ignore these inconvenient facts in their effort to deprive DEKALB of the "considerable deference" that afforded to the choice of its home forum, Missouri.

The cases cited by the Delaware DJ Plaintiffs to support their position—*EEOC v. Univ. of Penn.*, 850 F.2d 969 (3d Cir. 1988) and *Optical Recording Corp. v. Capitol-EMI Music, Inc.*, 803 F. Supp. 971, 973 (D. Del. 1992)—both fall within one of the exceptions recognized by this Court, and thus, are not applicable here. [*See* Opp. Br. at 14-17] In *EEOC*, a non-patent case, the court affirmed the district court's decision to depart from the first-filed rule when the University of Pennsylvania filed the earlier declaratory judgment action away from its "home turf" in an effort to anticipate the enforcement action it knew was imminent. Here, DEKALB filed first on its "home turf," Missouri. DEKALB did not "race to the courthouse" in anticipation of an imminent suit by Syngenta. In *Optical Recording*, Capitol Records arguably brought the earlier declaratory judgment action to anticipate any suit brought by Optical Recording, and, moreover, there was evidence that Capitol Records brought the case in spite of the ongoing good faith efforts of Optical Recording to amicably negotiate a settlement without litigation. The patents asserted in *Optical Recording* were also identical in both the first and second cases. Additionally, the second-filed case had proceeded further than the first. *Id.* at 974.

It is also noteworthy that the Delaware DJ Plaintiffs filed this declaratory judgment action after they lost their first motion to transfer (nearly six months ***after*** DEKALB filed its patent infringement suit in Missouri against the Syngenta Companies for infringement of the same '798 patent). Unlike the case in *Optical Recording*, the first-filed case in Missouri has advanced much further than the second one here. Syngenta has filed its answer. After the Syngenta Companies filed their motions, the Missouri court entered a scheduling order. [Ex. 4]. The parties have exchanged disclosures and will begin the claim construction process on April 15, 2007, pursuant to that order. [*Id.*] The parties have also responded to written discovery requests (including requests for production and interrogatories) and document production has begun. "The interests of judicial economy dictate that an action involving the same patents-in-suit and most of the same parties should not proceed simultaneously in two different district courts." *Air Prods. & Chems., Inc. v. MG Nitrogen Servs.*, 133 F. Supp. 2d 354, 357 (D. Del. 2001).

### C. DEKALB Is Not Seeking To Avoid This Court's Prior Summary Judgment Order Because It Does Not Adversely Affect Claim Construction For The '798 Patent

The DJ Delaware Plaintiffs attempt to portray DEKALB as seeking to avoid this forum because this Court's summary judgment order on the '880, '863 and '835 patents somehow adversely affects claim construction for the '798 patent. [Opp. Br. at 2, 3] That allegation is baseless. Other than construing the asserted '880 and '863 claims as "dependent" claims (and construing the asserted '835 gene claims as directed to transformed plants and plant cells), no other disputed claim construction issue was relevant to the legal issues on which this Court's summary judgment was based. [*See*

Ex. 6 (D.I. 375)] Syngenta has conceded this point in conjunction with its appellate briefing, stating that no disputed claim terms of the '880 and '863 patents were implicated by this Court's summary judgment determinations. [*See* Ex. 7, Red Br., at 57] In fact, the only disputed limitation mentioned in this Court's order was "chloroplast transit peptide," which related to the '835 patent. The other disputed claim terms relating to the '880 and '863 patents, "herbicide," "resistance," and "progeny," were not mentioned. Thus, none of these disputed limitations had any relationship to the conclusions of law resolved in the summary judgment rulings currently on appeal.

Nonetheless, the DJ Delaware Plaintiffs now argue that this Court adopted all of its proposed constructions [Opp. Br. at 3], relying upon a single sentence in a footnote to this Court's summary judgment order stating that "***For the purposes of appeal*** ... the court adopts the claim construction proposed by defendants (D.I. 309) in connection with the asserted claims of the '880 and '863 patents." [Ex. 6 at 16, n.8 (emphasis added)] But that position is inconsistent with statements made by Syngenta's counsel, Mr. Dunner, during the February 7, 2007 oral argument before the Federal Circuit. There, he claimed not to have "the foggiest notion" as to what this footnote actually meant:

> MR. DUNNER: I would mention only one last point and that is they raise a point what should the court do about vacating the district court's claim construction. I suggest that under the *Broadcast Innovation* case where there was a remand but the claim construction was not vacated because it was not relevant to the issues on appeal, the same rule should apply in this case.
>
> COURT: Is it fair to do it in a footnote though, without any explanation?
>
> MR. DUNNER: Your Honor, that's right, but if the court wants to on remand suggest that when the court goes back down, the Court should provide reasons, that would be perfectly appropriate, but I see no reason why the claim construction need be vacated. I think that would be prejudicial and unnecessary in this case, and I think *Broadcast Innovation* supports the relief that we've requested.

> COURT: What does it mean to say "for purposes of appeal, I adopt this claim construction?"
>
> MR. DUNNER: Your Honor, I don't honestly have the foggiest notion of why she said that because those interpretations are not implicated in this appeal. I really don't know. I hate to say I don't know, but I'll finish on that note if there are no other questions. Thank you.

[Ex. 8, Kim Decl. (regarding Fed. Cir. Hearing Tr.)]

This Court's only ruling as to the '880 and '863 patents' method claims was that they were not infringed because certain steps had been carried out by DEKALB before the patents issued. [Ex. 6 at 3-13] This analysis is wholly unrelated to the '798 patent's ***product*** claims, which are infringed by the use and sale of the product itself. This was clearly articulated by DEKALB's counsel before the court in Missouri in conjunction with a hearing regarding Syngenta's ***first*** motion to transfer:

> MS. KNOLL: … Your Honor, … we don't have any intention of relitigating somehow issues that have been lost. I mean DeKalb is not running from any adverse rulings by anybody. What we're going to do – and I think Syngenta is the one who's going to be opposed to this -- is I'm going to urge Your Honor to adopt Judge Tilley's claim construction of this very patent, which has already been done by Judge Tilley. He's construed glyphosate resistance. He had to make a construction of the '798 claims in order to determine the inventorship issue. So I don't intend at all to ask you to relook at whatever Judge Robinson did, and just as a point of clarification, she never did construe the word "progeny". So the Court can read those orders and see what exactly Judge Robinson had did.

[Ex. 9, Nov. 17, 2006 Hearing Tr. (E.D. Mo.), at 55:19-57:4]

The DJ Delaware Plaintiffs also make several assertions regarding certain claim constructions that are inconsistent with the record, as addressed below.

### 1. The DJ Delaware Plaintiffs' Construction Of The Term "Progeny" Is Contrary To The Plain Meaning Of The Term And Inconsitent With The Prior Record

The DJ Delaware Plaintiffs argue that this Court has interpreted the term "progeny" as limited to "the next generation ('R1') plant," supporting its

noninfringement position with respect to the '798 patent. [Opp. Br. at 7] However, Syngenta's proposed construction is contrary to the plain meaning of the term, which this Court recognized during the March 9, 2006 claim construction hearing when it said that "progeny would be all generations downstream," i.e., "the R1 and all succeeding generations."[1] [Ex. 10, Hearing Tr. (Del.) at 23:17-18; 27:2-4; *see also* 24:18-19] Not only is Syngenta's proposed construction contrary to the plain meaning of the term, but with respect to the '863 patent, Syngenta never advocated for this interpretation until it altered its proposed construction for this term in its March 20, 2006 claim chart submission. [*See* Ex. 11 at 10; Ex. 13 at 7] This was ***after*** the claim construction hearing and ***after*** all briefing had been submitted.

**2. The DJ Delaware Plaintiffs' Construction Of The Term "Resistance" Is Inconsitent With Syngenta's Prior Position And With The Prior Construction Reached By The North Carolina Court**

The Delaware DJ Plaintiffs also argue that the patents raise overlapping invalidity issues [Opp. Br. at 8-9], although none of those issues has ever been ruled upon by this Court. For example, despite the fact that Syngenta previously took the position in this Court that ***no construction*** of the term "resistance" was necessary [Ex. 12 at 5, 26-27], the Delaware DJ Plaintiffs now argue that this Court "has agreed with Syngenta" that

---

[1] This Court's comments at the claim construction hearing were also consistent with the construction reached by the Illinois court. There, Syngenta's predecessor Ciba-Geigy made the same argument that "progeny" means "the immediate offspring of a particular cross" to limit '880 patent claims 4-9 to the R1-R3 generations. [Ex. 14, Ciba's Initial Markman Hearing Memorandum, at 97] The Illinois court rejected that argument, concluding that "progeny" means "any generation but R0, and is certainly not limited to R1," with the caveat that the earliest generation covered by claims 4-9 depends on the particular claim. [Ex. 15 at 39-43]

"glyphosate resistance" means that the corn "will not be significantly injured when glyphosate is applied to it." [Opp. Br. at 8] Not only should Syngenta (including the Delaware DJ Plaintiffs) be precluded from advancing this position in view of its prior position, Syngenta has never provided this Court with any briefing on the meaning of "resistance," instead advancing this proposal, for the first time, in conjunction with its March 20 claim chart submission—i.e., ***after*** the claim construction hearing and ***after*** all briefing had been submitted. [Ex. 11; Ex. 13] Thus, this cannot be considered a final construction of the term "glyphosate resistance" as it appears in the '863 patent (much less the '798 patent).

Moreover, this proposed claim construction directly conflicts with that previously reached by the court in North Carolina, specifically pertaining to the '798 patent.[2] [Ex. 16 at 44, 46] That court found "resistance" to refer only to a comparative improvement over non-transformed plants. *Id.* Moreover, the Syngenta companies are collaterally estopped from challenging that claim construction because it was necessary to the court's judgment in that case and that action involved the same parties-in-interest—DEKALB and Syngenta's predecessor-in-interest, Rhone Poulenc Agro. Thus, the North Carolina court's claim construction of the '798 patent is binding upon Syngenta and therefore must apply in the current '798 patent litigation.

**D. The Interests Of Justice Favor Transfer To Missouri**

Transfer to Missouri is in the interest of justice. DEKALB filed its action for infringement of the '798 patent in the Missouri court first. The Missouri court has

---

[2] The construction reached by the North Carolina court is also consistent with the Illinois court's prior construction. [Ex. 15 at 46]

***already*** denied the Syngenta Companies' motion to transfer DEKALB's infringement action to Delaware. The motions recently filed by the Syngenta Companies in the Missouri court—(1) to dismiss and (2) to sever and transfer—raise no new grounds for transfer that could not have been raised in their first motion to transfer. Accordingly, transfer to Missouri is in the interest of justice because it will prevent the Syngenta Companies from circumventing the Missouri court's order denying transfer. Although these motions are currently pending before the Missouri court, Defendants address them below to respond to certain issues raised by the Delaware DJ Plaintiffs in their opposition.

**1. Delaware DJ Plaintiffs' Motion To Dismiss The Missouri Action For Lack of Personal Jurisdiction Is Procedurally Defective And Without Merit**

As set forth in more detail in DEKALB's submissions to the Missouri court, Syngenta's assertions that Missouri lacks personal jurisdiction over the DJ Delaware Plaintiffs is incorrect for at least two reasons. [*See generally*, Ex. 17] First, DJ Delaware Plaintiffs previously failed to move to dismiss for lack of personal jurisdiction in conjunction with their prior October 20, 2006 motion to transfer. Given the strong nexus between a § 1404(a) motion to transfer and a Rule 12(b)(3) motion to change venue, the DJ Delaware Plaintiffs' prior failure to move on these jurisdictional grounds with their first motion to transfer constitutes a waiver and bars their motion under Rules 12(g) and 12(h). [*See id.* at § III.A]

Separately, the evidence shows that the DJ Delaware Plaintiffs have maintained "intertwined business relationships" with other named defendants for whom jurisdiction was not challenged sufficient to establish the minimum contacts necessary for personal

jurisdiction under Eighth Circuit law. *See Anderson v. Dassault Aviation*, 361 F.3d 449, 455 (8th Cir. 2004). That evidence shows that these companies cooperate extensively with respect to brand management, market strategy, advertising, research, product testing and product planning, with overlapping directors and officers. [*See* Ex. 17 at § III.B]

Thus, despite Delaware DJ Plaintiffs' claim to the contrary, personal jurisdiction exists for these parties in Missouri. In its opposition, the Delaware DJ Plaintiffs argue that Federal Circuit law is controlling in this context, requiring the party to have minimum contacts with the forum state. [*See* Opp. Br. at 11, n. 4] However, although Federal Circuit law ***generally*** applies when determining personal jurisdiction as to claims arising under patent law, the Federal Circuit also looks to the relevant state and regional circuit case law to determine the relevant standard to be applied in contexts similar to these, i.e., such as corporate veil piercing. *See 33D Sys. Inc. v. Aarotech Lab., Inc.*, 160 F.3d 1372, 1380 (Fed. Cir. 1998) (in the context of corporate veil-piercing); *Minn. Min. & Mfg. Co. v. Eco Chem., Inc.* 757 F.2d 1256, 1265 (Fed. Cir. 1985). Thus, because this analysis is analogous to that of corporate veil-piercing, the Federal Circuit would look to the law of the Eighth Circuit. *See Anderson*, 361 F.3d 449 at 452 (Under Eighth Circuit law, "neither physical presence in [the forum] nor piercing [the] corporate veil is required to establish the minimum contacts necessary for the exercise of personal jurisdiction in [the forum].").[3]

---

[3] Moreover, Delaware DJ Plaintiffs' assertion that this position is inconsistent with its basis for opposing Syngenta's motion to transfer to Delaware is also incorrect. [*See* Opp. Br. at 11, n. 4] Although JC Robinson may have the same "symbiotic relationship" with these same entities, this is not sufficient to establish the proper minimum contacts with Delaware under the controlling authority here. This is because neither Delaware (nor the 3rd Circuit), have adopted the "symbiotic relationship" test to determine whether

### 2. Delaware DJ Plaintiffs Do Not Dispute That Suit Could Not Have Been Brought Against JC Robinson In Delaware

The DJ Delaware Plaintiffs also fail to provide a legitimate explanation for how jurisdiction or venue would have been proper in Delaware over defendant JC Robinson Seeds, Inc., instead noting that Monsanto had previously sued JC Robinson in Delaware. [Opp. Br. at 9] However, the DJ Delaware Plaintiffs simply miss the point. A defendant may not legally use waiver as a basis for creating venue and jurisdiction to support a §1404(a) transfer. *Hoffman v. Blaski*, 363 U.S. 335 (1960); *Chrysler Credit Corp. v. Country Chrysler, Inc.*, 928 F.2d 1505, 1515 (10th Cir. 1991). Such a selective use of waiver to create venue in a distant forum would truly be forum shopping. Moreover, Syngenta has already advanced this argument in the Missouri court and it was rejected. [Ex. 18]

### E. The Convenience Of The Witnesses And Parties Favors Transfer To Missouri

Despite the DJ Delaware Plaintiffs' assertions to the contrary [See Opp. Br. at 18-20], the fact remains that Missouri is a more convenient forum than Delaware. The DJ Delaware Plaintiffs cannot dispute the following:

- Many of DEKALB's witnesses either reside or work in the St. Louis area (or regularly travel their on business);
- DEKALB sued in its home forum in the first action, Missouri, and the DJ Delaware Plaintiffs' filed this declaratory judgment action in Delaware, away from their "home turf";

---

sufficient minimum contacts with Delaware have been established necessary to exercise personal jurisdiction . *See Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 373 (3d Cir. 2002); *Reach & Assocs., P.C. v. Dencer*, 269 F. Supp. 2d 497, 505-506 (D. Del. 2003)("Delaware courts apply the alter ego theory strictly and analyze and employ a similar analysis when decided whether it is appropriate to pierce the corporate veil."); *Applied BioSystems, Inc. v. Cruachem, Ltd.*, 772 F. Supp. 1458, 1463 (D. Del. 1991).

- Most of the DJ Delaware Plaintiffs' witnesses reside in the mid-west or North Carolina, not Delaware;

- The DJ Delaware Plaintiffs' principal places of business are in Illinois and North Carolina, not Delaware;

- DEKALB's (and Monsanto's) principal place of business is Missouri; and

- The DJ Delaware Plaintiffs have not claimed that Dr. Klein, the lone third party witnesses who resides in Delaware, would not be available to testify at a trial in Missouri (or that he has previously been deposed and his deposition has been videotaped).

The DJ Delaware Plaintiffs' response to these indisputable facts is that some of the relevant witnesses do not reside Missouri. What the DJ Delaware Plaintiffs cannot assert, however, is that they reside in Delaware (with the exception of Dr. Klein). Taken collectively, for these reasons and the reasons set forth in § V.A.4 of Defendants' opening brief, the convenience of the witnesses and the parties favors transfer to Missouri.

## III. CONCLUSION

For all of the above reasons, Defendants DEKALB and Monsanto respectfully request that the Court transfer this action to Missouri so that the parties' claims regarding the '798 patent can litigated in one court with all parties present. Alternatively, Defendants request that the Court in its discretion decline to exercise jurisdiction over this declaratory judgment action and dismiss it.

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

By: _/s/ David E. Moore_
Richard L. Horwitz (#2246)
David E. Moore (#3983)
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, Delaware 19801
Telephone (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Defendants*

OF COUNSEL:

Susan K. Knoll
Thomas A. Miller
Steven G. Spears
HOWREY LLP
1111 Louisiana, 25th Floor
Houston, Texas 77002
Telephone (713) 787-1400

Dated: March 23, 2007
Public Version Dated: April 2, 2007
786883 / 31144

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

**CERTIFICATE OF SERVICE**

I, David E. Moore, hereby certify that on April 2, 2007, the attached document was hand delivered on the following persons and was electronically filed with the Clerk of the Court using CM/ECF which will send notification of such filing(s) to the following and the document is available for viewing and downloading from CM/ECF:

John W. Shaw
Young Conaway Stargatt & Taylor, L.L.P.
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801

I hereby certify that on April 2, 2007, I have Electronically Mailed the foregoing document(s) to the following non-registered participants:

Michael J. Flibbert
Finnegan, Henderson, Farabow,
Garrett & Dunner, L.L.P.
901 New York Ave., NW
Washington, DC 20001-4413
michael.flibbert@finnegan.com

*/s/ David E. Moore*
Richard L. Horwitz
David E. Moore
Potter Anderson & Corroon LLP
Hercules Plaza – Sixth Floor
1313 North Market Street
Wilmington, DE 19801
(302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

774535 / 31144

# EXHIBIT 1

US005538880A

# United States Patent [19]

Lundquist et al.

[11] Patent Number: 5,538,880

[45] Date of Patent: * Jul. 23, 1996

[54] METHOD FOR PREPARING FERTILE TRANSGENIC CORN PLANTS

[75] Inventors: **Ronald C. Lundquist**, Minnetonka; **David A. Walters**, Bloomington, both of Minn.

[73] Assignee: **DeKalb Genetics Corporation**, St. Paul, Minn.

[ * ] Notice: The term of this patent shall not extend beyond the expiration date of Pat. No. 5,538,877.

[21] Appl. No.: **249,458**

[22] Filed: **May 26, 1994**

**Related U.S. Application Data**

[63] Continuation of Ser. No. 974,379, Nov. 10, 1992, which is a continuation of Ser. No. 467,983, Jan. 22, 1990, abandoned.

[51] Int. Cl.[6] .......... **C12N 15/00**; C12N 15/05; A01H 1/06; A01H 4/00

[52] U.S. Cl. .......... **435/172.3**; 435/172.1; 435/240.48; 435/240.49; 935/52; 935/55; 935/67; 935/85; 800/205; 800/235; 800/DIG. 56

[58] Field of Search .......... 435/172.3, 172.1, 435/240.4, 240.45, 240.49, 287; 800/205, 235; 935/52, 53, 55, 67, 85

[56] **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,370,160 | 1/1983 | Ziemelis | 71/117 |
| 4,559,302 | 12/1985 | Ingolia | 435/172.3 |
| 4,581,847 | 4/1986 | Hibberd et al. | 47/58 |
| 4,665,030 | 5/1987 | Close | 435/240 |
| 4,666,844 | 5/1987 | Cheng | 435/240 |
| 4,727,028 | 2/1988 | Santerre et al. | 435/240.2 |
| 4,806,483 | 2/1989 | Wang | 435/240.49 |
| 4,940,835 | 7/1990 | Shah et al. | 800/205 |
| 5,049,500 | 9/1991 | Arntzen et al. | 435/172.3 |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 0126537A2 | 4/1983 | European Pat. Off. | A61K 9/52 |
| 0141373A3 | 5/1985 | European Pat. Off. | A01G 7/00 |
| 0154204A2 | 9/1985 | European Pat. Off. | C12N 15/00 |
| 0160390A2 | 11/1985 | European Pat. Off. | A01H 15/10 |
| 0204549A2 | 10/1986 | European Pat. Off. | C12N 15/00 |
| 0202668A2 | 11/1986 | European Pat. Off. | C12N 5/02 |
| 0242236A1 | 10/1987 | European Pat. Off. | C12N 15/00 |
| 0242246A1 | 11/1987 | European Pat. Off. | C12N 15/00 |
| 0299552A1 | 1/1988 | European Pat. Off. | C12N 15/00 |
| 0262971A2 | 5/1988 | European Pat. Off. | A01H 1/02 |
| 0270356A2 | 6/1988 | European Pat. Off. | C12N 15/00 |
| 0275069A2 | 7/1988 | European Pat. Off. | C12N 15/00 |
| 0280400A2 | 8/1988 | European Pat. Off. | A01C 1/06 |
| 0282164A2 | 9/1988 | European Pat. Off. | C12N 5/00 |
| 0292435A1 | 11/1988 | European Pat. Off. | C12N 15/00 |
| 0289479A2 | 11/1988 | European Pat. Off. | C12N 15/00 |
| 0290395A2 | 11/1988 | European Pat. Off. | C12N 15/00 |
| 0301749A2 | 2/1989 | European Pat. Off. | C12N 15/00 |
| 0334539A2 | 9/1989 | European Pat. Off. | C12N 15/00 |
| 0331855A2 | 9/1989 | European Pat. Off. | C12M 3/00 |
| 0348348A2 | 12/1989 | European Pat. Off. | A01N 65/00 |
| 04421741 | 4/1991 | European Pat. Off. | C12N 15/82 |
| 3738874A1 | 11/1988 | Germany | A01H 1/06 |
| 8801444 | 1/1990 | Netherlands | C12N 15/87 |
| 2159173 | 11/1985 | United Kingdom | C12N 15/00 |
| WO85/01856 | 5/1985 | WIPO | A01B 76/00 |
| WO85/02972 | 7/1985 | WIPO | A01C 1/06 |
| WO87/05629 | 9/1987 | WIPO | C12N 15/00 |
| WO89/04371 | 5/1989 | WIPO | C12N 21/00 |
| WO89/12102 | 12/1989 | WIPO | C12N 15/00 |
| WO90/10691 | 8/1990 | WIPO | C12N 5/00 |

OTHER PUBLICATIONS

"Bullets" Transform Plant Cells, *Agricell Report*, 9, 5 (Jul. 1987).

"Shotgunning DNA into Cells," *Genetic Engineering News*, (Jul./Aug. 1987).

Ahokes, H. "Electrophoretic transfection of cereal grains with exogenous nucleic acid," Soc. Biochem. Biophys. Microbio. Fen., Biotieteen Paivat (Bioscience Days), Technical University of Helsinki, Espoo, p. 2 (1989).

Armstrong, C. L., et al., "Genetic and cytogenetic variation in plants regenerated from organogenic and friable, embryonic tissue cultures of maize," *Biological Abstracts*, vol. 85, Abstract No. 117662 (1988).

Barker, R. F., et al., "Nucleotide Sequence of the T–DNA Region from the *Agrobacterium tumefaciens* Octopone Ti Plasmid pTi15955," *Plant Mol. Biol.*, 2, 335–350 (1983).

Bevan, M., et al., "A Chimaeric Antibiotic Resistance Gene as a Selectable Marker for Plant Cell Transformation," *Nature*, 304, 184–187 (1983).

Bevan, M., et al., "Structure and Transcription of the Nopaline Synthase Gene Region of T–DNA," *Nuc. Acids Res.*, 11, 369–385 (1983).

Booy, G., et al., "Attempted Pollen–Mediated Transformation of Maize," *J. Plant Physiol.*, 135, 319–324 (1989).

Callis, J., et al., "Introns Increase Gene Expression in Cultures Maize Cells," *Genes and Development*, 1, 1183–1200 (1987).

Cao, J., et al., "Transformation of Rice and Maize using the Biolistic Process," In: *Plant Gene Transfer*, Alan R. Liss, Inc., pp. 21–33 (1990).

Chandler, V. L., et al., "Two Regulatory Genes of the Maize Anthocyanin Pathway are Homologous Isolation of B Utilizing R Genomic Sequences," *The Plant Cell*, 1, 1175–1183 (1989).

Christou, P., et al., "Cotransformation Frequencies of Foreign Genes in Soybean Cell Cultures," *Theor. Appl. Genet.*, 79, 337–341 (1990).

(List continued on next page.)

*Primary Examiner*—Gary Benzion
*Attorney, Agent, or Firm*—Schwegman, Lundberg, Woessner & Kluth

[57] **ABSTRACT**

Fertile transgenic *Zea mays* (corn) plants which stably express heterologous DNA which is heritable are disclosed along with a process for producing said plants. The process comprises the microjectile bombardment of friable embryogenic callus from the plant to be transformed. The process may be applicable to other graminaceous cereal plants which have not proven stably transformable by other techniques.

**18 Claims, 10 Drawing Sheets**

appeared uninhibited on both levels of hygromycin. The control callus appeared to have about 80% of the weight gain of 13E. The callus lines were transferred to fresh media at the same respective levels of hygromycin.

V. Confirmation of Transformed Callus

A Southern blot was prepared from DNA from the line 24C. As shown in FIG. 6B, a band was observed for the line 24C at the expected size of 1.05 Kb showing that the line 24C contained the HPT coding sequence. No band was observed for DNA from control tissue. The name of the callus line 24C was changed to PH2.

VI. Plant Regeneration and Production of Seed

The line 24C along with unselected control callus were placed onto RM5 medium to regenerate plants as in Example I. After 16 d the callus was transferred to R5 medium as in Example I.

EXAMPLE III

The procedure of Example II was repeated exactly except that different plasmids were used.

The plasmids pBII221 and pHYGI1 described in Example I were used as well as pMS533 which is a plasmid that contains the insecticidal Bacillus thuringiensis endotoxin (BT) gene fused in frame with the neomycin phosphotransferase (NPTII) gene. 5' of the fusion gene are located segments of DNA from the CaMV 35S and nopaline synthase promoters. 3' from the fusion gene are segments of DNA derived from the tomato protease inhibitor I gene and the poly A region of the nopaline synthase gene.

Callus was bombarded exactly as in Example I except that the DNA used in the tungsten/DNA preparations differed. Two tubes contained plasmids pHYGI1 and pMS533 and one tube contained no plasmid but 5 ul TE-1 (10 mM Tris-HCl pH 8.0, 1 mM EDTA pH 8.0).

The following bombardments were done:

| | |
|---|---|
| 9 × pHYGI1/pMS533 | Potential positive treatment |
| 2 × TE prep | Control treatment |

After bombardment the callus from the pHYGI1/pMS533 treatments was placed onto round 1 selection plates, F medium containing 15 mg/l hygromycin, as ten 25 mg pieces per plate. The same was done for one of the plates bombarded with the TE preparation (selected control callus). One plate of callus bombarded with the TE preparation was placed onto F medium with no hygromycin; this callus was maintained throughout the ongoing experiment as a source of control tissue and was referred to as unselected control callus.

After 12 d the callus on round 1 selection plates appeared to show about 90% of the weight gain of the unselected control callus. All of the callus was transferred from round 1 selection plates to round 2 selection plates containing 60 mg/l hygromycin as ten 30 mg pieces per plate.

After 22 d of selection on round 2 selection plates, the callus appeared completely uninhibited. All of the callus was transferred from round 2 selection plates to round 3 selection plates containing 60 mg/l hygromycin.

At 74 d post-bombardment a single viable sector was observed proliferating from the surrounding necrotic tissue. The callus line was from pHYGI1/pMS533 treated material and was designated 86R. The callus line 86R was transferred to F medium.

After 24 d the callus line 86R had grown substantially. Portions of the callus were then transferred to (i) F media containing 15 mg/l hygromycin and (ii) F media containing 60 mg/l hygromycin. Control callus was plated on F media with 15 mg/l hygromycin.

After 19 d of culture, the callus line 86R appeared to grow rapidly and was uninhibited on both levels of hygromycin. The control callus appeared to have only about 50% of the weight gain of 86R. The callus lines were transferred to fresh media at the same respective levels of hygromycin to further test the resistance of the callus line 86R to hygromycin.

COMPARATIVE EXAMPLE A

The basic procedures of Examples I-III have been attempted except varying the selection regime or the form of the callus. These other attempts, which are detailed in Table 2 below, were not successful. Since they were not repeated several times, it is not known whether they can be made to work. In all of the procedures, no viable sectors were observed. In the Table, "Sieved" indicates that the callus was passed through an 860 micron sieve before bombardment; the selective agent was hygromycin for each case except when pMXTI1 was the plasmid and methotrexate the selection agent.

TABLE 2

Summary of Comparative Example A

| Recip. Tissue | Plasmids | Recov. Period | Round 1 Level | Round 1 Period | Round 2 Level | Round 2 Period |
|---|---|---|---|---|---|---|
| Clumps | pCHN1-1 pBII221 | 13 | 60 | 21 | 60 | 81 |
| Clumps | pCHN1-1 pBII221 | 14 | 100 | 22 | — | — |
| Clumps | pHYGI1 pBII221 | 8 | 60 | 19 | 30 | 132 |
| Clumps | pCHN1-1 pBII221 | 0 | 30 | 22 | 60 | 109 |
| Clumps | pMTXI1 pBII221 | 8 | 3 | 103 | — | — |
| Sieved | pCHN1-1 pBII221 | 13 | — | — | — | — |

What is claimed is:

1. A process for producing a fertile transgenic *Zea mays* plant comprising the steps of (i) bombarding intact regenerable *Zea mays* cells with DNA-coated microprojectiles, (ii) identifying or selecting a population of transformed cells, and (iii) regenerating a fertile transgenic plant therefrom, wherein said DNA is transmitted through a complete sexual cycle of said transgenic plant to its progeny, and imparts herbicide resistance thereto.

2. The process of claim 1 wherein the fertile transgenic *Zea mays* plant is regenerated from transformed embryogenic tissue.

3. The process of claim 1 wherein the cells are derived from immature embryos.

4. A process comprising obtaining progeny from a fertile transgenic plant obtained by the process of claim 1 which comprise said DNA.

5. The process of claim 4 wherein said progeny are obtained by crossing said fertile transgenic plant with an inbred line.

6. The process of claim 4 comprising obtaining seed from

# EXHIBIT 2



US006013863A

# United States Patent [19]

Lundquist et al.

[11] Patent Number: 6,013,863

[45] Date of Patent: Jan. 11, 2000

[54] FERTILE TRANSGENIC CORN PLANTS

[75] Inventors: **Ronald C. Lundquist**, Minnetonka; **David A. Walters**, Bloomington, both of Minn.

[73] Assignee: **Dekalb Genetics Corporation**, Dekalb, Ill.

[21] Appl. No.: **08/844,555**

[22] Filed: **Apr. 21, 1997**

**Related U.S. Application Data**

[62] Division of application No. 08/677,695, Jul. 10, 1996, which is a continuation of application No. 07/974,379, Nov. 10, 1992, Pat. No. 5,538,877, which is a continuation of application No. 07/467,983, Jan. 22, 1990, abandoned.

[51] **Int. Cl.**[7] ........................ **C12N 15/00**; C12N 15/82; A01H 1/06; A01H 4/00

[52] **U.S. Cl.** ........................ **800/293**; 800/278; 800/288; 800/300; 435/430; 435/285.3

[58] **Field of Search** .................................. 800/205, 200, 800/250, DIG. 56, 293, 278, 288; 47/58, DIG. 1; 435/172.3, 172.1, 412, 424, 430, 430.1, 287, 285, 285.3

[56] **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,370,160 | 1/1983 | Ziemelis | 71/117 |
| 4,399,216 | 8/1983 | Axel et al. | 435/6 |
| 4,520,113 | 5/1985 | Gallo et al. | 436/504 |
| 4,535,060 | 8/1985 | Comai | 435/172.3 |
| 4,536,475 | 8/1985 | Anderson | 435/172.3 |
| 4,559,301 | 12/1985 | Turner | 435/76 |
| 4,559,302 | 12/1985 | Ingolia | 435/172.3 |
| 4,581,847 | 4/1986 | Hibberd et al. | 47/58 |
| 4,634,665 | 1/1987 | Axel et al. | 435/68 |
| 4,642,411 | 2/1987 | Hibberd et al. | 800/1 |
| 4,665,030 | 5/1987 | Close | 435/240 |
| 4,666,844 | 5/1987 | Cheng | 435/240 |
| 4,683,202 | 7/1987 | Mullis | 435/91 |
| 4,708,818 | 11/1987 | Montagnier et al. | 435/5 |
| 4,727,028 | 2/1988 | Santerre et al. | 435/240.2 |
| 4,743,548 | 5/1988 | Crossway et al. | 435/172.3 |
| 4,761,373 | 8/1988 | Anderson et al. | 435/172.3 |
| 4,806,483 | 2/1989 | Wang | 435/240.49 |
| 4,885,357 | 12/1989 | Larkins et al. | 530/373 |
| 4,886,878 | 12/1989 | Larkins et al. | 536/26 |
| 4,940,835 | 7/1990 | Shah et al. | 800/205 |
| 4,945,050 | 7/1990 | Sanford et al. | 435/172.1 |
| 4,956,282 | 9/1990 | Goodman et al. | 435/69.51 |
| 4,971,908 | 11/1990 | Kishore et al. | 435/172.1 |
| 5,001,060 | 3/1991 | Peacock et al. | 435/172.3 |
| 5,004,863 | 4/1991 | Umbeck | 800/205 |
| 5,013,658 | 5/1991 | Dooner et al. | 435/172.3 |
| 5,015,580 | 5/1991 | Christou et al. | 435/172.3 |
| 5,034,322 | 7/1991 | Rogers et al. | 435/172.3 |
| 5,036,006 | 7/1991 | Sanford et al. | 435/170.1 |
| 5,049,500 | 9/1991 | Arntzen et al. | 435/172.3 |
| 5,077,399 | 12/1991 | Brauer et al. | 536/27 |
| 5,082,767 | 1/1992 | Hatfield et al. | 435/6 |
| 5,094,945 | 3/1992 | Comai | 435/172.3 |
| 5,110,732 | 5/1992 | Benfey et al. | 435/172.3 |
| 5,134,074 | 7/1992 | Gordon et al. | 435/240.4 |

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| B-80893/87 | 12/1988 | Australia | C12N 15/00 |
| 2032443 A1 | 12/1990 | Canada | C12N 15/87 |
| 0 126 537 A2 | 4/1983 | European Pat. Off. | |
| 0 131 623 B1 | 1/1984 | European Pat. Off. | C12N 15/11 |
| 0 141 373 A3 | 5/1985 | European Pat. Off. | A01G 7/00 |
| 0 142 924 A2 | 5/1985 | European Pat. Off. | C12N 15/00 |
| 0 154 204 A2 | 9/1985 | European Pat. Off. | C12N 15/00 |
| 0 160 390 A2 | 11/1985 | European Pat. Off. | A01H 15/10 |
| 0 174 791 A2 | 3/1986 | European Pat. Off. | C12N 15/00 |
| 0 189 707 A2 | 8/1986 | European Pat. Off. | C12N 15/00 |
| 0 193 259 A1 | 9/1986 | European Pat. Off. | C12N 15/00 |
| 0 204 549 A2 | 10/1986 | European Pat. Off. | C12N 15/00 |
| 0 202 668 A2 | 11/1986 | European Pat. Off. | C12N 5/02 |
| 0 242 236 A1 | 10/1987 | European Pat. Off. | C12N 15/00 |
| 0 242 246 A1 | 10/1987 | European Pat. Off. | C12N 15/00 |
| 0 299 552 A1 | 1/1988 | European Pat. Off. | C12N 15/00 |
| 0 257 472 A2 | 3/1988 | European Pat. Off. | C12N 15/00 |
| 0 262 971 A2 | 5/1988 | European Pat. Off. | A01H 1/02 |
| 0 269 601 A2 | 6/1988 | European Pat. Off. | C12N 15/00 |
| 0 270 356 A2 | 6/1988 | European Pat. Off. | C12N 15/00 |
| 0 271 408 A2 | 6/1988 | European Pat. Off. | C12N 15/00 |
| 0 275 069 A2 | 7/1988 | European Pat. Off. | C12N 15/00 |

(List continued on next page.)

OTHER PUBLICATIONS

U.S. application No. 07/392,176, Adams et al., Aug. 9, 1989.

U.S. application Ser. No. 07/205,155, Entitled "Stable Transformation of Plant Cells", pp. 1–29, Filed Jun. 10, 1988.

"'Bullets' Transform Plant Cells", *Agricell Report*, 9 (Jul. 1987).

Catalog, Handbook of Fine Chemicals, Aldrich Chem. Co., p. 508 (1988).

"Cornell U. Gene Gun Hits Biotech Bullseye", *Agriculture Technology*, p. 13.

"Dalapon", Merck Index, 11th Edition, Budavae, S., (ed.), Merck and Co., pp. 405–406 (1989).

Dialog Search of Japanese Patent No. 61–134343 (1986).

EPO Notice Regarding Publication of Bibliographic Data for EPO 0485506 (1992).

"Herbicide–Resistant Corn", *CT Academy of Science and Engineering, Case Reports*, 5, 6 (1990).

International Search Report, PCT/US 90/04462, mailed Jan. 15, 1991.

International Search Report, PCT/US 94/09699, mailed Aug. 16, 1995.

Office Action dated May 30, 1989, Goldman et al., USSN 06/880,271, filed Jun. 30, 1986.

Office Action dated Mar. 8, 1990, Goldman et al., USSN 06/880,271, filed Jun. 30, 1986.

Patent Family Record for Australian Patent 8780893.

(List continued on next page.)

*Primary Examiner*—Gary Benzion
*Attorney, Agent, or Firm*—Schwegman, Lundberg, Woessner & Kluth, P.A.

[57] **ABSTRACT**

A process of preparing fertile *Zea mays* plants is provided wherein said plants are resistant to the herbicide glyphosate, as well as processes for preparing seed, human food or animal feed therefrom.

**8 Claims, 6 Drawing Sheets**

work. In all of the procedures, no viable sectors were observed. In the Table, "Sieved" indicates that the callus was passed through an 860 micron sieve before bombardment; the selective agent was hygromycin for each case except when pMXTI1 was the plasmid and methotrexate the selection agent.

TABLE 4

Summary of Comparative Example A

| Recip. Tissue | Plasmids | Recov. Period | Round 1 Level | Round 1 Period | Round 2 Level | Round 2 Period |
|---|---|---|---|---|---|---|
| Clumps | pCHN1-1 pBII221 | 13 | 60 | 21 | 60 | 81 |
| Clumps | pCHN1-1 pBII221 | 14 | 100 | 22 | — | — |
| Clumps | pHYGI1 pBII221 | 8 | 60 | 19 | 30 | 132 |
| Clumps | pCHN1-1 pBII221 | 0 | 30 | 22 | 60 | 109 |
| Clumps | pMTXI1 pBII221 | 8 | 3 | 103 | — | — |
| Sieved | PCHN1-1 pBII221 | 13 | — | — | — | — |

What is claimed is:

1. A process for producing a fertile transgenic *Zea mays* plant comprising the steps of (i) bombarding intact regenerable *Zea mays* cells with DNA-coated microprojectiles, wherein said DNA comprises at least a screenable marker gene; (ii) selecting a population of transformed cells expressing the selectable marker gene; and (iii) regenerating a fertile transgenic plant therefrom, wherein said DNA is expressed so as to impart glyphosate resistance to said transgenic plant and is transmitted through a normal sexual cycle of said transgenic plant to progeny plants.

2. The process of claim 1 wherein the fertile transgenic *Zea mays* plant is regenerated from transformed embryogenic tissue.

3. The process of claim 1 wherein the cells are derived from immature embryos.

4. The process of claim 1 wherein said DNA encodes an EPSP synthase.

5. The process of claim 1 further comprising obtaining transgenic glyphosate resistant progeny plants of subsequent generations from said fertile transgenic plant.

6. The process of claim 5 further comprising obtaining seed from one of said progeny plants.

7. A process for producing seed comprising:

(a) providing a fertile transgenic *Zea mays* produced by the process of claim 1, plant comprising heterologous heritable DNA that is expressed so as to impart glyphosate resistance to said transgenic *Zea mays* plant;

(b) cultivating said transgenic *Zea mays* plant;

(c) obtaining seed from said cultivated *Zea mays* plant.

8. The process of claim 7 wherein the DNA encodes an EPSP synthase.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION

PATENT NO. : 6,013,863
DATED : January 11, 2000
INVENTOR(S) : Lundquist et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Column 10,
Line 12, delete the comma and insert a prime sign, therefor.
Line 73, delete "ST.L.1" and insert -- ST.LS.1 --, therefor.

Column 11,
Line 44, delete "Nicatiana" and insert -- Nicotiana --, therefor.

Column 13-14,
In the first two rows of Table 2, delete all four occurences of "ncomycin" and insert -- neomycin --, therefor.
In the second to last row and first column of Table 2, delete "luciterase" and insert -- luciferase --, therefor.
Footnote 1, add a space between "EMBO" and "J", both occurrences.
Footnote 2, add a space between "PNAS" and "USA".
Footnote 2, underline "Nucl. Acids Res., 14,".
Footnote 3, underline "EMBO J., 3," and "Nature, 303,".
Footnote 4, underline "Nature, 310,", "ibid.," and "EMBO J., 2,".
Footnote 5, delete "Somat. Cell, Mol. Genet." and replace with -- Somat. Cell. Mol. Genet., 13, --therefore.
Footnote 6, underline "Theor, Appl. Genet., 66", Nature, 300,", "Plant Mol. Biol., 5," and "J. Mol. Appl. Genet., 2".
Footnote 7, underline "EMBO J., 4,", "Nuc. Acids Res., 14," and "EMBO J., 2,".
Footnote 8, underline "Science, 284" and "Plant Mol. Biol., 5," both occurrences.
Footnote 9, underline "Plant Mol. Biol., 2,".
Footnote 10, underline "Mol. Gen. Genet., 210,".
Footnote 11, underline "Nature, 317" and "Biotechnology, 5,".
Footnote 12, underline "EMBO J., 6,", both occurrences.
Footnote 13, underline "Biotechnology, 2,".
Footnote 14, underline "Nuc. Acids Res., 15" and "EMBO J., 6,".
Footnote 15, underline "Mol. Gen. Genet., 204,".
Footnote 16, underline "Science, 234,", "PNAS USA", and "Nucl. Acids Res., 15,".

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION

Page 2 of 2

PATENT NO. : 6,013,863
DATED : January 11, 2000
INVENTOR(S) : Lundquist et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Column 29,
Line 29, delete "screenable" and insert -- selectable --, therefor.

Column 30,
Line 21, insert "plant" before -- produced --.
Line 22, insert "said" before -- plant --.

Signed and Sealed this

Twenty-third Day of October, 2001

Attest:

Nicholas P. Godici

NICHOLAS P. GODICI
*Acting Director of the United States Patent and Trademark Office*

*Attesting Officer*

# EXHIBIT 3

US005554798A

# United States Patent [19]

[11] Patent Number: 5,554,798

[45] Date of Patent: Sep. 10, 1996

Lundquist et al.

[54] FERTILE GLYPHOSATE-RESISTANT TRANSGENIC CORN PLANTS

[75] Inventors: Ronald C. Lundquist, Minnetonka; David A. Walters, Bloomington, both of Minn.

[73] Assignee: DeKalb Genetics Corporation, St. Paul, Minn.

[21] Appl. No.: 441,073

[22] Filed: May 15, 1995

### Related U.S. Application Data

[63] Continuation of Ser. No. 508,045, Apr. 11, 1990, Pat. No. 5,484,956, which is a continuation-in-part of Ser. No. 467,983, Jan. 22, 1990, abandoned.

[51] Int. Cl.[6] .......................... A01H 4/00; C12N 15/05

[52] U.S. Cl. .............................. 800/205; 800/DIG. 56; 435/172.3; 435/172.1; 435/240.5; 435/240.45; 536/23.71

[58] Field of Search .............................. 800/205, 250, 800/DIG. 56; 435/172.3, 172.1

[56] References Cited

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,370,160 | 1/1983 | Ziemelis | 71/117 |
| 4,399,216 | 8/1983 | Axel et al. | 435/6 |
| 4,535,060 | 8/1985 | Comai | 435/172.3 |
| 4,559,301 | 12/1985 | Turner | 435/76 |
| 4,559,302 | 12/1985 | Ingolia | 435/172.3 |
| 4,581,847 | 4/1986 | Hibberd et al. | 47/58 |
| 4,634,665 | 1/1987 | Axel et al. | 435/68 |
| 4,642,411 | 2/1987 | Hibberd et al. | 800/1 |
| 4,665,030 | 5/1987 | Close | 435/240 |
| 4,666,844 | 5/1987 | Cheng | 435/240 |
| 4,683,202 | 7/1987 | Mullis | 435/91 |
| 4,727,028 | 2/1988 | Santerre et al. | 435/240.2 |
| 4,743,548 | 5/1988 | Crossway et al. | 435/172.3 |
| 4,761,373 | 8/1988 | Anderson et al. | 435/172.3 |
| 4,806,483 | 2/1989 | Wang | 435/240.49 |
| 4,940,835 | 7/1990 | Shah et al. | 800/205 |
| 4,971,908 | 11/1990 | Kishore et al. | 435/172.1 |
| 5,001,060 | 3/1991 | Peacock et al. | 435/172.3 |
| 5,004,863 | 4/1991 | Umbeck | 800/205 |
| 5,015,580 | 5/1991 | Christou et al. | 435/172.3 |
| 5,034,322 | 7/1991 | Rogers et al. | 435/172.3 |
| 5,049,500 | 9/1991 | Arntzen et al. | 435/172.3 |
| 5,094,945 | 3/1992 | Comai | 435/172.3 |
| 5,110,732 | 5/1992 | Benfey et al. | 435/172.3 |
| 5,134,074 | 7/1992 | Gordon et al. | 435/240.4 |
| 5,177,010 | 1/1993 | Goldman et al. | 435/172.3 |
| 5,187,073 | 2/1993 | Goldman et al. | 435/172.3 |
| 5,188,642 | 2/1993 | Shah et al. | 47/58 |
| 5,188,958 | 2/1993 | Moloney et al. | 435/240.4 |
| 5,250,515 | 10/1993 | Fuchs et al. | 514/12 |
| 5,254,799 | 10/1993 | DeGreve et al. | 800/205 |
| 5,258,300 | 11/1993 | Glassman et al. | 435/240.4 |
| 5,268,463 | 12/1993 | Jefferson | 536/23.7 |
| 5,290,924 | 3/1994 | Last et al. | 536/24.1 |
| 5,302,523 | 4/1994 | Coffee et al. | 435/172.1 |
| 5,350,689 | 9/1994 | Shillito et al. | 435/240.47 |
| 5,352,605 | 11/1994 | Fraley et al. | 435/240.4 |
| 5,371,003 | 12/1993 | Murray et al. | 435/172.3 |
| 5,405,765 | 4/1995 | Vasil et al. | 435/172.3 |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 80893/87 | 12/1988 | Australia | C12N 15/00 |
| 0126537A2 | 4/1983 | European Pat. Off. | A61K 9/52 |
| 0131623B1 | 1/1984 | European Pat. Off. | C12N 15/11 |
| 0141373A3 | 5/1985 | European Pat. Off. | A01G 7/00 |
| 0154204A2 | 9/1985 | European Pat. Off. | C12N 15/00 |
| 0160390A2 | 11/1985 | European Pat. Off. | A01H 15/10 |
| 0193259A1 | 9/1986 | European Pat. Off. | C12N 15/00 |
| 0204549A2 | 10/1986 | European Pat. Off. | C12N 15/00 |
| 0202668A2 | 11/1986 | European Pat. Off. | C12N 5/02 |
| 0242236A1 | 10/1987 | European Pat. Off. | C12N 15/00 |
| 0242246A1 | 11/1987 | European Pat. Off. | C12N 15/00 |
| 0299552A1 | 1/1988 | European Pat. Off. | C12N 15/00 |
| 0257472A2 | 3/1988 | European Pat. Off. | C12N 15/00 |
| 0262971A2 | 5/1988 | European Pat. Off. | A01H 1/02 |
| 0271408 | 6/1988 | European Pat. Off. | C12N 15/00 |
| 0270356A2 | 6/1988 | European Pat. Off. | C12N 15/00 |
| 0275069A2 | 7/1988 | European Pat. Off. | C12N 15/00 |
| 0280400A2 | 8/1988 | European Pat. Off. | A01C 1/06 |
| 0282164A2 | 9/1988 | European Pat. Off. | C12N 5/00 |
| 0292435A1 | 11/1988 | European Pat. Off. | C12N 15/00 |
| 0289479A2 | 11/1988 | European Pat. Off. | C12N 15/00 |
| 0290395A2 | 11/1988 | European Pat. Off. | C12N 15/00 |
| 0301749A2 | 2/1989 | European Pat. Off. | C12N 15/00 |
| 0353908A2 | 7/1989 | European Pat. Off. | C12N 15/29 |
| 0334539A2 | 9/1989 | European Pat. Off. | C12N 15/00 |
| 0331855A2 | 9/1989 | European Pat. Off. | C12M 3/00 |
| 0348348A2 | 12/1989 | European Pat. Off. | A01N 65/00 |
| 0385962A1 | 2/1990 | European Pat. Off. | C12N 15/82 |
| 0360750A2 | 3/1990 | European Pat. Off. | C12N 15/29 |
| 0359617A2 | 3/1990 | European Pat. Off. | C12N 15/53 |
| 0408403A1 | 5/1990 | European Pat. Off. | C12N 15/32 |
| 0442174A1 | 4/1991 | European Pat. Off. | C12N 15/82 |
| 0424047A1 | 4/1991 | European Pat. Off. | C12N 15/87 |
| 0459643A2 | 5/1991 | European Pat. Off. | C12N 15/82 |
| 0442175A1 | 8/1991 | European Pat. Off. | A01H 1/02 |
| 0452269A2 | 11/1991 | European Pat. Off. | C12N 15/82 |
| 0469273A1 | 2/1992 | European Pat. Off. | C12N 15/82 |
| 0485970A3 | 5/1992 | European Pat. Off. | C12N 15/82 |

(List continued on next page.)

OTHER PUBLICATIONS

"Dekalb Researchers Produce Fertile Corn Plants with Foreign Genes," *ARI Newsletter* (Oct./Nov. 1990).

"Genetic Engineering Advance Announced for Corn Plants," Investor's Daily, (Apr. 19, 1990).

"Genetically Engineered Corn: Breakthrough Brings Market Closer," *Genetic Technology News*, 8–11 (Oct. 1990).

"Keystone Crops," *Agricultural Genetics Report*, (Mar./Apr. 1990).

(List continued on next page.)

*Primary Examiner*—Gary Benzion

*Attorney, Agent, or Firm*—Schwegman, Lundberg, Woessner & Kluth, P.A.

[57] ABSTRACT

Fertile transgenic *Zea mays* (corn) plants which stably express heterologous DNA which is heritable are provided along with a process for producing said plants. The preferred process comprises the microprojectile bombardment of friable embryogenic callus from the plant to be transformed. The process may be applicable to other graminaceous cereal plants which have not proven stably transformable by other techniques.

6 Claims, 6 Drawing Sheets

60 mg/l hygromycin. Control callus was plated on F media with 15 mg/l hygromycin.

After 19 days of culture, the callus line 86R appeared to grow rapidly and was uninhibited on both levels of hygromycin. The control callus appeared to have only about 50% of the weight gain of 86R. The callus lines were transferred to fresh media at the same respective levels of hygromycin to further test the resistance of the callus line 86R. After 26 days of culture, the callus line 86R appeared uninhibited on 60 mg/l hygromycin.

Southern blots were performed on DNA isolated from the callus line 86R and control callus to confirm the presence of the hygromycin resistance gene and to determine whether the BT gene was present.

For detection of the HPT coding sequence, DNA isolated from 86R callus and control callus was digested with the restriction enzymes BamHI, XhoI, or PstI as described in Examples I and II. After hybridization with a probe prepared from the HPT coding sequence, the following bands were observed. For the BamHI digest, bands were observed at the expected size of 1.05 Kb as well as at approximately 3.0 and 2.3 Kb. This result demonstrates that the HPT coding sequence is present in the callus line 86R. The additional bands at 3.0 and 2.3 Kb indicate that either digestion was incomplete or that multiple rearranged copies are present. For the XhoI digest, a single band was observed at approximately 5.1 Kb. Because XhoI does not cut pHYGI1, this suggests incorporation of the hygromycin construct into DNA different than pHYGI1. For the PstI digestion, a large band was observed at approximately 5.1 Kb. This band appeared to be two fragments of similar molecular weight Two or more bands would be expected from a PstI digestion if the gene was incorporated into high molecular weight DNA. In no case was hybridization observed for DNA from control callus for any of the above-mentioned digestions.

For detection of the BT gene, a Southern blot was carried out on DNA isolated from 86R and control callus digested with the enzymes BamHI and XhoI in combination. A BamHI, XhoI co-digestion liberates the 1.8 Kb BT coding sequence from the pMS533 construction used in this transformation. The blot prepared was hybridized to a probe prepared from the 1.8 Kb BT coding sequence. A band was observed for 86R DNA at the expected size of 1.8 Kb whereas no hybridization was observed for control DNA. Additional bands of much lesser intensity were also observed for 86R DNA. This result demonstrates that the BT coding sequence is present in the callus line 86R. This further demonstrates the introduction into maize of an unselected gene with potential commercial value. The name of callus line 86R was changed to CB1.

Plants are being regenerated from CB1 callus and control callus as described in Example I.

The invention has been described with reference to various specific and preferred embodiments and techniques. However, it should be understood that many variations and modifications may be made while remaining within the spirit and scope of the invention.

What is claimed is:

1. A fertile transgenic *Zea mays* plant containing an isolated heterologous DNA construct encoding EPSP synthase wherein said DNA construct is expressed so that the plant exhibits resistance to normally toxic levels of glyphosate, wherein said resistance is not present in a *Zea mays* plant not containing said DNA construct, and wherein said DNA construct is transmitted through a complete normal sexual cycle of the transgenic plant to the progeny generation.

2. The transgenic plant of claim 1 wherein the heterologous DNA construct comprises a promoter.

3. A seed produced by the transgenic plant of claim 1 which comprises said heterologous DNA construct.

4. A progeny transgenic *Zea mays* plant derived from the transgenic plant of claim 1 wherein said progeny plant expresses said heterologous DNA construct so that the progeny plant exhibits said glyphosate tolerance.

5. A seed derived from the progeny plant of claim 4 wherein said seed comprises said heterologous DNA construct.

6. The transgenic plant of claim 1 wherein the plant is obtainable by a process comprising the steps of:

(i) bombarding intact regenerable *Zea mays* cells with microprojectiles coated with said heterologous DNA construct;

(ii) identifying or selecting a population of transformed cells; and

(iii) regenerating a fertile transgenic plant therefrom.

* * * * *

# EXHIBIT 4

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

DEKALB GENETICS CORPORATION,

Plaintiff(s),

vs.

SYNGENTA SEEDS, INC., et al.,

Defendant(s).

Case No. 4:06CV01191 ERW

**CASE MANAGEMENT ORDER - TRACK 3: COMPLEX**

Pursuant to the Civil Justice Reform Act Expense and Delay Reduction Plan and the Differentiated Case Management Program of the United States District Court of the Eastern District of Missouri, and the Rule 16 Conference held on **January 26, 2007**.

**IT IS HEREBY ORDERED** that the following schedule shall apply in this case, and will be modified only upon a showing of exceptional circumstances:

**I. SCHEDULING PLAN**

1. This case has been assigned to Track 3 (Complex).

2. All motions for joinder of additional parties or amendment of pleadings shall be filed no later than **March 30, 2007**.

3. Disclosure shall proceed in the following manner:

(a) The parties shall make all disclosures required by Rule 26(a)(1), Fed.R.Civ.P., no later than **February 16, 2007**.

(b) The parties shall disclose all expert witnesses and shall provide the reports required by Rule 26(a)(2), Fed.R.Civ.P., no later than **September 27, 2007**, and shall make expert witnesses available for depositions, and have depositions completed, no later than **November 30, 2007**. The parties shall disclose all rebuttal expert witnesses and shall provide the reports required by Rule 26(a)(2), Fed.R.Civ.P., no later than **October 31, 2007**, and shall make rebuttal expert witnesses available for depositions, and have depositions completed, no later than **November 30, 2007**.

(c)    The parties are permitted twenty (20) depositions per side, thirty-five (35) interrogatories per party, and a maximum of seventy-five (75) requests for admission per party.

(d)    Requests for physical or mental examinations of parties pursuant to Rule 35, Fed.R.Civ.P., are not anticipated.

(e)    The parties shall complete all fact discovery in this case no later than **August 17, 2007** and shall complete all expert discovery no later than **November 30, 2007**.

(f)    Motions to compel shall be pursued in a diligent and timely manner, but in no event filed more than eleven (11) days following the discovery deadline set out above.

4.    This case shall be referred to alternative dispute resolution on **October 1, 2007**, and that reference shall terminate on **January 4, 2008**.

5.    Claim Construction

(a)    On **April 15, 2007**, the parties shall exchange lists of those claim terms that they believe need construction and their proposed claim construction of those terms. This document will not be filed with the Court. On or before **May 1, 2007**, the parties will meet and confer to identify all disputed claim terms that need to be construed. Those claim constructions that are agreed to shall be included in the jury instructions submitted in this case and no briefing or claim construction hearing will be held as to those terms.

(b)    Each party shall file with the Court and serve on the other party its opening brief regarding its proposed construction for the disputed claim terms no later than **June 2, 2007**. Responsive claim construction briefs shall be filed with the Court and served on the other party no later than **June 25, 2007**.

(c)    A Claim Construction Hearing will be held on **August 3, 2007**, at **8:30 a.m.** Each party shall be limited to a total of 2.5 hours for presentation of that party's position.

6.    Any motions to dismiss, motions for summary judgment or motions for judgment on the pleadings must be filed no later than **December 21, 2007**.   Briefs in opposition shall be filed within twenty (20) days and any reply briefs shall be filed within five (5) days.

7.    The final Pretrial Conference will be held on **April 25, 2008**, at **8:30 a.m.** This conference will be held in the chambers of Judge E. Richard Webber.

## II. ORDER RELATING TO TRIAL

This action is set for a JURY trial on May 5, 2008, at 8:30 a.m. in Courtroom 12 South of the U.S. District Courthouse. This is a three week docket.

Pursuant to Local Rule 8.04 the court may tax against one or all parties the per diem, mileage, and other expenses of providing a jury for the parties, when the case is terminated or settled by the parties at a time too late to cancel the jury attendance or to use the summoned jurors in another trial, unless good cause for the delayed termination or settlement is shown.

**In this case, unless otherwise ordered by the Court, the attorneys shall, not less than twenty (20) days prior to the date set for trial:**

1. Stipulation: Meet and jointly prepare and file with the Clerk a JOINT Stipulation of all uncontested facts, which may be read into evidence subject to any objections of any party set forth in said stipulation (including a brief summary of the case which may be used on Voir Dire).

2. Witnesses:

(a) Deliver to opposing counsel, and to the Clerk, a list of all proposed witnesses, identifying those witnesses who will be called to testify and those who may be called.

(b) Except for good cause shown, no party will be permitted to call any witnesses not listed in compliance with this Order.

3. Exhibits:

(a) Mark for identification all exhibits to be offered in evidence at the trial (Plaintiffs shall mark exhibits P-1, P-2, P-3, etc. Defendants shall mark exhibits D-1, D-2, D-3, etc.) and deliver to opposing counsel and to the Clerk a list of such exhibits, identifying those that will be introduced into evidence and those that may be introduced. The list shall clearly indicate for each business record whether the proponent seeks to authenticate the business record by affidavit or declaration pursuant to Fed.R.Evid. 902(11) or 902(12).

(b) Submit said exhibits or true copies thereof, and copies of all affidavits or declarations pursuant to Fed.R.Evid. 902(11)or 902(12), to opposing counsel for examination. Prior to trial, the parties shall stipulate which exhibits may be introduced without objection or preliminary identification, and shall file written objections to all other exhibits.

(c) All written exhibits, exceeding one page, in documentary form to be offered in evidence that will be shown to the jury must be accompanied by an exact duplicate for each juror. (This does not apply to exhibits shown electronically.) No exhibit shall be shown to the jury in opening statements or at any other time until it is received in evidence or the Court has granted permission for the exhibit to be shown to the jury.

(d) Except for good cause shown, no party will be permitted to offer any exhibits not identified or not submitted by said party for examination by opposing counsel in compliance with this Order. Any objections not made in writing **at least fifteen (15) days prior to trial** may be considered waived.

**4.** Depositions, Interrogatory Answers, and Request for Admissions:

(a) Deliver to opposing counsel and to the Clerk a list of all interrogatory answers or parts thereof and depositions or parts thereof (identified by page and line numbers), and answers to requests for admissions proposed to be offered in evidence. **At least fifteen (15) days before trial,** opposing counsel shall state in writing any objections to such testimony and shall identify any additional portions of such depositions not listed by the offering party which opposing counsel proposes to offer.

(b) Except for good cause shown, no party will be permitted to offer any interrogatory answer, or deposition or part thereof, or answer to a request for admissions not listed in compliance with this Order. Any objections not made as above required may be considered waived.

**5.** Instructions:

(a) Submit to the Court and to opposing counsel their written request for instructions and forms of verdicts reserving the right to submit requests for additional or modified instructions **at least fifteen (15) days before trial** in light of opposing party's requests for instructions. (Each request must be supported by at least one pertinent citation.)

(b) Eighth Circuit Jury Instructions will be used in all cases if available. If instructions from any other source are proffered, they must be accompanied by case authority.

(c) Parties shall submit a "clean" copy and a "dirty" copy of each instruction proffered. A "clean" copy for the jury will reflect only "Instruction No. _____" at the top with no further explanatory comments at the top or bottom of the page.

**6.** Trial Brief: Submit to the Court and opposing counsel a trial brief stating the legal and factual issues and authorities relied on and discussing any anticipated substantive or procedural problems.

7. Motions In Limine: File all motions in limine to exclude evidence, and submit a courtesy copy directly to the Court's chambers, **at least fifteen (15) days before trial.**

Failure to comply with any part of this order may result in the imposition of sanctions.

Dated this 26th day of January, 2007.

E. RICHARD WEBBER
UNITED STATES DISTRICT JUDGE

# EXHIBIT 5

INTENTIONALLY LEFT BLANK

# EXHIBIT 6

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MONSANTO COMPANY and MONSANTO TECHNOLOGY LLC, )
)
Plaintiffs, )
)
v. )
)
SYNGENTA SEEDS, INC., SYNGENTA BIOTECHNOLOGY, INC., et al. )
)
Defendants. )
) Civ. No. 04-305-SLR (lead case)

DEKALB GENETICS CORPORATION, )
)
Plaintiff, )
)
v. )
)
SYNGENTA SEEDS, INC., SYNGENTA BIOTECHNOLOGY, INC., et al. )
)
Defendants. )

---

Richard L. Horwitz, Esquire and David E. Moore, Esquire of Potter, Anderson & Corroon LLP, Wilmington, Delaware. Counsel for Plaintiff. Of Counsel: Susan K. Knoll, Esquire, Thomas A. Miller, Esquire, Melinda Patterson, Esquire, Stephen E. Edwards, Esquire and Steven G. Spears, Esquire of Howrey LLP, Houston, Texas.

John W. Shaw, Esquire and Karen E. Keller, Esquire of Young, Conaway, Stargatt & Taylor, LLP, Wilmington, Delaware. Counsel for Defendant. Of Counsel: Michael J. Flibbert, Esquire, Howard W. Levine, Esquire and Jennifer A. Johnson, Esquire of Finnegan, Henderson, Farabow, Garrett & Dunner, LLP, Washington, D.C..

---

MEMORANDUM OPINION

Dated: May 10, 2006
Wilmington, Delaware

ROBINSON, Chief Judge

## I.    INTRODUCTION

On May 12, 2004, Monsanto Company, together with Monsanto Technology LLC, sued Syngenta Seeds, Inc., Syngenta Biotechnology Inc., Golden Harvest Seeds, Inc. Garwood Seed Co., Golden Seed Company, LLC (collectively called defendants) in this court for infringement of U.S. Patent No. 4,940,835 (the "'835 patent") issued to Shah et al.. On July 27, 2004, DeKalb Genetics Corporation, a wholly owned subsidiary of Monsanto Company, sued Syngenta in the Northern District of Illinois, alleging that Syngenta had infringed U.S. Patent Nos. 5,538,880 (the "'880 patent") and 6,013,863 (the "'863 patent") issued to Lundquist et al. (collectively referred to as the "Lundquist patents").    Both actions charged defendants with patent infringement in the use of GA21 corn, which is a genetically modified corn tolerant to the herbicide glyphosate.    The Illinois district court granted defendants' motion to transfer the action to this court.    (D.I. 92)    This court consolidated the two actions on August 23, 2005.[1] (D.I. 111)    Before the court are defendants' two motions for summary judgment of noninfringement of the Lundquist patents and nonenablement of the '835 patent.    (D.I. 208, 213)

## II.    BACKGROUND

The product at issue in this case, GA21 corn, is a

---

[1]Monsanto Company, Monsanto Technology LLC and DeKalb Genetics Corporation are collectively referred to as "plaintiffs."

transgenic corn product that is tolerant to the herbicide glyphosate. (D.I. 209) The original GA21 transformation event resulted from a collaboration between Rhone-Poulenc Argo, S.A. ("RPA") and DeKalb in which RPA provided the gene construct that was incorporated by DeKalb into the transformed corn plant. (Id. at 5) To transform the corn cells with the RPA construct, DeKalb employed the three-step "bombardment" method of claim 1 of the Lundquist patents. (Id. at 5-7) According to plaintiff DeKalb, steps (i)-(iii) of claim 1 in the Lundquist patents were performed on July 15, 1993, July 27, 1993 and February 25, 1994, respectively. (Id. at 8) Plaintiff DeKalb asserts that after the issuance of the patents, defendants performed steps using the GA21 corn product that infringe the asserted claims. Plaintiff DeKalb asserts infringement of claims 5 and 6 of the '863 patent and claims 4-9 of the '880 patent.

**III. STANDARD OF REVIEW**

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10 (1986).

"Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." Horowitz v. Fed. Kemper Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

## IV. DISCUSSION

### A. NonInfringement of the Lundquist Patents

Defendants assert that they cannot infringe the asserted claims for several reasons. First, because plaintiff DeKalb performed steps (i)-(iii) of the claims 1, defendants cannot be liable for infringing those claims and, therefore, cannot be

liable for infringing any claims dependent on the claims 1. Defendants also argue that they cannot be liable under § 271(g) because all the steps alleged to infringe the process claims were performed in the United States. Defendants' motion for summary judgement for noninfringement of the Lundquist patents raises several legal issues properly resolved by the court.

**1. Infringement of dependent claims**

The initial question is whether the asserted claims are dependent claims. Claims 4-9 of the '880 patent read:

> 4. A process comprising obtaining progeny from a fertile transgenic plant obtained by the process of claim 1 which comprise said DNA.
> 5. The process of claim 4 wherein said progeny are obtained by crossing said fertile transgenic plant with an inbred line.
> 6. The process of claim 4 comprising obtaining seed from said progeny and obtaining further progeny plants comprising said DNA from said seed.
> 7. The process of claim 5 wherein the progeny obtained are crossed back to the inbred line, to obtain further progeny which comprise said DNA.
> 8. The process of claim 6 wherein seeds are obtained from said further progeny plants and plants comprising said DNA are recovered from said seed.
> 9. The process of claim 7 wherein said further progeny are crossed back to the inbred line to obtain progeny which comprise said DNA.

('880 patent, col. 22, ll. 61-3) Claims 5-6 of the '863 patent read:

> 5. The process of claim 1 further comprising obtaining transgenic glyphosate resistant progeny plants of subsequent generations from said fertile plant.
> 6. The process of claim 5 further comprising obtaining seed from one of said progeny plants.

('863 patent, col. 30, ll. 14-6)

The patent statute, 35 U.S.C. § 112, ¶ 4, provides that "a claim in dependent form shall contain a reference to a claim previously set forth and then specify a further limitation of the subject matter claimed." Claims 5 and 6 of the '863 patent follow this form exactly and, therefore, are dependent on claim 1 either directly (claim 5) or indirectly (claim 6). Claims 5-9 of the '880 patent, like claims 5 and 6 of the '863 patent, are clearly dependent on claim 4. If claim 4 is dependent on claim 1, claims 5-9 are all indirectly dependent on claim 1. Claim 4 of the '880 patent does not exactly follow the form specified in the statute but, nevertheless, is a dependent claim. Claim 4 refers to claim 1 ("a fertile transgenic plant obtained by the process of claim 1") and recites a further step ("obtaining progeny"). Furthermore, claim 4 includes the phrase "said DNA" which refers back to the DNA of claim 1. All the asserted claims are dependent from claim 1 of their respective patents.

The effect of writing a claim in dependent form is that it "shall be construed to incorporate by reference all the limitations of the claim to which it refers." 35 U.S.C. § 112, ¶ 4. As a result, all of the limitations set out in the independent claims must be met. Claim 1 of the '880 patent reads:

> A process for producing a fertile transgenic *Zea mays* plant comprising the steps of (i) bombarding intact

> regenerable *Zea mays* cells with DNA-coated microprojectiles, (ii) identifying or selecting a population of transformed cells, and (iii) regenerating a fertile transgenic plant therefrom, wherein said DNA is transmitted through a complete sexual cycle of said transgenic plant to its progeny, and imparts herbicide resistance thereto.

('880 patent, col. 22, ll. 48-55) Claim 1 of the '863 patent reads:

> A process for producing a fertile transgenic *Zea mays* plant comprising the steps of (i) bombarding intact regenerable *Zea mays* cells with DNA-coated microprojectiles, wherein said DNA comprises at least a screenable marker gene; (ii) selecting a population of transformed cells expressing the selectable marker gene; and (iii) regenerating a fertile transgenic plant therefrom, wherein said DNA is expressed so as to impart glyphosate resistance to said transgenic plant and is transmitted through a normal sexual cycle of said transgenic plant to progeny plants.

('863 patent, col. 29 l. 26-col. 30 l. 6) It is not disputed that only plaintiff DeKalb performed steps (i)-(iii) set out in claim 1 of both patents.

There are two fundamental principles which find general application to the facts of record. First, "[i]t is axiomatic that dependent claims cannot be found infringed unless the claims from which they depend have been found . . . infringed." Wahpeton Canvas Co., Inc. v. Frontier, Inc., 870 F.2d 1546, 1553 (Fed. Cir. 1989).[2] The second principle that must be examined is

[2]Plaintiff asserts that this proposition has been narrowed by the Federal Circuit in Wilson Sporting Goods Co. v. David Geoffrey & Assoc., 904 F.2d 677 (Fed. Cir. 1990). The Court in that case found that the independent claim of the patent in suit was not infringed because it could not be given a range of

the "all elements rule". The Federal Circuit has held that "[i]nfringement of process inventions is subject to the 'all-elements rule' whereby each of the claimed steps of a patented process must be performed in an infringing process, either literally or by an equivalent of that step." Canton Bio-Medical, 216 F.3d at 1370. In addition, "[a] method claim is directly infringed only by one practicing the patented method." Joy Techs., 6 F.3d at 775. The Federal Circuit has explained in General Foods Corp. v. Studiengesellschaft Kohle mbH, 972 F.2d 1272 (Fed. Cir. 1992):

> It cannot be said - though it often is, incorrectly, by the uninitiated - that a part of a claim is "claimed" subject matter. For example, a claim to a process comprising the step A followed by step B followed by step C defines, as a matter of law, only the A-B-C process and one cannot properly speak of any single step as being "claimed," for it is not; all that is claimed is the process consisting of the combination of all three steps. Such a claim, therefore, creates no patent right or monopoly in step A, no right to prevent others from using step A apart from the combination of steps A-B-C. Step A is not "patented."

Id. at 1274.

Clearly, plaintiff DeKalb did not engage in any infringing activity when it performed steps (i)-(iii) of the claims 1. Nevertheless, plaintiffs argue, based on the reasoning of a

---

equivalents broad enough to encompass the accused device without also covering the prior art. Although the Federal Circuit went on to determine that it had to consider whether the dependent claims might be infringed, even though the independent claim was not, this court declines to broaden the scope of this holding to the facts at bar.

single district court case, E.I. DuPont DeNemours & Co. v. Monsanto, 903 F.Supp. 680 (D. Del. 1995),[3] that defendants should be held liable for infringement even though they performed only the final steps of the claimed process and even though the first steps of the process were performed by plaintiff DeKalb. In DuPont, plaintiff DuPont owned patents covering a three-step process for manufacturing certain stain-resistant nylon carpet fibers. Under a toll processing agreement with CaMac, Monsanto practiced step (a) of the patented process. It then shipped the product resulting from step (a) to CaMac, who performed steps (b) and (c). CaMac then sold the resulting fibers. CaMac was held liable for direct infringement of the process patent under § 217(a) because "a party cannot avoid liability for infringement by having someone else perform one or more steps of a patented process for them." Id. at 735.

The facts reviewed by the court in DuPont, of course, are distinguishable from those at bar. In DuPont, all of the steps of the claimed process were performed by parties who had not been given permission to so act. In the case at bar, the critical initial steps of the claimed process were performed by the patent owner, at a time before the patents were even issued. These facts are more suited to a business tort than patent infringement litigation, and the court declines to create an exception to

---

[3]A non-binding, non-precedential opinion.

fundamental principles of patent law to reach what, in fact, might be the fair result. Therefore, the court concludes that, under the "all elements rule", defendants are not liable for infringement of the asserted claims of the '863 and '880 patents.

**2. Section 102(g)**

The final issue raised in connection with the Lundquist patents is whether a patented process performed in the United States constitutes infringement under § 271(g). This court has previously addressed the issue in British Telecommunications v. Qwest Communications Inc., Nos. 03-526-SLR, 03-527-SLR, 03-528-SLR, slip op. at 7 (D. Del. Feb. 24, 2004). "In the case at bar, the patented methods at issue are being used, if at all, in this country; consequently, the fundamental purpose underlying passage of the statute [§ 271(g)] has absolutely no application." Id. The court finds no precedent to now mandate a different conclusion. If the accused infringement of the process claims occurs in the United States, defendant are not liable under § 271(g).[4]

**B. Enablement of the '835 Patent**

It is undisputed that claims 5 and 6 of the '835 depend from claim 1. All three claims are directed to a chimeric gene. Claim 1 reads:

---

[4]As is stated in British Telecommunications, remedies already exist for domestic use of a patented process.

> 1. A chimeric plant gene which comprises:
> (a) a promoter sequence which functions in plant cells;
> (b) a coding sequence which causes the production of RNA, encoding a choloroplast transit peptide/5-enolpyruvylshikimate-3-phosphate synthase fusion polypeptide, which cholorplast transit peptide permits the fusion polypeptide to be imported into a cholorplast of a plant cell; and
> (c) a 3' non-translated region which encodes a polyadenylation signal which functions in plant cells to cause the addition of polyadenylate nucleotides to the 3' end of the RNA;
> the promoter being heterologous with respect to the coding sequence and adapted to cause sufficient expression of the fusion polypeptide to enhance the glyphosate resistance of a plant cell transformed with the gene.

('835 patent, col. 32, ll. 31-47) The chimeric gene is claimed using functional language. "The functional language is, of course, an additional limitation in the claim." K-2 Corp. V. Salomon, 191 F.3d 1356, 1363 (Fed. Cir. 1999). The phrase, "which chloroplast transit peptide permits the fusion polypeptide to be imported into a chloroplast of a plant cell," modifies the coding sequence of the gene. This functional language requires that the gene contain a coding sequence for RNA encoding a chloroplast transit peptide ("CPT") that permits the fusion polypeptide to be imported into a chloroplast of "a plant cell." The claim also describes the promoter being adapted to cause sufficient expression of the fusion polypeptide to enhance glyphosate resistance of "a plant cell transformed with the gene." Thus, the claim uses the broad language of "a plant cell" in its limitations.

The issue raised at bar is how the enablement requirement plays out with broad functional language.

> Functional terminology may render a claim quite broad. By its own literal terms a claim employing such language covers any and all embodiments which perform the recited function. Legitimate concern often properly exists, therefore, as to whether the scope of protection defined thereby is warranted by the scope of enablement indicated and provided by the description contained in the specification.

In re Swinehart, 439 F.2d 210, 1032 (C.C.P.A. 1971). Section 112 requires that the patent specification enable "those skilled in the art to make and use the full scope of the claimed invention without 'undue experimentation.'" Koito Mfg. Ltd. v Turn-Key-Tech, LLC, 381 F.3d 1142, 1155 (Fed. Cir. 2004) (citing Genentech, Inc. v. Novo Nordisk A/S, 108 F.3d 1361, 1365 (Fed. Cir. 1997); Amgen Inc v. Hoechst Maion Roussel, Inc., 314 F.3d 1313, 1334 (Fed. Cir. 2003) (holding that the enablement requirement requires that the specification teach those in the art enough that they can make and use the invention without "undue experimentation"). "The scope of the [patent] claims must be less than or equal to the scope of the enablement. The scope of enablement, in turn, is that which is disclosed in the specification plus the scope of what would be known to one of ordinary skill in the art without undue experimentation." Nat'l Recovery Techs. v. Magnetic Separation Sys., In.c, 166 F.3d 1190, 1196 (Fed. Cir. 1999); see also In re Goodman, 11 F.3d 1046, 1050 (Fed. Cir. 1993) ("[T]he specification must teach those of skill

in the art 'how to make and how to use the invention as broadly as it is claimed'.").

In In re Vaeck, 947 F.2d 488 (Fed. Cir. 1991), the Federal Circuit held that the PTO did not err in rejecting applicants' generic claims to hybrid genes and transformed cells. More specifically, the patent application in Vaeck related to a genetically engineered bacterium capable of expressing an insecticidal protein. Applicants transformed cyanobacterial host cells with a Bacillus gene that expresses an insecticidal protein and a DNA promoter. The specification disclosed "two particular species of Bacillus (B. thuringiensis, B. sphaericus) as sources of insecticidal protein; and nine genera of cyanobacteria (Synechocystis, Anacystis, Synechococcus, Agmenellum, Aphanocapsa, Gloecapsa, Nostoc, Anabaena and Ffremyllia ) as useful hosts." It set forth two working examples, which used the same cyanobacteria strain (Synechocystis 6803) with different promoters. Claim 1 was to "A chimeric gene capable of being expressed in Cyanobacteria cells . . . ." Other claims were to preferred Bacillus species, promoters, and selectable markers, and to hybrid plasmid vectors and bacterial strains and cyanobacterium with the claim 1 chimeric gene.

The PTO examiner and Board rejected all the claims, except the claim limited to the deposited plasmid, for want of enabling disclosure, relying on "the relatively high degree of

unpredictability in this particular art": "[T]he claims ... are not limited to any particular genus or species of cyanobacteria" and "the cyanobacteria are a diverse and relatively poorly studied group of organisms, comprising some 150 different genera, and ... heterologous gene expression in cyanobacteria is 'unpredictable.'" The applicants appealed, arguing that their invention is "pioneering," which entitles them to claims of broad scope and that narrower claims would provide no real protection, because the level of skill in this art is so high and art workers could easily avoid the claims. Applicants argued that given the disclosure in their specification, "any skilled microbiologist could construct vectors and transform many different cyanobacteria, using a variety of promoters and Bacillus DNA, and could easily determine whether or not the active Bacillus protein was successfully expressed by the cyanobacteria." Id. at 495.

The Federal Circuit affirmed the rejection:

> Taking into account the relatively incomplete understanding of the biology of cyanobacteria **as of appellants' filing date**, as well as the limited disclosure by appellants of particular cyanobacterial genera operative in the claimed invention, we are not persuaded that the PTO erred in rejecting [the claims, except dependent claim 47, which is limited to the Anacystis and Synechocystis cyanobacterium genera, and claim 48, which is limited to Synechocystis 6803] under § 112, first paragraph. **There is no reasonable correlation between the narrow disclosure in appellants' specification and the broad scope of protection sought in the claims encompassing gene expression in any and all cyanobacteria . . . .**
>
> In so doing we do not imply that patent applicants in art areas currently denominated as

> "unpredictable" must never be allowed generic claims encompassing more than the particular species disclosed in their specification. It is well settled that patent applicants are not required to disclose every species encompassed by their claims, even in an unpredictable art. ... **However, there must be sufficient disclosure, either through illustrative examples or terminology, ... to teach those of ordinary skill how to make and how to use the invention as broadly as it is claimed.** This means that the disclosure must adequately guide the art worker to determine, without undue experimentation, which species among all those encompassed by the claimed genus possess the disclosed utility. Where ... a claimed genus represents a diverse and relatively poorly understood group of microorganisms, the required level of disclosure will be greater than, for example, the disclosure of an invention involving a "predictable" factor such as a mechanical or electrical element.

Id. at 496 (emphasis added).[5]

Similar to Vaeck, the state of the relevant art at the time of filing the '835 patent was unpredictable.[6] The patent is directed to transforming plant cells, both monocots and dicots, with specific genes. The parent patent, from which the '835 patent originates, was filed July 7, 1986. Defendants have cited extensive prior litigation establishing that in 1986, a person of skill in the art could not transform a monocot. Indeed, the

---

[5]Accord Enzo Biochem, Inc. v. Calgene, Inc., 188 F.3d 1362 (Fed. Cir. 1999) (the Federal Circuit concluding that the "breadth of enablement in the patent specifications [was] not commensurate in scope with the claims, as the quantity of experimentation required to practice antisense in cells other than E. coli at the filing date would have been undue").

[6]No genuine issue of material fact is raised as to this issue.

Federal Circuit has consistently found that claims directed to plants or plant cells generally were not enabled in and around 1986. See In re Goodman, 11 F.3d 1046 (Fed. Cir. 1993) (relying on a 1987 article, found no effective method of transforming cells from monocot plants as of 1985); Plant Genetic Sys., N.V. v. DeKalb Genetics Corp., 315 F.3d 1335 (Fed. Cir. 2003) (affirming the district court's findings that, as of March 11, 1987, no method existed for the transformation of monocot plants or plant cells; therefore, the claims to plant cells and methods of making plant cells were not enabled).

Plaintiffs do not dispute the fact that, as of 1986, no method existed for one of skill in the art to transform monocot plant cells. Plaintiffs instead argue that, because the claims are not directed to a plant cell but, rather, are directed to a gene which functions in a plant, the disclosure need not be enabling for both monocots and dicots. The summary judgment motion, consequently, revolves around the issue of whether monocots **and** dicots must be enabled when the claim is directed to a gene that functions in a plant cell.

Although none of the cases cited above are precisely on point, nevertheless, the analyses highlight several propositions. First, unlike most of the cases cited, where the question was whether undue experimentation by those of skill in the art was

required for enablement of the claimed invention,[7] it is undisputed by plaintiffs that those of skill in the art could not transform monocot plant cells with the chimeric gene claimed in the '835 patent as of the filing date of the '835 patent. Second, the fact that the patentee amended the claim language to distinguish "plant cell" and "gene" claims (found by the examiner to be enabled) from "plant" claims (found by the examiner to not be enabled for monocots) is less than compelling in light of the subsequent analyses of the Federal Circuit in Vaeck, 947 F.2d at 496, and PGS v. DeKalb, 315 F.3d at 1344. Therefore, the court concludes that plaintiffs cannot avoid the enabling requirement by claiming a gene that functions in plant cells rather than claiming plants transformed by a gene.

## V. CONCLUSION

For the reasons discussed above, defendants' motions for summary judgment are granted. An order consistent with this memorandum opinion shall issue.[8]

---

[7]See, e.g., Johns Hopkins University v. CellPro, Inc., 152 F.3d 1342, 1361 (Fed. Cir. 1998) (the Federal Circuit rejected an enablement challenge where it was not satisfied that the unsuccessful attempts to produce the full scope of the claimed invention were consistent with the level of ordinary skill in the art or with the patent's teachings).

[8]For purposes of appeal, and consistent with the above conclusions of law, the court adopts the claim construction proposed by defendants (D.I. 309) in connection with the asserted claims of the '880 and '863 patents. For purposes of appeal, and consistent with the above conclusions of law, the court adopts the claim construction proposed by defendants (D.I. 309) in

connection with the asserted claims of the '835 patent, except
for the construction of "chloroplast transit peptide", which
shall be:  "A chloroplast transit peptide is a naturally
occurring series of amino acids that causes the transport of a
polypeptide into a chloroplast."

# EXHIBIT 7

2006-1472

IN THE

# UNITED STATES COURT OF APPEALS

FOR THE FEDERAL CIRCUIT

MONSANTO COMPANY, MONSANTO TECHNOLOGY LLC, and DEKALB GENETICS CORP.,

*Plaintiffs-Appellants,*

v.

SYNGENTA SEEDS, INC., SYNGENTA BIOTECHNOLOGY, INC., GARST SEED CO., GOLDEN HARVEST SEEDS, INC., GARWOOD SEED CO., GOLDEN SEED COMPANY, LLC, SOMMER BROS. SEED COMPANY, THORP SEED CO., and JC ROBINSON SEEDS, INC.,

*Defendants-Appellees.*

**Appeal from the United States District Court for the District of Delaware in Consolidated Case No. 04-CV-305, Chief Judge Sue L. Robinson**

## BRIEF OF DEFENDANTS-APPELLEES

DONALD R. DUNNER
HERBERT H. MINTZ
MICHAEL J. FLIBBERT
HOWARD W. LEVINE
JENNIFER A. JOHNSON
FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, L.L.P
901 New York Avenue, N.W.
Washington, D.C. 20001-4413
(202) 408-4000

*Attorneys for Defendants-Appellees*

October 16, 2006

performed using microprojectile bombardment, ***a technique that had not yet become available at the '835 patent's filing date***. As "enablement is determined as of the effective filing date of the patent," such evidence has no bearing on the enablement issue. *PGS*, 315 F.3d at 1339.[17] As of the 1986 filing date of the '835 patent, "the monocot barrier" was firmly in place and whether later experimentation was or was not successful is irrelevant to the enablement issue before this Court. This "red-herring" argument should be ignored.

### H. This Court Should Not Vacate the District Court's Claim Constructions

There are disputed claim terms of the '880, '863, and '835 patents that were not implicated by the two summary judgment motions granted by the district court. If this Court affirms the district court's decisions, there is no reason to even reach these claim construction issues, as they are moot. If, on the other hand, this Court reverses the district court on either summary judgment issue, it should decline to address the claim construction issues that were not implicated by the summary judgment determinations.

---

[17] Before the district court, Monsanto relied on *Amgen* and *In re Brana* for the proposition that post-filing declarations and publications may be relied on to show enablement. (A5442.) What Monsanto left out is that such evidence "goes to prove that the disclosure was in fact enabling ***when filed***." *In re Brana*, 51 F.3d 1560, 1567 n.19 (Fed. Cir. 1995). As such, the work with the aroA gene in April 1993 is irrelevant because it does not address what could have been done as of the 1986 filing date of the '835 patent.

Respectfully submitted,

Donald R. Dunner
Herbert H. Mintz
Michael J. Flibbert
Howard W. Levine
Jennifer A. Johnson
FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, L.L.P.
901 New York Avenue, N.W.
Washington, D.C. 20001-4413
(202) 408-4000

Attorneys for Defendants-Appellees

October 16, 2006

**CERTIFICATE OF SERVICE**

I hereby certify that on October 16, 2006, two true and correct copies of the foregoing Brief of Defendants-Appellants were served by the indicated means to the persons at the addresses listed:

**Via Federal Express:**
Susan K. Knoll
Thomas A. Miller
Scott W. Clark
**Howrey LLP**
111 Louisiana, 25th Floor
Houston, Texas 77002
Tel: 713-787-1400
Fax: 713-787-1440

Millicent Hartwell
FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, L.L.P.
901 New York Avenue, N.W.
Washington, D.C. 20001-4413
Telephone: (202) 408-4000

**CERTIFICATE OF COMPLIANCE**

I certify that the foregoing BRIEF OF DEFENDANTS-APPELLEES contains 13,934 words as measured by the word processing software used to prepare this brief.

Dated: October 16, 2006

Respectfully submitted,

Donald R. Dunner
Herbert H. Mintz
Michael J. Flibbert
Howard W. Levine
Jennifer A. Johnson
FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, L.L.P.
Attorneys for Defendants-Appellees

# EXHIBIT 8

**EXHIBIT 8**

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

SYNGENTA BIOTECHNOLOGY, INC., GARWOOD SEED CO., GOLDEN SEED COMPANY, L.L.C., and THORP SEED CO.,

Plaintiffs,

v.

DEKALB GENETICS CORPORATION, and MONSANTO COMPANY,

Defendants.

Civil Action No. 07-38

**DECLARATION OF DREW KIM**

I, Drew Kim, hereby affirm and declare that:

1. I am an attorney at the firm of Howrey LLP, located at 1111 Louisiana St., 25th Floor, Houston, Texas 77002.

2. I submit this declaration in support of the Reply in Support of Defendants DEKALB Genetics Corporation and Monsanto Company's Motion to Transfer.

3. Attached to this declaration is a true and correct transcribed excerpt from the February 7, 2007 oral argument before the United States Court of Appeals for the Federal Circuit in Monsanto Company v Syngenta Seeds, 2006-1472.

4. This excerpt was transcribed from the digital recording of the oral argument available on the Federal Circuit's website (http://www.cafc.uscourts.gov/oralarguments/).

5. The attached excerpt begins at approximately the 27 minute and 12 second mark of the digital recording.

DM_US\8306987.v1

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed on this 22 day of March, 2007.

Drew Kim

Drew Kim

**TRANSCRIBED EXCERPT**

The following is an excerpt from the February 7, 2007 oral argument before the United States Court of Appeals for the Federal Circuit in *Monsanto Company, et al. v Syngenta Seeds, et al.*, 2006-1472.

COURT: What's the distinction though on this issue of Monsanto claims you don't have to enable every mode? What's the difference between enabling the full scope and enabling every mode?

MR. DUNNER: The cases that Monsanto rely [sic] on basically say that you have to have a mode to practice the full scope. A mode. For example, if the claims only called for dicots, and you had 4 different ways of transforming dicots and 3 of them didn't work, that's okay. That's not a problem because they have a mode of practicing the full scope of that claim, dicots. But when the claim calls for dicots and monocots or a genus which embraces dicots and monocots, then you have to have a disclosure which enables the full mode of practicing dicots and monocots. And in fact if you look at the *Goodman* case and if you look at the *PGS* case, you'll see that both of those cases involve monocots and dicots, and both of them involve plant cells, and the court held in both they had to be enabled for the full scope, namely monocots and dicots. Now how does Monsanto respond? Well, again, I already dealt with it, you only need one mode to practice the claimed invention. That doesn't satisfy the requirement that it practice the full extent of the claim. They also say the claims recite a plant gene not a plant cell. The problem there is they're ignoring the functional language which clearly implicates plant cells and the district court didn't construe it otherwise.

They also argue that once transformation techniques became available after the filing date, a person of ordinary skill in the art could follow the patent's teachings and could design a gene to provide glyphosate [sic] resistance. Well the problem with that is that the enablement must be at the time of the filing date and the events they're talking about came in 1992 and 1993, long after the 1986 filing date. I submit your Honors that for all those reasons the Court should affirm.

I would mention only one last point and that is they raise a point what should the court do about vacating the district court's claim construction. I suggest that under the *Broadcast Innovation* case where there was a remand but the claim construction was not vacated because it was not relevant to the issues on appeal, the same rule should apply in this case.

COURT: Is it fair to do it in a footnote though, without any explanation?

MR. DUNNER: Your Honor, that's right, but if the court wants to on remand suggest that when the court goes back down the court should provide reasons, that would

be perfectly appropriate, but I see no reason why the claim construction need be vacated. I think that would be prejudicial and unnecessary in this case, and I think *Broadcast Innovation* supports the relief that we've requested.

COURT:  What does it mean to say "for purposes of appeal, I adopt this claim construction?"

MR. DUNNER:  Your Honor, I don't honestly have the foggiest notion of why she said that because those interpretations are not implicated in this appeal. I really don't know.  I hate to say I don't know, but I'll finish on that note if there are no other questions.  Thank you.

# EXHIBIT 9

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| DEKALB GENETICS CORPORATION, Plaintiff, | ) | |
| v. | ) | No. 4:06-CV-1191-ERW |
| SYNGENTA SEEDS, INC., et al., Defendants. | ) | |

MOTION HEARING

BEFORE THE HONORABLE E. RICHARD WEBBER
UNITED STATES DISTRICT JUDGE

NOVEMBER 17, 2006

APPEARANCES:

For Plaintiff: Joseph P. Conran, Esq.
HUSCH & EPPENBERGER, LLC

Susan K. Knoll, Esq.
Thomas A. Miller, Esq.
HOWREY LLP

For Defendant: Glenn E. Davis, Esq.
ARMSTRONG TEASDALE LLP

Howard W. Levine, Esq.
Michael J. Flibbert, Esq.
FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP

REPORTED BY: Gayle D. Madden, CSR, RDR, CRR
Official Court Reporter
United States District Court
111 South Tenth Street, Third Floor
St. Louis, MO 63102
(314) 244-7987

Page 54

They're going to try to reargue everything they lost before Judge Robinson. They're going to reargue the meaning of glyphosate resistance, which they lost. They're going to reargue the meaning of the term "progeny", which they lost. They're going to argue that all of these claim construction rulings should be redone as issues of law.

Now, we submit they should not be permitted to do that, but I think what we're saying is that is what's going to happen, and I think that's apparent from the briefing. It's apparent from the arguments. That is the reason this case is in this court. If Monsanto and DeKalb had prevailed in Delaware, I don't think there's any question this case would have been filed in Delaware because they have consistently filed where they thought they had a good claim construction ruling. They have consistently avoided courts where they got adverse rulings.

And Ms. Knoll referred to the earlier Bayer case that they filed in this court on the Shah patent. Well, you might wonder, well, why didn't they bring the Shah case in this court; they had brought a prior case in the Shah patent. The reason is they got an adverse claim construction ruling in this court, largely adverse to them. The case then settled. Monsanto says, "Well, it settled and we won the case."

Our position is that was extremely adverse to them. In fact, we had a summary judgment of noninfringement motion

Page 55

pending based on the same claim construction that Judge Robinson actually entered the same construction on that Shah patent that the Missouri court entered. So the reason they filed the case in Delaware was that they had gotten an adverse claim construction ruling in this court.

So they are going to try to reargue those issues here. We submit that is contrary to judicial economy, contrary to the interests of justice to allow them to do that.

THE COURT: Okay.

MR. FLIBBERT: I don't think I have any other comments unless Your Honor has questions.

THE COURT: All right.

MR. FLIBBERT: Thank you, Your Honor.

THE COURT: Thank you.

MS. KNOLL: Your Honor, if I may respond?

THE COURT: Absolutely. Yeah, we will go back and forth until everyone's exhausted and falls on the floor and gives up.

MS. KNOLL: Well, to this last point, Your Honor, is that we don't have any intention of relitigating somehow issues that have been lost. I mean DeKalb is not running from any adverse rulings by anybody. What we're going to do -- and I think Syngenta is the one who's going to be opposed to this -- is I'm going to urge Your Honor to adopt Judge Tilley's claim construction of this very patent, which has

Page 56

already been done by Judge Tilley. He's construed glyphosate resistance. He had to make a construction of the '798 claims in order to determine the inventorship issue. So I don't intend at all to ask you to relook at whatever Judge Robinson did, and just as a point of clarification, she never did construe the word "progeny". So the Court can read those orders and see what exactly Judge Robinson had did. The other point, Your Honor --

THE COURT: Did she construe glyphosate resistance?

MS. KNOLL: No. Now, the other thing that needs to just be straightened out and emphasized here is that the Shah case has nothing to do with this anymore. I mean the Shah patent expires next July. So all the arguments about rearguing Shah is just crazy. We're not going to be rearguing anything for Shah.

The summary judgment in Delaware was of noninfringement of the Lundquist patents. There's never been any kind of adjudication, litigation or otherwise, as to the validity of the Lundquist patents. So the noninfringement of the process patents that are at issue in Delaware have nothing to do with noninfringement or invalidity of this patent, the '798 patent.

And this Court, Your Honor, in the Monsanto versus Bayer case denied transfer even when it was the exact same patent claims and the exact same accused product. That's not

Page 57

the test. That's not the analysis. It doesn't hinge on whether the claims are similar or if they are exactly the same. So there's not going to be any relitigating of things that have already been done.

Now, when I first looked at this case, Your Honor, it seems to me it could almost be a Track I case because a substantial amount of discovery has been done. Lundquist and Walters have been deposed by Syngenta and by people for days and days and days and days. So there's a significant amount of discovery that's already finished. There will be probably some supplementing of document production and other things, but my initial reaction was this could even be a Track I case because these people and the evidence has been collected over time. The new and additional information will have to do with what's going on in the glyphosate-tolerant corn market now, the numbers as far as how many units have been sold. You know, more of the things that go to actual damages calculations and those kinds of things will be the principal amount of discovery.

THE COURT: Wouldn't there have to be a lot of new discovery after claim construction is completed in this court?

MS. KNOLL: I don't think a lot of new discovery after claim construction. The claims are really pretty simple on their face, and I don't think there will have to be yet additional claim construction because people are already on

# EXHIBIT 10

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

- - -

MONSANTO COMPANY and MONSANTO TECHNOLOGY LLC, : CIVIL ACTION

Plaintiffs :

vs :

SYNGENTA SEEDS, INC. and SYNGENTA BIOTECHNOLOGY, INC., et al., :

Defendants : NO 04-305 (SLR)

- - -

Wilmington, Delaware
Thursday, March 9, 2006
3:00 o'clock, p m

- - -

BEFORE: HONORABLE SUE L. ROBINSON, Chief Judge

- - -

APPEARANCES:

POTTER, ANDERSON & CORROON LLP
BY: RICHARD L HORWITZ, ESQ

-and-

Valerie J. Gunning
Official Court Reporter

APPEARANCES (Continued):

HOWREY LLP
BY: SUSAN K KNOLL, ESQ.,
THOMAS A. MILLER, ESQ
SCOTT W. CLARK, ESQ. and
DONALD MAHONEY, ESQ
(Houston, Texas)

Counsel for Plaintiffs

YOUNG, CONAWAY, STARGATT & TAYLOR, LLP
BY: JOHN W SHAW, ESQ.

-and-

FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP
BY: MICHAEL J FLIBBERT, ESQ.
HOWARD W. LEVINE, ESQ.,
SANYA SUKDUANG, ESQ. and
JENNIFER JOHNSON, ESQ
(Washington, D C.)

Counsel for Defendants

- - -

P R O C E E D I N G S

(Proceedings commenced in the courtroom, beginning at 3:00 p m.)

THE COURT: Good afternoon, counsel.

(Counsel respond, "Good afternoon, your Honor.")

THE COURT: A couple of preliminary things. I gave you this old claim construction order of mine because, in going through your claim construction chart, it occurred to me that by parsing the claims in the way you construed them is not at all helpful to a lay jury. I mean, this would be great if you were giving this to the Federal Circuit, but as far as I'm concerned, if a lay jury got a claim construction chart like that, they would be no better off than if they just read the claim

So what I did in this prior case, and I can't recall if any of you were involved in that, was I took the whole claim and construed it in lay language as a whole, not parsing out specific words.

We are going to go through the claim construction chart because I've decided, in my old age and with the number of cases I have, that sometimes the subtle distinctions you put in your differing claim language are too subtle for me to

really figure out why you've chosen different words. And so we are going to go through the claim chart to help me determine whether there really is a significant difference or whether you all are just ships crossing in the night and actually agree or can't agree to something, and if there is a difference, you can tell me in terms of your validity arguments or your infringement arguments why it is you think the language you chose is important and correct.

So that's how we're going to start it out and we are going to spend some time doing it, and then whatever time is left in the afternoon, you can give me your prepared speeches

So I gave you this form because I might, in fact, be resorting to this kind of form for your case. If you'd like to help me out and give a stab at it, that would be great Otherwise, if I think this is more helpful to a jury and accurate, I might do it this way rather than the way you've proposed

So if there are preliminary matters you want to address, I'm happy to hear them Otherwise, I would like to get right to the claim chart.

I hope you all brought the document that I'm going to be working off of, and you're going to tell me, just by sitting, you don't have to stand, this is informal. This is like a workshop You are instructing me why it is that

is going to be the level of resistance.

Our position is as set forth in this definition, is that if you have a transgenic plant side by side with a nontransgenic plant and you apply a herbicide to both plants, you will see a difference between the transgenic and the nontransgenic

THE COURT: Right. So you're describing the effect of the resistance; you are not really describing what resistance is necessarily But that, to me, is an issue that we can address later. I'm not sure it's one that requires our time now

Oh, all right. Progeny, and all of the other definitions of progeny as we go through here This comes up I don't know how many times in the 44 pages of your claim construction chart.

So --

MR. FLIBBERT: Your Honor, there may be one other thing on Claim 4.

THE COURT: Yes?

MR. FLIBBERT: That is, Syngenta maintains in Claim 4 of the '880 patent a dependent claim, and that's a critical issue on the noninfringement position.

THE COURT: I remember reading that, but I'm trying to...

(Pause.)

MR. MILLER: Your Honor, the first occurrence of progeny occurs on Page 10, and that's still in connection with Claim 1.

MR. FLIBBERT: Okay. That's fine. I'm sorry.

THE COURT: I thought I hadn't missed that yet.

Perhaps, Mr Miller, first, you can explain the difference to me between your construction and --

MR. MILLER: Yes, your Honor. The fundamental difference is that our position is that progeny encompasses all generations downstream from the generation that you are talking about. So if you make the initial transgenic plant, you do that by transforming cells, regenerating those cells into a plant. That's called an R0 plant by common jargon.

Progeny of the R0 plant is any generation downstream. Every time you take -- you take the R0 and cross it with another plant, you produce from that an R1 plant. You cross the R1 plant with another plant, you get an R2 plant, and so on and so on

Progeny of the R0 plant is all of those generations downstream

THE COURT: All right

MR. MILLER: If you are talking about -- did you have a question?

THE COURT: Well, I just wanted to, having had

that explanation, to me, that basically is what R1 progeny means, but I'm not sure what it is defendant meant.

MR. FLIBBERT: Yes, your Honor. Really, again, our position is simply based on intrinsic evidence, particularly the specification that, as Mr. Miller said, when one processes the R generation plant, one obtains R1.

THE COURT: We are all in agreement on that.

MR. FLIBBERT: Yes. There was an amendment filed. Really, the critical piece of evidence here, intrinsic evidence, is the file history, your Honor. There was an amendment filed. We had it cited. Page 15

Actually, when we talk about Claim 4, there are other -- Claims 4 through 9, there are other arguments that were made on the same paper.

THE COURT: Well, first of all -- wait a minute. Before you go on to explain why you defined it this way, tell me what you mean by R1 progeny To me, my progeny would be all generations downstream, so I don't know what you mean by R1 progeny What is it that's different?

MR. FLIBBERT: R1 is simply the progeny that results directly to plants and actually result from the seed of the R0 plant.

THE COURT: Okay. So it is -- it's the phrase no matter how they are obtained from the R0 plant of Claim 1 that you are distinguishing?

MR. FLIBBERT: It's the first generations It's the -- R1 means the first generation of plants that result from the R0 plant In other words, there could be an infinite number of generations, but R1 is the first generation. It's the children plants of the R0.

THE COURT: I thought we were in agreement with that.

MR. FLIBBERT: Yes. That's what R1 is.

THE COURT: I think I even understand what R1 is.

MR. FLIBBERT: Okay

THE COURT: What I make sure, I want to understand the difference between R1 progeny. I mean, are you disputing the no matter how they are obtained language in their construction?

MR. FLIBBERT: They're saying the term progeny covers not just R1 here, but all generations later.

THE COURT: Well, isn't that what progeny mean? Succeeding generations?

MR. FLIBBERT: Here they're talking about progeny that result from the cross with the R0 plant and that's the direct progeny That's the first generation and that's how it's defined in the file history and in the specification

In other words, your Honor, the invention here,

remember, is this three-step bombardment process for transforming the corn steps All of these other steps about progeny, they say explicitly in the specification that that is well-known. This is just conventional plant breeder. So it's not unusual that they decided to claim a couple of generations beyond the real invention, which is the making of the R0 plant.

So these are -- these additional claims simply cover making specific crosses with the R0 plant, with the R1 plant, with the R2 plant, and that's explicitly argued in the file wrapper

So it's consistent with what the actual invention is, which is this three-step transformation process to make what Mr. Miller said: R0. Everything else is conventional. It's as old as agriculture to make these crosses.

So the several Claims 4 through 9 are simply covering particular crosses that result after making the R0. So like the children, the grandchildren and maybe great grandchildren. It does not go infinitely into the future

MR MILLER: Your Honor --

MR FLIBBERT: But that's what they argued in the file history

MR MILLER: Your Honor, if we wanted to claim R1 progeny, the word R1 would have appeared in the claim. If we

wanted to claim R2 progeny and only R2 progeny, we would have put the word R2 in the claim. None of these claims, Claim 1 or Claims 4 to 9, have those limitations in them. They simply say progeny And as your Honor pointed out, that means all succeeding generations

That is supported by the specification. The specification at any number of places talks about -- for example, Page 11 of the chart just refers to subsequent progeny, subsequent generations.

On Page 12 to 13, there is in particular a passage that talks about a breeding program that you would normally put plants in in order to get commercial hybrids, and we annotated that to indicate just what generation they were talking about. And they are talking about R4 and later progeny.

So the notion that these claims should somehow be restricted to one specific generation, it's not in the claim language, because those R1, R2, R3 limitations aren't there. There are no such limitations in the specification The specification speaks very broadly.

And the argument that Syngenta is making about the prosecution history was also made previously by Syngenta and rejected In the prosecution, the examiner was saying, Well, your claims aren't different from each other And what the applicants were pointing out was how they were different,

not how they were the same

THE COURT: All right. Let's say I agree at this point with the R1 and succeeding generations To me, that is what the definition of progeny is.

I guess, is there a dispute? I mean, I'm not sure what Monsanto means when it says, no matter how they are obtained from the R0 plant of Claim 1. What does that mean?

MR MILLER: Your Honor, that means that the plant somewhere back in its history must have the R0 plant in its history that was made by Claim 1, but it does not have to be directly made for R0 In other words, it could be generations removed from the R0 and it's still a progeny claim.

THE COURT: And in terms of Syngenta's position, setting aside the succeeding generations, which I'm still not sure I understand Syngenta's argument, but is there a dispute with that phrase or --

MR FLIBBERT: Which particular phrase, your Honor?

THE COURT: No matter how they are obtained from the R0 plant of Claim 1.

MR FLIBBERT: We dispute that because Claims 4 through 9 are talking about specific crosses, and so their definition would essentially read out all of the particular

crosses that are being discussed in those claims

THE COURT: So we're talking about claim differentiation?

MR FLIBBERT: Yes. These are dependent claims. They have different scope under Syngenta's interpretation. R1 is different from R2 is different from R3. But these are different claims that involve different types of crosses and so their interpretation eliminates that. That's the problem with their construction because each of the Claims 4 through 9 are talking about a different type of cross and their construction just eliminates that.

THE COURT: Let's hear from Mr. Miller on that point

MR MILLER: Your Honor, it does not eliminate it The fact that -- as I said, in Claim 4, it's talking about making a progeny plant, and all that requires is that somewhere back in the past, it came from that R0 plant described in Claim 1.

Claims 4 and 5 define a certain set of progeny plants The next two claims, 6 and 7, are necessarily restricted. They do not include the generation that is discussed in Claims 4 and 5.

So there is claim differentiation. You knock off the front generation So, for example, Claims 4 and 5 can cover R1 and later generations Claims 6 and 7 cover R2 and

# EXHIBIT 11

**THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY**

# EXHIBIT 12

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MONSANTO COMPANY and
MONSANTO TECHNOLOGY LLC,

Plaintiffs,

v.

SYNGENTA SEEDS, INC.
SYNGENTA BIOTECHNOLOGY, INC., et al.,

Defendants.

C. A. No. 04-305 SLR
(Lead Case)

---

DEKALB GENETICS CORPORATION,

Plaintiff,

v.

SYNGENTA SEEDS, INC.,
SYNGENTA BIOTECHNOLOGY, INC., et al.

Defendants.

**JOINT CLAIM CONSTRUCTION STATEMENT**

John W. Shaw
YOUNG CONAWAY STARGATT & TAYLOR, L.L.P.
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600

Attorneys for Defendants

OF COUNSEL:
Michael J. Flibbert
Don O. Burley
Howard W. Levine
FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, L.L.P.
901 New York Ave., NW
Washington, DC 20001-4413
(202) 408-4000

Dated: January 11, 2006

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19801
(302) 984-6000

Attorneys Plaintiffs

OF COUNSEL:
Susan K. Knoll
Thomas A. Miller
Melinda Patterson
Stephen E. Edwards
Steven G. Spears
HOWREY LLP
1111 Louisiana, 25th Floor
Houston, TX 77002
(713) 787-1400

**Monsanto Company et al. v. Syngenta Seeds, Inc. et al. No. 04-305 (SLR)**

**JOINT CLAIM CONSTRUCTION STATEMENT – January 11, 2006**

| U.S. Patent No. 5,538,880 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| 1. A process for producing a fertile transgenic *Zea mays* plant comprising the steps of | **"comprising"**<br>**Proposed Construction:** This phrase means including, and does not exclude the presence of additional elements. | No construction is necessary. |
| (i) bombarding intact regenerable *Zea mays* cells with DNA-coated microprojectiles | ***"Zea mays"***<br>**Proposed Construction:** This phrase means corn of all types, including, but not limited to, field corn, popcorn, sweet corn, flint corn, and dent corn. | No construction is necessary. |
| | **"intact regenerable *Zea mays* cells"**<br>**Proposed Construction:** This phrase means corn cells that, after transformation, must be capable of regeneration of a plant containing the transgene. | No construction is necessary. |

| U.S. Patent No. 5,538,880 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| (ii) identifying or selecting a population of transformed cells, and | No construction is necessary. | No construction is necessary. |
| (iii) regenerating a fertile transgenic plant therefrom | **"transgenic"**<br><br>**Proposed Construction:** This phrase means a corn plant that includes a DNA sequence resulting from genetic engineering. | No construction is necessary. |
| wherein said DNA is transmitted through a complete sexual cycle of said transgenic plant to its progeny, and imparts herbicide resistance thereto. | **"said DNA"**<br><br>**Proposed Construction:** This phrase means the DNA that was inserted into the transformed cells, even if altered by the insertion process or by later natural processes, so long as a person of ordinary skill can recognize it as the inserted DNA. | No construction is necessary. |
| | **"wherein said DNA is transmitted through a complete sexual cycle of said transgenic plant to its progeny"**<br><br>**Proposed Construction:** This phrase does not define a necessary step of the claimed process, and merely requires that the R0 plant be capable of passing the transgene to progeny through either pollen or egg cells, with or without human intervention. | No construction is necessary. |

| U.S. Patent No. 5,538,880 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| | **"herbicide"**<br><br>**Proposed Construction:** This phrase means a chemical agent capable of killing plant cells.<br><br>See intrinsic evidence cited in support of Plaintiffs' construction of "herbicide resistance," below. | **"herbicide":** means a chemical agent employed to kill or inhibit the growth of weeds. The term "herbicide" as used in the '880 patent excludes antibiotics.<br><br>**INTRINSIC EVIDENCE**<br><br>**<u>Specification</u>**<br><br>"However, selection generally entails the use of some ***toxic agent, e.g. herbicide or antibiotic***, which can effect [*sic*, affect] either the regenerability or the resultant plant fertility." '880 patent, col. 2, lines 53-55 (emphasis added); *see also* '880 patent, col. 10, lines 5-22 (using the phrase "toxic agent" three times to refer to the selection agent).<br><br>"Useful selectable markers are well known in the art and include, for example, ***antibiotic and herbicide resistance genes***. . . . Other selectable markers known in the art include . . . the antibiotics kanamycin, neomycin, and G418, as well as those genes which code for resistance or tolerance to [the herbicides] glyphosate, . . . imidazolinones, sulfonylureas, bromoxynil, dalapon, and the like. Those selectable marker genes which confer herbicide resistance or tolerance are also of commercial utility in the resulting transformed plants." '880 patent, col. 7, lines 8-22 (emphasis added). |

| U.S. Patent No. 5,538,880 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| | | <u>**Prosecution History**</u><br><br>Preliminary Amendment dated Nov. 12, 1996 (DeKalb's submission of separate application claims directed to "***herbicide resistance***" (e.g., claims 56, 62, 64-66) and "***antibiotic resistance***" (e.g., claims 68-72)). '695 appl. PH at 2456-62 (emphasis added).<br><br>Response to Restriction Requirement dated Aug. 21, 1997 ("Applicants provisionally elect with traverse a selectable marker gene encoding ***antibiotic resistance*** wherein the gene encodes resistance to bleomycin, encodes resistance to ***hygromycin***, is the *htp* gene, encodes resistance to neomycin, kanamycin or G418, is the *nptII* gene, or is the *nptI* gene.") '695 appl. PH at 2557-58 (emphasis added).<br><br>Office Action dated Aug. 23, 1991 (stating that the hygromycin B-phosphotransferase, B-glucuronidase, and luciferase genes disclosed in the specification "***are not considered to be genes that confer resistance to art recognized 'herbicides'***"). '983 appl. PH at 699 (emphasis added).<br><br>Office Action dated May 13, 1992:<br><br>"While it may be nothing more than a matter of semantics as to whether hygromycin can be considered a herbicide, it remains a fact that the only compound that may have such properties exemplified in the instant specification was hygromycin. However, |

January 11, 2006
DM_US\8298658.v1

| U.S. Patent No. 5,538,880 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
| --- | --- | --- |
| | | ***there is no evidence that the expression of hygromycin***, as taught in the specification, imparts properties that satisfy the claim limitation to:<br><br>. . . ***imparts herbicide resistance*** to said fertile transgenic Zea mays plant.<br><br>Clearly Applicants have not demonstrated the above limitation." '983 appl. PH at 724 (emphasis added).<br><br>Office Action dated July 27, 1994 (distinguishing the gene exemplified in the specification, which provides "hygromycin resistance," from "art known and available DNA sequences," which provide "herbicide resistance"). '379 appl. PH at 858. |
| | **"herbicide resistance"**<br><br>**Proposed Construction:** This phrase means that the plant has more resistance to an agent having herbicidal activity, when applied to plant material, than the same plant that does not have the transgene under the same conditions of application and plant material, and is not limited to resistance to agents used as commercial herbicides. | **"herbicide resistance"**<br><br>No construction of the claim term "herbicide resistance" is necessary apart from construction of the term "herbicide" as set forth above. |

| U.S. Patent No. 5,538,880 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| | <u>**Specification**</u><br><br>"A preferred selectable marker gene is the hygromycin B phosphotransferase (HPT) coding sequence."<br><br>['880 patent, col. 7, ll. 11-13]<br><br>Example I uses the hygromycin B phosphotransferase (HPT) coding sequence to obtain progeny of fertile transgenic corn that resist the herbicidal effects of hygromycin.<br><br>['880 patent, col. 12-18]<br><br>Example I, root elongation bioassay:<br><br>"After the seed had germinated, approximately 1 cm of the primary root tip was excised from each seedling and plated on MS salts, 20 g/l sucrose, ***50 mg/l hygromycin***, 0.25% Gelrite, and incubated in the dark at 26° C for 4 d.<br><br>Roots were evaluated for the presence or absence of abundant root hairs and root branches. ***Roots were classified as transgenic (hygromycin resistant) if they had root hairs and root branches, and untransformed (hygromycin sensitive) if they had limited numbers of branches.***"<br><br>['880 patent, col. 18, ll. 16-26 (emphasis added)] | |

| U.S. Patent No. 5,538,880 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| | Example I, etiolated leaf bioassay:<br><br>"After the root tips were excised as described above, the seedlings of one PH1 ear and one control ear were transferred to moist vermiculite and grown in the dark for 5 d. At this point 1 mm sections were cut from the tip of the coleoptile, surface sterilized 10 seconds, and plated on MS basal salts, 20 g/l sucrose, 2.5 g/l Gelrite with either 0 (control) or ***100 mg/l hygromycin*** and incubated in the dark at 26 C° for 18 hr.<br><br>They were then incubated in a light regimen of 14 hours light 10 hours dark at 26° C for 48 hr, and rated on a scale of from 0 (all brown) to 6 (all green) for the percent of green color in the leaf tissue. ***Shoots were classified as untransformed (hygromycin sensitive) if they had a rating of zero and classified as transformed (hygromycin resistant) if they had a rating of 3 or greater.***"<br><br>[*Id.* at col. 18, ll. 27-45 (emphasis added)]<br><br><u>Prosecution History</u><br><br>The Examiner initially rejected the claims that recited "herbicide resistance" for lack of enablement:<br><br>"[The pending claim reciting herbicide resistance is] rejected under 35 U.S.C. § | |

| U.S. Patent No. 5,538,880 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| | 112, first paragraph, as the disclosure is enabling only for claims limited to the transformation and expression of a selectable marker or reporter gene . . . .<br><br>The specification teaches the transformation and expression of . . . hygromycin B phosphotransferase, B-glucuronidase, and luciferase. . . . With the exception of the genes noted above, ***which are not considered to be genes that confer resistance to art recognized "herbicides,"*** the specification is silent as to a gene which when expressed would impart said herbicide resistance."<br><br>[SM0000699, Office Action, dated Aug. 23, 1991, at p. 2, '983 application (emphasis added)]<br><br>In their response, the Applicants stated:<br><br>[T]he Examiner is respectfully requested to consider that this position is inconsistent with his position taken with respect to the herbicide resistance claim (9) of Applicants' corresponding PCT Application . . . . As taken from the Written Opinion mailed November 18, 1991, it is the Examiner's opinion that: ***"[t]he selectable marker[s kanamycin, hygromycin and methotrexate] employed [in the prior art] all possess herbicidal properties."*** | |

| U.S. Patent No. 5,538,880 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| | [SM0000711-12, Response To Office Action, dated Feb. 24, 1992, at p. 1-2, '983 application (emphasis added)]<br><br>The Examiner maintained the rejection, but stated:<br><br>"While it may be nothing more than a matter of semantics as to whether hygromycin can be considered a herbicide, it remains a fact that the only compound that may have such properties exemplified in the instant specification was hygromycin."<br><br>[SM0000724, Office Action, dated May 13, 1992, at p. 2, '983 application]<br><br>In his reasons for allowance, the Examiner agreed that the example of hygromycin resistance in the specification provided support for "herbicide resistance:"<br><br>***Exemplified in the specification***, ... [are] R0 plants transformed with DNA encoding hygromycin β-phosphotransferase (HPT) .... R1 progeny evaluated by root elongation bioassay, etiolated leaf bioassay, and Southern blot assay confirm that the primary regenerants and segregating progeny were genetically transformed with non-native DNA. These plants affected a new non-native plant phenotype corresponding to hygromycin resistance. ... ***The above example [of hygromycin*** | |

| U.S. Patent No. 5,538,880 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| | ***resistance],*** … and the general discussion of art known and available DNA sequences, including herbicide resistance as a type of selectable or screenable marker, ***provides a sufficient written description of whole plants produced by the claimed process.***<br><br>[SM0000858, Examiner's Statement Of Reasons For Allowance, dated July 27, 1994, at p. 2, '379 application (emphasis added)] | |
| | **"progeny"**<br><br>**Proposed Construction:** This phrase means the R1 and succeeding generations, no matter how they are obtained from the R0 plant of claim 1.<br><br>**<u>Claim Language</u>**<br><br>The term "progeny" has the same meaning in claims 1 and 4-9. Other words in claims 6-9 merely restrict the earliest of the generations of progeny plants covered by those claims.<br><br>Claim 1 covers the R0 generation, which are the initial regenerated plants. The immediate offspring of the R0 plants are called R1 plants. The immediate offspring of the R1 plants are called R2 plants, and so on. | **"progeny":** means the R1 progeny.<br><br>See intrinsic evidence cited in support of 'progeny' in claim 4, below. |

| U.S. Patent No. 5,538,880 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| | <u>**Specification**</u><br><br>"The present invention is directed to the production of fertile transgenic plants and seeds of the species Zea mays and to the plants, plant tissues, and seeds derived from such transgenic plants, as well as the ***subsequent progeny*** and products derived therefrom."<br><br>['880 patent, col. 4, ll. 50-54 (emphasis added)]<br><br>"The invention further relates to regenerated fertile mature maize plants from transformed embryogenic tissue, transgenic seeds produced therefrom, and R1 and ***subsequent generations***."<br><br>['880, col. 3, ll. 64-67 (emphasis added)]<br><br>"The transgenic plants produced herein are expected to be useful for a variety of ***commercial and research purposes***. Transgenic plants can be created for use in traditional agriculture to possess traits beneficial to the grower (e.g. agronomic traits such as pest resistance or increased yield), beneficial to the consumer of the grain harvested from the plant (e.g. improved nutritive content in human food or animal feed) or beneficial to the food processor (e.g. improved processing traits)."<br><br>['880 patent, col. 12, ll. 1-10 (emphasis | |

| U.S. Patent No. 5,538,880 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
| --- | --- | --- |
| | added)]<br><br>"Only if the DNA introduced into the corn is heritable can the corn be used in ***breeding programs*** as required for successful commercialization of transgenic corn."<br><br>['880 patent, col. 1, ll. 50-53 (emphasis added)]<br><br>"Some of the plants of this invention may be produced from the transgenic seed produced from the fertile transgenic plants using conventional crossbreeding techniques to develop commercial hybrid seed containing heterologous DNA."<br><br>['880 patent, col. 5, ll. 7-10]<br><br>Generally, the commercial value of the transformed corn produced herein will be greatest if the heterologous DNA can be incorporated into many different hybrid combinations. . . . As such, it is necessary to incorporate the heterologous DNA into a large number of parental lines so that many hybrid combinations can be produced containing the desirable heterologous DNA. This may conveniently be done by breeding programs in which a conversion process (backcrossing) is performed by ***crossing the initial transgenic fertile plant* [R0] *to normal elite inbred lines* [to obtain an R1] *and then crossing the progeny back to the normal parent*** **[to obtain an R2]**. The progeny from this cross will | |

| U.S. Patent No. 5,538,880 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| | segregate such that some of the plants will carry the heterologous DNA whereas some will not. The plants that do carry the DNA are then ***crossed again*** **[to obtain an R3]** to the normal plant resulting in progeny which segregate once more. ***This crossing is repeated*** **[resulting in R4 and later progeny]** until the original normal parent has been converted to a genetically engineered line containing the heterologous DNA and also possessing all other important attributes originally found in the parent. A separate backcrossing program will be used for every elite line that is to be converted to a genetically engineered elite line. . . . Corn breeding and the techniques and skills required to transfer genes from one line or variety to another are well-known to those skilled in the art.<br><br>['880 patent, col. 11, ll. 33-64 (emphasis added)]<br><br>**Prosecution History**<br><br>In the Supplemental Amendment that added the claims to the application that became patent claims 4-9, the Applicants stated:<br><br>"Claims 32-35 [patent claims 6-9] are supported … at pages 19-20 of the specification, which set forth methodologies for obtaining ***R2 and higher generation progeny*** plants from the initial R0 transgenic plants." | |

| U.S. Patent No. 5,538,880 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
| --- | --- | --- |
| | [SM0001047, Supplemental Amendment, dated Mar. 28, 1995, at p. 2, '458 application (emphasis added)]<br><br>Pages 19-20 of the application contain the text that became column 11, lines 33-64 of the '880 patent specification, quoted above.<br><br>[SM0000986-87, Specification of the '458 application, at p. 19-20] | |
| 4. A process comprising obtaining progeny from a fertile transgenic plant obtained by the process of claim 1 which comprise said DNA. | **"progeny"**<br><br>**Proposed Construction:** This phrase means the R1 and succeeding generations, no matter how they are obtained from the R0 of claim 1.<br><br>**<u>Claim Language</u>**<br><br>The term "progeny" has the same meaning in claims 1 and 4-9. Other words in claims 6-9 restrict the earliest of the generations of progeny plants covered by those claims, but no words in claims 4-9 restrict the latest generation of progeny covered.<br><br>See intrinsic evidence cited in support of Plaintiffs' construction of "progeny" in claim 1, above.<br><br>**<u>Additional Prosecution History</u>**<br><br>In response to the Examiner's rejection on the basis that "the claims are viewed as substantial | **"progeny":** means the R1 progeny.<br><br>**INTRINSIC EVIDENCE**<br><br>**<u>Claim Language</u>**<br><br>The term "progeny" is used consistently in claims 4-7 and should have the same meaning in each of those claims.<br><br>Claim 4 states that "progeny" are obtained "from a fertile transgenic plant obtained by the process of claim 1," i.e., from an "R0" plant produced by the process of claim 1. Sexual crosses of R0 generation plants are known in the art as "R1" progeny.<br><br>In addition, claim 5 refers to "said progeny" of claim 4, which confirms that the term "progeny" in claims 4 and 5 has the same meaning. |

| U.S. Patent No. 5,538,880 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| | duplicates" [SM0001052, Office Action, dated April 26, 1995, at p. 3, '458 application], the Applicants demonstrated the ***differences*** between the generations of progeny claimed:<br><br>"claim 31 recites that in step (iv), 'R1' progeny of the "R0" plant of step (iii), are obtained by crossing the R0 plant with an inbred line. Claim 33 effectively recites step (iv), obtaining 'R1' progeny; (v) crossing the 'R1' progeny with the inbred line, and (vi) obtaining further 'R2' progeny.<br>Step 34 recites that (vii) the 'further (R2) progeny" are crossed back to the inbred line to obtain further 'R2' progeny."<br><br>[SM0001055, Response Under 37 C.F.R. § 1.116 dated June 5, 1995, at 1, '458 application] There was no need at the time to emphasize the ***similarities*** between the claims, i.e., that they covered subsequent generations. The Examiner then withdrew his rejection, stating "[a]ll claims are allowable." [SM0001075, Suspension Of Prosecution, dated Sept. 6, 1995, '458 application] | **Specification**<br><br>"The plants regenerated from the transformed callus are referred to as the R0 generation or R0 plants. The seeds produced by various ***sexual crosses of the R0 generation plants*** are referred to as ***R1 progeny or the R1 generation***. When R1 seeds are germinated, the resulting plants are also referred to as the R1 generation." '880 patent, col. 11, lines 14-19 (emphasis added).<br><br>**Prosecution History**<br><br>Response Under 37 C.F.R. § 1.116 dated June 5, 1995 (DeKalb argued that application claim 31 (which issued as patent claim 5) recited that, "in step (iv), ***'R1' progeny*** of the 'R0' plant of step (iii), are obtained by crossing the R0 plant with an inbred line.") '880 patent PH at 1055 (emphasis added). |
| | **"A process comprising obtaining progeny from a fertile transgenic plant obtained by the process of claim 1"**<br><br>**Proposed Construction:** This phrase means that the claimed process comprises the step of | **"obtained by the process of claim 1": means** that claim 4 is a dependent claim that requires the performance of steps (i)-(iii) of claim 1.<br><br>Whether or not expressly construed to be a dependent claim, claim 4 requires the |

| U.S. Patent No. 5,538,880 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| | obtaining progeny using the fertile transgenic plant produced by the process of claim 1 as a starting material. The claimed process does not include the steps recited in claim 1.<br><br>**Specification**<br><br>The present invention is directed to ***the production of*** fertile transgenic plants and seeds of the species *Zea mays* and to the plants, plant tissues, and seeds derived from such transgenic plants, as well as ***the subsequent progeny*** and products ***derived therefrom.***<br><br>['880 patent, col. 4, ll. 50-53 (emphasis added)]<br><br>**Prosecution History**<br><br>The predecessor of claim 4—claim 30 of the '458 application—read:<br><br>30. ***The process of claim [1] further comprising*** (iv) obtaining progeny from said fertile transgenic plant of step (iii), which comprise said DNA.<br><br>[SM0001046 Supplemental Amendment, dated Mar. 28, 1995, at p. 1, '458 application (emphasis added)] | performance of steps (i)-(iii) of claim 1 and the additional step of obtaining progeny (as defined above) from a fertile transgenic plant obtained by the process of claim 1.<br><br>**INTRINSIC EVIDENCE**<br><br>**Claim Language**<br><br>Claim 4 expressly refers to claim 1.<br><br>The phrase "said DNA" refers to the DNA of claim 1 or it would lack antecedent basis.<br><br>**Prosecution History**<br><br>Supplemental Amendment dated March 28, 1995 (application claim 30, which later issued as patent claim 4, was a dependent claim reciting, "The process of claim 23 further comprising (iv) obtaining progeny from said fertile transgenic plant of step (iii), which comprise said DNA.") '880 patent PH at 1046.<br><br>Amendment Under 37 C.F.R. § 1.312 (DeKalb amended application claim 30 and represented to the PTO that the amended claim did "not introduce new matter" and was "allowable without further search or consideration.") '880 patent PH at 1082-83 and 1085.<br><br>Response to Rule 312 Communication (The PTO entered DeKalb's Rule 312 amendment on the ground that it was "directed to ***matters*** |

| U.S. Patent No. 5,538,880 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| | | ***of form not affecting the scope of the invention.***") '880 patent PH at 1108 (emphasis added).<br><br>Index of Claims (identifying application claims 23 and 36 (patent claims 1 and 10) as independent claims and the remaining claims, including application claim 30 (patent claim 4), as dependent claims). '880 patent PH at 1130. |
| 5. The process of claim 4 wherein said progeny are obtained by crossing said fertile transgenic plant with an inbred line. | **"said progeny"**<br><br>**Proposed Construction:** This phrase means the R1 and succeeding generations, which must be obtained by crossing the R0 plant of claim 1 with an inbred line.<br><br>**Claim Language**<br><br>No words in claim 5 cut off all the generations of progeny after the R1 from being covered by the claim.<br><br>See intrinsic evidence cited in support of Plaintiffs' construction of "progeny" in claims 1 and 4, above. | **"said progeny"**; means the R1progeny.<br><br>**INTRINSIC EVIDENCE**<br><br>**Claim Language**<br><br>The term "progeny" is used consistently in claims 4-7 and should have the same meaning in each of those claims.<br><br>In addition, claim 5 refers to "*said* progeny" of claim 4. The term "progeny" in claim 5 therefore has the same meaning as the term "progeny" in claim 4.<br><br>**Specification**<br><br>"The plants regenerated from the transformed callus are referred to as the R0 generation or R0 plants. The seeds produced by various ***sexual crosses of the R0 generation plants*** are referred to as ***R1 progeny or the R1 generation***. When R1 seeds are germinated, |

| U.S. Patent No. 5,538,880 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| | | the resulting plants are also referred to as the R1 generation." '880 patent, col. 11, lines 14-19 (emphasis added).<br><br>**<u>Prosecution History</u>**<br><br>Response Under 37 C.F.R. § 1.116 dated June 5, 1995 (DeKalb argued that application claim 31 (which issued as patent claim 5) recited that, "in step (iv), ***'R1' progeny*** of the 'R0' plant of step (iii), are obtained by crossing the R0 plant with an inbred line.") '880 patent PH at 1055 (emphasis added). |
| 6. The process of claim 4 comprising obtaining seed from said progeny and obtaining further progeny plants comprising said DNA from said seed. | **"said progeny"**<br><br>**Proposed Construction:** This phrase means the R1 and succeeding generations, no matter how they are obtained from the R0 of claim 1.<br><br>**<u>Claim Language</u>**<br><br>Claim 6 refers to "said progeny"—the progeny from claim 4. The progeny of claim 4 include the R1 and later generations.<br><br>See intrinsic evidence cited in support of Plaintiffs' construction of "progeny" in claims 1 and 4, above. | **"said progeny"**: means the R1 progeny.<br><br>**INTRINSIC EVIDENCE**<br><br>**<u>Claim Language</u>**<br><br>The term "progeny" is used consistently in claims 4-7 and should have the same meaning in each of those claims.<br><br>In addition, claim 6 refers to "*said* progeny" of claim 4. The term "progeny" in claim 6 therefore has the same meaning as the term "progeny" in claim 4.<br><br>**<u>Specification</u>**<br><br>"The plants regenerated from the transformed callus are referred to as the R0 generation or |

| U.S. Patent No. 5,538,880 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
| --- | --- | --- |
| | | R0 plants. The seeds produced by various sexual crosses of the R0 generation plants are referred to as ***R1 progeny or the R1 generation.*** When R1 seeds are germinated, the resulting plants are also referred to as the R1 generation." '880 patent, col. 11, lines 14-19 (emphasis added).<br><br>**Prosecution History**<br><br>Response Under 37 C.F.R. § 1.116 dated June 5, 1995 (DeKalb argued that application claim 31 (which issued as patent claim 5) recited that, "in step (iv), ***'R1' progeny*** of the 'R0' plant of step (iii), are obtained by crossing the R0 plant with an inbred line.") '880 patent PH at 1055 (emphasis added) |
| | **"further progeny"**<br><br>**Proposed Construction:** This phrase means the same plants as claim 4, except for R1 plants.<br><br>**Claim Language**<br><br>As the claim 4 plants include plants from generations R1 and higher, "further progeny" must necessarily mean one generation later. Therefore, this term means the R2 and later generations.<br><br>No words in claim 6 cut off all the generations | **"further progeny":** means the R2 progeny.<br><br>**INTRINSIC EVIDENCE**<br><br>**Claim Language**<br><br>The term "further progeny" is used consistently in claims 6-9 and should have the same meaning in each of those claims.<br><br>**Prosecution History**<br><br>Response Under 37 C.F.R. § 1.116 dated June 5, 1995 (DeKalb argued that application claim 33 (which issued as patent claim 7) |

| U.S. Patent No. 5,538,880 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| | of progeny after the R2 from being covered by the claim.<br><br>See intrinsic evidence cited in support of Plaintiffs' construction of "progeny" in claims 1 and 4, above. | "effectively recites step (iv), obtaining 'R1' progeny; (v) crossing the 'R1' progeny with the inbred line, and (vi) obtaining ***further 'R2' progeny.***"). '880 patent PH at 1055 (emphasis added). |
| 7. The process of claim 5 wherein the progeny obtained are crossed back to the inbred line, to obtain further progeny which comprise said DNA. | **"the progeny"**<br><br>**Proposed Construction:** This phrase means the R1 and succeeding generations, which must be obtained by crossing the R0 plant of claim 1 with an inbred line.<br><br>**Claim Language**<br><br>Claim 7 refers to "the progeny"—the progeny from claim 5. The progeny of claim 5 include the R1 and later generations.<br><br>See intrinsic evidence cited in support of Plaintiffs' construction of "progeny" in claims 1 and 4, above. | **"the progeny":** means the R1 progeny.<br><br>**INTRINSIC EVIDENCE**<br><br>**Claim Language**<br><br>The term "progeny" is used consistently in claims 4-7 and should have the same meaning in each of those claims.<br><br>In addition, claim 7 refers to "the progeny" obtained from the process of claim 5. The term "progeny" in claim 7 therefore has the same meaning as the term "progeny" in claim 5.<br><br>**Specification**<br><br>"The plants regenerated from the transformed callus are referred to as the R0 generation or R0 plants. The seeds produced by various ***sexual crosses of the R0 generation plants*** are referred to as ***R1 progeny or the R1 generation***. When R1 seeds are germinated, the resulting plants are also referred to as the R1 generation." '880 patent, col. 11, lines 14-19 (emphasis added). |

| U.S. Patent No. 5,538,880 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
| --- | --- | --- |
| | | **Prosecution History**<br><br>Response Under 37 C.F.R. § 1.116 dated June 5, 1995 (DeKalb argued that application claim 33 (which issued as patent claim 7) "effectively recites step (iv), obtaining ***'R1' progeny***; (v) crossing the ***'R1' progeny*** with the inbred line, and (vi) obtaining further 'R2' progeny."). '880 patent PH at 1055 (emphasis added). |
| | **"further progeny"**<br><br>**Proposed Construction:** This phrase means a plant obtained by back-crossing a plant covered by claim 5 with the inbred line used in claim 5 and thus does not cover R1 plants.<br><br>**Claim Language**<br><br>As the claim 5 plants include plants from generations R1 and higher, "further progeny" must necessarily mean one generation later. Therefore, this term means the R2 and later generations.<br><br>No words in claim 7 cut off all the generations of progeny after the R2 from being covered by the claim.<br><br>See intrinsic evidence cited in support of Plaintiffs' construction of "progeny" in claims 1 and 4, above. | **"further progeny":** means the R2 progeny.<br><br>INTRINSIC EVIDENCE<br><br>**Claim Language**<br><br>The term "further progeny" is used consistently in claims 6-9 and should have the same meaning in each of those claims.<br><br>In addition, claim 7 states that the "progeny" (R1 progeny) obtained from the process of claim 5 are crossed back to the inbred line to obtain "further progeny." Crossing R1 progeny back to an inbred line would produce "R2" progeny.<br><br>**Prosecution History**<br><br>Response Under 37 C.F.R. § 1.116 dated June 5, 1995 (DeKalb argued that application claim 33 (which issued as patent claim 7) "effectively recites step (iv), obtaining 'R1' |

| U.S. Patent No. 5,538,880 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| | | progeny; (v) crossing the 'R1' progeny with the inbred line, and (vi) obtaining ***further 'R2' progeny*.**"). '880 patent PH at 1055 (emphasis added). |
| 8. The process of claim 6 wherein seeds are obtained from said further progeny plants and plants comprising said DNA are recovered from said seed. | **"said further progeny"**<br><br>**Proposed Construction:** This phrase means the same plants as claim 4, except for R1 plants.<br><br>**<u>Claim Language</u>**<br><br>Claim 8 refers to "said further progeny"—meaning the "further progeny" of claim 6. The "further progeny" of claim 6 include the R2 and later generations.<br><br>See intrinsic evidence cited in support of Plaintiffs' construction of "progeny" in claims 1 and 4, above. | **"said further progeny":** means the R2 progeny.<br><br>**INTRINSIC EVIDENCE**<br><br>**<u>Claim Language</u>**<br><br>The term "further progeny" is used consistently in claims 6-9 and should have the same meaning in each of those claims.<br><br>In addition, claim 8 refers to "*said* further progeny plants" of claim 6. The term "further progeny" in claim 8 therefore has the same meaning as the term "further progeny" in claim 6. |
| | **"plants comprising said DNA are recovered from said seed"**<br><br>**Proposed Construction:** This phrase means the same plants as claim 4 except for R1 and R2 plants.<br><br>**<u>Claim Language</u>**<br><br>This term refers to plants obtained by the seed set from the "further progeny plants" of claim | **"plants comprising said DNA are recovered from said seed"**<br><br>No construction is necessary. |

| U.S. Patent No. 5,538,880 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| | 6. As the claim 6 plants include plants from generations R2 and higher, the "plants comprising said DNA…" must necessarily be one generation later. Therefore this term means the R3 and later generations.<br><br>No words in claim 8 cut off all the generations of progeny after the R3 generation from being covered by the claim.<br><br>See intrinsic evidence cited in support of Plaintiffs' construction of "progeny" in claims 1 and 4, above. | |
| 9. The process of claim 7 wherein said further progeny are crossed back to the inbred line to obtain progeny which comprise said DNA. | **"said further progeny"**<br><br>**Proposed Construction:** This phrase means a plant obtained by back-crossing a plant covered by claim 5 with the inbred line used in claim 5 and thus does not cover R1 plants.<br><br>**<u>Claim Language</u>**<br><br>Claim 9 refers to "said further progeny"—meaning the "further progeny" of claim 7. The progeny of claim 7 include the R2 and later generations.<br><br>See intrinsic evidence cited in support of Plaintiffs' construction of "progeny" in claims 1 and 4, above. | **"said further progeny": means the R2 progeny.**<br><br>**INTRINSIC EVIDENCE**<br><br>**<u>Claim Language</u>**<br><br>The term "further progeny" is used consistently in claims 6-9 and should have the same meaning in each of those claims.<br><br>In addition, claim 9 refers to "*said* further progeny" of claim 7. The term "further progeny" in claim 9 therefore has the same meaning as the term "further progeny" in claim 7. |

| U.S. Patent No. 5,538,880 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
| --- | --- | --- |
| | | **<u>Prosecution History</u>**<br><br>Response Under 37 C.F.R. § 1.116 dated June 5, 1995 (DeKalb argued that application claim 35 (which issued as patent claim 9) "recites that (vii) the ***'further (R2) progeny'*** are crossed back to the inbred line to obtain 'R3' progeny.") '880 patent PH at 1055 (emphasis added). |
| | **"progeny" (second occurrence)**<br><br>**Proposed Construction:** This phrase means a plant obtained by back-crossing a plant covered by claim 7 with the inbred line used in claim 5 and thus does not cover R1 or R2 plants.<br><br>**<u>Claim Language</u>**<br><br>The claim indicates that the "further progeny" of claim 7 are crossed back to obtain another generation of progeny. As the claim 7 plants include plants from generations R2 and higher, the progeny of those plants must necessarily be the R3 and later generations.<br><br>No words in claim 9 cut off all the generations of progeny after the R3 generation from being covered by the claim.<br><br>See intrinsic evidence cited in support of Plaintiffs' construction of "progeny" in claim 1, above. | **"progeny" (second occurrence):** means the R3 progeny.<br><br>**INTRINSIC EVIDENCE**<br><br>**<u>Claim Language</u>**<br><br>The claim states that the "further progeny" (R2 progeny) obtained from the process of claim 7 are crossed back to the inbred line to obtain "progeny." Crossing R2 progeny back to an inbred line would produce "R3" progeny.<br><br>**<u>Prosecution History</u>**<br><br>Response Under 37 C.F.R. § 1.116 dated June 5, 1995 (DeKalb argued that application claim 35 (which issued as patent claim 9) "recites that (vii) the 'further (R2) progeny' are crossed back to the inbred line to obtain ***'R3' progeny.***") '880 patent PH at 1055 (emphasis added). |

| U.S. Patent No. 6,013,863 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| 1. A process for producing a fertile transgenic *Zea mays* plant comprising the steps of | **"comprising"**<br><br>**Proposed Construction:** This phrase means including, and does not exclude the presence of additional elements. | No construction is necessary. |
| (i) bombarding intact regenerable *Zea mays* cells with DNA-coated microprojectiles, wherein said DNA comprises at least a selectable marker gene | **"*Zea mays*"**<br><br>**Proposed Construction:** This phrase means corn of all types, including, but not limited to, field corn, popcorn, sweet corn, flint corn, and dent corn. | No construction is necessary. |
| | **"intact regenerable *Zea mays* cells"**<br><br>**Proposed Construction:** This phrase means corn cells that, after transformation, must be capable of regeneration of a plant containing the transgene. | No construction is necessary. |
| (ii) selecting a population of transformed cells expressing the selectable marker gene; and | No construction is necessary. | No construction is necessary. |
| (iii) regenerating a fertile transgenic plant therefrom, | **"transgenic plant"**<br><br>**Proposed Construction:** This phrase means a | No construction is necessary. |

| U.S. Patent No. 6,013,863 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| | corn plant that includes a DNA sequence resulting from genetic engineering. | |
| wherein said DNA is expressed so as to impart glyphosate resistance to said transgenic plant and is transmitted through a normal sexual cycle of said transgenic plant to progeny plants. | **"said DNA"**<br><br>**Proposed Construction:** This phrase means the DNA that was inserted into the transformed cells, even if altered by the insertion process or by later natural processes, so long as a person of ordinary skill can recognize it as the inserted DNA. | No construction is necessary. |
| | **"wherein said DNA is . . . transmitted through a normal sexual cycle of said transgenic plant to its progeny plants"**<br><br>**Proposed Construction:** This phrase does not define a necessary step of the claimed process, and merely requires that the R0 plant be capable of passing the transgene to progeny through either pollen or egg cells, with or without human intervention. | No construction is necessary. |
| | **"glyphosate resistance"**<br><br>**Proposed Construction:** This phrase means that the plant has more resistance to glyphosate, when applied to plant material, than the same plant that does not have the | **"glyphosate resistance"**<br><br>No construction is necessary.<br><br>Syngenta notes that the '863 patent does not define "glyphosate resistance" and the |

| U.S. Patent No. 6,013,863 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| | transgene under the same conditions of application and plant material.<br><br>The phrase "glyphosate resistance" is analogous to the phrase "herbicide resistance" in claim 1 of the '880 patent. The meaning of the term "glyphosate" is undisputed. See intrinsic evidence cited in support of Plaintiffs' construction of "herbicide resistance" in claim 1 of the '880 patent, above. | examples of the patent all relate to resistance to the antibiotic hygromycin, not to resistance to glyphosate (or any other herbicide). |
| 5. The process of claim 1 further comprising obtaining transgenic glyphosate resistant progeny plants of subsequent generations from said fertile transgenic plant. | **"progeny"**<br><br>**Proposed Construction:** This phrase means the R1 and succeeding generations.<br><br>See intrinsic evidence cited in support of Plaintiffs' construction of "progeny," above. | No construction is necessary.<br><br>The parties agree that claim 5 is a dependent claim. |
| 6. The process of claim 5 further comprising obtaining seed from one of said progeny plants. | **"progeny"**<br><br>**Proposed Construction:** This phrase means the same plants as claim 5 except for R1 plants.<br><br>See intrinsic evidence cited in support of Plaintiffs' construction of "progeny," above. | No construction is necessary.<br><br>The parties agree that claim 6 is a dependent claim. |

| U.S. Patent No. 4,940,835 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| 1. A chimeric plant gene which comprises: | **"chimeric plant gene"**<br><br>**Proposed Construction:** This phrase means a chimeric gene that is expressible in a plant. | No construction is necessary. |
| | **"comprises"**<br><br>**Proposed Construction:** This phrase means includes, and does not exclude the presence of additional elements. | No construction is necessary. |
| (a) a promoter sequence which functions in plant cells | **"which functions in plant cells"**<br><br>**Proposed Construction:** This phrase describes a characteristic of the promoter and does not mean that the claim covers plant cells rather than chimeric genes as recited in the preamble.<br><br>**<u>Specification</u>**<br><br>"[p]romoters which are known or found to cause transcription of the EPSPS gene in plant cells can be used in the present invention."<br><br>['835 patent, col. 3, ll. 25-27] | **"a promoter sequence which functions in plant cells":** Syngenta contends that this language constitutes a necessary limitation of the claim and requires the promoter cause sufficient expression of the fusion polypeptide to enhance the glyphosate resistance of a plant cell transformed with the gene.<br><br>**INTRINSIC EVIDENCE**<br><br>**<u>Claim Language</u>**<br><br>The claim expressly requires that the promoter sequence must "function" (work) in plant cells. The specific function of the promoter is |

| U.S. Patent No. 4,940,835 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
| --- | --- | --- |
| | "The particular promoter selected should be capable of causing sufficient expression to result in the production of an effective amount of EPSPS polypeptide to render the plant cells and plants regenerated therefrom substantially resistant to glyphosate. Those skilled in the art will recognize that the amount of EPSPS polypeptide needed to induce resistance may vary with the type of plant. The degree of expression needed may vary with the EPSPS coding sequence used."<br><br>['835 patent, col. 3, ll. 33-42]<br><br>"The 3' non-translated region contains a polyadenylation signal which functions in plants to cause the addition of polyadenylate nucleotides to the 3' end of the EPSPS mRNA."<br><br>['835 patent, col. 5, ll. 13-16]<br><br>"In cases where the EPSPS sequence is derived from a plant source one can use the 3' non-translated region naturally associated with the particular EPSPS gene."<br><br>['835 patent, col. 5, ll. 16-19]<br><br>"Examples of other suitable 3' regions are the 3' transcribed, non-translated regions containing the polyadenylation signal of the nopaline synthase (NOS) gene of the Agrobacterium tumor-inducing (Ti) plasmid or the conglycinin (7S) storage protein gene." | defined by the subsequent claim language "the promoter being . . . adapted to cause sufficient expression of the fusion polypeptide to enhance the glyphosate resistance of a plant cell transformed with the gene."<br><br>**Specification**<br><br>"The particular promoter selected should be capable of causing sufficient expression to result in the production of an effective amount of EPSPS polypeptide to render the plant cells and plants regenerated therefrom substantially resistant to glyphosate." '835 patent, col. 3, lines 33-38.<br><br>In addition, Examples 2-13 all demonstrate either the transformation of dicot plant cells or the regeneration of dicot plants from the transformed plant cells with a gene that contains a promoter than functions to enhance glyphosate resistance.<br><br>**Prosecution History**<br><br>Examiner Interview Summary Record for Jan. 4, 1988 PTO interview ("The applicant agreed to use function[al] language in [the] claims.") '835 patent PH at 5311.<br><br>Amendment dated Jan. 25, 1988 ("In the broadest sense, a suitable promoter will be any promoter that functions in plants since this promoter would drive the chimeric gene, produce more EPSPS and as a result make the |

| U.S. Patent No. 4,940,835 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| | ['835 patent, col. 5, ll. 19-23] | plant cell more resistant to glyphosate herbicide.") '835 patent PH at 5324. |
| | **"plant cells"**<br><br>**Proposed Construction:** This phrase means cells of any plant species. | No construction is necessary. |
| (b) a coding sequence which causes the production of RNA, encoding a chloroplast transit peptide/5-enolpyruvylshikimate-3-phosphate synthase fusion polypeptide, which chloroplast transit peptide permits the fusion polypeptide to be imported into a chloroplast of a plant cell; and | **"chloroplast transit peptide"**<br><br>**Proposed Construction:** This phrase means a series of amino acids that causes the transport of a polypeptide into a chloroplast, regardless of the cleavage step.<br><br>**Claim Language**<br><br>The function of a "chloroplast transit peptide," is defined by the claim language that specifically describes its function, i.e., "permits the fusion polypeptide to be imported into a chloroplast of a plant cell."<br><br>**Specification**<br><br>Non-homologous chloroplast transit peptides may function: | **"chloroplast transit peptide":** means a naturally occurring chain of amino acids that is located at the N-terminal portion of a nuclear-encoded polypeptide, which directs the polypeptide to a chloroplast and is cleaved (or removed) from the EPSPS polypeptide.<br><br>**INTRINSIC EVIDENCE**<br><br>**Specification**<br><br>The following supports Syngenta's position that the CTP must be naturally occurring:<br><br>"Suitable CTP's for use in the present invention may be obtained from various sources. Most preferably, the CTP is obtained from the endogenous EPSPS gene of the |

| U.S. Patent No. 4,940,835 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
| --- | --- | --- |
| | "Suitable CTP's for use in the present invention may be obtained from various sources. Most preferably, the CTP is obtained from the endogenous EPSPS gene of the subject plant to the transformed."<br><br>['835 patent, col. 4, ll. 35-38]<br><br>"Although there is little homology between the CTP sequences of the EPSPS gene and the ssRUBISCO gene (see, e.g., Broglie (1983), one may find that non-homologous CTPs may function in particular embodiments."<br><br>['835, patent, col. 4, ll. 40-44]<br><br>"Suitable CTP sequences for use in the present invention can be easily determined by assaying the chloroplast uptake of an EPSPS polypeptide comprising the CTP of interest as described in Example 18 hereinafter."<br><br>['835 patent, col 4, ll. 44-48]<br><br>Example 19 is an example of a chloroplast transit peptide that is not one that would be found in nature:<br><br>"EXAMPLE 19: CTP of Petunia EPSPS Facilitates Chloroplast Uptake of Heterologous Protein | subject plant to the [*sic*, be] transformed. Alternately, one may often use a CTP from an EPSPS gene of another plant." '835 patent, col. 4, lines 35-40.<br><br>In addition, Examples 2-13 all concern the use of a naturally occurring CTP.<br><br>The following supports Syngenta's position that a defining feature of the CTP is that it is cleaved or removed from the EPSPS polypeptide:<br><br>"The CTP leader sequence causes the polypeptide to be imported into chloroplasts, and the CTP leader sequence encoded by the plant-derived EPSPS gene is believed to be ***removed*** from the remainder of the polypeptide so that an active portion of the EPSPS polypeptide exists and functions inside the chloroplast." '835 patent, col. 4, lines 28-34 (emphasis added).<br><br>"To verify that precursor EPSPS (+CTP) is taken up and processed by chloroplasts, the total translation products containing [$^{35}$S]methionine-labeled pre-EPSPS were incubated with freshly isolated, intact chloroplasts from *L. sativa*. The pre-EPSPS (+CTP) was rapidly translocated into chloroplasts and ***cleaved*** to the mature EPSPS of $M_r\alpha48$ kDa." '835 patent, col. 29, line 67 - col. 30, line 5 (emphasis added).<br><br>"Chloroplast import assays in vitro showed |

| U.S. Patent No. 4,940,835 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
| --- | --- | --- |
| | The following EPSPS experiments show that the CTP can target a heterologous protein to the stroma compartment. The 72-amino-acid transit peptide of EPSPS was fused to the mature ssRUBISCO from wheat. The mature wheat ssRUBISCO cDNA (Broglie et al 1983) was obtained as an SphI/PstI fragment of .about.0.6 kb. This SphI/PstI fragment contains the entire mature wheat ssRUBISCO coding region of 128 amino acids (beginning at the N-Terminal methionine) and 200 bp of the 3' untranslated region. The mature ssRUBISCO cDNA fragment was fused behind the P. hybrida EPSPS CTP cDNA fragment. This fusion was done by joining an EcoRI/SphI fragment of pMON6242 with the wheat ssRUBISCO cDNA. ***The construct pMON6242 is a derivative of pMON6140 and contains P. hybrida EPSPS with an engineered consensus cleavage site for ssRUBISCO. The cleavage site of pMON6140 EPSPS (ser-val-ala-thr-ala-gln/lys) was changed to gly-gly-arg-val-ser-cys/met in pMON6242. This change introduces an in-frame SphI site which allows CTP switching between ssRUBISCO and EPSPS.*** The construct pMON6242 has previously been cloned into pGEM-2 and shown to give a chimeric precursor enzyme which is transported into chloroplasts in vitro and proteolytically processed in the correct fashion.<br><br>The EcoRI/SphI fragment from pMON6242 | that the chimeric protein was transported into the stroma and proteolytically *cleaved* to a final product of ~15 kD (the ssRUBISCO has a molecular weight of 15 kD)." '835 patent, col. 31, lines 8-12 (emphasis added). |

| U.S. Patent No. 4,940,835 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| | was fused to the SphI site from wheat ssRUBISCO and cloned into plasmid pIBI to give pMON6149. In vitro transcription/translation of pMON6149 gave a single polypeptide of the predicted molecular weight for the fusion protein (~23 kD). Chloroplast import assays in vitro showed that the chimeric protein was transported into the stroma and proteolytically cleaved to a final product of ~15 kD (the ssRUBISCO has a molecular weight of 15 kD).<br><br>These results show that the EPSPS CTP alone confers sufficient information to target a heterologous protein to the chloroplast stroma."<br><br>['835 patent, col. 30, l. 45-col. 31, l. 15 (emphasis added)]<br><br>The specification distinguishes between transport and cleavage:<br><br>"The CTP leader sequence causes the polypeptide to be ***imported*** into chloroplasts, ***and*** the CTP leader sequence encoded by the plant-derived EPSPS gene is believed to be ***removed*** from the remainder of the polypeptide so that an active portion of the EPSPS polypeptide exists and functions inside the chloroplast.")<br><br>['835 patent, col. 4, ll. 28-34 (emphasis | |

| U.S. Patent No. 4,940,835 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| | added)]<br><br>Transport is required. Cleavage is not:<br><br>"...a chloroplast transit peptide which allows the polypeptide...to be ***transported*** from the cytoplasm of the plant cell into a chloroplast in the plant cell..."<br><br>['835 patent, col. 2, ll. 24-28 (emphasis added)]<br><br>"The EPSPS gene encodes a polypeptide which contains a chloroplast transit peptide (CTP), which enables the EPSPS polypeptide (or an active portion thereof) to be ***transported*** into a chloroplast inside the plant cell."<br><br>['835 patent, col. 2, l. 66-col. 3, l. 2 (emphasis added)]<br><br>"The EPSPS gene is transcribed into mRNA in a nucleus and the mRNA is translated into a precusor [sic] polypeptide (CTP/mature EPSPS) in the cytoplasm. The precusor [sic] polypeptide (or a portion thereof) is ***transported*** into the chloroplast."<br><br>['835 patent, col. 3, ll. 19-24(emphasis added)]<br><br>"EPSPS genes which encode an enzyme with a functional chloroplast transit peptide (which is ***preferably*** removed from the | |

| U.S. Patent No. 4,940,835 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
| --- | --- | --- |
| | mature EPSPS polypeptide)"<br><br>['835 patent, col. 5, ll. 41-43(emphasis added)]<br><br>[*See generally*, '835 patent, Examples] | |
| | **"chloroplast transit peptide/5-enolpyruvylshikimate-3-phosphate synthase fusion polypeptide"**<br><br>**Proposed Construction:** This phrase means a polypeptide that has at least two parts, which must include a chloroplast transit peptide (as defined above) joined to an EPSPS, where such chloroplast transit peptide need not be directly adjacent to the EPSPS.<br><br>**Claim language**<br><br>Claim 1 uses the open-ended term "comprises": "A chimeric plant gene which ***comprises*** ..."<br><br>**Specification**<br><br>The CTP/EPSPS fusion polypeptide may or may not be heterologous:<br><br>"This invention involves...a gene which encodes.5-enolpyruvylshikimate-3-phosphate synthase (EPSPS) polypeptide which, when expressed in a plant cell | **"chloroplast transit peptide/5-enolpyruvylshikimate-3-phosphate synthase fusion polypeptide"**: means a chain of amino acids consisting of a chloroplast transit peptide (as defined above) fused to an EPSPS, where the chloroplast transit peptide and EPSPS are not found together in nature.<br><br>**INTRINSIC EVIDENCE**<br><br>**Prosecution History**<br><br>Patent Applications filed on Aug. 7, 1985 and Oct. 29, 1985 ("Although it is not known whether a ***fusion peptide*** comprising (1) a CTP sequence derived from ***a heterologous protein*** such as ssRUBISCO, coupled to (2) a mature EPSPS sequence derived from a bacterial or plant cell, might confer some degree of glyphosate resistance upon a transformed cell, removal of the CTP leader sequence from the mature EPSPS sequence is preferred.") '482 appl. PH at 5012, lines 16-23; '390 appl. PH at 5107, lines 16-23 (emphasis added). |

| U.S. Patent No. 4,940,835 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| | contains a chloroplast transit peptide…"<br><br>['835 patent, col. 2, ll. 21-25]<br><br>Examples 1-7 and 10-17 are non-heterologous examples:<br><br>"The following examples further demonstrate several preferred embodiments of this invention."<br><br>['835 patent, col. 6, ll. 10-11; Examples 1-7 and 10-17]<br><br>"The EPSPS gene of the present invention encodes a CTP/EPSPS fusion polypeptide. After the CTP/EPSPS polypeptide from a gene of this invention is translated from mRNA in the cytoplasm of the transformed plant cell, it is believed to be processed in the same manner as the natural EPSPS polypeptide."<br><br>['835 patent, col. 4, ll. 23-28]<br><br>"[O]ne may find that ***non-homologous*** CTP's may function ***in particular embodiments***."<br><br>['835 patent, col. 4, ll. 43-45 (emphasis added)]<br><br>A homologous fusion is described as being preferred.<br><br>"Figure 1 depicts the major steps used in one preferred embodiment of the | <u>Specification</u><br><br>"The EPSPS gene of the present invention encodes an CTP/EPSPS ***fusion polypeptide***. After the CTP/EPSPS polypeptide from a gene of this invention is translated from mRNA in the cytoplasm of the transformed plant cell, it is believed to be processed in the same manner as the ***natural*** EPSPS polypeptide." '835 patent, col. 4, lines 23-28 (emphasis added).<br><br>The specification describes that the CTP/EPSPS fusion polypeptide has two parts. For the CTP, the specification describes:<br><br>"Suitable CTP's for use in the present invention may be obtained from various sources. Most preferably, the CTP is obtained from the endogenous EPSPS gene of the subject plant to the transformed. Alternately, one may often use a CTP from an EPSPS gene of another plant. Although there is little homology between the CTP sequences of the EPSPS gene and the ssRUBISCO gene (see, e.g., Broglie (1983), one may find that non-homologous CTPs may function in particular embodiments. Suitable CTP sequences for use in the present invention can be easily determined by assaying the chloroplast uptake of an EPSPS polypeptide comprising the CTP of interest as described in Example 18 hereinafter." '835 patent, col. 4, lines 35-48.<br><br>For the EPSPS, the specification describes: |

| U.S. Patent No. 4,940,835 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| | invention."<br><br>['835 patent, col. 2, ll. 41-42, Figure 1]<br><br>**Prosecution History**<br><br>The specification as originally filed drew a distinction between the endogenous EPSPS present in the non-transformed plant and that supplied by the transgene:<br><br>"After the EPSPS polypeptide from a gene of this invention is translated from mRNA in the cytoplasm of the transformed plant cell, it is believed to be processed in the same manner as the natural EPSPS polypeptide."<br><br>[0005012, Specification as filed on Aug. 7, 1985, at p. 10, '482 application]<br><br>Addition of the term "CTP/EPSPS fusion polypeptide" in a subsequent application did not change the nature of the distinction being drawn:<br><br>"The EPSPS gene of the present invention encodes an CTP/EPSPS fusion polypeptide. After the ***CTP/EPSPS polypeptide*** from a gene of this invention is translated from mRNA in the cytoplasm of the transformed plant cell, it is believed to be processed in the same manner as the natural EPSPS polypeptide." | "The sequence encoding a EPSPS polypeptide can be obtained from numerous sources. Suitable sources include bacteria, fungi and plants. EPSPS coding sequences from other sources can be obtained using the full-length petunia cDNA (see FIG. 4) or a suitable fragment thereof as a hybridization probe as described in Examples 1 and 14-17." '835 patent, col. 4, lines 49-55.<br><br>"The following EPSPS experiments show that the CTP can target a heterologous protein to the stroma compartment. The 72-amino-acid transit peptide of EPSPS was fused to the mature ssRUBISCO from wheat. . . . The mature ssRUBISCO cDNA fragment was fused behind the *P. hybrida* EPSPS CTP cDNA fragment. This fusion was done by joining an EcoRI/SphI fragment of pMON6242 with the wheat ssRUBISCO cDNA." '835 patent, col. 30, lines 45-58.<br><br>In addition, Examples 8-9 describe transforming plant cells with a construct where the CTP and EPSPS do not occur together in nature. |

| U.S. Patent No. 4,940,835 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| | ['835 patent, col. 4, lines 23-28 (emphasis added).<br><br>[0005357-62, Shah Declaration dated Oct. 24, 1988, at p. 1, '814 application] | |
| | **"permits the fusion polypeptide to be imported into a chloroplast of a plant cell"**<br><br>**Proposed Construction:** This phrase means the function of a chloroplast transit peptide (as defined above) and does not mean that the claim covers plant cells rather than chimeric genes as recited in the preamble.<br><br>**Specification**<br><br>"Suitable CTP's for use in the present invention may be obtained from various sources. Most preferably, the CTP is obtained from the endogenous EPSPS gene of the subject plant to the transformed. Alternately, one may often use a CTP from an EPSPS gene of another plant. Although there is little homology between the CTP sequences of the EPSPS gene and the ssRUBISCO gene (see, e.g., Broglie (1983), one may find that non-homologous CTPs may function in particular embodiments."<br><br>['835 patent, col. 4, ll. 35-44] | **"chloroplast transit peptide permits the fusion polypeptide to be imported into a chloroplast of a plant cell":** Syngenta contends that this language constitutes a necessary limitation of the claim and requires the CTP to permit the fusion polypeptide to be imported into a chloroplast of a plant cell.<br><br>**INTRINSIC EVIDENCE**<br><br>**Claim Language**<br><br>The claim expressly requires that the CTP permit the fusion polypeptide to be imported into a chloroplast of a plant cell.<br><br>**Prosecution History**<br><br>Examiner Interview Summary Record for Jan. 4, 1988 PTO interview ("The applicant agreed to use function[al] language in [the] claims.") '835 patent PH at 5311.<br><br>**Specification**<br><br>"The CTP leader sequence causes the polypeptide to be ***imported*** into chloroplasts, |

| U.S. Patent No. 4,940,835 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| | [*See generally* '835 patent, Example 18] | and the CTP leader sequence encoded by the plant-derived EPSPS gene is believed to be removed from the remainder of the polypeptide so that an active portion of the EPSPS polypeptide exists and functions inside the chloroplast." '835 patent, col. 4, lines 28-34.<br><br>"To verify that precursor EPSPS (+CTP) is taken up and processed by chloroplasts, the total translation products containing [$^{35}$S]methionine-labeled pre-EPSPS were incubated with freshly isolated, intact chloroplasts from *L. sativa*. The pre-EPSPS (+CTP) was rapidly translocated into chloroplasts and cleaved to the mature EPSPS of $M_r\alpha 48$ kDa." '835 patent, col. 29, line 67 - col. 30, line 5.<br><br>"Chloroplast import assays in vitro showed that the chimeric protein was transported into the stroma and proteolytically cleaved to a final product of ~15 kD (the ssRUBISCO has a molecular weight of 15 kD)." '835 patent, col. 31, lines 8-12.<br><br>In addition, Examples 2-13 show transforming dicot plant cells or the regeneration of dicot plants from the transformed plant cells with a gene that contains a CTP such that the fusion polypeptide is imported into the chloroplast and provides glyphosate resistance. |

| U.S. Patent No. 4,940,835 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
| --- | --- | --- |
| (c) a 3' non-translated region which encodes a polyadenylation signal which functions in plant cells to cause the addition of polyadenylate nucleotides to the 3' end of the RNA; | **"which functions in plant cells"**<br><br>**Proposed Construction:** This phrase describes a characteristic of the 3' region and does not mean that the claim covers plant cells rather than chimeric genes as recited in the preamble.<br><br>See intrinsic evidence cited in support of Plaintiffs' construction of "which functions in plant cells" in part (a) of claim 1, above. | **"which functions in plant cells to cause the addition of polyadenylate nucleotides to the 3' end of the RNA":** Syngenta contends that this language constitutes a necessary limitation of the claim and requires the 3' non-translated region to encode a polyadenylation signal which functions in plant cells to cause the addition of polyadenylate nucleotides to the 3' end of the mRNA.<br><br>**INTRINSIC EVIDENCE**<br><br>**Claim Language**<br><br>The claim language expressly requires that the 3' non-translated region must encode a polyadenylation signal which functions in plant cells to cause the addition of polyadenylate nucleotides to the 3' end of the mRNA.<br><br>**Specification**<br><br>"The 3' non-translated region contains a polyadenylation signal which functions in plants to cause the addition of polyadenylate nucleotides to the 3' end of the EPSPS mRNA." '835 patent, col. 5, lines 13-16.<br><br>**Prosecution History**<br><br>Examiner Interview Summary Record for Jan. 4, 1988 PTO interview ("The applicant agreed to use function[al] language in [the] claims.") '835 patent PH at 5311. |

| | | |
|---|---|---|
| the promoter being heterologous with respect to the coding sequence and adapted to cause sufficient expression of the fusion polypeptide to enhance the glyphosate resistance of a plant cell transformed with the gene. | **"adapted to cause sufficient expression of the fusion polypeptide to enhance the glyphosate resistance of a plant cell transformed with the gene"**<br><br>**Proposed Construction:** This phrase describes a characteristic of the promoter and does not mean that the claim covers plant cells rather than chimeric genes as recited in the preamble.<br><br>**<u>Specification</u>**<br><br>"[t]he particular promoter selected should be capable of causing sufficient expression to result in the production of an effective amount of EPSPS polypeptide to render the plant cells and plants regenerated therefrom substantially resistant to glyphosate."<br><br>['835 patent, col. 3, ll. 33-38] | **"the promoter being . . . adapted to cause sufficient expression of the fusion polypeptide to enhance glyphosate resistance of a plant cell transformed with the gene":** Syngenta contends that this language constitutes a necessary limitation of the claim and requires that the promoter be adapted to cause sufficient expression of the fusion polypeptide to enhance the glyphosate resistance of a plant cell transformed with the gene. The parties agree that the term "transformed" means that the chimeric plant gene is stably integrated into the genome of the plant cell.<br><br>**INTRINSIC EVIDENCE**<br><br>**<u>Claim Language</u>**<br><br>The claim language expressly requires that the promoter be adapted to cause sufficient expression of the fusion polypeptide to enhance the glyphosate resistance of a plant cell transformed with the gene.<br><br>**<u>Specification</u>**<br><br>"The EPSPS gene of the present invention is inserted into the genome of a plant by any suitable method." '835 patent, col. 5, lines 24-25.<br><br>"This confirms that the CaMV/EPSPS gene conferred glyphosate resistance upon the transformed cells." '835 patent, Ex. 2, col. 16, lines 61-63.<br><br>"The cells transformed with the CaMV/EPSPS |

| | | |
|---|---|---|
| | | gene created substantial amounts of callus tissue on 0.5 mM glyphosate, whereas the cells which did not contain that gene did not create any detectable callus tissue." '835 patent, Ex. 3, col. 17, lines 1-5.<br><br>"This confirms that the CaMV 35S/EPSPS/NOS gene conferred glyphosate resistance on the soybean cells." '835 patent, Ex. 4, col. 19, lines 58-60.<br><br>"Transformation of tobacco cells using pMON542 (construct with CTP) as previously described in Example 3 resulted in glyphosate resistance." '835 patent, Ex. 8, col. 23, lines 40-42.<br><br>"As indicated in Table 2, the control plants were killed when sprayed with 0.4 pounds/acre of glyphosate. In contrast, the petunia plants which were transformed were healthy and viable after spraying with 0.8 pounds/acre. The transformed plants are more resistant to glyphosate exposure than the non-transformed control plants." '835 patent, Ex. 11, col. 25, lines 34-40.<br><br>"After 10 days the control tobacco leaves were completely inhibited and showed no signs of callus growth; the leaves from plants transformed with the chimeric EPSPS that the chimeric petunia EPSPS gene confers glyphosate resistance to tobacco plants." '835 patent, Ex. 13, col. 26, lines 16-20.<br><br>In addition, Examples 2-13 show the transformation of a dicot plant cell or the regeneration of a dicot plant from a |

| | | |
|---|---|---|
| | | transformed plant cell with a promoter-CTP/EPSPS gene such that the cell or plant has enhanced glyphosate resistance.<br><br>**<u>Prosecution History</u>**<br><br>Examiner Interview Summary Record for Jan. 4, 1988 PTO interview ("The applicant agreed to use function[al] language in [the] claims.") '835 patent PH at 5311. |
| | **"enhance the glyphosate resistance of a plant cell"**<br><br>**Proposed Construction:** This phrase means that the plant cell has more resistance to glyphosate, when applied to plant material, than the same plant cell that does not have the transgene under the same conditions of application and plant material.<br><br>**<u>Specification</u>**<br><br>[*See generally*, '835 patent, Examples, *e.g.*, Table 2, col. 25, ll. 34-41, and Examples 2-13] | **"enhance the glyphosate resistance of a plant cell":** means the plant cell will survive application of glyphosate at a concentration sufficient to select a transformed plant cell from a non-transformed plant cell.<br><br>**INTRINSIC EVIDENCE**<br><br>**<u>Specification</u>**<br><br>"As used herein, a EPSPS gene 'confers a substantial degree of glyphosate resistance upon a plant cell' if it allows a selectable fraction of a culture of transformed plant cells to survive a concentration of glyphosate which kills essentially all untransformed cells from the same type of plant under the same conditions." '835 patent, col. 5, lines 61-66.<br><br>"Within 10 days after transfer to the media containing glyphosate, actively growing callus tissue appeared on the periphry [*sic*, periphery] of all disks on the control plate containing no glyphosate. On media containing 0.1 mM |

| | | |
|---|---|---|
| | | glyphosate, there was little detectable difference between the control disks and the transformed tissue. At 0.25 mM glyphosate, there was very little growth of callus from control disks, while substantial growth of transformed tissue occurred. At 0.5 mM glyphosate, there was no callus growth from the control disks, while a significant number of calli grew from the transformed disks. This confirms that the CaMV/EPSPS gene conferred glyphosate resistance upon the transformed cells." '835 patent, Ex. 2, col. 16, lines 51-63.<br><br>In addition, in Examples 2-13, the inventors select either dicot plant cells or plants on the basis of glyphosate resistance. |
| | No construction is necessary. | **"transformed"**: means the stable integration of the chimeric plant gene in a plant cell's genome. |
| 5. A chimeric gene of claim 1 in which the coding sequence encodes a mutant 5-enolpyruvylshikimate-3-phosphate synthase (EPSPS). | No construction is necessary. | No construction is necessary. |
| 6. A chimeric gene of claim 1 in which the EPSPS coding sequence encodes an EPSPS from an organism selected from the group consisting of bacteria, fungi and plants. | No construction is necessary. | No construction is necessary. |

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

**CERTIFICATE OF SERVICE**

I, David E. Moore, hereby certify that on January 11, 2006, the attached document was hand-delivered to the following persons and was electronically filed with the Clerk of the Court using CM/ECF which will send notification of such filing(s) to the following and the document is available for viewing and downloading from CM/ECF:

John W. Shaw
Karen E. Keller
Young Conaway Stargatt & Taylor, L.L.P.
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801

I hereby certify that on January 11, 2006, I have Federal Expressed the foregoing document(s) to the following non-registered participants:

Richard F. Schwed
Stephen Fishbein
Shearman & Sterling LLP
599 Lexington Avenue
New York, NY 10022-6069

Michael J. Flibbert
Don O. Burley
Howard W. Levine
Finnegan, Henderson, Farabow, Garrett & Dunner, L.L.P.
901 New York Ave., NW
Washington, DC 20001-4413

Richard L. Horwitz
David E. Moore
Potter Anderson & Corroon LLP
Hercules Plaza – Sixth Floor
1313 North Market Street
Wilmington, DE 19801
(302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

# EXHIBIT 13

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

MONSANTO COMPANY and
MONSANTO TECHNOLOGY LLC,

Plaintiffs,

v.

SYNGENTA SEEDS, INC.
SYNGENTA BIOTECHNOLOGY, INC., et al.,

Defendants.

---

DEKALB GENETICS CORPORATION,

Plaintiff,

V.

SYNGENTA SEEDS, INC.,
SYNGENTA BIOTECHNOLOGY, INC., et al.

Defendants.

C. A. No. 04-305 SLR
(Lead Case)

**JOINT CLAIM CONSTRUCTION SUBMISSION**

Pursuant to the Court's instruction at the March 9, 2006 hearing in Wilmington, Delaware, the parties have met and conferred and submit the following proposed constructions of the asserted claims of United States Patent Nos. 4,940,835 ("the '835 patent"), 5,538,880 ("the '880 patent") and 6,013,863 ("the '863 patent"):

| U.S. Patent No. 5,538,880 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| 1. A process for producing a fertile transgenic *Zea mays* plant comprising the steps of (i) bombarding intact regenerable *Zea mays* cells with DNA-coated microprojectiles, (ii) identifying or selecting a population of transformed cells, and (iii) regenerating a fertile transgenic plant therefrom, wherein said DNA is transmitted through a complete sexual cycle of said transgenic plant to its progeny, and imparts herbicide resistance thereto. | A process that includes three steps for producing a fertile corn plant in which DNA is introduced through genetic engineering.<br><br>First, corn cells are bombarded with microscopic beads (microprojectiles) that are coated with the DNA. The bombarded corn cells are capable of being regenerated (i.e., developing) into fertile corn plants.<br><br>Second, bombarded corn cells that contain the DNA are selected out of all of the bombarded cells by applying a chemical agent (such as an antibiotic or commercial herbicide) that is capable of killing plant cells. The corn cells that contain the DNA are protected from the chemical agent by a protein produced by a selectable marker gene in the DNA, while the corn cells that do not contain the DNA are killed.<br><br>Third, a fertile transgenic corn plant (called an R0 plant) is regenerated from the selected cells containing the DNA. The resulting fertile transgenic corn plant is capable of passing the DNA to the next (R1) generation and succeeding generations of corn plants.<br><br>The fertile transgenic corn plant is | A process that includes three steps for producing a fertile corn plant in which DNA is introduced through genetic engineering.<br><br>First, corn cells are bombarded with microscopic beads (microprojectiles) that are coated with the DNA. The bombarded corn cells are capable of being regenerated (i.e., growing) into fertile corn plants.<br><br>Second, bombarded corn cells that contain the DNA are selected out of all of the bombarded cells.<br><br>Third, a fertile transgenic corn plant (called an R0 plant) is regenerated from the selected cells containing the DNA. The resulting fertile transgenic corn plant is capable of passing the DNA to the next (R1) generation of corn plants.<br><br>The fertile transgenic corn plant is |

| U.S. Patent No. 5,538,880 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| | herbicide resistant, meaning that the plant can better withstand the harmful effects of a chemical agent (such as an antibiotic or commercial herbicide) that is capable of killing plant cells than a regular corn plant. | herbicide-resistant, meaning that the plant will not be significantly injured when a herbicide is applied to it. A herbicide is a chemical agent used to kill or inhibit the growth of weeds. |
| 4. A process comprising obtaining progeny from a fertile transgenic plant obtained by the process of claim 1 which comprise said DNA. | A process that includes obtaining an R1 or succeeding generation corn plant having the fertile transgenic corn plant produced by the process of claim 1 somewhere in its ancestry. The resulting R1 or succeeding generation corn plant contains the DNA that was introduced by bombardment. | A process that involves practicing the three steps of claim 1 and a fourth step of using the resulting R0 corn plant to obtain the succeeding R1 generation corn plants containing the DNA that was introduced by bombardment. |
| 5. The process of claim 4 wherein said progeny are obtained by crossing said fertile transgenic plant with an inbred line. | During the process of obtaining the R1 and succeeding generation corn plant recited in claim 4, the R0 fertile transgenic corn plant was crossed with a corn plant from an inbred corn line. | A process that involves practicing all of the steps of claim 4 in which the R1 generation corn plants are obtained by crossing the R0 fertile transgenic corn plant with a corn plant from an inbred corn line. |
| 6. The process of claim 4 comprising obtaining seed from said progeny and obtaining further progeny plants comprising said DNA from said seed. | The process of claim 4 plus at least the additional steps of obtaining seed from the R1 or succeeding generation corn plant produced by the process of claim 4 and then growing an R2 or succeeding generation corn plant from that seed. The R2 or succeeding generation corn plant contains the DNA that was introduced by | A process that involves practicing all of the steps of claim 4 plus at least the additional steps of obtaining seed from the R1 generation corn plant produced by the process of claim 4 and then growing an R2 generation corn plant from that seed. The R2 generation corn plant contains the DNA that was introduced by bombardment. |

| U.S. Patent No. 5,538,880 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| | bombardment. | |
| 7. The process of claim 5 wherein the progeny obtained are crossed back to the inbred line, to obtain further progeny which comprise said DNA. | The process of claim 5 plus at least the additional step of crossing the R1 or succeeding generation corn plant produced by the process of claim 5 with a corn plant from the inbred corn line of claim 5 to obtain an R2 or succeeding generation corn plant. The R2 or succeeding generation corn plant contains the DNA that was introduced by bombardment. | A process that involves practicing all of the steps of claim 5 plus at least the additional step of crossing the R1 generation corn plant produced by the process of claim 5 with a corn plant from the inbred corn line of claim 5 to obtain an R2 generation corn plant. The R2 generation corn plant contains the DNA that was introduced by bombardment. |
| 8. The process of claim 6 wherein seeds are obtained from said further progeny plants and plants comprising said DNA are recovered from said seed. | The process of claim 6 plus at least the additional steps of obtaining seed from the R2 or succeeding generation corn plant produced by the process of claim 6 and then growing an R3 or succeeding generation corn plant from that seed. The R3 or succeeding generation corn plant contains the DNA that was introduced by bombardment. | A process that involves practicing all of the steps of claim 6 plus at least the additional steps of obtaining seed from the R2 generation corn plant produced by the process of claim 6 and then growing an R3 generation corn plant from that seed. The R3 generation corn plant contains the DNA that was introduced by bombardment. |
| 9. The process of claim 7 wherein said further progeny are crossed back to the inbred line to obtain progeny which comprise said DNA. | The process of claim 7 plus at least the additional step of crossing the R2 or succeeding generation corn plant produced by the process of claim 7 with a corn plant from the inbred corn line of claim 7 to obtain an R3 or succeeding generation corn plant. The R3 or succeeding generation corn plant contains the DNA that was | A process that involves practicing all of the steps of claim 7 plus at least the additional step of crossing the R2 generation corn plant produced by the process of claim 7 with a corn plant from the inbred corn line of claim 7 to obtain an R3 generation corn plant. The R3 generation corn plant contains the DNA |

| U.S. Patent No. 5,538,880 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
| --- | --- | --- |
| | introduced by bombardment. | that was introduced by bombardment. |

| U.S. Patent No. 6,013,863 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| 1. A process for producing a fertile transgenic *Zea mays* plant comprising the steps of (i) bombarding intact regenerable *Zea mays* cells with DNA-coated microprojectiles, wherein said DNA comprises at least a selectable marker gene; (ii) selecting a population of transformed cells expressing the selectable marker gene; and (iii) regenerating a fertile transgenic plant therefrom, wherein said DNA is expressed so as to impart glyphosate resistance to said transgenic plant and is transmitted through a normal sexual cycle of said transgenic plant to progeny plants. | A process that includes three steps for producing a fertile corn plant in which DNA is introduced through genetic engineering.<br><br>First, corn cells are bombarded with microscopic beads (microprojectiles) that are coated with the DNA, which includes at least a selectable marker gene. The bombarded corn cells are capable of being regenerated (i.e., developing) into fertile corn plants.<br><br>Second, bombarded corn cells that contain the DNA are selected out of all of the bombarded cells by applying a chemical agent (such as an antibiotic or commercial herbicide) that is capable of killing plant cells. The corn cells that contain the DNA are protected from the chemical agent by a protein produced by the selectable marker gene, while the corn cells that do not contain the DNA are killed.<br><br>Third, a fertile transgenic corn plant (called an R0 plant) is regenerated from the selected cells containing the DNA. The resulting fertile transgenic corn plant is capable of passing the DNA to the next (R1) generation and succeeding | A process that includes three steps for producing a fertile corn plant in which DNA is introduced through genetic engineering.<br><br>First, corn cells are bombarded with microscopic beads (microprojectiles) that are coated with the DNA, which includes at least a selectable marker gene. The bombarded corn cells are capable of being regenerated (i.e., growing) into fertile corn plants.<br><br>Second, bombarded corn cells that contain the DNA are selected out of all of the bombarded cells.<br><br>Third, a fertile transgenic corn plant (called an R0 plant) is regenerated from the selected cells containing the DNA. The resulting fertile transgenic corn plant is capable of passing the DNA to the next (R1) generation of corn plants. |

| U.S. Patent No. 6,013,863 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| | generations of corn plants.<br><br>The fertile transgenic corn plant is glyphosate resistant, meaning that the plant can better withstand the harmful effects of glyphosate than a regular corn plant. | The fertile transgenic corn plant is glyphosate-resistant, meaning that the plant will not be significantly injured when glyphosate is applied to it. |
| 5. The process of claim 1 further comprising obtaining transgenic glyphosate resistant progeny plants of subsequent generations from said fertile transgenic plant. | The process of claim 1 plus at least the additional step of obtaining an R1 or succeeding generation corn plant from a corn plant produced by the process of claim 1. | A process that involves practicing the three steps of claim 1 plus at least the additional step of obtaining glyphosate-resistant R1 generation corn plants from the R0 corn plant produced by the process of claim 1. |
| 6. The process of claim 5 further comprising obtaining seed from one of said progeny plants. | The process of claim 5 plus at least the additional step of obtaining seed from the R1 or succeeding generation corn plant produced by the process of claim 5. | A process that involves practicing all of the steps of claim 5 plus at least the additional step of obtaining seed from one of the R1 generation corn plants produced by the process of claim 5. |

| U.S. Patent No. 4,490,835 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| 1. A chimeric plant gene which comprises:<br><br>(a) a promoter sequence which functions in plant cells;<br><br>(b) a coding sequence which causes the production of RNA, encoding a chloroplast transit peptide/5-enolpyruvylshikimate-3-phosphate synthase fusion polypeptide, which chloroplast transit peptide permits the fusion polypeptide to be imported into a chloroplast of a plant cell; and | A "gene" is a portion of DNA that produces a polypeptide (also known as a "protein"), and a "chimeric" gene includes DNA sequences from two or more different genes. The chimeric plant gene of claim 1 is made of at least three elements. | The "chimeric plant gene" of claim 1 includes three elements that must function (work) in "plant cells" containing the gene. The term "plant cells" means all types of plant cells, including both monocots (such as corn) and dicots (such as petunia). A "gene" is a portion of DNA that produces a polypeptide (also known as a "protein"), and a "chimeric" gene includes DNA sequences from two or more different genes. |
| (c) a 3' non-translated region which encodes a polyadenylation signal which functions in plant cells to cause the addition of polyadenylate nucleotides to the 3' end of the RNA;<br><br>the promoter being heterologous with respect to the coding sequence and adapted to cause sufficient expression of the fusion polypeptide to enhance the glyphosate resistance of a plant cell transformed with the gene. | The first element (a) is a promoter sequence, which is a DNA sequence that tells the cell to start a process that results in production of the CTP/EPSPS fusion polypeptide (defined below). The promoter sequence comes from a different gene than the coding sequence element (b) (that is, it is heterologous to the coding sequence element (b)) and it functions in plant cells.<br><br>The second element (b) is a DNA coding sequence that causes the production of a chloroplast transit peptide ("CTP") / 5-enolpyruvylshikimate-3-phosphate synthase ("EPSPS") fusion polypeptide ("CTP/EPSPS fusion polypeptide"). The CTP/EPSPS fusion polypeptide has at least | The first element (a) of claim 1 is a promoter sequence, which is a DNA sequence that tells the cell to start a process that results in production of the CTP/EPSPS fusion polypeptide (defined below). The promoter sequence comes from a different gene than both parts of the CTP/EPSPS fusion polypeptide, and it functions in all types of plant cells.<br><br>The second element (b) is a DNA coding sequence that causes the production of a chloroplast transit peptide ("CTP") / 5-enolpyruvylshikimate-3-phosphate synthase ("EPSPS") fusion polypeptide ("CTP/EPSPS fusion polypeptide"). The CTP/EPSPS fusion polypeptide has at least |

| U.S. Patent No. 4,490,835 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| | two parts, a CTP part and an EPSPS part, which are joined together, but need not be directly adjacent to each other. A CTP is a series of amino acids that causes the transport of a polypeptide into a chloroplast, a sub-compartment in the plant cell that is the site of photosynthesis. EPSPS is an enzyme that is involved in the production of certain amino acids for the growth of plants and bacteria. The EPSPS polypeptide gives the plant cell enhanced glyphosate resistance. | two parts, a CTP part and an EPSPS part, which are joined together. The CTP and EPSPS parts come from different sources and are not found together in nature. A CTP is a series of amino acids that naturally occurs in plants and causes the transport of the EPSPS protein into a chloroplast, a compartment in the plant cell. After the CTP transports the EPSPS protein to the chloroplast, the CTP is removed from the CTP/EPSPS fusion polypeptide. The EPSPS protein gives the plant cell enhanced glyphosate resistance. |
| | The third element (c) is a 3' non-translated region, which is a DNA sequence at the end of the chimeric plant gene that functions in plant cells to create a polyadenylation signal which allows the cell to produce the CTP/EPSPS fusion polypeptide. | The third element (c) is a DNA sequence at the end of the plant gene that functions in plant cells to assist in the production of the CTP/EPSPS fusion polypeptide. |
| | The promoter sequence causes sufficient production of the CTP/EPSPS fusion polypeptide such that the plant cell containing the chimeric gene can withstand the harmful effects of glyphosate better than a regular plant cell can. | The promoter sequence must cause sufficient production of the CTP/EPSPS fusion polypeptide to enhance the glyphosate resistance of plant cells transformed with the gene. A plant cell is "transformed" when a gene is stably incorporated into its DNA. The transformed plant cell has enhanced glyphosate resistance if it can grow in the |

| U.S. Patent No. 4,490,835 Claims | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| | | presence of glyphosate at concentrations that kill untransformed cells. |
| 5. A chimeric gene of claim 1 in which the coding sequence encodes a mutant 5-enolpyruvylshikimate-3-phosphate synthase (EPSPS). | The coding sequence in the chimeric plant gene of claim 1 causes the production of an EPSPS polypeptide that is altered from the way it exists in nature. | The CTP/EPSPS fusion polypeptide in the plant gene of claim 1 causes the production of an EPSPS protein that has been altered from the way it normally exists in nature. |
| 6. A chimeric gene of claim 1 in which the EPSPS coding sequence encodes an EPSPS from an organism selected from the group consisting of bacteria, fungi and plants. | The EPSPS coding sequence in the chimeric plant gene of claim 1 produces a bacterial, fungal and/or plant EPSPS. | The EPSPS protein in the plant gene of claim 1 is obtained from a bacteria, fungus and/or plant. |

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

By: */s/ David E. Moore*
Richard L. Horwitz (#2246)
David E. Moore (#3983)
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, Delaware 19801
Telephone (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Plaintiffs*

OF COUNSEL:

Susan K. Knoll
Thomas A. Miller
Melinda Patterson
Stephen E. Edwards
Steven G. Spears
HOWREY LLP
1111 Louisiana, 25th Floor
Houston, Texas 77002
Telephone (713) 787-1400

Dated: March 20, 2006

YOUNG CONAWAY STARGATT & TAYLOR, LLP

By: */s/ John W. Shaw*
John W. Shaw (#3362)
Adam W. Poff (#3990)
The Brandywine Building
1000 West Street
Wilmington, Delaware 19899-0391
Telephone (302) 571-6689

*Attorneys for Defendants*

OF COUNSEL:

Michael J. Flibbert
Howard W. Levine
Sanya Sukduang
FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP
901 New York Avenue, N.W.
Washington, D.C. 20001-4413
Telephone (202) 408-4000

Dated: March 20, 2006

724419

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

**CERTIFICATE OF SERVICE**

I, David E. Moore, hereby certify that on March 20, 2006, the attached document was hand delivered on the following persons and was electronically filed with the Clerk of the Court using CM/ECF which will send notification of such filing(s) to the following and the document is available for viewing and downloading from CM/ECF:

John W. Shaw
Young Conaway Stargatt & Taylor, L.L.P.
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801

I hereby certify that on March 20, 2006, I have Electronically Mailed the foregoing document(s) to the following non-registered participants:

Richard F. Schwed
Thomas A. McGrath III
Shearman & Sterling LLP
599 Lexington Avenue
New York, NY 10022-6069
rschwed@shearman.com

Michael J. Flibbert
Don O. Burley
Howard W. Levine
Finnegan, Henderson, Farabow, Garrett & Dunner, L.L.P.
901 New York Ave., NW
Washington, DC 20001-4413
michael.flibbert@finnegan.com
don.burley@finnegan.com
howard.levine@finnegan.com

*/s/ David E. Moore*
Richard L. Horwitz
David E. Moore
Potter Anderson & Corroon LLP
Hercules Plaza – Sixth Floor
1313 North Market Street
Wilmington, DE 19801
(302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

700765

# EXHIBIT 14

IN THE UNITED STATES DISTRICT COURT
FOR NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

---------------------------------x

DEKALB GENETICS CORPORATION,

Plaintiff,

v.

CIBA-GEIGY CORPORATION,

and

MYCOGEN CORPORATION, including its operating subsidiaries AGRIGENETICS, INC. (d.b.a. MYCOGEN SEEDS) and MYCOGEN PLANT SCIENCE, INC.,

Defendants.

---------------------------------x

Civil Action Nos. 96-C50114
96-C50241

District Judge Philip G. Reinhard

CIBA'S INITIAL MARKMAN HEARING MEMORANDUM

Dimitrios T. Drivas
William P. DiSalvatore
WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036

David C. Van Dyke
CASSIDAY SCHADE & GLOOR
20 North Wacker Drive
Suite 1040
Chicago, Illinois 60606-1289

Attorneys for Defendant
Ciba-Geigy Corporation

RECEIVED
A.W. & D.
AUSTIN
APR 20 1999

TABLE OF CONTENTS

Page

I. INTRODUCTION ........ 1

II. SUMMARY OF THE ARGUMENT ........ 3

III. BACKGROUND ........ 5

A. THE CORN SEED INDUSTRY ........ 5

1. The Industry Has Been Revolutionized By Insect Resistant *Bt* Corn ........ 7

B. CORN TRANSFORMATION ........ 8

1. The Early Attempts to Transform Corn ........ 8
2. The Use of Markers In Plant Transformation ........ 9
3. Fertile Corn Had Been Successfully Regenerated From Culture By The Mid-1980's ........ 12
4. The Prior Art on Direct Gene Transfer ........ 13
5. The Gene Gun Breakthrough ........ 14
6. Regenerable Cultures As Gene Gun Targets ........ 16
7. Simultaneous Independent Invention ........ 17
8. The Development of Insecticidal *Bt* Corn ........ 18
9. The Patents-in-Suit and Their Relationships ........ 20
10. DeKalb and Not the Patent Office Determined Who Was the First To Invent as Between Adams et al. and Lundquist et al. ........ 21

C. THE PROSECUTION OF THE PATENTS-IN-SUIT ........ 23

1. The Lundquist et al. Prosecution ........ 24

a. The 467,983 application (abandoned) ........ 24
b. The 974,379 (FWC) Application Which Issued As the '877 Patent ........ 29
c. The 249,458 application Which Issued As The '880 Patent ........ 36
d. The 508,045 Application Which Issued As The '956 Patent ........ 39

2. The Adams et al. Work and Their File Histories ........ 56

a. The Original Filing - Ser. No. 07/392,176 - Abandoned and Not Claimed for Priority ........ 56
b. The First Priority Application Ser. No. 07/513,298 (Abandoned) ........ 57
c. Serial No. 07/565,844 Which Issued as The '318 Patent ........ 58

Page

d. The 233,067 Application Which Issued as The '520 Patent.........62

IV. APPLICABLE LAW FOR CLAIM CONSTRUCTION.........66

A. PRINCIPALS OF CLAIM CONSTRUCTION.........66

B. EVIDENCE TO BE CONSIDERED IN CLAIM CONSTRUCTION.........66

1. Intrinsic Evidence.........66
2. Intrinsic Evidence and the Narrowing of Claims.........67
3. Extrinsic Evidence.........68

V. ARGUMENT.........69

A. U.S. Patent No. 5,484,956.........69

1. "containing heterologous DNA encoding *Bacillus thuringiensis* endotoxin, wherein said DNA is expressed so that the plant exhibits resistance to an insect".........70
2. "wherein said DNA is transmitted through a complete normal sexual cycle of the R0 plant to the R1 generation".........74
3. "wherein said DNA is introduced into said plant by microprojectile bombardment of *Zea mays* callus cells".........75
4. "An R1 transgenic *Zea mays* plant derived from the plant of claim 1" (Claim 5).........77
5. "so that the R1 plant exhibits said phenotypic characteristics" (Claims 5 and 6).........77
6. "progeny".........78

B. U.S. Patent No. 5,538,877.........82

1. "establishing a regenerable embryogenic callus culture from a *Zea mays* plant to be transformed".........83
2. "identifying or selecting a transformed cell line".........85
3. "wherein said DNA is transmitted through a complete sexual cycle of said transgenic plant to its progeny".........86
4. "imparts herbicide resistance thereto".........87
5. "said DNA comprises a selectable marker gene or reporter gene".........90
6. "said selectable marker gene imparts herbicide resistance to said fertile transgenic Zea mays plants".........91
7. "imparts insect resistance thereto".........91

C. U.S. Patent No. 5,538,880.........91

1. "bombarding intact regenerable *Zea mays* cells with DNA-coated microprojectiles".........93
2. "identifying or selecting a population of transformed cells".........95

Page

3. "cells are derived from immature embryos" ..... 96
4. "obtaining progeny from a fertile transgenic plant obtained by the process of claim 1" ..... 97
5. "progeny" ..... 97

D. U.S. Patent No. 5,489,520 ..... 98

1. "establishing a regenerable culture from a *Zea mays* plant to be transformed" ..... 100
2. "gene encoding for phosphinothricin acetyl transferase" ..... 101
3. "identifying or selecting a transformed cell line" ..... 102
4. "progeny" ..... 103
5. "wherein said gene is chromosomally integrated" ..... 104
6. "obtaining progeny" ..... 105
7. "preparing seed" ..... 105

VI. CONCLUSION ..... 106

4. "obtaining progeny from a fertile transgenic plant obtained by the process of claim 1"

Claims 4 and 13 expressly contain a step of obtaining progeny from the plant produced in claim 1. The "obtaining progeny" step must be interpreted as making a sexual cross of the plant made by claim 1. This further supports the interpretation of clause (iii) of claim 1 and 10 and therefore clause (iv) of claims 1 and 6 of the '877 patent as not being directed to a sexual crossing step under the doctrine of claim differentiation. Clause (iii) refers merely to a characterization of the capabilities of the transformed DNA while the subject term is an actual process step.

5. "progeny"

The term "progeny" as used in the claims of the '880 patent has the conventional meaning as discussed above for the '877 patent, the immediate offspring of a particular cross. The claims are in conformity with this definition as they recite that the DNA is transmitted through "a," i.e., one, sexual cycle to progeny. This means that the DNA is transmitted to the immediate offspring (R1 generation) of a particular cross (with the R0 generation plant of claim 1 or 10).

If this were not the case then numerous claims would be substantially overlapping, and thus superfluous. If progeny were read to mean all generations, the claims 5 and 7; claims 14 and 16; claims 7 and 9; claims 16 and 18; claims 6 and 8; and claims 15 and 17 would all cover the same generations of transgenic corn.

The meaning of the term "progeny" as the immediate offspring of a sexual cross is strongly supported by the explanation DeKalb provided on the scope of claims 50-55 added in a supplemental amendment dated March 28, 1995 (U.S. Application Serial No. 08/249,458). These claims ultimately issued as claims 4-9 of the '880 patent. The Examiner rejected the claims in a Final Rejection dated April 26, 1995 as indefinite and duplicative. (SM 1052). In its May 31, 1995, Response Under 37 C.F.R. § 1.116 - Expedited Examining Procedure - Group 1803,

DeKalb explained that the claims were not duplicative but distinct. DeKalb relied on the conventional meaning of "progeny" used in the specification as the offspring of a sexual cross. (SM 1055). (See discussion in the related '956 and '880 patents). DeKalb specifically identified each use in the claims of the term progeny to the specific sexual cross generation, e.g., R2, R3. (SM 1055). Claim 6 would be rendered totally incomprehensible by any other definition of the term. DeKalb committed to a particular meaning in the specification or during prosecution, so that meaning is then binding here. CVI/Beta, 112 F.3d at 1158-59.

The term "obtaining seed from said progeny" in claims 6 and 8 is also ambiguous. It would literally mean collecting seed from the plant. This would not be possible unless the progeny plant of the preceding claim were sexually crossed and pollinated. Thus an additional sexual crossing step must be implied in these process claims with each instance of the term "progeny" referring specifically to the offspring of each such preceding sexual cross.

D. U.S. Patent No. 5,489,520

DeKalb and its counsel determined that the Adams et al. inventors were not the first to invent a method of making herbicide resistant corn by microprojectile bombardment and the claims reflect that determination. The claims do not call for conferring herbicide resistance and are limited to a selectable marker gene encoding phosphinothricin acetyl transferase. Otherwise, the claim interpretation issues here are largely the same as those for the '877 patent whose claim format and terms were the basis of the claims here.

The asserted claims of the '520 patent are set out below with the disputed claim terms underlined:

1. A process for producing a fertile transgenic *Zea mays* plant comprising the steps of

(i) establishing a regenerable culture from a Zea mays plant to be transformed,

## VI. CONCLUSION

For all the foregoing reasons, Ciba requests that the Special Master recommend and the Court accept and adopt the construction of the claims as set forth above.

Respectfully submitted,

Dated: April 19, 1999

Dimitrios Drivas

Dimitrios T. Drivas
William P. DiSalvatore
WHITE & CASE LLP
1155 Avenue of the Americas
New York, NY 10036
Telephone: (212) 819-8200

David C. Van Dyke
CASSIDAY, SCHADE & GLOOR
20 North Wacker Drive, Suite 1040
Chicago, IL 60606-3100
(312) 444-2451

Attorneys for Defendant
Ciba-Geigy Corporation

CERTIFICATE OF SERVICE

The undersigned hereby certifies that true and correct copies of CIBA'S INITIAL

MARKMAN HEARING MEMORANDUM were served on April 19, 1999, as follows:

BY FEDEX

Robert L. Harmon, Esq.
174 Columbus Drive
Islamorada, Florida 33036

Charles H. DeLaGarza
ARNOLD, WHITE & DURKEE
4850 U.S. Bank Place
601 Second Avenue South
Minneapolis, MN 55402-4320

David L. Parker, Esq.
ARNOLD, WHITE & DURKEE
1900 One American Center
600 Congress Avenue
Austin, TX 78701-3248

Allan W. Jansen, Esq.
LYON & LYON
3200 Park Center Drive, Suite 1200
Costa Mesa, California 92626

Daniel J. Thomasch, Esq.
ORRICK, HERRINGTON & SUTCLIFFE,
LLP
666 Fifth Avenue
New York, New York 10103

Craig Diviney, Esq.
DORSEY & WHITNEY, LLP
220 S. Sixth Street
Minneapolis, Minnesota 55402

Sharon R. Barner, Esq.
FOLEY & LARDNER
Suite 330, One IBM Plaza
330 North Wabash Avenue
Chicago, IL 60611-3608

John J. Holevas, Esq.
WILLIAMS AND McCARTHY
321 West State Street
Rockford, IL 61101

# EXHIBIT 15

Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Philip G. Reinhard | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 96 C 50112 | DATE | 9/17/1999 |
| CASE TITLE | DeKalb Genetics Corp. vs. Pioneer Hi-Bred Int'l Inc. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due ______.

(3) ☐ Answer brief to motion due______. Reply to answer brief due______.

(4) ☐ Ruling/Hearing on ______ set for ______ at ______.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on ______ set for ______ at ______.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on ______ set for ______ at ______.

(7) ☐ Trial[set for/re-set for] on ______ at ______.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to ______ at ______.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] The court hereby adopts all of the findings in the special master's Report and Recommendation as the findings of the court. Pioneer's request for an oral hearing on the issue of claim construction is denied.

(11) ■ [For further detail see order on the reverse side of the original minute order.]

| | |
|---|---|
| ☐ | No notices required, advised in open court. |
| ☐ | No notices required. |
| ☐ | Notices mailed by judge's staff. |
| ☐ | Notified counsel by telephone. |
| ☐ | Docketing to mail notices. |
| ☐ | Mail AO 450 form. |
| ☐ | Copy to judge/magistrate judge. |

| SW | courtroom deputy's initials | Date/time received in central Clerk's Office |
|---|---|---|

number of notices

date docketed

docketing deputy initials

date mailed notice

mailing deputy initials

Document Number

(Reserved for use by the Court)

## ORDER

Seven patent infringement suits, in which DeKalb Genetics Corporation is the plaintiff, were referred on January 4, 1999, to Special Master Robert L. Harmon, who was approved by all the parties, pursuant to Fed. R. Civ. P. 53. The order of reference specified that the special master would "report to this court and the parties his conclusions, and the reasons for them, regarding the meaning of any disputed term in any allegedly infringed claim of the following patents: U.S. Patent Nos. 5,484,956; 5,489,520; 5,538,877; and 5,538,880." Order of Reference, ¶ 3, DeKalb Genetics Corp. v. Pioneer Hi-Bred Int'l, Inc., 96 C 50112 (N.D. Ill. Jan. 4, 1999). The special master held an evidentiary hearing on May 25-28, 1999, in which six expert witnesses testified and extensive attorney argument was heard. The parties filed extensive briefs both before and after the hearing. The special master's lengthy and comprehensive Report and Recommendation regarding claim construction was received by the court on June 30, 1999. All parties have filed objections to various aspects of the Report and Recommendation, but it is not necessary for the court to specifically address each objection. Suffice it to say, all counsel for all parties are knowledgeable and have been very thorough in presenting their arguments to the court.

The court, not the jury, has the power and obligation to construe as a matter of law the meaning of language used in patent claims. Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995) aff., 517 U.S. 370 (1996). This court has reviewed *de novo* the thorough Report and Recommendation, the objections thereto filed by the parties, the transcripts of the evidentiary hearing and the patents and their prosecution histories. The court hereby adopts all of the findings in the special master's Report and Recommendation as the findings of the court. See Fed. R. Civ. P. 52.

Mycogen and Pioneer's requests for oral hearings on the issue of claim construction are denied as neither seek to submit additional evidence, but rather to argue legal positions already clear to the court.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

DEKALB GENETICS CORPORATION,

Plaintiff,

v.

PIONEER HI-BRED INTERNATIONAL, INC., MYCOGEN CORPORATION, including its Operating subsidiaries AGRIGENETICS, INC. and MYCOGEN PLANT SCIENCES, INC., CIBA-GEIGY CORPORATION, and NORTHRUP KING CO. (formerly Sandoz Seeds Co.),

Defendants.

Civil Actions 96 C 50112
96 C 50114
96 C 50169
96 C 50239
96 C 50241
96 C 50284
98 C 50186

Judge Philip G. Reinhard
Magistrate P. Michael Mahoney
Special Master Robert L. Harmon

Transgenic Corn Patent Litigation

U.S. ... 99 JUN 30 AM 11:09 FILED-WD

DOCKETED
JUL 01 1999

**REPORT AND RECOMMENDATION
OF SPECIAL MASTER
REGARDING CLAIM CONSTRUCTION**

U.S. ... 99 JUN 30 AM 11:09 FILED-WD

These seven civil actions are related by the fact that each involves an assertion of infringement of one or more of four United States patents owned by plaintiff DeKalb Genetics Corporation (DeKalb). The patents are in the field of genetic engineering and address the production of transgenic corn. The four principal defendants are Pioneer Hi-Bred International, Inc. (Pioneer), Northrup King Co. (NK), Ciba Geigy Corporation (Ciba), and Mycogen Corporation (Mycogen).

In an Order of Reference dated January 4, 1999, the Court appointed the undersigned as Special Master (SM) in these cases pursuant to Rule 53, FRCP. The specific purpose of the reference was to have the SM provide a recommended construction of the claims of the patents in suit. Under the express terms of the Order, the SM has "all of the powers described in Rule 53 of Fed. R. Civ. P., to conduct an evidentiary hearing on the record to hear and recommend to the

382

Court the resolution of all issues of interpretation of the claims of the patents-in-suit, as provided for in *Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995), *aff'd.*, 517 U.S. 370, 116 S.Ct. 1384 (1996)," and "is not limited by any prior rulings of Judge Reinhard or Magistrate Mahoney."

A four-day hearing was held in Chicago, Illinois on May 25-28, 1999. Live witness testimony was received from six expert witnesses, each with a Ph.D. in biological science and each with substantial experience and achievement in technical areas pertinent to the technology of the patents in suit. Their testimony was helpful in assisting the SM to acquire sufficient understanding of that technology to inform and enable the claim construction exercise. In addition, counsel explained the prosecution histories of the patents and attempted to demonstrate how the transactions reflected there supported their positions on claim interpretation. Extensive attorney argument was entertained throughout the hearing. Massive written submissions were filed preceding and subsequent to the hearing. Upon full consideration of all matters raised during those proceedings, this report is respectfully submitted in response to the Court's directive to recommend a construction of the claims of the patents in suit.

## GOVERNING LEGAL PRINCIPLES

### The Legal Framework for Claim Construction

Proper claim construction necessarily precedes a determination of whether the claims read on the accused devices or methods for infringement purposes.[1] Indeed, claim construction

[1] E.g., Fonar Corp. v. Johnson & Johnson, 821 F.2d 627, 3 USPQ2d 1109, 1112 (Fed. Cir. 1987)

Received: 6/30/99 2:11PM; 815 988 0019 -> ARNOLD,WHITE&DURKEE; Page 4
06/30/99 WED 14:02 FAX 815 968 0019 WILLIAMS & McCARTHY 004

will normally control the remainder of the decisional process,[2] for it is axiomatic that the claims must be construed in the same way for infringement that they are for determining validity.[3]

In the Markman case, supra, the Supreme Court held that interpretation of patent claims is a question for the court, while application of properly construed claims to determine infringement is a question for the finder of fact, in this case the jury. As a starting point, the words in a patent claim should be given their ordinary and customary meaning unless it appears from the specification that the patentee defined them otherwise.[4] Nonetheless, when technical or scientific terms in the claims require definition or explanation or understanding in the course of deciding whether the claims are infringed, it is the court's responsibility to undertake that task.[5]

In discharging its Markman responsibility, the court must inevitably decide what the scope of the underlying evidentiary inquiry will be. The Federal Circuit explained this decisional process in Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 39 USPQ2d 1573 (Fed. Cir. 1996). Ordinarily, the court should confine itself, if possible, to an examination of the intrinsic patent documents: the patent itself and its prosecution history. In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim element. In those cases where the public record unambiguously describes the scope of the patented invention, reliance on any extrinsic evidence is improper. Only if there is still some genuine ambiguity in the claims, after consideration of all available intrinsic evidence, should the court resort to extrinsic evidence such as expert testimony. And even if the judge decides to hear all possible evidence before construing the claims, expert testimony inconsistent with the intrinsic evidence

---

[2] Panduit Corp. v. Dennison Mfg. Co., 810 F.2d 1561, 1 USPQ2d 1593, 1597 (Fed. Cir. 1987).
[3] E.g., Intervet America, Inc. v. Kee-Vet Labs., Inc., 887 F.2d 1050, 12 USPQ2d 1474, 1476 (Fed. Cir. 1989). It is recommended that the jury be so instructed.
[4] E.g., York Prods. Inc. v. Central Tractor F&F Center, 99 F.3d 1568, 40 USPQ2d 1619, 1622 (Fed. Cir. 1996). Statements in the prosecution history are also pertinent; for example, a clear disavowal of claim coverage can limit the construction of the claim. Id. at 1624.
[5] Fromson v. Anitec Printing Plates Inc., 132 F.3d 1437, 45 USPQ2d 1269, 1271 (Fed. Cir. 1997).

should be accorded no weight. Extrinsic evidence in general, and expert testimony in particular, may be used only to help the court come to the proper understanding of the claims; it may not be used to vary or contradict the claim language. Nor may it contradict the import of other parts of the specification. Nor may the inventor's subjective intent as to claim scope, when unexpressed in the patent documents, have any effect.

As indicated, the parties called six highly articulate and qualified experts in biological science. In considering the evidence adduced through these witnesses, the SM was constantly mindful of the Federal Circuit's clear direction in Bell & Howell Doc. Man. Prod. Co. v. Altek Sys., 132 F.3d 701, 45 USPQ2d 1033, 1038 (Fed. Cir. 1998):

> Once a dispute over claim construction arises, "experts" should also not be heard to inject a new meaning into terms that is inconsistent with what the inventor set forth in his or her patent and communicated, first to the patent Examiner and ultimately to the public. Patents should be interpreted on the basis of their intrinsic record, not on the testimony of such after-the-fact "experts" that played no part in the creation and prosecution of the patent. * * * Use of expert testimony to explain an invention may be useful. But reliance on extrinsic evidence to interpret claims is proper only when the claim language remains genuinely ambiguous after consideration of the intrinsic evidence, *Vitronics*, 90 F.3d at 1584, 39 USPQ2d at 1578, i.e., when the intrinsic evidence is "insufficient to enable the court to construe disputed claim terms." Id. at 1585, 39 USPQ2d at 1579. Accordingly, any expert testimony that is inconsistent with unambiguous intrinsic evidence should be accorded no weight. * * *

These admonitions have conditioned the methodology employed in this proceeding. The parties have submitted extensive extrinsic evidence, and the SM has been willing, within reason, to consider all such evidence. In the end, however, apart from whatever benefit this evidence may have provided in gaining an understanding of the technology at hand, it has not been relied upon in construing the claims.[6] All potential ambiguities in the claim language itself were resolvable by reference to the intrinsic patent documents.

---

[6] See Mantech Environmental Corp. v. Hudson Environmental Serv. Inc., 152 F.3d 1368, 47 USPQ2d 1732, 1737 (Fed. Cir. 1998), where the Federal Circuit held that "the district court was legally correct both in admitting and

The SM is also mindful of the admonition of the Federal Circuit that "claim construction is not an obligatory exercise in redundancy," and that it is unnecessary to repeat or restate every claim term in order to comply with the Markman directive that claim construction is a matter for the court.[7] Such an approach would carry the very real potential of confusing rather than enlightening the jury.[8] Thus, where terms are expressly defined in the patent specification, it is sufficient simply to refer the jury to that definition; the court can decide at the time of trial whether explanatory technical testimony would be necessary or, indeed, helpful at all. And where a term is not defined or used in a special way in the specification, and is otherwise unambiguous, the jury should be instructed to give the term its ordinary meaning and will presumably require no additional assistance.

It is also important to understand that claim construction is an obligation of the court that is independent of the views asserted by the adversary parties.[9] Among them, the parties have requested consideration and construction of many, but not all, of the elements of the claims of the patents in suit. The SM has considered each claim as a whole, and each element of each claim, and has recommended a specific interpretation of those terms and phrases, and only those terms and phrases, that require construction. Accordingly, to the extent various claim elements are not addressed in this report, it may be assumed that the SM is recommending that they be

---

accepting the testimony of the parties' expert witnesses 'for the purpose of background in the technical area at issue,' * * * and then basing its claim construction solely upon intrinsic evidence. Although this information always may be admitted by the trial court to educate itself about the patent and the relevant technology, the claims and the written description remain the primary and more authoritative sources of claim construction. Thus, they always must be considered and where clear must be followed." See also Key Pharm. Inc. v. Hercon Labs. Corp., 161 F.3d 709, 48 USPQ2d 1911 (Fed. Cir. 1998).

[7] United States Surgical Corp. v. Ethicon, Inc., 103 F.3d 1554, 41 USPQ2d 1225, 1236 (Fed. Cir. 1997).

[8] For example, repeatedly instructing a jury that an ordinary English word does not really mean what they think it does, but instead has the meaning of some synonym, can only cause confusion. If they meant not the one but the other, why did the inventors and their attorneys not use the other? This is a question no jury should have to concern itself with.

[9] Exxon Chem. Patents Inc. v. Lubrizol Corp., 64 F.3d 1553, 35 USPQ 1801, 1802 (Fed. Cir. 1995).

grouped in the category of claim elements that need no construction, and that would be subject to a general jury instruction concerning application of ordinary English usage. Similarly, this report is not to be viewed as reflecting an acceptance or endorsement by the SM of any proposed construction of either party, unless it expressly so states. Once again, if the report is silent as to a particular element, that means only that the SM is suggesting that no construction is necessary, regardless of what a party may have offered as a proposed construction.

**The Timing of the Inquiry**

There is a threshold question in the claim construction analysis that requires some consideration. It is the person of ordinary skill in the field of the invention through whose eyes the claims are construed. Such person is deemed to read the words used in the patent documents with an understanding of their meaning in the field, and to have knowledge of any special meaning and usage in the field. The inventor's words that are used to describe the invention – the inventor's lexicography – must be understood and interpreted by the court as they would be understood and interpreted by a person in that field of technology. Thus the court starts the decisionmaking process by reviewing the same resources as would that person, viz., the patent specification and the prosecution history. These documents have legal as well as technological content, for they show not only the framework of the invention as viewed by the inventor, but also the issues of patentability as viewed by the patent Examiner.[10]

But this does not resolve the timing of the inquiry. An important question remains: as of what date must the court step into the shoes of the person skilled in the art? To put it another way, what is the state of knowledge, viewed chronologically, possessed by such a person when the claim construction exercise is performed? Surprisingly, the law on this seemingly

[10] Multiform Desiccants Inc. v. Medzam Ltd., 133 F.3d 1473, 45 USPQ2d 1429, 1432 (Fed. Cir. 1998).

fundamental point is not crystal clear. In Markman[11] itself, the Federal Circuit said "the focus is on the objective test of what one of ordinary skill in the art at the time of the invention would have understood the term to mean." But it is not clear that this was intended to define a rigid time frame for conducting the analysis. In a more recent case the court remarked that an inventor cannot "by later testimony change the invention and the claims from their meaning at the time the patent was drafted and granted."[12] Even more recently, the court observed that "the literal meaning of a claim is fixed upon its issuance."[13] In point of fact, it does not appear that the Federal Circuit has ever squarely addressed the proper timing of the claim construction inquiry in a context where the answer might be outcome-determinative.

It makes a certain amount of sense to use the issue date, or perhaps even the filing date, as the chronological viewing post in determining the understanding of the hypothetical person of ordinary skill in the art. After all, the give and take of prosecution has not taken place as of the date of filing or date of invention. The ultimate language of the issued claims usually has not even been formulated until some prosecution has taken place – sometimes not until late in the prosecution. Indeed, as of the actual date of invention, claims and claim language are not part of the picture. Certainly it would not seem unreasonable, for purposes of claim construction, to permit the hypothetical person of skill to be regarded as possessing prior art information that could be acquired at least during the period between actual invention and the filing of the patent application.

[11] Markman v. Westview Instr., Inc., 52 F.3d 967, 34 USPQ2d 1321, 1335 (Fed. Cir. 1995).
[12] Voice Tech. Group Inc. v. VMC Sys. Inc., 164 F.3d 605, 49 USPQ2d 1333, 1341 (Fed. Cir. 1999). A pair of recent cases from the District of Kansas has also used the issue date as the pertinent time for determining what the claims would have meant to a person of ordinary skill in the art. KCJ Corp. v. Kinetic Concepts, Inc., 30 F.Supp.2d 1319, 1323 (D. Kan. 1998); Hay & Farage Indus. v. New Holland North Am. Inc., 25 F.Supp.2d 1170, 1173 (D. Kan. 1998).
[13] Al-Site Corp. v. VSI Int'l Inc., — F.3d —, 50 USPQ2d 1161, 1168 (Fed. Cir. 1999).

Nonetheless, the SM has concluded that, given the importance of the date of invention in other assessments of the knowledge of one skilled in the art,[14] it would not be prudent to brush aside Markman's focus upon that date as mere dictum. Clearly, prosecution history is an important source of intrinsic evidence in interpreting claims because it is a contemporaneous exchange between the applicant and the Examiner. The public has the right to rely on an applicant's remarks made in seeking allowance of claims.[15] But the prosecution history can be given full play by simply viewing it as would a hypothetical person of ordinary skill in the art who, though reading it later, was basing an understanding of it upon knowledge of the scope and content of the prior art as it existed at the time of invention.

This conclusion, however, raises another consideration, viz.: what is the date of invention and, if it is demonstrated to precede the filing date, does that time difference matter in construing the claims? Mycogen suggests (Mycogen's Memorandum Regarding the Date of Claim Construction, handed up during the hearing) that "it would seem prudent to resolve the proper date of invention prior to any construction of the claims in this case." In its post-hearing memorandum, Ciba says that it "does not propose that the SM determine, as a factual matter, the actual dates of invention, such as for purposes of Section 102(g)." Pioneer, who asserts that the invention date is the appropriate vantage point, but that the filing date may sometimes be used as an approximation, does not comment on whether the date of invention needs to be decided at this juncture. (Pioneer's Brief Regarding the Proper Date for Evaluating Claim Construction)

[14] E.g., Sensonics, Inc. v. Aerosonic Corp., 81 F.3d 1566, 38 USPQ 1551, 1554 (Fed. Cir. 1996) (obviousness under 35 U.S.C. §103). But inquiries under §112 tend to focus upon the filing date. E.g., Amgen, Inc. v. Chugai Pharm. Co., 927 F.2d 1200, 18 USPQ2d 1016, 1024 (Fed. Cir. 1991) (best mode); Vas-Cath Inc. v. Mahurkar, 935 F.2d 1555, 19 USPQ2d 1111, 1119 (Fed. Cir. 1991) (§112¶1 generally); Hybritech Inc. v. Monoclonal Antibodies, Inc., 802 F.2d 1367, 231 USPQ 81, 94 (Fed. Cir. 1986) (enablement).

[15] Desper Prods. Inc. v. Qsound Labs. Inc., 157 F.3d 1325, 48 USPQ2d 1088, 1096-97 (Fed. Cir. 1998).

DeKalb, who contends that the filing date is the only appropriate date, is likewise silent on the subject.

Clearly, the record is not sufficiently developed at this point to permit an informed and reasoned decision on the actual date of invention for the several inventions claimed in the patents in suit. Moreover, any such effort, if it involved fact-finding (which it surely must), would invade the province of the jury with respect to matters such as prior invention under 35 U.S.C. §102(g) and antedating prior art under §§102(a) and (e).[16] However, Ciba points out that, during the prosecution of the Lundquist patents, the applicants submitted affidavits under Rule 131,[17] seeking to antedate certain prior art by establishing an earlier date of invention. The earliest date in question was May 1989, and the Rule 131 showing was simply directed at establishing a date of invention sometime prior to that date. Accordingly, it would seem reasonable to select, as a date upon which to assess the knowledge of one of ordinary skill in the art, the time frame just prior to May of 1989. Although no similar showing was made during prosecution of the Adams '520 patent, the technology is so similar, and the chronology so close (Lundquist originally filed in January of 1990 and Adams in April of 1990), that it is not unreasonable under the circumstances to use that date for the '520 patent as well.

The claim construction analysis in this report has been conducted, therefore, by seeking to understand what the claims would have meant to a person of ordinary skill in the art, having knowledge of the art as it existed as of May 1989.

---

[16] Priority of invention is a question of law to be determined based upon underlying factual determinations. E.g., Innovative Scuba Concepts, Inc. v. Feder Indus., Inc., 26 F.3d 1112, 31 USPQ2d 1132, 1134 (Fed. Cir. 1994).
[17] Rule 131 (37 C.F.R. §1.131) provides an ex parte mechanism whereby a patent applicant may antedate subject matter in a reference, even if the reference describes the same invention that is claimed by the applicant, provided that the same invention is not claimed in the reference when the reference is a United States patent. The disclosure in a reference United States patent does not fall under 35 U.S.C. §102(g) but under 35 U.S.C. §102(a) or (e), and thus can be antedated in accordance with Rule 131. But when the subject matter sought to be antedated is claimed in the reference patent, Rule 131 is not available and an interference must be had to determine priority. In re Zletz, 893 F.2d 319, 13 USPQ2d 1320, 1322-23 (Fed. Cir. 1989).

**The Written Description Requirement**

A general observation regarding defendants' positions on some of the claim construction questions addressed in this report seems to be in order. In several instances, they appear to be suggesting nothing more nor less than a straightforward importation of limitations from the specification into the claim. This is, of course, forbidden.[18] Although the specification may well indicate that certain embodiments are preferred, particular embodiments appearing in the specification will not be read into the claims when the claim language is broader than such embodiments.[19] If everything in the specification were required to be read into the claims, or if structural claims were to be limited to devices operated precisely as a specification-described embodiment is operated, there would be no need for claims. Nor could an applicant, regardless of the prior art, claim more broadly than that embodiment.[20]

But defendants' fundamental argument does raise concerns that may have to be addressed outside the strict context of claim construction. What they seem truly to be suggesting is that, in some instances, there is no support in the patent specification for the claimed invention. In other words, the argument is that DeKalb is claiming more broadly (or even differently) than its patent disclosures permit. This argument cannot be lightly dismissed.

The first paragraph of 35 U.S.C. §112 contains what has become known as the "written description" requirement. This provision, which is distinct from the enablement and best mode requirements, serves to ensure that the inventor had possession, as of the filing date of the application, of the specific subject matter later claimed. Put another way, the applicant must

---

[18] E.g., Intervet, supra note 3, 12 USPQ2d at 1476.
[19] Electro Med. Sys. S.A. v. Cooper Life Sciences, Inc., 34 F.3d 1048, 32 USPQ2d 1017, 1021 (Fed. Cir. 1994).
[20] SRI Int'l v. Matsushita Elec. Corp., 775 F.2d 1107, 227 USPQ 577, 585 (Fed. Cir. 1985).

convey with reasonable clarity to those skilled in the art that he or she was in possession of the invention claimed.[21]

The Federal Circuit appears to be in the early stages of development of a doctrine resting upon the principle that when the preferred embodiment is fairly described in the specification as the invention itself, the claims are not necessarily entitled to a scope broader than that embodiment.[22] The recent decision of the Federal Circuit in Gentry Gallery, Inc. v. Berkline Corp., 134 F.3d 1473, 45 USPQ2d 1498 (Fed. Cir. 1998), is the latest clear exemplar of this doctrinal trend.[23] As the court put the matter in Gentry, 45 USPQ2d at 1503:

> It is a truism that a claim need not be limited to a preferred embodiment. However, in a given case, the scope of the right to exclude may be limited by a narrow disclosure. * * *
>
> In sum, the cases * * * do not stand for the proposition that an applicant can broaden his claims to the extent that they are effectively bounded only by the prior art. Rather, they make clear that claims may be no broader than the supporting disclosure, and therefore that a narrow disclosure will limit claim breadth.

At first glance, this language would seem to provide some support for defendants' position on construction of some claim elements. But one must be careful to observe precisely what it was that the court actually did about the perceived discrepancy between disclosure and claim in Gentry. Rather than treat the matter as a claim construction issue, or even an infringement issue, the court there analyzed it as a question of compliance with the written description requirement of 35 U.S.C. §112¶1. And properly so, for the evaluation of claim breadth versus fullness of disclosure has no determinative role to play in a claim construction exercise. It is of course true that claims should be construed, where possible, to preserve their validity.[24] But it is equally true

---

[21] E.g., In re Alton, 76 F.3d 1168, 37 USPQ2d 1578, 1581 (Fed. Cir. 1996).
[22] See Modine Mfg. Co. v. United States ITC, 75 F.3d 1545, 37 USPQ2d 1609, 1612 (Fed. Cir. 1996).
[23] See also Fromson v. Anitec Printing Plates Inc., 132 F.3d 1437, 45 USPQ2d 1269, 1274-75 (Fed. Cir. 1997); Vehicular Tech. Corp. v. Titan Wheel Int'l, Inc., 141 F.3d 1084, 46 USPQ2d 1257 (Fed. Cir. 1998).
[24] E.g., Modine, supra note 242 37 USPQ2d at 1617. Indeed, the purpose of restricting the scope of claims through the reverse doctrine of equivalents (a doctrine somewhat akin to the one under consideration) often is to preserve the

that it is improper to attempt to avoid invalidity by importing claim limitations from narrower claims or even from the specification.[25] The courts will not save claims by redrafting them with extraneous limitations.[26]

That being the case, the real Gentry issue that may emerge here is not whether the patent claims must be construed as limited to the materials and techniques actually disclosed, but whether the inventors of the patents provided a written description adequate to convey to a skilled artisan that they had possession of a broader or different invention than that.[27] Such a question, however, is one of validity, a topic that is beyond the scope of this report.

## THE PATENT TECHNOLOGY

The technology at hand is genetic engineering. Only the most rudimentary understanding of high-level principles of molecular biology is required in order to analyze the claim construction issues presented in this case.

Each of the thousands of different protein molecules that characterize a complex organism is a precise sequence of amino acids. There are approximately twenty naturally occurring amino acids. Deoxyribonucleic acid (DNA), which contains the genetic information for living things, is found in the chromosomes of cells. The DNA molecule is an enormous structure built from sequential combinations of four smaller molecules (bases) linked together to form the DNA chain. It is the sequencing of these bases along the DNA strand that encodes the

---

validity of claims with respect to their original intended scope. Texas Instr., Inc. v. United States ITC, 846 F.2d 1369, 6 USPQ2d 1886, 1889 (Fed. Cir. 1988).

[25] E.g., Environmental Designs, Ltd. v. Unocal, 713 F.2d 693, 218 USPQ 865, 871 (Fed. Cir. 1983); Kalman v. Kimberly-Clark Corp., 713 F.2d 760, 218 USPQ 781, 788 (Fed. Cir. 1983).

[26] E.g., Corning Glass Works v. Sumitomo Elec. U.S.A., Inc., 868 F.2d 1251, 9 USPQ2d 1962, 1966 (Fed. Cir. 1989).

[27] In a very recent case, the Federal Circuit indicated that Gentry "considers the situation where the patent's disclosure makes crystal clear that a particular (i.e., narrow) understanding of a claim term is an 'essential element

genetic information required to produce a particular sequence of amino acids and, thereby, a particular protein. Thus, a gene may be thought of as a segment of DNA that encodes for a particular protein. Each protein performs a unique biological function and confers on the organism the traits that distinguish it from other organisms.[28]

It may immediately be seen that it might be desirable to incorporate genetic information encoding a protein that confers a useful or beneficial trait in one organism into another organism that does not naturally include that gene. This has become a reality in the rapidly-advancing field of genetic transformation. The specific aspect of that field addressed by the patents in suit is the production of transgenic corn. The patents and the testimony of the witnesses at trial reveal some of the significant problems faced by early researchers in the field. Taken together, the pose the complex question: How to get the non-native or heterologous DNA into the corn and ensure that it expresses as a heritable trait? The complex story of how these problems were overcome, and by whom, while it may become important at the plenary trial of these cases, need not be recounted here. The specific technology necessary to enable construction of the claims can be described adequately by reference to the preferred techniques employed by the inventors of the patents in suit.[29]

In general, the heterologous DNA is introduced into the target corn cells by a microprojectile bombardment process, also referred to as a biolistic process. In this technique, very small particles of a biologically inert material, such as tungsten or gold, are coated with the DNA of interest. When the coated particles are accelerated toward the target cells, some

---

of [the inventor's] invention.'" Johnson Worldwide Assoc. Inc. v. Zebco Corp., --- F.3d ---, 50 U.S.P.Q.2d 1607, 1613 (Fed. Cir. 1999).

[28] The '520 patent defines "genotype" as the genetic complement of an organism, and "phenotype" as traits exhibited by an organism resulting from the interaction of genotype and environment. (C13L13, 31-32)

[29] It must be kept in mind, of course, that claims can be, and often are, broader than the preferred embodiment. See notes 18-27 and accompanying text, supra.

particles are able to enter the cells, releasing the DNA so that it has a chance to integrate with the native DNA. ('956 patent, C10L38-57; '520 patent, C10L24-47) Although the patents acknowledge other techniques for transferring heterologous DNA, e.g. Agrobacterium infection, electroporation, and polyethylene glycol-mediated transformation ('956 patent, C4L8-12; '520 patent, C10L13-23), all of the patents clearly identify microprojectile bombardment as the preferred technique.

As will be seen, one of the large issues of claim construction has to do with the target of the bombardment. In the preferred embodiment, a culture is initiated using immature corn embryos. These are placed, embryo axis down, in a conventional solid culture medium containing a hormone such as 2,4-D. Under appropriate conditions, the corn embryo cells begin to dedifferentiate into a proliferating mass of cells or tissue called "callus." The callus forms on an area of the upper side of the embryo called the "scutellum." The goal is to produce a friable, fast growing, embryogenic callus capable of differentiating into somatic embryos.

Once suitable callus tissue is obtained, it is subjected to the bombardment process. During this process, some cells will not receive any of the heterologous DNA, some will be destroyed by the microprojectiles, and some will be transformed. The next task is to separate, or "select" the transgenic cells or tissues for further processing. This is preferably accomplished by introducing into the target cells during transformation a "selectable marker gene" that enables selection of those target cells and tissues that also contain the heterologous DNA of interest. For example, the so-called "bar" gene (originating in Streptomyces species) encodes for phosphinothricin acetyl transferase (PAT), which inactivates the active ingredient in the herbicide bialaphos. Exposure of post-bombardment callus to the herbicide will enable separation of the successfully transformed cells from those that are unchanged. In other words,

the transgenic cells, being resistant to bialaphos, continue to proliferate, while the unchanged cells die.

The final step is regeneration of the transformed cell lines into plants. Using conventional techniques, transformed callus can be regenerated into corn plants by placing it in suitable regeneration media under conditions that promote tissue differentiation and ultimate plantlet growth. The resultant plants, if they are stably transformed and fertile, can then be used in a conventional breeding program to obtain hybrid seed.

The patents provide preferred examples of heterologous DNA that can be introduced to transform corn for beneficial purposes. The '956 patent postulates a transformation scheme using a DNA sequence originating in *Bacillus thuringiensis* (BT) which encodes for an insecticidal endotoxin. The same patent also discloses the use of a gene from *E. coli* that confers resistance to the antibiotic hygromycin. The '520 teaches transformation with the bar gene to obtain PAT expression to inactivate bialophos and other herbicides. The latter two examples illustrate the fact that a single transgene may find utility in more than one context, i.e., as a selectable marker gene in the transformation process itself, and as a gene expressing a beneficial trait, such as resistance to herbicides, in the corn plant.

The patents in suit fall into two groups. One, the so-called "Lundquist" (after one of the two joint inventors) family of patents, comprises United States Patents No. 5,484,956 (issued January 16, 1996), No. 5,538,877, and No. 5,538,880 (both issued July 23, 1996). Each of the three Lundquist patents traces its lineage back to an original Lundquist application filed January 22, 1990, and they accordingly have essentially identical specifications. The "Adams" (after the first-named of thirteen joint inventors) family includes No. 5,489,520 (issued February 6, 1996), which traces back to an original Adams application filed April 17, 1990.

In general, the '880 and '877 patents claim methods for producing fertile corn plants that contain transgenic DNA which imparts insect or herbicide resistance. The '877 patent also claims a method for producing such a plant in which the DNA includes a selectable marker or reporter gene. The '956 patent claims a fertile transgenic corn plant that contains heterologous DNA encoding BT endotoxin. The '520 patent claims a process for producing a fertile corn plant that contains transgenic DNA which includes a selectable marker gene encoding for PAT.

## DISCUSSION

Claim construction begins, as it must, with the words of the claims.[30] The claims of the four patents in suit are set out in the attached Appendix. In the discussion that follows, certain claim terms or elements may be common to different claims, sometimes in different patents. It may be assumed, unless expressly stated otherwise, that the discussion applies to all occurrences of such terms or elements.

**Terms Well-Defined in the Patents**

The term *Zea mays* occurs in all of the claims of the patents in suit. The Lundquist patents (e.g., '956 patent, C4L48-54) define that species of plant as corn, including field corn, popcorn, sweet corn, flint corn, and dent corn. The Adams '520 patent uses the term consistently with that definition. It is recommended that the jury be instructed that *Zea mays* means corn of all types, including but not limited to field corn, popcorn, sweet corn, flint corn, and dent corn.[31]

The claims of the '520 and '877 patent use the term "gene." Both families of patents use the word throughout as synonymous with "DNA sequence," and it is recommended that the jury be so instructed.

---

[30] Vehicular Tech. Corp. v. Titan Wheel Int'l, 141 F.3d 1084, 46 USPQ2d 1257, 1260 (Fed. Cir. 1998).
[31] It is also suggested that the jury be instructed that dependent claim 3 of the '956 patent does not change the meaning of *Zea mays*, but rather expressly narrows the kinds of corn to "field corn, popcorn, sweet corn, flint corn and dent corn." This would provide an apt illustration of claim dependency.

The word "transgenic" appears in the claims of each patent. Both families of patents make it clear that the key element underlying this term is genetic engineering. For example, the '520 patent says that the DNA sequences are 'incorporated into recipient cells by genetic engineering methods rather than classical reproduction or breeding techniques." (C3L53-56) The Lundquist patents expressly define the term "transgenic" to include "any cell, cell line, callus, tissue, plant part or plant, the genotype of which has been altered beneficially by the presence of heterologous DNA that was introduced into the genotype by a process of genetic engineering." (E.g., '956 patent, C4L55-59) "Heterologous DNA" is defined in the Lundquist patents (see, e.g. '956 patent, C6L30-52) as a DNA segment that is synthetic, semi-synthetic, or biologically derived, and includes non-plant genes such as those from bacteria, yeasts, animals, or viruses, as well as modified genes and portions of genes.[32] The heterologous DNA is not limited to non-plant sources, however, and can be from another *Zea mays* genotype, or even the same genotype into which it is to be introduced. The '520 patent similarly defines transgenic plants as "plants that have incorporated exogenous genes or DNA sequences, including but not limited to genes or DNA sequences which are perhaps not normally present, genes not normally transcribed and translated ('expressed') in a given cell type, or any other genes of [sic. "or"] DNA sequences which one desires to introduce into the non-transformed plant, such as genes which may normally be present in the non-transformed plant but which one desires to have altered expression." (C33L40-50) Accordingly, it is recommended that the jury be instructed that, in the claims of each of the patents, a "transgenic" corn plant is one that includes a DNA sequence resulting from genetic engineering.

[32] The parties have raised the larger issue of the meaning of "heterologous DNA" as actually employed in the claims; this is dealt with separately later in this report.

The claims of the '520, '877, and '880 patents employ the word "comprising." It is recommended that the jury be instructed that "comprising," in the parlance of patent claims, is synonymous with "including," and does not exclude the presence of additional elements.[33]

The claims of the '956 patent make reference to the R0 and R1 generations of corn plants. Although there is no dispute as the meaning of these designations, they play a large role in the construction of the term "progeny," as it is much more convenient to set out a formal construction of that term using such designations. Accordingly, it is recommended that the jury be instructed that a plant of the R0 generation is the regenerated plant; a plant of the R1 generation is a plant that has been grown from seed of the R0 plant harvested after that R0 plant has been fertilized by pollen from a different corn plant (crossed), its own pollen (self mated), or pollen of a sibling plant (sib mated); a plant of the R2 generation is one that has been grown from seed harvested from a crossed, selfed or sibbed R1 plant, etc.[34]

**Process Steps**

The claims of the '887, '880, and '520 patents are directed to processes, each comprising a number of steps. In each instance, the next step builds upon the proceeding step, in logical fashion. Thus, in this case, as in Mantech Environmental Corp. v. Hudson Environmental Serv. Inc., 152 F.3d 1368, 47 USPQ2d 1732, 1739 (Fed. Cir. 1998), the sequential nature of the claim steps is apparent from the plain meaning of the claim language and nothing in the written description suggests otherwise. It is recommended, therefore, that the jury be instructed that the

---

[33] Hewlett-Packard Co. v. Repeat-O-Type Stencil, 123 F.3d 1445, 43 USPQ2d 1650, 1655 (Fed. Cir. 1997). So, too, with the word "comprises."

[34] The Lundquist patents teach that "plants regenerated from the transformed callus are referred to as the R0 generation or R0 plants. The seeds produced by the various sexual crosses of the R0 generation plants are referred to as R1 progeny or the R1 generation. When R1 seeds are germinated, the resulting plants are also referred to as the R1 generation." (E.g., '880 patent, C11L14-15)

process claims of the patents in suit require the method steps to be performed sequentially, in the order set forth in the claim.

The independent process claims of the '520, '887, and '880 patents each contain the following language: "wherein said DNA is transmitted through a complete sexual cycle of said transgenic plant to its progeny." The independent product claim of the '956 patent is similar, except it uses the phrase "complete normal sexual cycle." Such language does not constitute a process step or limitation; rather, it defines a characteristic of the R0 plant that is the subject of the '956 claims and that is produced by the process of the independent claims of the other patents. Nor does the language in any way exclude human intervention in the reproductive process. It is clear that "normal sexual cycle" referred to is the fundamental corn reproductive process whereby genetic material is passed to progeny through either pollen or egg cells. Corn breeding and hybrid seed production systems obviously involve, almost invariably, human intervention in that process, e.g., detasseling in crossing blocks to ensure cross-pollination, hand pollination, etc. It is recommended that the jury be instructed that this language does not define a necessary step in the process of the independent process claims, and merely requires that the R0 plant be capable of passing the transgene to progeny through either pollen or egg cells, without or without human intervention.

**Product-by-Process**[35]

The claims of the '956 patent are directed to a corn plant having heterologous DNA that encodes for BT endotoxin. Each claim, however, contains a phrase that can only be described as a method limitation: "wherein said DNA is introduced into said plant by microprojectile

---

[35] This is the only topic upon which defendant NK took a position. Accordingly, except for the discussion of this topic, the use of the collective term "defendants" should be understood to exclude NK, unless the context indicates otherwise.

bombardment of *Zea mays* callus cells." Despite this clear language, DeKalb contends that these claims must be construed as not limited to plants that are transformed by the biolistic technique. Rather, it says, these claims are so-called "product-by-process" claims, and therefore must be construed to cover the recited corn plant, no matter what technique was used to introduce the heterologous DNA.

This contention may seem somewhat remarkable given the Federal Circuit's unswerving adherence to the proposition that each limitation of a claim is material and essential, and that in order for a court to find infringement, the patent owner must show the presence of every limitation or its substantial equivalent in the accused product.[36] What DeKalb is contending – nothing more and nothing less – is that the microprojectile bombardment language is not a limitation at all, and may be safely ignored in deciding both infringement and validity.

DeKalb is quick to point out that there is perfectly good authority for what may seem on the surface to be a rather strange proposition: that a claim may be – indeed, must be – read and interpreted as though it did not contain what is some rather explicit language. For this it cites Scripps Clinic & Res. Found. v. Genentech, Inc., 927 F.2d 1565, 18 USPQ2d 1001, 1016 (Fed. Cir. 1991), for the statement that "the correct reading of product-by-process claims is that they are not limited to product prepared by the process set forth in the claims." The claim in Scripps was in the following format: "Highly purified and concentrated human or porcine VIII:C prepared in accordance with the method of claim 1." A similar format was at issue in a case decided the following year, Atlantic Thermoplastics Co. v. Faytex Corp., 970 F.2d 834, 23 USPQ2d 1481 (Fed. Cir. 1992): "The molded innersole produced by the method of claim 1."

---

[36] E.g., Lemelson v. United States, 752 F.2d 1538, 224 USPQ 524, 533 (Fed. Cir. 1985); Perkin-Elmer Corp. v. Westinghouse Elec. Corp., 822 F.2d 1529, 3 USPQ2d 1321, 1325 (Fed. Cir. 1987). See generally, Pennwalt Corp. v. Durand-Wayland, Inc., 833 F.2d 931, 4 USPQ2d 1737 (Fed. Cir. 1987)

But despite what appears to be a classical product-by-process claim in each case, the difference in outcome in the two cases is startling.

The panel decision in Atlantic Thermoplastics did not purport to overrule Scripps. Instead, it conducted a detailed analysis of Supreme Court and other precedent and concluded that "process terms in product-by-process claims serve as limitations in determining infringement." This holding, not surprisingly, provoked a request for rehearing in banc. Although the request was ultimately denied, it was not without controversy. See the dissenting opinions of Judges Nies, Rich, Lourie, and Newman, 974 F.2d 1979, 23 USPQ2d 1801, and the concurring opinion of Judge Rader, 974 F.2d 1299, 24 USPQ2d 1138.

In the present litigation the Court has already had occasion to consider the apparent conflict between Scripps and Atlantic Thermoplastics. Defendant NK moved, in Civil Action No. 96 C 50169, for summary judgment of noninfringement of the '956 patent on the ground that it employed a substantially different process to transfer heterologous DNA. Instead of using microprojectile bombardment, according to NK, it uses passive protoplast uptake. DeKalb responded by pointing out that, under Scripps, NK should not be able to escape liability simply because its used a different technique for gene transfer. In a Memorandum Opinion and Order dated August 14, 1997, this Court found that there was a direct conflict between the panel decisions in Scripps and Atlantic Thermoplastics. Applying the Federal Circuit's conflict rule,[37] this Court honored the Scripps rule. That led to a denial of NK's summary judgment motion.

[37] The Federal Circuit has adopted the rule that prior decisions of a panel of the court are binding precedent on subsequent panels unless and until overturned in banc. Where there is direct conflict, the precedental decision is the first. E.g., Newell Cos. v. Kenney Mfg. Co., 864 F.2d 757, 9 USPQ2d 1417, 1423 (Fed. Cir. 1988). The Atlantic Thermoplastics panel apparently felt that it had found a way around the in banc rule, noting that a "decision that fails to consider Supreme Court precedent does not control if the court determines that the prior panel would have reached a different conclusion if it had considered controlling precedent." 23 USPQ at 1485n.2. However, as pointed out in one of the dissents from the denial of rehearing, 23 USPQ at 1816, that "merely states a reason why Scripps was wrongly decided with respect to the product-by-process issue."

The SM does not recommend that the Court revisit its resolution of the Scripps/Atlantic Thermoplastics dilemma. If the direct conflict rule has meaning, it would seem to obligate bench and bar to follow Scripps until the Federal Circuit tells us otherwise. But that does not mean that the claims of the '956 patent are to be construed as though the words "wherein said DNA is introduced into said plant by microprojectile bombardment of *Zea mays* callus cells" were missing. Let us look again at the Scripps rule: "the correct reading of product-by-process claims is that they are not limited to product prepared by the process set forth in the claims." The question immediately arises, are the claims of the '956 patent product-by-process claims? The answer to that question resolves the matter of claim construction.

That a process limitation appears in a claim does not convert it to a product-by-process claim.[38] It appears that in connection with NK's motion for summary judgment, the parties simply treated independent claim 1 as a product-by-process claim, without controversy.[39] But that does not alone resolve the matter, in view of the obligation of a court to construe claims independent of the views of the adversary parties.[40]

The precedent of the Federal Circuit itself does not provide much direct guidance on the matter, with the exception of Judge Newman's opinion dissenting from the denial of rehearing in banc in Atlantic Thermoplastics. In that opinion, reported at 974 F.2d 1979, 23 USPQ 1801, 1802-1816, she does an exhaustive analysis of the cases, and concludes that true product-by-process claims are those in which the product cannot be properly defined and discriminated from

[38] Fromson v. Advance Offset Plate, Inc., 720 F.2d 1565, 219 USPQ 1137, 1141 (Fed. Cir. 1983).
[39] In the Court's Memorandum Opinion and Order, p.3n.2, the Court said "The parties here both treat claim 1 of the '956 patent as a product-by-process claim rather than a pure product or a pure process claim. The court has no reason to question that assessment."
[40] See note 9, supra, and accompanying text.

prior art otherwise than by reference to the process of producing it. This is in contrast to a product claim that merely includes a process limitation.

The claims of the '956 patent yield quite readily to such an approach. Without the language reciting microprojectile bombardment, claim 1 parses out, rather simply, to (1) a fertile R0 corn plant that (2) contains the BT gene, wherein (3) the BT gene expresses to confer insect resistance, while (4) that expression is not present in a plant not containing the gene, and (5) wherein the gene can be transmitted to the R1 generation through a complete normal sexual cycle of the plant. This provides a complete and adequate definition of the product – a corn plant – regardless of the process by which the BT gene is introduced. It also adequately discriminates from the prior art described in the '956 patent. As the patent recites it, prior attempts to produce transgenic corn were characterized by failure in several respects. Although certain types of corn cells had been successfully transformed, the resulting cells "either could not be regenerated into corn plants or the corn plants produced were sterile." (C2L6-7) On the other hand, although certain types of corn cells had been regenerated to produce fertile plants, no stable transformation of such cells had been achieved. (C2L11-17)

The product limitations of claim 1 address each of these alleged shortcomings of the prior art – regenerability, fertility, and stability – and thus differentiate the claimed corn plant over prior corn plants. The limitation of a "fertile transgenic *Zea mays* plant of the R0 generation" requires that the plant be one that was regenerated and is fertile. The requirement that the gene be "transmitted through a complete normal sexual cycle of the R0 plant to the R1 generation" addresses both fertility and stability. And the limitation that the gene be "expressed so that the plant exhibits resistance to an insect, wherein said expression is not present in said plant not containing" the gene, likewise addresses stability. The further recital of microprojectile

bombardment is not necessary to complete this definition and differentiation. A corn plant having the product characteristics of claim 1 would be distinguishable from the prior art described in the patent whether the BT gene had been introduced by microprojectile bombardment or some other technique. Thus, the '956 claims are not product-by-product claims and do not fall within the very limited exception -- ostensibly embraced by Scripps – to the elementary patent law rule that every limitation in a patent claim is material.[41]

Nonetheless, even if by some stretch the '956 claims could be regarded as subject to the Scripps ruling, the prosecution history reveals ample basis for construing the claims as they are written. During prosecution the Examiner rejected the pending claims on grounds of lack of enablement. (SM163)[42] The Examiner's position was that the specification enabled only biolistic transformation. In an amendment, application claim 25 was added, with a limitation to the biolistic process. (SM177) The Examiner continued to reject all claims except 25 for lack of enablement. (SM211) In a final office action (SM275), the Examiner maintained the rejection of all claims but claim 25 on the grounds of lack of enablement, and indicated that claim 25 would be allowable if rewritten in independent form. The Examiner's comments are illuminating (SM276):

> * * * Note that at page 2 of the previous Office Action the Examiner indicated that the rejection was based on the lack of enablement (i.e., a section 112, first paragraph rejection) for plant produced by a process other than that disclosed, that is to maize plants produced by the biolistic process. This process, and only this process, is evidenced by available art to overcome prior art attempts to produce the claimed invention. Furthermore evidence existed in the art that transgenic plants produced by prior art processes are essentially different. The fact that the biolistic process appears to be essential to overcome plant sterility and/or chromosome integration and heritability of a transgene only provides guidance to the practitioner in the art as to how to apply the exemplified process to produce the claimed invention. While the recitation of limitations in product claims to fertile transgenic plants in which the transgene is both

[41] E.g., Glaxo, Inc. v. Novopharm, Ltd., 110 F.3d 1562, 42 USPQ2d 1257, 1261 (Fed. Cir. 1997).
[42] The prosecution histories of the patents in suit, as submitted by the parties, have been sequentially numbered with the prefix SM followed by the page number.

> chromosomally integrated and heritable may overcome rejections based on 35 USC § 102 or 103, neither novelty nor obviousness are considerations under section 112, first paragraph. Accordingly, as Applicants have failed to rebut the Examiner's evidence that the process is essential to the claimed product the rejection is still warranted and is maintained.

What the Examiner was telling the applicants here is quite clear. He was pointing out that, while the product limitations of the claims might well be sufficient to distinguish over the prior art (for purposes of novelty and nonobviousness), the lack of a recital of microprojectile bombardment (in all claims save claim 25) meant that the specification was not sufficient to enable the practice of those claims, inasmuch as it disclosed only microprojectile bombardment in an enabling fashion. Indeed, what the Examiner was actually doing here was attempting to avoid the very patentability/validity problem that the Federal Circuit was addressing in the Gentry case.[43] In his view, based upon the evidence that he had before him, the biolistic process was "essential to the claimed product," and the written description did not adequately support broader claims than that.

The applicants responded by amending the claims so that all of them recited microprojectile bombardment. (SM285) Their comments to the Examiner in this respect are revealing:

> This amendment is in accord with the amendment which the Examiner indicated would overcome the 35 U.S.C. §112(1) rejection based on the alleged failure of the specification to enable claims other than those directed to "genetically engineered plants produced via biolistic transformation" in the Office Action dated November 30, 1990. As amended, claim 1 is enabled by the specification, since it is directed to those fertile transgenic Zea mays plants which are produced by microprojectile bombardment, or "biolistics." (SM286)

Here, they were telling the world that the addition of the microprojectile bombardment limitation was to obviate the nonenablement rejection. They went on to argue vigorously that the properties

[43] See notes 18-27, supra, and accompanying text.

of the transgenic plant, as recited in the claims, distinguished over the prior art even without the biolistic process limitation. They complained that it "is well settled that it is improper to require an Applicant to insert process limitations into a product claim unless the compositional features which distinguish the product from the art cannot otherwise be recited in the claim." (SM287; emphasis present) They even cited Scripps for the proposition that they were entitled to a product claim that would encompass transgenic corn plants produced by microprojectile bombardment, as well as by "any other process achieving the same result." (SM288) But in the end, they conceded:

> Nonetheless, in order to advance the prosecution of the present application, claim 1 has been amended to recite that the recited transgenic Zea mays plant is one which is produced by microprojectile bombardment.
>
> Therefore, it is respectfully submitted that the amended claims are fully in accord with 35 U.S.C. §112, and withdrawal of this rejection is respectfully requested. (SM289)

Here, they were clearly telling the world that, although they believed they might be entitled to a product claim that covered transgenic corn regardless of the transformation mechanism, they were no longer pursuing such a claim in this application.

In his Reasons for Allowance of the '956 patent, the Examiner stated that the "invention is drawn to fertile transgenic *Zea mays* plants comprising heterologous DNA encoding *Bacillus thuringiensis (Bt)* endotoxin which was produced by the process of microprojectile bombardment of *Zea mays* callus cells followed by plant regeneration." (SM510) As was their right, the applicants filed comments on the reasons for allowance (SM527), stating that the claims were "intended to cover any fertile, transgenic R0 *Zea mays* plants comprising a Bt toxin gene that is prepared by transformation with heterologous DNA, whether it be by microprojectile bombardment or some other transformation methodology." The process language concerning microprojectile bombardment was said to have been introduced "simply as a means of addressing

any possible §101 "Product of Nature" concerns, in order to demonstrate that the claimed plant is a product of man rather than a product of nature." Finally, they flatly stated that their intention is "that this language not be construed as limited to plants prepared by microprojectile bombardment," citing Scripps.

These self-serving statements represent nothing more than a belated, afterthought attempt to patch up a position that simply will not hold water. First, and most importantly, the applicants had made their intention clear in the amendment after final rejection (SM285) when they acquiesced in the Examiner's §112 rejection by amending the claims. If they intended to seek a product claim without the biolistic limitation, they should have done it at that point. The suggestion that they could insert the process language to escape a rejection of the claims, and then later be permitted to escape the limitation that the language establishes, offends every adult notion of fair play. The public is entitled to rely upon what a patent applicant actually does with the claims during prosecution, rather than be bound by what that applicant later says its intentions were.[44] A patent applicant cannot disclose and claim an invention narrowly and then, in the course of an infringement suit, argue effectively that the claims should be construed to cover that which is neither described nor enabled in the patent.[45]

Moreover, the reason asserted in the comments for having added the biolistic language – to avoid a possible "product of nature" problem, simply does not ring true. As previously indicated, a "transgenic" corn plant is one that includes a DNA sequence resulting from genetic engineering. This would seem more than adequate to identify the claimed plant as a product of

[44] The prosecution history limits the interpretation of claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance. Standard Oil Co. v. American Cyanamid Co., 774 F.2d 448, 227 USPQ 293, 296 (Fed. Cir. 1985). The relevant inquiry is whether a competitor would reasonably believe that the applicant had surrendered the particular subject matter. Cybor Corp. v. FAS Tech., Inc., 138 F.2d 1448, 46 USPQ2d 1169, 1175 (Fed. Cir. 1998).
[45] North Am. Vaccine Inc. v. American Cyanamid Co., 7 F.3d 1571, 28 USPQ2d 1333, 1337 (Fed. Cir. 1993).

man as opposed to a product of nature. And if not, it would have been a simple matter to insert a limitation to genetic engineering, or some other definition that would have excluded a product of nature and not limited the transformation technique to biolistic processes. It also bears noting that, at the time the microprojectile bombardment limitation was added to the claims, there was no outstanding rejection based upon product of nature concerns.

Finally, consideration should be given to the rule that claims should be construed, where possible, to preserve their validity.[46] DeKalb cautions that this rule should not be accorded too broad a sweep. It argues that if claims were always to be construed to preserve validity, a court could never determine that a claim was invalid. But no case suggests that the rule be taken to that extreme. Indeed, the Federal Circuit has made it clear that it is improper to attempt to avoid invalidity by importing claim limitations from narrower claims or even from the specification.[47] The courts will not save claims by redrafting them with extraneous limitations.[48] However, the application of the rule in the present case does not involve importing a limitation – just the opposite. The concern is that, were the microprojectile bombardment limitation to be read out of the '956 claims, the very invalidity defense of enablement that the Examiner felt was cured by the addition of that limitation would be back in play. Giving effect to the limitation to avoid that problem is a far cry from importing an extraneous limitation into the claim. It amounts to nothing more than honoring the express language of the claim so as to avoid invalidity.[49]

---

[46] E.g., Modine, supra note 20, 37 USPQ2d at 1617.
[47] E.g., Environmental Designs, Ltd. v. Unocal, 713 F.2d 693, 218 USPQ 865, 871 (Fed. Cir. 1983); Kalman v. Kimberly-Clark Corp., 713 F.2d 760, 218 USPQ 781, 788 (Fed. Cir. 1983).
[48] E.g., Corning Glass Works v. Sumitomo Elec. U.S.A., Inc., 868 F.2d 1251, 9 USPQ2d 1962, 1966 (Fed. Cir. 1989).
[49] If a claim is susceptible to a broader and a narrower meaning, and the narrower one is clearly supported by the intrinsic evidence while the broader one raises questions of enablement, the narrower of the two should prevail. Digital Biometrics, Inc. v. Identix, Inc., 149 F.3d 1335, 47 USPQ2d 1418, 1424 (Fed. Cir. 1998).

It is recommended that the jury be instructed that the claims of the '956 patent are not infringed unless the accused plant was produced using microprojectile bombardment or its substantial equivalent.

**Target of the Microprojectile Bombardment**

As already indicated, the microprojectile bombardment limitation of the product claims of the '956 patent cannot be ignored. Each of the process claims of the remaining three patents contains a step calling for bombardment with DNA-coated microprojectiles. The question at hand here is, what is the target of this biolistic process?

In claiming the target, each patent defines it a little differently:

- '520 patent – "a regenerable culture from a *Zea mays* plant"
- '880 patent – "intact regenerable *Zea mays* cells"
- '956 patent – "*Zea mays* callus cells"
- '877 patent – "regenerable embryogenic callus culture from a *Zea mays* plant"

In the '520 and '877 patents, the first step of the claims calls for "establishing" the culture, which is then transformed by bombardment. The '956 and '880 patent claims respectively call for bombardment of "callus" cells and "intact regenerable" cells, without any preceding establishment step.

All of the patents make it clear that the preferred target of the bombardment is a so-called Type II callus, which is defined in the '520 patent as a "friable, fast growing embryogenic callus." (C13L1) What the parties hotly dispute is whether the claims must be construed to require that the target of the bombardment be a Type II callus.

In arguing their side of the question, the defendants rely heavily upon the prosecution histories of the patents, and rightly so, for this undisputed public record of proceedings in the

PTO is of primary significance in understanding the claims. Markman, supra, 34 USPQ2d at 1330. However, although the prosecution history can and should be used to understand the language used in the claims, it cannot enlarge, diminish, or vary the limitations in the claims. Id. Only where an applicant, through statements made during prosecution, may commit to a particular meaning for a patent term is that meaning then binding in litigation.[50]

In relying on the prosecution histories of the patents, defendants have tended not to discriminate the prosecution of one patent from another. Instead, they have tended to point to transactions in the prosecution of one patent as supporting their proposed construction of the claims of another. This is dangerous. The Federal Circuit recently explored this problem in Abtox Inc. v. Exitron Corp., 122 F.3d 1019, 43 USPQ2d 1545, 1551, opinion modified at 46 USPQ2d 1735 (Fed. Cir. 1997). The teaching of Abtox is that, while it may be permissible to rely upon statements made during prosecution of other patents in a chain of related applications, it is important to confine the statements to their proper context in terms of the claims actually being prosecuted there.[51] That is the methodology employed in this report. Thus, only if statements made during prosecution of, say, the '877 patent are directly relevant, by reason of identity or close similarity in the terms actually used in the claims, are those statements considered in connection with construction of the claims of, say, the '880 patent.

Establishing a regenerable embryogenic callus culture. The '877 claims call out the step of "establishing a regenerable embryogenic callus culture" to be transformed by bombardment. A "callus" is defined in the '520 patent (C12L63) as a "proliferating mass of cells or tissue in vitro," and no party seems to take issue with that definition as a general proposition. Certainly the term

[50] CVI/Beta Ventures, Inc. v. Tura LP, 112 F.3d 1146, 42 USPQ2d 1577, 1585 (Fed. Cir. 1997).
[51] Sextant Avionique, S.A. v. Analog Devices Inc., —F.3d —, 49 USPQ2d 1865 (Fed. Cir. 1999) is not to the contrary.

is used throughout the Lundquist patents consistently with that definition, although the emphasis is on a particular type of callus, namely Type II. But the '877 patent goes on to say that:

> Although successful transformation and regeneration has been accomplished herein with friable, embryogenic callus, this is not meant to imply that other transformable regenerable cells, tissue, or organs cannot be employed to produce the fertile transgenic plants of this invention. The only actual requirement for the cells which are transformed is that after transformation they must be capable of regeneration of a plant containing the heterologous DNA following the particular selection or screening procedure actually used. (C5L55-63; emphasis added)

DeKalb's position is that this statement establishes the only essential condition on the target, i.e., the transformed cells must after transformation be capable of regeneration of a plant containing the transgene. Thus, if the claim calls for "callus cells," those callus cells must exhibit that property. Using this approach, the term "callus cells" would be construed to mean a proliferating mass of cells or tissue in a culture medium that comprises cells which are regenerable at some point after transformation.

The defendants contend that this language requires a Type II callus as the target, or at least a callus culture that contains cells that can be regenerated at the time of transformation, and excludes immature embryos. In addition, they assert special significance for the term "establishing." Ciba says establishing means:

> culturing the cells to a state where they are a regenerable embryogenic callus meeting the test set out in the '877 patent at col. 5, l. 17-21. "Establishing" should be given its ordinary meaning of making stable or permanent and does not mean initiating. The clause should be construed as having a regenerable embryogenic callus culture in hand.

Mycogen argues that it means:

> initiating a regenerable callus culture, e.g., from an immature embryo, propagating the culture, and maintaining it through subculture to provide a target for biolistic transformation * * * .

Pioneer's contention is somewhat more convoluted:

> Pioneer agrees with DeKalb's interpretation of "establishing," as "placing corn material in culture conditions that will allow a callus to develop." However, Pioneer maintains that **the callus culture must be established prior to the bombardment step,** and accordingly the bombardment of immature embryos that have been placed on callus induction media does not fall within the scope of the claims.

For its part, DeKalb says that this language refers to taking any corn cells, tissues or organs which are capable of forming somatic embryos and regenerating a plant, placing them on or in callus initiation medium, and beginning cellular division.

An attempt to restate the contentions of the parties in understandable fashion seems in order here. DeKalb is urging that the claim language requires only that corn cells, which (1) have the capacity to form somatic embryos and (2) are capable of regeneration at some time after transformation, be (3) placed on callus initiation media, so that (4) cellular division begins prior to bombardment. The defendants contend that the language requires more. They urge that the language means that the target, at the time of bombardment, must be something that a person of ordinary skill in the art would recognize as (1) a callus culture, not just immature embryos, and (2) comprising cells that are, at the time of bombardment, regenerable.

With this restatement as a focus, it becomes possible to analyze the differences between the positions of the parties. They are definitely at odds on the matter of whether the target cells must be regenerable at the time of bombardment. Defendants contend, as Mycogen puts it, that the cells of the culture must have "a present capacity to give rise to regenerated plants." This restrictive definition must be understood for what it is: an undisguised effort to limit the claims of the '877 patent to the target disclosed in the examples described in the specification. Inasmuch as neither the actual language of the claims nor the import of the specification taken as a whole compels such a construction,[52] justification for such a limitation must be found, if at all,

[52] Indeed, the language quoted above in the text, from column 6, lines 18-27 of the '956 patent, teaches just the contrary, that the invention is not limited to Type II callus.

in the prosecution history. Thus, the question is whether prosecution history compels a construction that requires that the intact corn cells be regenerable at the time of bombardment, contrary to the statement in the patent that "the only actual requirement for the cells which are transformed is that after transformation they must be capable of regeneration of a plant." (Emphasis added.)

The SM has been directed to no transaction in the '877 prosecution history that would even support this construction, much less compel it.[53] Only if the phrase "regenerable embryonic callus culture" were to be construed as limited to Type II callus would this result obtain.

The parties seem agreed that "embryogenic" means material that can form somatic embryos. Thus the remaining crucial point of difference between the parties is the meaning of the phrase "establishing a * * * callus culture." Again, defendants' position is not compelled by either the claim language or the specification. The prosecution history, however, does provide some support.

During the prosecution of the '877 patent, the Examiner rejected the claims over the Klein Bio/Technology publication. (SM662) In response, the applicants pointed out that in Klein "callus is not mentioned as a possible target in this paragraph, which clearly refers to the use of intact embryos as targets. In contrast to this methodology, Applicants' claim recites that friable embryogenic callus cultures were bombarded." (SM674) In a later response, the applicants again distinguished Klein on the ground that it identified the scutellum of cultured immature embryos as the bombardment target. (SM770-71) DeKalb concedes (at page 15 of its post-hearing brief) that "regenerable friable embryogenic callus culture" (which was indeed the

[53] As will be seen below, the Klein reference was distinguished on the basis that the transformation target was scutellum of immature embryos, not callus (SM674, 713, 770-71), rather than on any argument that the pending claims required the target cells to be regenerable at the time of bombardment.

language in the claims being prosecuted at that time) refers to a Type II callus culture. But it also points out that the term "friable" was later removed from the claims.

It may well be that the elimination of the word "friable" would negate the conclusion that the phrase "regenerable embryogenic callus culture" is limited to Type II callus, but the fact remains that the applicants were telling the PTO, and the world, that the target of the bombardment step was different from the scutella of immature embryos that were apparently bombarded in Klein. Thus, the phrase must be interpreted to require a different target than Klein used. At the same time, it must be understood that these statements in no way constitute an unequivocal concession that the claims are limited to a transformation target of Type II callus or exclude immature embryos from the definition of "callus." What the statements say is that bombarding the scutellum of cultured immature embryos is distinguishable from bombarding callus cells that can be regenerated after transformation. But this simply tees up a fundamental infringement issue and not a claim construction issue. The infringement issue is the factual question of whether bombardment of whatever the defendants may have bombarded amounts to bombardment of a "callus culture." If the target was merely the scutellum of cultured immature embryos, then the construction of the claims prohibits a finding of infringement. It seems reasonable to expect that at trial there may be any amount of expert technical testimony, pro and con, on the question of whether the particular scutella that served as the target did not already comprise a "callus,culture" as that term is used in the claims, or whether it was the same as the target disclosed in Klein.

Adding the word "establishing" to the mix does not alter this construction. Plain English and logic tells us that one cannot have a "callus culture" to bombard until it has been established to some extent. Merely setting up the conditions under which callus initiation can take place

does not, at that instant, produce a "callus culture." On the other hand, it may produce a callus culture very quickly. Again, expert testimony will undoubtedly be forthcoming at trial on this question. But the jury needs no instruction on the meaning of the word "establishing." It is used in the claims in its ordinary meaning.

Accordingly, it is recommended that the jury be instructed that "regenerable embryogenic callus culture" means that the target of the bombardment step must be a proliferating mass of embryogenic cells or tissue in a culture medium, and that the mass must comprise cells or tissue which are regenerable after transformation, and must not be merely the immature embryo scutellum that was used as a target in the Klein reference.

Callus cells. The '956 patent claims require bombardment of "callus cells." Ciba contends that "callus cells" should be interpreted to exclude immature embryos placed on callus initiation medium. Pioneer and Mycogen agree, and Mycogen offers a positive definition as well, i.e., "cells in a regenerable callus culture that has been propagated and maintained through subculture, the cells of the culture having a present capacity to give rise to regenerated plants." DeKalb urges that the term means "cells which form when any corn cell, tissue or organ has been placed on or in callus initiation medium and cellular division has begun." Although it concedes that regeneration is implied in the claims (post-hearing brief, p.11), it again argues that there is no basis in the specification or prosecution history for any construction that the callus cells must be capable of regenerating a corn plant either before or immediately after bombardment. The same language quoted above in connection with the '877 patent also appears in the '956 patent (C6L18-27) and also supports DeKalb's position on both counts. The prosecution history, however, reveals the same set of transactions with respect to the Klein reference.

During the prosecution of the '956 patent, the Examiner rejected the claims over Klein. (SM170) In response, the applicants pointed out that Klein contained a "suggestion to transform scutellum and then to generate callus from the transformed cells" and "not a suggestion that callus of any sort should be the target of biolistic transformation." (SM189) In a later response, the applicants again distinguished Klein on the ground that it identified the scutellum of cultured immature embryos as the bombardment target. (SM249-51) Once again, these statements in no way constitute an unequivocal concession that the claims are limited to a transformation target of Type II callus or exclude immature embryos from the definition of "callus." But what the statements do say is that bombarding the <u>scutellum</u> of cultured immature embryos is distinguishable from bombarding callus cells that can be regenerated after transformation. The applicants clearly differentiated the callus cells that are the subject of the bombardment in the '956 claims from the scutellum of immature embryos that was the Klein bombardment target.

It is therefore recommended that the jury be instructed that "callus cells" means a proliferating mass of cells in a culture medium, and that the mass must comprise cells which are regenerable after transformation, and must not be merely the immature embryo scutellum that was used as a target in the Klein reference.

<u>Intact regenerable cells.</u> The '880 claims call for bombardment of "intact regenerable *Zea mays* cells." Here the term "callus" is not used. The defendants assert that this language must be construed essentially identically to the construct they contended for the '956 patent, i.e., cells that have a present capacity to give rise to regenerated plants, to the exclusion of cells of an immature embryo. DeKalb again urges, as it did for the '956 patent, that the term means any corn cells that are capable of being regenerated into a mature corn plant at the time regeneration is initiated.

Again, the language at column 6, lines 10-18 of the '880 patent, tends to support DeKalb's proposed construction.

The prosecution of the '880 patent is similar to the '956 and '877 in this respect. The applicants argued that the Klein reference was distinguishable because it taught bombardment of scutellum rather than callus. (SM1038) This is not pertinent to the issue at hand, because the claims of the '880 patent do not require callus. They simply require corn cells that are "regenerable." Beyond question, it is clear that in the preferred embodiment described in the Lundquist patents, the target was a Type II callus comprising cells that were regenerable at the time of bombardment. But the patents make it clear that this was not required, and nothing in the prosecution history demonstrates that the applicants committed to a different meaning for the term "regenerable."

Again, there may be complex infringement issues generated by the term "regenerable." But these are questions of infringement, not claim construction. It is recommended that the jury be instructed that "intact regenerable *Zea mays* cells," as the target of bombardment in the '880 claims, means corn cells that, after transformation, must be capable of regeneration of a plant containing the transgene.

<u>Establishing a regenerable culture.</u> The teaching of the '520 patent, like that of the Lundquist patents, is that the invention is not limited to the use of Type II callus. It contains the following statement (C9L56-67):

> Other recipient cell targets include, but are not limited to, meristem cells, Type I and II calli and gametic cells such as microspores and pollen. Pollen, as well as its precursor cells, microspores, may be capable of functioning as recipient cells for genetic transformation, or as vectors to carry foreign DNA for incorporation during fertilization. Direct pollen transformation would obviate the need for cell culture. Meristematic cells (i.e. plant cells capable of continual cell division and characterized by an undifferentiated cytological appearance, normally found at growing points or tissues in plants such as root tips, stem apices, lateral buds, etc.) may represent another type of recipient plant cell.

The '520 claims recite the steps of "establishing a regenerable culture" and then transforming the culture by bombarding it. The defendants argue for essentially the same construction as the other patents. Pioneer neatly summarizes its position, in the context of this claim language, as an immature embryo "is not a culture." DeKalb asserts that the language means any corn cell, tissue or organ which is capable of regenerating into a mature plant and has been grown or is growing on or in a culture medium. The plain language of the claims and the specification of the '520 patent are consistent with DeKalb's position.

Moreover, nothing in the prosecution history of either the '520 patent or its parent application compels a contrary construction. Although the Klein reference was cited in a rejection against the parent, there was no effort to distinguish the pending claims on the basis of either "regenerable" or "culture." Klein was not made the basis for a rejection in the '520 prosecution.

It is recommended that the jury be instructed that "regenerable culture" means that the transformation target in the second step of the '520 claims is any corn cell, tissue or organ that is capable of regenerating into a mature plant and has been grown or is growing on or in a culture medium. As with the '877 patent, the jury needs no instruction as to the word "establishing."

**Meaning of the Term "Progeny"**

All claims of the patents in suit employ the word "progeny," except for the '956 patent, which uses the term only in dependent claim 6. The parties hotly contest the meaning of the word as used in the claims. DeKalb construes progeny to mean any and all generations of

descendants from a transgenic plant. Basically, defendants argue that the term refers to the immediate offspring of a particular sexual cross of the transformed plant.[54]

Neither the claims nor the specification provide any real support for defendants' position. The logical, grammatical construction of the claim language itself is that, unless used in a specifically different context (see discussion of '880 claims below), "progeny" can refer to any generation but R0, and is certainly not limited to R1. The specifications do not alter this conclusion. Often, when the term is used, it is apparent that the reference is to the R1 generation, but that is because the experiments exemplified in the patents had only been carried to the R1 generation. At other times, however, it is clear that the usage of the word is much broader. For example, the Lundquist patents state:

> The present invention is directed to the production of fertile transgenic plants and seeds of the species *Zea mays* and to the plants, plant tissues, and seeds derived from such transgenic plants, as well as the subsequent progeny and products derived therefrom. (E.g., '956 patent, C4L48-52)

Similarly, in the Adams '520 patent:

> Furthermore, it would be of particular significance to provide novel approaches to monocot transformation, such as transformation of maize cells, which would allow for the production of stably transformed, fertile corn plants and progeny into which desired exogenous genes have been introduced. (C3L14-19)

---

[54] Claim scope is determined without regard for the accused product or process. E.g., Young Dental Mfg. Co. v. Q3 Special Prods., Inc., 112 F.3d 1137, 42 USPQ2d 1589, 1592 (Fed. Cir. 1997). Nonetheless, one might wonder what the fuss is about. As Ciba points out, under defendants' proposed construction of "progeny," "DeKalb could preclude anyone from making R0 and R1 plants with the claimed methods – and therefore any new plant products – during the patent term." (Post-Markman Hearing Memorandum, p. 10) Apparently, however, some of the accused activity involves descendants of R0 plants that pre-date the patents' issuance. This circumstance may present a nice question of infringement, but it does not invoke claim construction. As the Federal Circuit took pains to point out in SRI, supra note 20, 227 USPQ at 583, "claims are not construed 'to cover' or 'not to cover' the accused device. That procedure would make infringement a matter of judicial whim. It is only after the claims have been construed without reference to the accused device that the claims, as so construed, are applied to the accused device to determine infringement." (Emphasis present.)

This varied use of a term in the written description demonstrates its breadth rather than providing a limited definition.[55]

More importantly, it is clear from the patents that there was no intention to limit the invention to plants of the R1 generation. Indeed, the intent was expressed to the contrary. The Lundquist patents expressed it this way:

> Fertile, transgenic plants may then be used in a conventional maize breeding program in order to incorporate the introduced heterologous DNA into the desire lines or varieties. Conventional breeding programs employ a conversion process (backcrossing). Methods and references for convergent improvement of corn are given by Hallauer et al., (1988) incorporated herein by reference. Briefly, conversion is performed by crossing the initial transgenic fertile plant to normal elite inbred lines. The progeny from this cross will segregate such that some of the plants will carry the heterologous DNA whereas some will not. The plants that do carry the DNA are then crossed again to the normal plant resulting in progeny which segregate once more. This backcrossing process is repeated until the original normal parent has been converted to a line containing the heterologous DNA and also possessing all other important attributes originally found in the parent. Generally, this will require about 6-8 generations. A separate backcrossing program will be generally used for every elite line that is to be converted to a genetically engineered elite line. (E.g., '956 patent, C13L43-62; emphasis added)

There is no mistaking the import of this passage. The intention is to incorporate the transgene into hybrid corn lines through a conventional breeding program, a process that will take several generations. That message is also clear in the '520 patent, which hypothesizes that "the development of these and other techniques for the preparation of stable genetically transformed monocots such as maize could potentially revolutionize approaches to monocot breeding." (C3L22-25) These statements are clearly inconsistent with any limitation of the claim scope to only two or three generations. As DeKalb correctly summarized the matter (Post-Markman Hearing Brief, pp. 34-35):

> Defendants have asserted that under DEKALB's construction of "progeny" as meaning any and all generations of descendants, it would never be possible to demonstrate that the claimed subject matter was enabled, since there would always be future generations of progeny to which transmission of the foreign gene had not yet been

[55] Johnson Worldwide Assoc. v. Zebco Corp., supra note 27, 50 USPQ2d at 1611.

> demonstrated. Such an argument is unrealistic. No patentee would limit claims to transgenic plants of potential commercial value to a single generation of transformant. No matter how a claim is worded, any language that was not limited to a single generation of descendent must have a scope similar to DEKALB's construction of progeny. Defendants' argument implies that a patentee could never draft a valid claim covering more than one generation of descendant, or alternatively must wait for many years after production of the R0 transformant to file a patent application which demonstrated transmission to as many generations of descendants as were claimed. This would present an insurmountable barrier to any patents directed to production of transgenic progeny.

Accordingly, if defendants' restrictive interpretation is to rule, it must be mandated by some clear and unequivocal transaction in the prosecution histories.

During prosecution of the '880 patent, the Examiner rejected application claims 33 and 35 as indefinite on the grounds that they were substantial duplicates of claim 31. (SM10-52) These claims correspond to claims 5(31), 7(33), and 9(35) of the '880 patent. In response, the applicants pointed out that the claims were not duplicative, in that claim 31 results in an R1 progeny, claim 33 an R2 progeny, and claim 35 an R3. (SM1055) Defendants seize upon this transaction as representing a concession on the part of the applicants that the claims were limited to those generations. This, in the opinion of the SM, is not a fair assessment of the transaction. It is much more likely that a person of ordinary skill in the art, having read and understood the '880 patent, and having gained an appreciation that the intent of the applicants was to establish a transgenic line through a conventional breeding program, would have reached a different conclusion. Such a person would, in the opinion of the SM, have understood that the applicants were merely pointing out how the claims differed, rather than attempting to define their complete scope. The differences were correctly noted: claim 33 did not cover R1 and claim 35 did not cover R1 and R2. But to transmute that showing into a concession that claim 31 covered only R1 and claim 33 only R2 and claim 35 only R3, is more than the language or circumstances can support.

Pioneer points out that, in claim 5 of the '956 patent, an R1 plant is said to be "derived from" the R0 plant. It argues from this that claim 6, which recites a progeny plant "derived from the plant of claim 5," must likewise be limited to the R2 generation. But claim 6, unlike claim 5, does not expressly call out an R2 plant. Indeed, unless the phrase "derived from" is narrowly interpreted to cover only a single generation derivation, this claim structure supports DeKalb's interpretation of progeny. But "derived from" cannot be read that narrowly. During the '956 prosecution, application claim 16 as originally filed was "The R1 and subsequent generations derived from the plant of claim 1." (SM74) This clearly supports a broader reading of "derived from." Later, new claims 36 and 37 were submitted as corresponding to claim 16, and the term "progeny" was used in place of "subsequent generations." This transaction provides strong support for DeKalb's position that progeny means the R1 and subsequent generations.

Pioneer also argues that, under this interpretation of "progeny," claims 4-9 and 13-18 of the '880 patent are "non-sensical and duplicative." It argues that there "would be no need for claims 5-9 and 11[sic:14]-18 if progeny covered all generations." (Post-*Markman* Hearing Brief, p. 11) This argument seems to misapprehend the fundamental purpose of multiple claims, particularly dependent claims that successively narrow the claimed invention. For example, a necessarily narrower dependent claim may be valid when the broader claim from which it depends is not.[56] Thus there might very well be a "need" for narrower claims, and patent applicants routinely – almost invariably – submit and pursue such claim programs. Moreover, claims are not presumed to have an identical scope merely because they can cover the same accused product or process. As the Federal Circuit explained in Tandon Corp. v. United States ITC, 831 F.2d 1017, 4 USPQ2d 1283, 1288 (Fed. Cir. 1987):

[56] Wahpeton Canvas Co. v. Frontier Inc., 870 F.2d 1546, 10 USPQ2d 1201, 1207n.10 (Fed. Cir. 1989).

> There is presumed to be a difference in meaning and scope when different words or phrases are used in separate claims. To the extent that the absence of such difference in meaning and scope would make a claim superfluous, the doctrine of claim differentiation states the presumption that the difference between claims is significant. D.M.I., 755 F.2d at 1574, 225 USPQ at 239; Autogiro, 384 F.2d at 404, 155 USPQ at 708. At the same time, practice has long recognized that "claims may be multiplied . . . to define the metes and bounds of the invention in a variety of different ways." Bourns, Inc. v. United States, 537 F.2d 486, 492 (Ct. Cl. 1976), 187 USPQ 174, 178 (Ct. Cl. 1975), aff'd. per curiam, 199 USPQ 256 (Ct. Cl. 1976). Thus two claims which read differently can cover the same subject matter.

There is no doubt that claims 4-9 and 13-18 are of differing scope, even employing the proper definition of progeny. However, in view of the apparent misunderstanding, at least on the part of one defendant, it may be that the Court will wish to consider instructing the jury on exactly how the dependency and interrelationship of these claims is to be sorted out. To that end, the following analysis of claims 4-9 could provide the framework for such an instruction (claims 13-18 mirror 4-9 and would be read the same way).

- Claim 4 covers the R1 and succeeding generations, no matter how they are obtained from the R0 plant of claim 1
- Claim 5 covers the R1 and succeeding generations, which must be obtained by crossing the R0 plant of claim 1 with an inbred line
- Claim 6 covers the same plants as claim 4 except for R1 plants
- Claim 7 covers a plant obtained by back crossing a plant covered by claim 5 with the inbred line used in claim 5 and thus does not cover R1 plants
- Claim 8 covers the same plants as claim 4 except for R1 and R2 plants
- Claim 9 covers a plant obtained by back crossing a plant covered by claim 7 with the inbred line used in claim 5 and thus does not cover R1 or R2 plants

It is recommended that the jury be instructed that, in all other occurrences of the term "progeny" in the claims of the patents in suit, it means the R1 and succeeding generations.

**Insect or Herbicide Resistance**

The claims of the Lundquist patents all require, in one fashion or another, that the heterologous DNA confer herbicide resistance or insect resistance to the regenerated plant or its progeny. Ciba and Pioneer take issue with DeKalb's construction of these terms.

Herbicide resistance. Independent claim 1 of the '877 patent requires that the R0 plant be capable of imparting herbicide resistance to its progeny. So, too, with independent claim 1 of the '880 patent. The dependent claims of that patent that address the production of progeny then require that characteristic to be expressed in the progeny plants.

Ciba and Pioneer urge that "herbicide resistance" be construed to mean (1) resistance at the plant level rather than the cellular level, and (2) resistance to chemicals sold to farmers for weed control at the concentrations and levels of application in which they are used to kill whole plants (Ciba) or applied at real-world levels under field conditions (Pioneer). DeKalb's position is that herbicide resistance is phenotypic trait of a transgenic corn plant which allows the cells of the plant to survive or grow in the presence of a herbicide which could kill or stunt the growth of nontransgenic plant cells; any herbicide will do, and field conditions are not required.

In the opinion of the SM, the claim language is clear and unambiguous, and nothing in the patent specifications or prosecution histories limits the construction that it should receive. The claims plainly do not require that the herbicide be a chemical that is sold to farmers for that purpose, nor do they require that it resistance to the herbicide be assessed under field conditions. These conclusions are confirmed by the statement in the Lundquist patents that the "transgenic plants may have many uses in research or breeding." (E.g., '877 patent, C11L62-63)

The claims also plainly require that progeny corn plants (and not merely the callus cells from which they were derived) exhibit the trait in question, but they do not exclude evaluation of

this condition by assessment at some level other than a whole plant growing in the field or greenhouse. Indeed, various techniques were employed in the Lundquist patents for evaluating the presence of the hygromycin resistance trait in R0 and R1 plants: direct testing by Southern blot in both R0 and R1, and root elongation bioassay and etiolated leaf bioassay for R1. (E.g., '880 patent, C17L39-C18L57) None of these involved application of a herbicide at "real-world levels under field conditions."

Defendants argue that the claims must exclude antibiotics such as hygromycin because they are not chemicals sold to farmers for herbicidal use. But this argument allows no room for the fact that the '880 and '877 patents also disclose and claim transformation with selectable marker genes, such as the "hygromycin B phosphotransferase (HTP) coding sequence , which may be derived from *E. coli.*" (E.g., '877 patent, C6L54-56) Claim 4 of the '877 patent specifies that the heterologous DNA includes a selectable marker gene and claim 5 requires that the claim 4 gene impart herbicide resistance to the R0 plant. This claim program supports the conclusion that claim 1 would be satisfied by transformation with a selectable marker gene that imparts herbicide resistance. The examples described in the specification are all concerned with hygromycin resistance gene transformations.

The prosecution histories support the conclusion that antibiotics, such as hygromycin, that exhibit herbicidal activity, are among the agents contemplated by the term "herbicidal resistance." During the prosecution of the '956 patent (which does not claim herbicidal resistance), the applicants asserted (SM137) that the term "herbicide resistance" is art-recognized, and referred to a list of herbicides in the specification (C9L20) that included methotrexate, a metabolic inhibitor that was characterized as a human drug by defendants' expert, Dr. Goodman. (Tr. 1035) In the prosecution of the '877 patent, the Examiner at one point

indicated that "it may be nothing more than a matter of semantics as to whether hygromycin can

be considered a herbicide," although he was troubled by the lack of evidence that the expression

of hygromycin, as taught in the specification, would satisfy the limitation of herbicide resistance

in a corn plant. (SM724)  In his reasons for allowing the patent, however, the Examiner

concluded that the hygromycin example in the patent, and the "general discussion of art known

and available DNA sequences, including herbicide resistance as a type of selectable or

screenable marker, provides a sufficient written description of whole plants produced by the

claimed process." (SM858)  In the prosecution of the '520 patent, the same Examiner remarked

that the '877 application was directed to expression of the hygromycin gene "which similarly

confers herbicide resistance to the plants and the progeny produced of that methodology."

(SM1332)  In short, the prosecution histories support the conclusion that "herbicide" is not

limited to chemicals sold to farmers as herbicides, but simply means agents that exhibit

herbicidal activity against corn cells.

Resistance is required, however.  Neither the claims nor the specification specify how

much resistance is required, and it is clear that the term is used qualitatively.  It is logical to

conclude that more resistance is required, when evaluated against the same herbicidal agent in

the same context (be it as a selectable marker gene or an agriculturally beneficial characteristic

of a corn plant growing in a farmer's field), than the same plant without the transgene.  It is

recommended that the jury be instructed that "herbicide resistance" means that the plant has

more resistance to an agent having herbicidal activity, when applied to plant material, than the

same plant that does not have the transgene under the same conditions of application and plant

material.

Insect resistance. The claims of the '956 patent specify a R0 plant containing DNA encoding BT endotoxin, wherein the DNA "is expressed so that the plant exhibits resistance to an insect and wherein said expression is not present in said plant not containing" the DNA. This language, by its very terms, requires that the R0 plant, which is required to be fertile and transgenic, exhibit the phenotypic characteristic of insect resistance. The claims of the other Lundquist patents are somewhat different. Independent claim 6 of the '877 patent requires only that the R0 plant be capable of imparting insect resistance to its progeny. So, too, with independent claim 10 of the '880 patent. Again, the dependent claims of that patent that address the production of progeny require that characteristic to be expressed in the progeny plants.

Ciba and Pioneer urge that "insect resistance" be construed to mean (1) resistance at the plant level rather than the cellular level, and (2) resistance to insect pests of corn rather than just any insect. Pioneer goes further and argues that the plants must "kill actual corn pests, namely, the European corn borer, under field conditions." DeKalb's position is that any insect will do, and that field conditions are not required; that the term requires insect resistance to be assessed when insects consume cells of the plant.

Again, the claim language is clear and unambiguous, and nothing in the patent specifications or prosecution histories impacts the construction that it should receive. The claims plainly require that corn plants exhibit the trait in question, not just callus cells from which the plants were derived. The claims just as plainly do not require that the insect be a European corn borer, or any other generally recognized corn pest. Nor do they require assessment of resistance under field conditions. The latter conclusions are confirmed by the statement in the Lundquist patents that the "transgenic plants produced herein are expected to be useful for a variety of commercial and research purposes." (E.g., '956 patent, C14L18-19)

What the claims do require, however, is "resistance," and although the claims, specifications, and prosecution histories do not require insect death, there must be some benchmark against which to assess that trait. Again, the most logical construct is to compare the transgenic plant with the same plant that does not contain the heterologous DNA. Accordingly, it is recommended that the jury be instructed that "insect resistance" means that the plant has more resistance to an insect, when the insect consumes or otherwise attacks plant material, than the same plant that does not have the transgene, under the same conditions.

**Heterologous DNA Encoding BT Endotoxin**

The claims of the '956 patent call for the use of "heterologous DNA encoding *Bacillus thuringiensis* endotoxin. Pioneer contends that this language is limited to a native BT gene from one of the 40,000+ strains of *Bacillus thuringiensis.* It says that the language cannot be read to cover plants containing DNA that is chemically manipulated,[57] truncated, or shortened, or DNA that merely encodes fragments of the full-length, native BT endotoxin.

This suggested construction is not supported by the intrinsic evidence. To the contrary, the '956 specification makes it clear that heterologous DNA encompasses "synthetic, semi-synthetic, or biologically derived DNA," including "modified genes" and "portions of genes." (C6L45-52) Moreover, the claim language itself does not require native DNA from *Bacillus thuringiensis*, but rather any DNA that encodes BT endotoxin. Reading the claim as a whole, in light of the specification, compels the conclusion that BT endotoxin means a protein that a person of ordinary skill in the art would recognize as a BT endotoxin, in terms of substantial

[57] For example, so-called "codon-optimized" DNA, which involves the rewriting of the DNA sequence of a gene derived from a foreign source, such as a bacterium, so that it can be better utilized by the cellular machinery of the recipient plant. (Tr. 914-16)

similarity both of structure and of insecticidal activity.[58] The prosecution history does not contain any transactions that would tend to contradict this interpretation.

It is recommended that the jury be instructed that "heterologous DNA encoding *Bacillus thuringiensis* endotoxin" means any DNA that encodes for an endotoxin that a person of ordinary skill in the art would recognize as a BT endotoxin, in terms of substantial similarity both of structure and of insecticidal activity.

**Said DNA**

All of the patent claims use the phrases "said DNA" or "said heterologous DNA" where appropriate to refer to further plant characteristics or process steps. Pioneer urges that this phraseology be construed to require that any progeny plant must contain the identical DNA sequence originally used in the bombardment process or found in the R0 transformant. DeKalb argues that this restrictive interpretation would not allow for any structural or sequential changes caused by the DNA insertion process or by natural processes occurring within the cell.

Again, Pioneer's interpretation appears to be at odds with the patent specifications. The '520 patent discloses the possibility of changes in structure or sequence following bombardment and chromosomal integration, noting that "intact sequences will not always be present, presumably due to rearrangement or deletion of sequences in the cell." (C12L50-52) The '956 patent similarly explains that the foreign gene is not present in the callus as the intact or nonchromosomal plasmid used to bombard the callus (C20L12-14) and that Southern blot technology indicated either incomplete digestion or that multiple rearranged copies were present (C25L48-49).

[58] It is clear that identity of structure and function is not required with respect to the endotoxin. The fact that the specification teaches that modified genes and portions of genes may be used allows for the possibility of differences in the encoded protein.

Pioneer argues (Opening Brief, p. 54) that the patents "do not enable or provide a written description for a method in which the heterologous DNA in a transgenic progeny plant is modified or changed during the breeding process." If this is so, then Pioneer may have identified a Gentry issue,[59] or some other issue, that could provide a defense under 35 U.S.C. §112¶1. But that argument does not compel Pioneer's suggested claim construction. The patents make it clear that an important goal is to incorporate the beneficial transgene into a breeding program, and if the gene is altered by natural processes during that program, that result is certainly contemplated by the patents. The key requirement is that a person of ordinary skill in the art be able to recognize the genetic material for what it originally was. If so much alteration or modification has occurred that this is no longer possible, then there will, at that stage, no longer be literal infringement. It is recommended that the jury be instructed that "said DNA" refers to the DNA that was inserted into the transformed cells, even if altered by the insertion process or by later natural processes, so long as a person of ordinary skill can recognize it as the inserted DNA.

**Chromosomal Integration**

The claims of the Adams '520 patent require that the transgene be "chromosomally integrated." Pioneer contends that this limitation should be read into the Lundquist patents as well. (Opening Brief, pp. 72-82) As best the SM can understand this argument, it addresses a pure Gentry issue[60] rather than one of claim construction. If Pioneer can establish that the Lundquist patents teach chromosomal integration as an essential element of the invention there disclosed, it may have identified a problem concerning the adequacy of the written description for claims that are not so limited. But it still will not have justified an interpretation of the claims that would supply that missing element.

---

[59] See notes 18-27, supra, and accompanying text.
[60] Id.

Report and Recommend... of Special Master Regarding Claim Const...tion
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

Page 51

Respectfully submitted,

Robert L. Harmon

Robert L. Harmon

Special Master

## APPENDIX

**Claims of U.S. Patent 5,484,956 (issued to Lundquist *et al.*)**

1. A fertile transgenic *Zea mays* plant of the R0 generation containing heterologous DNA encoding *Bacillus thuringiensis* endotoxin, wherein said DNA is expressed so that the plant exhibits resistance to an insect, wherein said expression is not present in said plant not containing said DNA, and wherein said DNA is transmitted through a complete normal sexual cycle of the R0 plant to the R1 generation, and wherein said DNA is introduced into said plant by microprojectile bombardment of *Zea mays* callus cells.

2. The transgenic plant of claim 1 wherein said DNA comprises a promoter.

3. The transgenic plant of claim 1 which is selected from the group consisting of field corn, popcorn, sweet corn, flint corn and dent corn.

4. A seed produced by the transgenic plant of claim 1 which comprises a replication of said heterologous DNA.

5. An R1 transgenic *Zea mays* plant derived from the plant of claim 1 wherein said R1 plant expresses said heterologous DNA so that the R1 plant exhibits said phenotypic characteristics.

6. A progeny transgenic *Zea mays* plant derived from the plant of claim 5 wherein said progeny plant expresses said heterologous DNA so that the progeny plant exhibits said phenotypic characteristics.

Claims of U.S. Patent 5,538,877 (issued to Lundquist *et al.*)

1. A process for producing a fertile transgenic *Zea mays* plant comprising the steps of (i) establishing a regenerable embryogenic callus culture from a *Zea mays* plant to be transformed, (ii) transforming said culture by bombarding it with DNA-coated microprojectiles, (iii) identifying or selecting a transformed cell line, and (iv) regenerating a fertile transgenic *Zea mays* plant therefrom, wherein said DNA is transmitted through a complete sexual cycle of said transgenic plant to its progeny and imparts herbicide resistance thereto.

2. The process of claim 1 wherein the callus culture subjected to bombardment is in clumps of about 30 to 80 mg per clump.

3. The process of claim 1 wherein said callus is initiated on solid media.

4. The process of claim 1 wherein the DNA comprises a selectable marker gene or a reporter gene.

5. The process of claim 4 wherein said selectable marker gene imparts herbicide resistance to said fertile transgenic *Zea mays* plant.

6. A process for producing a fertile transgenic *Zea mays* plant comprising the steps of (i) establishing a regenerable embryonic callus culture from a *Zea mays* plant to be transformed, (ii) transforming said culture by bombarding it with DNA-coated microprojectiles, (iii) identifying or selecting a transformed cell line, and (iv) regenerating a fertile transgenic *Zea mays* plant therefrom, wherein said DNA is transmitted through a complete sexual cycle of said transgenic plant to its progeny, and imparts insect resistance thereto.

7. The process of claim 6 wherein the callus culture subjected to bombardment is in clumps of about 30 to 80 mg per clump.

8. The process of claim 7 wherein said callus is initiated on solid media.

9. The process of claim 6 wherein the DNA comprises a selectable marker gene or a reporter gene.

10. The process of claim 9 wherein said selectable marker gene imparts herbicide resistance to fertile transgenic *Zea mays* plant.

**Claims of U.S. Patent 5,538,880 (issued to Lundquist *et al.*)**

1. A process for producing a fertile transgenic *Zea mays* plant comprising the steps of (i) bombarding intact regenerable *Zea mays* cells with DNA-coated microprojectiles, (ii) identifying or selecting a population of transformed cells, and (iii) regenerating a fertile transgenic plant therefrom, wherein said DNA is transmitted through a complete sexual cycle of said transgenic plant to its progeny, and imparts herbicide resistance thereto.

2. The process of claim 1 wherein the fertile transgenic *Zea mays* plant is regenerated from transformed embryogenic tissue.

3. The process of claim 1 wherein the cells are derived from immature embryos.

4. A process comprising obtaining progeny from a fertile transgenic plant obtained by the process of claim 1 which comprise said DNA.

5. The process of claim 4 wherein said progeny are obtained by crossing said fertile transgenic plant with an inbred line.

6. The process of claim 4 comprising obtaining seed from said progeny and obtaining further progeny plants comprising said DNA from said seed.

7. The process of claim 5 wherein the progeny obtained are crossed back to the inbred line, to obtain further progeny which comprise said DNA.

8. The process of claim 6 wherein seeds are obtained from said further progeny plants and plants comprising said DNA are recovered from said seed.

9. The process of claim 7 wherein said further progeny are crossed back to the inbred line to obtain progeny which comprise said DNA.

10. A process for producing a fertile transgenic *Zea mays* plant comprising the steps of (i) bombarding intact regenerable *Zea mays* cells with DNA-coated microprojectiles, (ii) identifying or selecting a population of transformed cells, and (iii) regenerating a fertile transgenic plant therefrom, wherein said DNA is transmitted through a complete sexual cycle of said transgenic plant to its progeny, wherein the DNA imparts insect resistance thereto.

11. The process of claim 10 wherein the fertile transgenic *Zea mays* plant is regenerated from transformed embryogenic tissue.

12. The process of claim 10 wherein the cells are derived from immature embryos.

13. A process comprising obtaining progeny from a fertile transgenic plant obtained by the process of claim 10, which comprise said DNA.

14. The process of claim 13 wherein said progeny are obtained by crossing said fertile transgenic plant with an inbred line.

15. The process of claim 13 comprising obtaining seed from said progeny and obtaining further progeny plants comprising said DNA from said seed.

16. The process of claim 14 wherein said progeny obtained are crossed back to the inbred line, to obtain further progeny which comprise said DNA.

17. The process of claim 15 wherein seeds are obtained from said further progeny plants and plants comprising said DNA are recovered from said seed.

18. The process of claim 16 wherein said further progeny are crossed back to the inbred line to obtain progeny which comprise said DNA.

**Claims of U.S. Patent 5,489,520 (issued to Adams *et al.*)**

1. A process for producing a fertile transgenic *Zea mays* plant comprising the steps of (i) establishing a regenerable culture from a *Zea mays* plant to be transformed, (ii) transforming said culture by bombarding it with DNA-coated microprojectiles, wherein said DNA comprises a selectable marker gene encoding for phosphinothricin acetyl transferase, (iii) identifying or selecting a transformed cell line and (iv) regenerating a fertile transgenic *Zea mays* plant therefrom, wherein said DNA is transmitted through a complete sexual cycle of said transgenic plant to its progeny, wherein said progeny comprises said selectable marker gene encoding phosphinothricin acetyl transferase, and wherein said gene is chromosomally integrated.

2. The method of claim 1, wherein the gene encoding phosphinothricin acetyl transferase is the bar gene of *Streptomyces hygroscopicus*.

3. The method of claim 1, wherein the gene encoding phosphinothricin acetyl transferase is the bar gene of *Streptomyces viridochromogenes*.

4. The method of claim 1, further comprising obtaining progeny of said fertile, transgenic *Zea mays* plant, wherein said progeny is a fertile, transgenic *Zea mays* plant that comprises the gene encoding for phosphinothricin acetyl transferase.

5. The method of claim 4, further comprising breeding said progeny with a non-transgenic maize plant, to prepare a fertile, transgenic *Zea mays* plant that comprises the gene encoding for phosphinothricin acetyl transferase.

6. The method of claim 4, further comprising breeding said progeny with a second transgenic maize plant to prepare a fertile, transgenic *Zea mays* plant that comprises the gene encoding for phosphinothricin acetyl transferase.

7. The method of any one of claims 1 through 6, further comprising preparing seed from one or more fertile, transgenic *Zea mays* plants that comprises the gene encoding for phosphinothricin acetyl transferase, wherein said seed contains the gene encoding for phosphinothricin acetyl transferase.

8. The method of claim 7, further comprising cultivating said seed to prepare a fertile, transgenic *Zea mays* plant that comprises the gene encoding for phosphinothricin acetyl transferase.

# EXHIBIT 16

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

RHONE-POULENC AGRO, S.A., (Now known as Aventis Crop Science SA),

Plaintiff,

v.

MONSANTO COMPANY, (Now known as Pharmacia Corp.),

and

DEKALB GENETICS CORP.,

Defendants.

1:97CV1138

MEMORANDUM OPINION

TILLEY, Chief Judge.

This Memorandum Opinion states the findings of fact and conclusions of law in connection with the trial held in this matter from August 22 to September 1, 2000. For the reasons outlined below, the Court finds that for patent 6,040,497 Rick DeRose, Georges Freyssinet, Michel Lebrun, Bernard Leroux, and Alain Sailland are entitled to be named as joint inventors; but for patent 5,554,798 it is determined that conception had occurred prior to any of the applicants making a significant inventive contribution and that their application should be denied. The Director of the Patent and Trademark Office will be directed to add those

concept of "partial resistance" would have no meaning unless "resistance" were interpreted as complete or absolute resistance. See Phillips v. AWH Corp., 415 F.3d 1303, 1314 (Fed. Cir. 2005) (explaining that the term "steel baffles" strongly implies that the term "baffles" does not inherently mean objects made of steel); Minebea Co. v. Think Outside, Inc., 159 Fed. Appx. 197, 202 (Fed. Cir. 2006) (explaining that because the claim provides that certain structures will "slide in addition to pivot" sliding motion should not be subsumed into pivoting motion).

However, after reviewing the specification, the prosecution history, and the arguments of counsel, it is determined that the intrinsic evidence substantially supports DeKalb's view that, as used in claim 1, "resistance" should be accorded its broader meaning, i.e. that a transgenic plant is "herbicide resistant" even if it is severely harmed by herbicides, so long as it is less harmed than the non-transgenic version of the plant would be at the same applied level of glyphosate.

For example, the specification – which does not describe a transformation in which glyphosate resistance was the trait being conferred – does describe a transformation which used the process claimed in the original application for conferring a trait for hygromycin resistance and also describes the testing for evidence that the DNA encoding hygromycin resistance had been inserted and passed to the R1 generation. In the test, the tissue was subjected to hygromycin

---

contrast, Example Two, which discussed experiments with the mutant maize ESPS gene, concluded that glyphosate resistance had been conferred. (Pros. Hist. '798 Patent at 815 (emphasis added).)

more than just immunity. That Amendment states: "The DNA construct is expressed so that the transgenic plant exhibits tolerance or resistance to glyphosate at levels that render it identifiable over the corresponding untransformed corn plant which does not comprise the heterologous DNA." (Pros. Hist. '798 Patent at 748-49.) The DeKalb attorney's statement conveys an understanding of resistance that includes the transgenic plant being harmed, but less so than the non-transgenic corn, and not that of immunity.

Such statements, made by the patent applicant himself, are strong evidence of the meaning intended in the claim language. See Markman, 52 F.3d at 980 ("Th[e] construction of the patent is confirmed by the avowed understanding of the patentee, expressed by him, or on his behalf, when his application for the original patent was pending . . . . [W]hen a patent bears on its face a particular construction, inasmuch as the specification and claim are in the words of the patentee, . . . such construction may be confirmed by what the patentee said when he was making his application.") (citing Goodyear Dental, 102 U.S. at 227).

There is no suggestion in the prosecution history that DeKalb, in its communications with the Patent Office, ever agreed to or was asked to limit the meaning of resistance to full or total resistance. In this context, it is interesting to note that the cited use of the phrase "resistance or partial resistance" was that of the patent examiner who at the time was necessarily using both as fulfilling the limitation of "resistance" in claim 1. The patent examiner's Interview Summary

the applicants making a significant inventive contribution and that their application to be added as joint inventors on that patent should be denied.

This the day of August 7, 2006

    /s/ N. Carlton Tilley, Jr.
United States District Judge

# EXHIBIT 17

**THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY**

# EXHIBIT 18

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| DEKALB GENETICS CORP., Plaintiff(s), vs. SYNGENTA SEEDS, INC., et al., Defendant(s). | ) | Case No. 4:06CV01191 ERW |

**MEMORANDUM AND ORDER**

This matter comes before the Court on Defendants' Motion to Transfer this action to the District of Delaware [doc. #23].

**I. BACKGROUND FACTS**[1]

This case involves a suit for patent infringement by Plaintiff Dekalb Genetics Corporation ("Plaintiff") against numerous Defendants, for infringement of U.S. patent No. 5,554,798 ("Lundquist '798 patent"). Plaintiff is suing for infringement of the Lundquist '798 patent by Defendant through the manufacture and marketing of GA21 corn. GA21 corn is genetically modified corn which is resistant to the herbicide glyphosate, the main ingredient in Monsanto's RoundUp products. The patents surrounding GA21 corn have been the subject of numerous lawsuits between Dekalb, or their parent company Monsanto, and Syngenta. There have been two previous lawsuits initiated by Monsanto, as well as an antitrust action initiated by Syngenta. Monsanto originally sued Syngenta in Delaware district court alleging patent infringement of the

[1]The Court's recitation of the facts comes from both Plaintiff and Defendants memorandums in support and opposition of Defendants Motion to Transfer.

"Shah" patent. Subsequently, Monsanto sued Syngenta in the Northern District of Illinois for alleged infringement of two Lundquist patents. This case was transferred, upon Defendants motion, to the District of Delaware and consolidated with the Shah action pending before that court, as well as with an antitrust action brought by Syngenta. Given the long history of litigation between these two parties, Defendant Syngenta sought to transfer the current action, which also involves a Lundquist patent, to the District of Delaware.

**II. LEGAL STANDARD**

28 U.S.C. § 1404(a) provides that: "for the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." The first inquiry in ruling on a motion to transfer under § 1404(a), is to determine whether the case could have originally been brought in the transferee forum. *Biometics, LLC. v. New Womyn, Inc.*, 112 F.Supp.2d 869, 875 (E.D.Mo. 2000). This distinguishes a transfer pursuant to § 1404(a) from a transfer pursuant to § 1406(a), "under § 1404(a) both the transferor and the transferee court have venue over the action, but it is more efficient to prosecute the action in the later court." *Chrysler Credit Corp. v. Country Chrysler, Inc.*, 928 F.2d 1509, 1515 n. 3 (10th Cir. 1901).

The Eighth Circuit has held that "the statutory language reveals three general categories of factors that courts must consider when deciding a motion to transfer: (1) the convenience of the parties, (2) the convenience of the witnesses, and (3) the interests of justice." *Terra International, Inc. v. Mississippi Chemical corporation*, 119 F.3d 688, 691 (8th Cir. 1997). This standard is "intended to place discretion in the district court to adjudicate motions for transfer according to an individualized case-by-case consideration of convenience and fairness. A motion to transfer under § 1404(a) thus calls on the district court to weigh in the balance a number of

case-specific factors." *Stewart Organization, Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988) (internal citations omitted). Courts have not limited the analysis to those specific factors listed in the statute, but rather have looked at numerous factors which play a role in the district court's decision. *Tera International Inc.*, 119 F.3d at 696; *see also Collins v. Missouri Electric Cooperative Employee Credit Union*, 2005 WL 1702687 (E.D.Mo. July 20, 2005). The burden is placed on the defendant to show that the transferee forum is more appropriate, as the plaintiff's choice of forum is given great respect. *Biometics, LLC.*, 112 F.Supp.2d at 875; *see also Terra International Inc.*, 119 F.3d at 695.

**III. DISCUSSION**

The Defendant in this action seeks to transfer the case to the District of Delaware, claiming that the action is more appropriately heard in that forum. They argue that it is more convenient for the parties to be in Delaware, that one of the key witnesses in the case is within the subpoena power of the Delaware court, and that the interests of justice heavily favor transfer because two other similar actions have been heard before the Delaware court or are currently pending before that court. *Def. Memo. in Support of Def. Mot. to Transfer*, 8-13. Additionally Defendants argue that venue is proper in Delaware. *Id.* at 14. Plaintiffs respond that great deference should be given to the Plaintiff's choice of forum, and further, that a weighing of the additional factors favor keeping the case in this Court. *Pl. Mot. in Opp. to Def. Mot. to Transfer*, 9-14. Most notably, Plaintiff argues that this action could not have been brought in Delaware, because the Delaware court does not have personal jurisdiction over Defendant JC Robinson, and therefore venue is not proper in the Delaware court. *Id.* at 8.

**A. Is Venue Proper in Delaware**[2]

The first question for the Court to address is whether venue would be proper in the district of Delaware. *Biometics*, 112 F.Supp.2d at 875 ("the initial inquiry. . . is whether this case might have been brought in the Central District of Illinois."). Plaintiff argues that venue is not proper in the District of Delaware because Defendant JC Robinson Seeds, Inc. ("JC Robinson"), is not subject to personal jurisdiction in the District of Delaware. *Pl. Mot. in Opp. to Def. Mot. to Transfer*, 8. The Defendant responds that Plaintiff Dekalb, and their parent company, Monsanto, have twice sued JC Robinson in Delaware. *Def. Reply Memo. in Support of Def. Mot. to Transfer*, 2, 13. One of these cases is a counterclaim, to an antitrust suit, that was asserted against the Defendants in this action, the second was a suit initiated by Monsanto against numerous defendants including JC Robinson.[3] *Id.* Defendants make two arguments in support of the Delaware court having personal jurisdiction over JC Robinson. First, Defendant argues that there are minimum contacts in Delaware, sufficient to satisfy personal jurisdiction, because of the prior litigation in which JC Robinson was involved in that forum. Second, Defendants argue that Monsanto, the parent company of Dekalb, represented to the Delaware court that jurisdiction was proper over all Defendants, and therefore the Plaintiff is now estopped from arguing a lack of personal jurisdiction over JC Robinson in that forum. *Id.* at 13.

---

[2]The Court recognizes that the Illinois district court found that venue was proper in Delaware. However, personal jurisdiction was not raised by the plaintiff in that action, and therefore it was not addressed by the court. The holding of the Illinois court is not binding on this Court.

[3]Plaintiff disputes that they have twice sued JC Robinson in Delaware. They disagree that JC Robinson was named as a defendant in the counterclaim in the antitrust action. As to the patent suit, they point out that JC Robinson was not initially named as a Defendant, and after they learned of JC Robinson, it consented to jurisdiction in Delaware.

Although the Defendants clearly argue that JC Robinson would subject itself, and has in prior suits subjected itself, to the jurisdiction of the District of Delaware, the Supreme Court has squarely held that a jurisdiction where venue "would have been proper," does not mean a jurisdiction where the suit "may now be rebrought with the defendants' consent." *Hoffman v. Blaski*, 363 U.S. 335, 342-343 (1960); *see also Chrysler Credit Corp.*, 928 F.2d at 1515 ("But § 1404(a) does not allow a court to transfer a suit to a district which lacks personal jurisdiction over the defendants, even if they consent to suit there."). Clearly, JC Robinson's consent to the Delaware District Court's jurisdiction will not be sufficient to allow transfer of the current action, assuming that transfer would otherwise be proper under § 1404(a). However, Defendants urge that by JC Robinson subjecting itself to prior lawsuits in the District of Delaware, involving the same subject matter, namely patents relating to GA21corn products, they now have minimum contacts with that district. *Hearing Transcript*, pg. 26, line 13-14 (Mr. Filibbert, Counsel for Defendant: "Minimum contacts are met in August of 2006 based on the extensive litigation activity that JC Robinson undertook."). This is a distinct argument from that discussed in the *Hoffman* case. Defendants are not arguing consent, but rather they are arguing that Plaintiff could have sued JC Robinson, in the District of Delaware, in any suit involving GA21 corn. This Court will address whether the prior litigation in Delaware is sufficient to satisfy personal jurisdiction over JC Robinson, in that forum.

In deciding whether personal jurisdiction exists over JC Robinson in the District of Delaware, the Court will look to Federal Circuit case law, as this is a patent case, as well as to the Delaware long arm statute. *3D Systems, Inc. v. Aarotech Laboratories, Inc.*, 160 F.3d 1373, 1377 (Fed. Cir. 1998) ("The Federal Circuit has exclusive jurisdiction over an appeal from a district court when that court's jurisdiction is based at least in part on a claim arising under the

patent laws of the United States."); *see also Cognex Corp. v. VCode Holdings, Inc.*, 2006 WL 3043129, at *11 (D.Minn. Oct. 24, 2006) ("When examining personal jurisdiction in the context of patent litigation, the law of the Federal Circuit applies."). Under the Federal Rules of Civil Procedure, a federal district court (here the Delaware District Court) applies the long-arm statute of the jurisdiction in which it sits, unless the Defendant is found to be a citizen of no state, and then the federal long arm provision applies.[4] *Deprenyl Animal Health, Inc. v. University of Toronto Innovations Foundation*, 297 F.3d 1343, 1350 (Fed. Cir. 2002) ("Rule 4 of the Federal Rules of Civil Procedure allows a plaintiff to rely on the state long arm statute of the state in which the federal district court sits."). The district court will apply the state's long arm statute, as long as it comports with the Constitutional requirements of due process. *Breckenridge Pharm., Inc. v. Metabolite Labs., Inc.*, 444 F.3d 1356, 1376 (Fed. Cir. 2006) ("A court must examine whether service may be accomplished under the long-arm statute and whether that statutory authority comports with due process."); *See also Walker v. West Michigan Nat'l Bank & Trust*, 14 Fed.Appx. 718, 721 (3rd Cir. 2005) ("[P]laintiff was obligated to establish that the defendants were subject to the Delaware Long Arm statute and that there was no Due Process violation."); *AeroGlobal Management, LLC. v. Cirrus Industries, Inc.*, 871 A.2d 428, 438 (Del. 2005) (same). As this Court must determine whether venue would have been proper in Delaware, before

---

[4]Fed. R. Civ. P. 4(k)(1)(A) states: "Service of summons or filing a waiver of service is effective to establish jurisdiction over the person of a defendant (A) who could be subjected to the jurisdiction of a court of general jurisdiction in the state in which the district court is located." . .."; Fed. R. Civ. P. 4(k)(2) provides for jurisdiction of the federal court over a defendant who is not a resident of any state: "If the exercise of jurisdiction is consistent with the Constitution and the laws of the United States, serving a summons or filing a waiver of service is also effective, with respect to claims arising under federal law, to establish personal jurisdiction over the person of any defendant who is not subject to the jurisdiction of the courts of general jurisdiction of any state."

deciding whether transfer is appropriate, the Court analyzes the Delaware long arm statute, as well as the due process requirements.[5]

The Court initially notes that JC Robinson is a Nebraska Corporation, with its principal place of business in Nebraska. In order for a Delaware court to exercise jurisdiction over JC Robinson, a nonresident, it must have authority under the Delaware long arm statute.[6] *See* Fed. R. Civ. P. 4(k)(1); *see also Hercules Inc. v. Leu Trust and Banking Ltd.*, 611 A.2d 476, 480 ("First we must consider whether Delaware's long arm statute is applicable. . . ."). In applying the Delaware long arm statute this Court accepts the interpretation provided by the Delaware Supreme Court. *3D Systems, Inc.*, 160 F.3d at 1377 ("We defer to the interpretation of a state's long-arm statute given by that state's highest court, particularly whether or not the statute is intended to reach the limit of federal due process."). The Delaware long arm statute has been

---

[5]The Court notes that neither party raised the question of whether personal jurisdiction would have been proper under the Delaware long arm statute; focusing their arguments on whether the minimum requirements of due process were met, sufficient for a Delaware Court to exercise personal jurisdiction. However, this Court cannot transfer a case to a court where venue would not have been proper in the transferee court, and therefore must determine whether the Delaware Court could have exercised personal jurisdiction over the Defendant JC Robinson, necessitating a discussion of the Delaware long arm statute.

[6]The Delaware Long Arm Statute provides in part:

> a court may exercise personal jurisdiction over any nonresident, or a personal representative, who in person or through an agent: (1) Transacts any business or performs any character of work or service in the State; (2) contracts to supply services or things in this State; (3) Causes tortious injury in the State or outside of the State by an act or omission outside the State if the person regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State; (5) Has an interest in, uses or possesses real property in the State; or (6) Contracts to insure or act as surety for, or on, any person, property, risk, contract, obligation or agreement located, executed or to be performed within the State at the time the contract is made, unless the parties otherwise provide in writing.

10 Del. C. § 3104(c)(1)-(5).

interpreted as conferring "jurisdiction to the maximum extent possible under the Due Process Clause. *Id.* The Defendants have not provided any evidence that Defendant JC Robinson conducts business in Delaware in any capacity, rather they rely solely on JC Robinson's prior activity in the Delaware District Court as the basis for that court's jurisdiction. This Court looks to whether jurisdiction would be proper under the Due Process Clause, as the Delaware long arm statute is construed as extending personal jurisdiction to the full extent of that clause.

In order for JC Robinson to be subject to the jurisdiction of the Delaware District Court, it must have had sufficient minimal contacts with that state for the Delaware court to exercise power over it. *International Shoe Co. v. State of Washington*, 326 U.S. 310. The Supreme Court, in interpreting the minimal contacts requirement, stated "it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State. . . ." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958). Under the facts of the case in *Hanson*, the Court held that "the cause of action in this case is not one that arises out of an act done or transaction consummated in the forum State." *Id.* at 251. Due Process is satisfied "if the defendant has purposefully directed his activities at residents of the forum and the litigation results from alleged injuries that arise out of or relate to those activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (internal citations omitted). The Federal Circuit has articulated a three part standard, based on Supreme Court precedent, for determining whether personal jurisdiction exists: "1) the purposefully directed activities. . ., 2) their relationship to the cause of action. . .[and], 3) the constitutional reasonableness of jurisdiction." *Akro Corp. v. Luker*, 45 F.3d 1541, 1546-1549. In order for JC Robinson to be subject to the district of Delaware's jurisdiction, it must have availed itself of the privileges of that

state and the cause of action must be one which arises out of that purposeful availment. *Hanson*, 357 U.S. at 253.

In this case Defendants argue that the purposeful availment sufficient for minimum contacts is the prior litigation in which JC Robinson was involved. In support of this argument Defendants cite *Cognex Corp.*, in which the court held that "[g]iven the frequent litigation of VData in Minnesota, it is fair and reasonable for [defendant] to expect to be haled into court here." 2006 WL 3043129 at *12. However, this Court is not persuaded by the court's analysis in *Cognex Corp.* The first requirement, as articulated by the Federal Circuit, is that the defendant purposefully availed itself of the forum state. *Akro Corp.*, 45 F.3d at 1546. JC Robinson has not purposefully availed itself of the State of Delaware. The first action in which it was involved was as a defendant, and the second was a counterclaim. As the Southern District of Florida held, "a party's initiation or defense of a legal action in Florida does not provide personal jurisdiction over that party in a separate suit. . . even where. . . the later suit arises from subject matter that is similar to the earlier suit." *United States of America v. Subklew*, 2001 WL 896473, at *3 (S.D. Fla. June 5, 2001); *see also Gibbons v. Brown*, 716 So.2d 868, 870 (Fla. Dist. Ct. App. 1998) ("A current defendant's prior decision to bring a suit in Florida should not act indefinitely as a sword of Damocles hanging perilously over the head of that defendant if she later challenges jurisdiction in a separate suit (albeit a suit arising from the same subject matter)."). Secondly, even if a prior lawsuit was considered purposefully availing oneself of the laws of that forum, JC Robinson's prior litigation activity is not the subject of the present suit. *See e.g. Hanson*, 357 U.S. at 251. The activities in the forum state must give rise to the litigation. *Id.* The activity that is the subject of the present suit, is the sale of GA21 corn; this activity took place in the Midwest. JC Robinson had no contacts with the state of Delaware prior to the lawsuit by Monsanto. The

action at bar is for patent infringement, not for some activity that resulted from the litigation that took place in Delaware.[7] The third consideration articulated by the Federal Circuit is the reasonableness of the forum's state exercise of jurisdiction. *Akro Corp.*, 45 F.3d at 1549. As this court finds that the first two requirements are not met, it is not necessary to address whether the exercise of jurisdiction would be reasonable.

**B. Plaintiffs are Estopped from Asserting a lack of Jurisdiction**

Defendants additionally argue that Plaintiff Dekalb's parent company, Monsanto, previously represented to the court in the District of Delaware that there was personal jurisdiction of JC Robinson, and therefore should be estopped from now asserting a lack of jurisdiction. *Def. Reply Memo. in Support of their Mot. to Transfer*, 13 ("This argument is contrary to the fact that Monsanto sued JC Robinson in Delaware twice in connection with the GA21 litigation"). Additionally, Defendants point to the fact that Monsanto "stipulated that venue over the defendants was proper in Delaware." *Id.* This Court does not see the relevance of the Plaintiff stipulating to jurisdiction over the Defendants. The fact that Monsanto previously asserted that jurisdiction was proper over the Defendants in a previous Delaware action, does not affect the question of whether venue would be proper in Delaware in this action, and as the Court has determined above, it would not. Defendants argument can be boiled down to a second attempt at arguing consent, which the Supreme Court rejected in *Hoffman*. 363 U.S. at 342-343.

---

[7]There is an eleventh circuit decision which initially seems to reach a different result. *See Huff v. Pharr*, 748 F.2d 1553 (11th Cir. 1984) ("The narrow issue of this appeal is whether the defendant's participation in the original litigation and his connection with the State of California prior to that litigation satisfy the minimum contacts requirement. . . We hold the defendant had the requisite minimum contacts."). However, this case is easily distinguishable, as the California court had jurisdiction over the defendant for purposes of the first action, based on the defendant's consent, and the second action was a suit to enforce the judgment obtained in the first action. *Id.* at 1554. Therefore, the second action was a direct result of the defendant's conduct in the first suit.

Furthermore, the cases raised by Defendants in support of this argument are factually distinguishable from the question of jurisdiction. *See e.g. New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) ("This rule, known as judicial estoppel, generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." (internal citations omitted)). The policy justifications for the doctrine of judicial estoppel further emphasize its inapplicability to the case at bar. "A court invokes judicial estoppel when a party abuses the judicial forum or process by making a knowing misrepresentation to the court or perpetrating a fraud on the court." *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1047 (8th Cir. 2006). There is no argument, from either party, that the Plaintiff could not have chosen to bring this action in Delaware, with the expectation that Defendant JC Robinson would have consented to jurisdiction. However, the fact that Plaintiff decided to bring this action in this Court is not sufficient to show that they are "perpetrating a fraud on the court." *Id.* If Plaintiff believed it would be preferable to bring this action in this Court, where venue is proper, that is the Plaintiff's prerogative. There is no evidence that either of the parties argued the question of venue or jurisdiction in the prior Delaware action. Additionally, the consent to jurisdiction in a prior suit, is not sufficient to allow this Court to transfer the case to Delaware.

## IV. CONCLUSION

The Court holds that venue would not be proper in the district of Delaware, and therefore transfer is not appropriate under 28 U.S.C. § 1404(a). In order for venue to be proper, the transferee court must have personal jurisdiction over each of the defendants. Personal jurisdiction requires minimum contacts sufficient to show the defendant purposely availed itself of that court's jurisdiction. The prior litigation in Delaware is not sufficient to satisfy this requirement. Furthermore, the fact that the Plaintiff, through its parent company Monsanto, previously asserted

that personal jurisdiction existed over the Defendants, is not a contrary legal position such that

Plaintiff is now estopped from asserting a lack of jurisdiction in the present action. The question

of the Delaware court's jurisdiction is a question of fact, which must be satisfied in order for this

Court to have the authority to transfer under 28 U.S.C. §1404(a).

Accordingly,

 **IT IS HEREBY ORDERED** that Defendants' Motion to Transfer [doc. #23] is

**DENIED.**

Dated this 29th Day of December, 2006.

E. RICHARD WEBBER
UNITED STATES DISTRICT JUDGE